**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

     *Plaintiffs*,

  v.

MAZARS USA LLP,

     *Defendant*,

COMMITTEE ON OVERSIGHT AND
GOVERNMENT REFORM OF THE
U.S. HOUSE OF REPRESENTATIVES,

   *Intervenor-Defendant*.

Case No. 1:19-cv-01136-APM

**OPPOSITION OF INTERVENOR-DEFENDANT COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

DOUGLAS N. LETTER
 *General Counsel*
TODD B. TATELMAN
 *Deputy General Counsel*
MEGAN BARBERO
 *Associate General Counsel*
BROOKS M. HANNER
 *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
douglas.letter@mail.house.gov

*Counsel for Intervenor-Defendant Committee on
Oversight and Reform of the U.S. House of
Representatives*

May 1, 2019

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

   I.   The Committee's Investigations of Government Ethics and Financial Disclosures............ 3

   II.  The Committee Issues a Subpoena to Mazars ..................................................... 8

   III. Trump Files Suit to Prevent Mazars from Complying with the Subpoena.......................... 9

ARGUMENT ........................................................................................................................ 9

PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ................................................. 9

   I.   Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits ........... 10

       A.   The Constitution Confers Broad Investigatory Powers on Congress ........................ 11

       B.   The Committee's Power to Investigate........................................................ 12

       C.   The Committee Has a Valid Legislative Purpose ....................................... 14

            *1. Supreme Court Precedent Does Not Require the Committee to Identify Any Particular Legislation Being Considered*............................................................ 15

            *2. The Committee's Subpoena Seeks Information in Furtherance of a Valid Legislative Purpose* ................................................................................ 17

            *3. The Committee Is Not Engaged in a Law-Enforcement Investigation* ................... 21

            *4. Trump's Assertion That the Committee Is Exposing for Exposure's Sake Lacks Merit* ................................................................................................ 23

   II.  Plaintiffs Have Failed to Establish a Likelihood of Irreparable Injury.............................. 24

   III. The Balance of Equities Tips Heavily in Favor of the Committee.................................... 26

   IV. The Public Interest Supports Enforcement of the Subpoena ........................................... 27

CONCLUSION...................................................................................................................... 28

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama,*
    753 F.3d 193 (D.C. Cir. 2014) .................................................................................10, 24

\* *Bean LLC v. John Doe Bank,*
    291 F. Supp. 3d 34 (D.D.C. 2018) ..........................................................11, 14, 16, 18, 21

\* *Barenblatt v. United States,*
    360 U.S. 109 (1959) ...................................................11, 13, 15, 16, 20, 23, 26

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ...........................................................................................................12

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................................25

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ..........................................................................................10

*Committee on the Judiciary, U.S. House of Representatives v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ..................................................................................26

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ......................................................................................10

\* *Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) .................................................3, 11, 12, 14, 18, 21, 23, 27

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943) .......................................................................................................19

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) ..................................................................................22, 27

*Hutcheson v. United States,*
    369 U.S. 599 (1962) .......................................................................................................22

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,*
    5 F.3d 1508 (D.C. Cir. 1993) ..........................................................................................27

\* *McGrain v. Daugherty,*
    273 U.S. 135 (1927) ...................................................11, 12, 15, 16, 22, 24, 26

*McPhaul v. United States,*
    364 U.S. 372 (1960) .................................................................................14, 18, 19, 21

*McSurely v. McClellan*,
    521 F.2d 1024 (D.C. Cir. 1975) ...............................................13, 19, 21, 27

*Okla. Press Publ'g Co. v. Walling*,
    327 U.S. 186 (1946) ...................................................................................19

*Quinn v. United States*,
    349 U.S. 155 (1955) ...............................................................................16, 21

\*   *Senate Select Comm. v. Packwood*,
    845 F. Supp. 17 (D.D.C. 1994) ...................................................17, 18, 20, 21

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .....................................................................10

*Townsend v. United States*,
    95 F.2d 352 (D.C. Cir. 1938) ................................................................. 13-14

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...............................................................................23

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991) ...............................................................................18, 21

*Watkins v. United States*,
    354 U.S. 178 (1957) ........................................................................ 1-2, 23, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................10, 24

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) .................................................25

**Constitution**

\*   U.S. Const. art. I, § 5, cl. 2.....................................................................................12

U.S. Const. art. I, § 7, cl. 2.......................................................................................6

**Legislative Sources**

*Committees: H.R. 1—116th Congress (2019-2020)*, Congress.gov,
    https://tinyurl.com/HR1Committees......................................................5

H.R. 1, 116th Cong., tit. VIII (2019) ......................................................................6

H.R. 391, 116th Cong. (2019).................................................................................17

H.R. 681, 116th Cong. (2019)............................................................................. 16-17

H.R. 706, 116th Cong. (2019) ................................................................................6, 16

H.R. 745, 116th Cong. (2019) ................................................................................6, 16

Rule X.3(i), Rules of the House of Representatives (116th Cong.) ...............................13

Rule X.4(c)(2), Rules of the House of Representatives (116th Cong.) ..........................13

Rule XI.1(b)(1), Rules of the House of Representatives (116th Cong.) .........................12

Rule XI.2(m)(1)(B), Rules of the House of Representatives (116th Cong.) ..................13

Rule 12(g), Rules of the House Comm. on Oversight and Reform (116th Cong.) ........13

*Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H.*
 *Comm. on Oversight & Reform*, 116th Cong. (2019) ......................................7, 8

**Other Sources**

Chase Peterson-Withorn, *What You (Don't) Know About Trump: The Huge Holes in*
 *Disclosure Rules and How They Could Be Fixed*, Forbes (Oct. 24, 2018, 12:07 PM),
 https://tinyurl.com/ForbesDisclosureRules...........................................................7

1 *Congress Investigates: A Documented History 1792-1974*
 (Arthur M. Schlesinger, Jr. & Roger Burns eds., 1983) .......................................1

2 James Wilson, *The Works of James Wilson*
 (James DeWitt Andrews ed., 1896) .....................................................................1

Woodrow Wilson, *Congressional Government*
 (Dover ed. 2006) (1885) ......................................................................................2

Intervenor-defendant the Committee on Oversight and Reform of the U.S. House of Representatives (Committee) submits this response in opposition to the motion for a preliminary injunction (Apr. 22, 2019) (ECF No. 11) (Pls.' Mem.) filed by Donald J. Trump (in his individual, not Presidential, capacity), The Trump Organization, Inc., Trump Organization LLC, The Trump Corporation, DJT Holdings LLC, The Donald J. Trump Revocable Trust, and Trump Old Post Office LLC (Trump or plaintiffs).  Plaintiffs seek extraordinary relief that, if granted, would directly impede ongoing Congressional investigations of national importance and threaten the Constitutional system that separates and divides power between the branches of government.

## INTRODUCTION

Trump's request here for a preliminary injunction betrays a fundamental misunderstanding of the powers of the Legislative Branch under the Constitutional scheme established by the Framers.  And Trump's view of the powers of Congress is blatantly inconsistent with many decades of Supreme Court precedent.

Congress's power to conduct oversight and investigations is firmly rooted in the separation of powers that undergirds our Constitutional framework.  As one of the Framers explained, they intended Congress to conduct investigations as the British House of Commons had—as "the grand inquest of the state . . . diligently inquir[ing] into grievances, arising from both men and things."  2 James Wilson, *The Works of James Wilson* 29 (James DeWitt Andrews ed., 1896).  Congress, therefore, is to "play its part in preserving the balance of powers through its possession and exercise of three vital powers: the power to authorize war; the power of the purse; and *the power of investigation*."  1 *Congress Investigates: A Documented History 1792-1974*, at i (Arthur M. Schlesinger, Jr. & Roger Burns eds., 1983) (emphasis added).

Contrary to Trump's allegation that the Committee here is merely attempting to "expose for the sake of exposure," Pls.' Mem. at 10 (quoting *Watkins v. United States*, 354 U.S. 178, 200

(1957)), the Committee is actually investigating the numerous and serious constitutional, conflict of interest, and ethical questions raised by the personal financial holdings of Trump, even as he serves as President, as well as those of other high-ranking government officials.

The Committee's investigations have already revealed that many of these conflicts of interest have been obscured from the public by inaccurate and incomplete disclosures and, as a result, the Committee is determining what legislation is required to ensure full public confidence in the officials charged with executing the nation's laws. The Committee is exercising its oversight and investigative powers in a manner wholly consistent with Congress's traditional purposes: to consider and enact legislation, oversee the administration of programs, monitor how taxpayer money is being spent, and inform the public. In the words of one well-known Congressional scholar:

> Quite as important as legislation is vigilant oversight of administration. . . . It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. . . . The informing function of Congress should be preferred to its legislative function.

Woodrow Wilson, *Congressional Government* 195, 198 (Dover ed. 2006) (1885).

Rather than afford the Committee's legitimate investigations into these serious issues of national importance the respect and deference to which they are entitled, Trump and his companies have treated Congress as a mere nuisance and continually engaged in stonewalling intended to obstruct and undermine these inquiries in every possible way. This suit is Trump's latest delay tactic and attempt to prevent the Committee from obtaining the critical information it requires to make an informed judgment about matters squarely within its legislative and oversight jurisdiction. By bringing suit against defendant Mazars USA LLP (Mazars), Trump aims to do indirectly what longstanding Supreme Court precedent unambiguously prevents him

from doing directly—namely, quash a valid Congressional subpoena.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505-06 (1975).

Trump's attacks on the Committee's investigations amount to nothing more than political histrionics and hyperbole.  Trump has provided no legally cognizable grounds sufficient to establish any likelihood of success on the merits, much less a substantial one.  His disapproval of the Committee's investigations and its efforts to obtain relevant information from Mazars, a third party, does not create a legal basis for this Court to grant the relief sought.

Accordingly, the motion for a preliminary injunction should be denied.

## BACKGROUND

### I.  The Committee's Investigations of Government Ethics and Financial Disclosures

Shortly after commencement of the 116th Congress, the Committee on Oversight and Reform—the principal investigative Committee of the House—began to investigate and conduct oversight regarding the following topics: Presidential financial disclosures and information required to be submitted to the Office of Government Ethics;[1] government ethics throughout the Executive Branch; potential conflicts of interest related to senior Executive Branch officials; possible constitutional violations flowing from the President's continued interest in his financial

---

[1] *See* Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Emory A. Rounds III, Dir., Office of Gov't Ethics (Jan. 22, 2019) (requesting documents relating to the President's reporting of debts and payments relating to women alleging extramarital affairs) (attached as Exhibit A to Declaration of Greta G. Gao); Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, Counsel to the President (Jan. 8, 2019) (same), https://tinyurl.com/Jan8CummingsCipolloneLetter; Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to George A. Sorial, Exec. Vice President and Chief Compliance Officer, Trump Org. (Jan. 8, 2019) (same), https://tinyurl.com/Jan8CummingsSorialLetter.

holdings,[2] including President Trump's financial interest in the Trump International Hotel, Washington, D.C., under a federal lease administered by the General Services Administration (GSA); any financial disclosures used to obtain that lease; and GSA's ongoing management of that lease.[3]

Many of these investigations share at their core the principle that senior government officials, including the nation's Chief Executive, should act in the country's best interest, not their own personal financial interest.  They stem, in part, from the President's refusal to liquidate his business interests and place the assets in a truly independent trust to insulate himself from even the perception of a conflict of interest.  As part of these investigations, the Committee requested documents from, among others, the White House, the Trump Organization, the Office of Government Ethics, and GSA, and requested interviews of officials such as former Deputy White House Counsel for Ethics and Compliance Stefan Passantino and President Trump's personal attorney, Sheri Dillon.

After the White House declined to produce requested documents—and the Office of Government Ethics provided new information raising questions about the accuracy of President Trump's financial disclosures—the Committee renewed its request for documents from the

---

[2] *See* Letter from the Honorable Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, to Sheri Dillon, Counsel to Donald Trump, and George A. Sorial, Exec. Vice President and Chief Compliance Officer, Trump Org. (Dec. 19, 2018), https://tinyurl.com/Dec19CummingsDillonLetter.

[3] *See, e.g.*, Letter from the Honorable Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, et al., to Timothy Horne, Acting Adm'r, Gen. Servs. Admin. (June 5, 2017), https://tinyurl.com/June5CummingsHorneLetter; Letter from the Honorable Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, et al., to Timothy Horne, Acting Adm'r, Gen. Servs. Admin. (July 6, 2017), https://tinyurl.com/July6CummingsHorneLetter; Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, et al., to Timothy Horne, Acting Adm'r, Gen. Servs. Admin. (Apr. 12, 2019), https://tinyurl.com/Apr12CummingsHorneLetter.

White House, citing its "plenary authority to legislate and conduct oversight regarding compliance with ethics laws and regulations."[4]  As the Committee explained to the White House, the Committee's legislative jurisdiction covers the Ethics in Government Act of 1978, "which requires federal officials to publicly disclose financial liabilities that could affect their decision-making on behalf of the American people."[5]  The Committee made clear that its investigations into "how existing laws are being implemented and whether changes to the laws are necessary . . . includ[ing] [to] laws relating to financial disclosures required of the President."[6]

At the same time the Committee has been investigating the accuracy and completeness of the President's financial disclosures and other related issues, the House introduced H.R. 1, "a historic reform package to restore the promise of our nation's democracy, end the culture of corruption in Washington, and reduce the role of money in politics to return the power back to the American people."[7]  As Chairman Cummings stated when H.R. 1 was introduced, "[o]ver the last two years, President Trump set the tone from the top in his Administration that behaving ethically and complying with the law is optional. . . .  This bill includes a number of reforms that will strengthen accountability for executive branch officials—including the President."[8]  One of

---

[4] Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, Counsel to the President 7 (Feb. 15, 2019), https://tinyurl.com/Feb15CummingsCipolloneLetter.

[5] *Id.*

[6] *Id.* at 9.

[7] Press Release, Speaker of the House Nancy Pelosi, Pelosi Remarks at Press Event on Introduction of H.R. 1, For the People Act (Jan. 4, 2019), https://tinyurl.com/HR1Remarks.  The bill was referred to the Committee on Oversight and Reform (among others) on January 3, 2019, and discharged from the Committee on March 4. *See Committees: H.R. 1—116th Congress (2019-2020)*, Congress.gov, https://tinyurl.com/HR1Committees.

[8] Press Release, House Comm. on Oversight & Reform, Chairman Cummings Issues Statement on H.R. 1 (Jan. 4, 2019), https://tinyurl.com/CummingsHR1PressRelease.

those reforms would "[r]equire[] the President and the Vice President to file a new financial disclosure report within 30 days of taking office."[9]  Indeed, H.R. 1 includes numerous provisions for reforming the financial disclosures of government officials and candidates for office, including disclosures of potential or actual Presidential conflicts of interest.  H.R. 1, 116th Cong., tit. VIII (2019).  If enacted, H.R. 1 would require, among other things, that the President and Vice President "divest of all financial interests that pose a conflict of interest" by either converting those interests to cash or investments that satisfy ethics rules or placing those interests in a qualified blind trust or disclosing information about business interests.  *Id.* § 8012.

Although the House passed H.R. 1 on March 8, 2019, the legislative process remains ongoing.  Following Senate consideration, the bill may either return to the House with amendments, or a conference committee may be established to resolve any differences between the two chambers, before being sent to the President for his signature or veto.  *See* U.S. Const. art. I, § 7, cl. 2.

In addition, several other bills have been introduced and referred to the Committee that address these and related issues.  These include a bill to strengthen the Office of Government Ethics, *see* H.R. 745, 116th Cong. (2019), and a bill proposing to prohibit the President and Vice President from conducting business directly with the Federal Government, *see* H.R. 706, 116th Cong. (2019).  The Committee also continues to examine whether additional measures are necessary to strengthen financial disclosure laws given what one former senior ethics official has described as the law's inadequacies as applied to this Administration:  "The financial disclosure

---

[9] *Id.*

rules are the result of compromises and are antiquated . . . They were built for another day and time—not for the complicated financial entanglements of the Trump administration."[10]

On February 27, 2019, while H.R. 1 was under consideration in the House, the Committee convened a hearing as part of its investigations into President Trump's compliance with financial disclosure requirements and potential conflicts of interest.[11]  At the hearing, the President's former attorney Michael Cohen testified that financial statements allegedly prepared by Mazars may have included false statements about President Trump's assets and liabilities.[12] In particular, Cohen testified that it was his "experience that Mr. Trump inflated his total assets when it served his purposes . . . and deflated his assets to reduce his real estate taxes."[13]  To corroborate his claims, Cohen produced to the Committee portions of financial statements from 2011, 2012, and 2013, some of which were prepared by Mazars.[14]

Given that the Committee had already obtained substantial evidence that President Trump had improperly omitted other liabilities from his federal financial disclosures—namely, hundreds of thousands of dollars in expenditures made by Cohen on Trump's behalf during the 2016

---

[10] Chase Peterson-Withorn, *What You (Don't) Know About Trump: The Huge Holes in Disclosure Rules and How They Could Be Fixed*, Forbes (Oct. 24, 2018, 12:07 PM), https://tinyurl.com/ForbesDisclosureRules (quoting Ambassador Norm Eisen, former Special Counsel for Ethics and Government Reform at the White House).

[11] *See Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2019) (Cohen Testimony), https://tinyurl.com/CohenHearing.

[12] *See id.* 13, 19.

[13] *See id.* (noting that Cohen was providing three years of the President's personal financial statements in which the President inflated his assets in requesting a loan to buy a professional football team and *Forbes* magazine).

[14] WeiserMazars LLP, Donald J. Trump: Statement of Financial Condition (June 30, 2011); WeiserMazars LLP, Donald J. Trump: Statement of Financial Condition (June 30, 2012); Donald J. Trump: Summary of Net Worth as of March 31, 2013. These documents are collectively attached as Exhibit B to Declaration of Greta G. Gao.

presidential campaign[15]—the allegation that Trump altered his assets and liabilities even before

assuming office raised grave questions about his potential conflicts of interest after being elected,

whether they are adequately captured by and reflected in his financial disclosures submitted

during the campaign or while in office, and whether it would be effective and appropriate to

reform financial disclosure or other laws in order to ensure transparency and prevent conflicts of

interest.

## II.   The Committee Issues a Subpoena to Mazars

Following Cohen's testimony and as part of the investigations described above, the

Committee wrote to Mazars on March 20, 2019, seeking information on how certain financial

statements and other financial disclosures were prepared for Trump and various of his business

entities in this suit.[16]  As the letter explained, the Committee had reviewed the information

provided by Cohen and identified several specific concerns about the President's reporting of his

assets and liabilities, including concerns about whether and to whom the President owes

significant debts identified in the financial statements.[17]  The letter also identified potential

differences between the Mazars financial statements and the President's financial disclosures.

For example, the 2012 financial statement prepared by Mazars did not include assets or liabilities

relating to the Trump International Hotel and Tower in Chicago and Trump International Hotel

in Las Vegas, but then-candidate Trump's 2015 financial disclosure form and subsequent

disclosures listed more than $75 million in debt connected to the Chicago property and assets of

---

[15] *See* Cohen Testimony 13-14.

[16] Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight
& Reform, to Victor Wahba, Chairman and Chief Exec. Officer, Mazars USA LLP (Mar. 20,
2019), https://tinyurl.com/Mar20CummingsLetter.

[17] *Id.* at 3.

more than $50 million for the Las Vegas property during the same period (but no debts).[18]

Accordingly, the Committee requested from Mazars documents and information relating to the

firm's preparation, review, and auditing of financial statements for Trump and his business

entities.

Mazars informed the Committee that it could not voluntarily provide the requested

documents without a Congressional subpoena.[19]  After discussions between the Committee and

Mazars, the Committee issued a subpoena to Mazars on April 15, 2019, seeking financial

statements, supporting documents, and related communications.[20]  The same day, Trump's

counsel requested that Mazars provide notice of its intent to comply with the subpoena in time to

allow a challenge to the subpoena in court.

### III.   Trump Files Suit to Prevent Mazars from Complying with the Subpoena

On April 22, 2019, five business days before the subpoena return date, counsel for Trump

notified the Committee that he had filed this suit challenging the subpoena to Mazars.  After

being contacted by the Court, counsel for all parties reached agreement on an accelerated

briefing schedule, which the Court entered, with a hearing set for May 14, 2019.

### ARGUMENT

### PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

Plaintiffs' motion for a preliminary injunction should be denied because the Committee's

subpoena to Mazars seeks information squarely within the Committee's legislative and oversight

---

[18] *Id.* at 2.

[19] Letter from Jerry D. Bernstein, BlankRome LLP, Outside Counsel to Mazars USA
LLP, to the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform
(Mar. 27, 2019), https://tinyurl.com/Mar27MazarsLetter.

[20] Subpoena from House Comm. on Oversight & Reform to Mazars USA LLP (Apr. 15,
2019) (Pl. Ex. A to Application for TRO (Apr. 22, 2019) (ECF No. 9-1)).

jurisdiction, and compliance with the subpoena would not injure any of the interested parties.  "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

To demonstrate entitlement to a preliminary injunction, a litigant must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  "When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation marks omitted).[21]

## I.   Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits

The best argument for denial of plaintiff's request for an injunction here is provided by a series of Supreme Court decisions, which themselves draw on historical practice stretching back to the earliest days of our Republic.  We therefore cite liberally from these Supreme Court rulings, which demonstrate what we said at the outset: Trump's suit reflects a seriously uninformed and mistaken view of the powers of Congress.  An injunction in Trump's favor here

---

[21] The D.C. Circuit has traditionally evaluated the four injunction factors on a sliding scale, but several Circuit Judges have correctly read the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), "at least to suggest, if not to hold, 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring, joined by Henderson, J.)).  In light of *Winter*, the sliding-scale approach is no longer valid, and likelihood of success is an indispensable prerequisite to injunctive relief.  Regardless of the approach this Court applies, however, plaintiffs here cannot satisfy the factors necessary to obtain a preliminary injunction.

would constitute a radical departure from many decades of law established by the Supreme Court.

### A.  The Constitution Confers Broad Investigatory Powers on Congress

The Supreme Court has consistently recognized that Congress's authority to obtain information necessary to conduct oversight and investigations is extremely broad.  *See, e.g.*, *Eastland*, 421 U.S. at 504 n.15 ("[T]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (quotation marks omitted)).  The Supreme Court has stated that Congress's "power to secure needed information by [compulsory process] has long been treated as an attribute of the power to legislate . . . [and] is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 161, 174 (1927); *see also, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate[.]"); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 43 (D.D.C. 2018) (similar).

As an essential aspect of Congress's constitutionally based oversight and investigative authority, the Supreme Court has made clear that the "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."  *Eastland*, 421 U.S. at 504. The Court has further explained:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.  All this was true before and

> when the Constitution was framed and adopted.  In that period the power of inquiry, with enforcing process, was regarded and employed as a necessary and appropriate attribute of the power to legislate—indeed, was treated as inhering in it.

*McGrain*, 273 U.S. at 175; *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (same), *superseded on other grounds by statute as recognized by McConnell v. FEC*, 540 U.S. 93 (2003); *Eastland*, 421 U.S. at 504-05 (same).  In upholding Congress's broad power to investigate, the Supreme Court has pointed out that James Madison and others "who had taken an important part in framing the Constitution" were Members of the House of Representatives who, in recognition of Congress's power to investigate, voted in favor of an inquiry into the Executive Branch. *McGrain*, 273 U.S. at 161.

Pursuant to the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, which provides that "[e]ach House [of Congress] may determine the Rules of its Proceedings," the House of Representatives has delegated extensive oversight and investigative authority to its Committees.  *See* Rule XI.1(b)(1), Rules of the House of Representatives (116th Cong.) (House Rules)[22] ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X [providing for Committees' jurisdiction].").

### B.  The Committee's Power to Investigate

The Committee on Oversight and Reform is the House's primary investigative Committee.  Unlike other standing Committees of the House, the Committee on Oversight and Reform is expressly authorized to investigate and conduct oversight into matters beyond the specific subjects within its legislative jurisdiction, including "the operation of Government

---

[22] *Available at* https://tinyurl.com/HouseRules116thCong.

activities at all levels, including the Executive Office of the President." House Rule X.3(i). Further, of critical importance here, House Rule X empowers the Committee to "at *any time* conduct investigations of *any matter* without regard to [the] clause conferring jurisdiction over the matter to another standing committee," and it authorizes the Committee to conduct these investigations to make "findings and recommendations" to other House committees of jurisdiction. House Rule X.4(c)(2) (emphases added). In other words, the Committee's investigative jurisdiction is conterminous with the jurisdiction of the entire House of Representatives and is intended to inform not only its own legislative function, but the legislative functions of all the other House Committees.

To carry out its extensive legislative, investigative, and oversight responsibilities, the Committee is empowered to issue subpoenas for testimony and documents. *See* House Rule XI.2(m)(1)(B); Rule 12(g), Rules of the House Comm. on Oversight and Reform (116th Cong.) (Committee Rules).[23]

The Supreme Court has instructed that the role of the courts in reviewing the Committee's investigations is narrow and limited. *Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."). Unlike in disputes regarding civil discovery, where "a rational legislative purpose is present for investigating a particular person, organization, or institution[,] [t]here is no requirement that every piece of information gathered in such an investigation be justified before the judiciary." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975), *vacated on other grounds by McSurely v. McClellan*, 553 F.2d 1277, 1280 (D.C. Cir. 1976) (en banc) (per curiam); *see also Townsend v.*

---

[23] *Available at* https://tinyurl.com/CORRules116thCong.

*United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) ("A legislative inquiry anticipates all possible cases which may arise thereunder and the evidence admissible must be responsive to the scope of the inquiry, which generally is very broad.").

The Supreme Court, moreover, has recognized that a Congressional investigation may lead "up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  *Eastland*, 421 U.S. at 509.

Given that the Committee's inquiry here involves serious constitutional questions and legitimate concerns about government ethics, there can be no question about its public importance.  Despite what Trump argues, the Supreme Court has established that it is not the function of this Court to adjudicate the motivations of the Committee or second-guess the Committee's reasonable determinations regarding the need for this information.  *Id.* at 508 (instructing that when "determining the legitimacy of a congressional act, [courts] do not look to the motives alleged to have prompted it"); *see also, e.g.*, *Bean LLC*, 291 F. Supp. 3d at 44 (holding that courts "lack[] the authority to restrict the scope of the Committee's investigation" and stating that they "*may not* [] engage in a line-by-line review of . . . Committee[] requests" (emphasis added)).

### C.  The Committee Has a Valid Legislative Purpose

Trump asserts that Mazars should be enjoined from compliance with the Committee's subpoena because it "is not supported by a legitimate legislative purpose."  Pls.' Mem. at 11.  Quite the opposite is true.  As the Supreme Court has made clear, this Court's examination should be limited to whether the Committee's inquiry is authorized under House Rules (which it is), and whether plaintiffs can demonstrate that the subpoena is "plainly incompetent or irrelevant to any lawful purpose," *McPhaul v. United States*, 364 U.S. 372, 381 (1960), which they cannot.  As explained above, the Committee's subpoena to Mazars expressly relates to

numerous investigations consistent not only with the Committee's legislative jurisdiction, but also its broad oversight and investigative mandate.  *See supra* pp. 8-9.

In an attempt to satisfy their burden, plaintiffs advance several arguments to support their claim that the Committee's subpoena is invalid.  Each is unavailing.

### 1.   Supreme Court Precedent Does Not Require the Committee to Identify Any Particular Legislation Being Considered

Plaintiffs contend that the subpoena is invalid because "Chairman Cummings has *never* identified a single piece of legislation he is considering."  Pls.' Mem. at 11 (emphasis in original).  The Committee, however, has no obligation—legal or otherwise—to identify a specific piece of legislation it is considering.  The Supreme Court requires only that the subject matter of the legislative inquiry be "one on which legislation *could* be had."  *McGrain*, 273 U.S. at 177 (emphasis added).

The Supreme Court has consistently confirmed that the legislative power of inquiry "has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress *might legislate or decide upon due investigation not to legislate*[.]"  *Barenblatt*, 360 U.S. at 111 (emphasis added).  For example, in *McGrain v. Daugherty*, the Court recognized that the original resolution authorizing the Senate's investigation into the Teapot Dome Affair made no mention of a legislative purpose.  273 U.S. at 177 ("It is quite true that the resolution directing the investigation does not in terms avow that it is intended to be in aid of legislation[.]").  Nevertheless, the Court upheld the investigation, noting that "[p]lainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit."  *Id.*  Moreover, the Court in *McGrain* concluded that it was "bound to presume that the action of the

legislative body was with a legitimate object, if it is capable of being so construed, and we have no right to assume that the contrary was intended."  *Id.* at 178 (quotation marks omitted).

Thus, the proper legal standard requires only that the subject matter of a legislative inquiry be "one on which legislation *could be* had."  *Id.* at 177 (emphasis added); *Bean LLC*, 291 F. Supp. 3d at 43 (D.D.C. 2018).  Were the law that Congress could only investigate matters upon which legislation already exists or is actively being considered—as plaintiffs suggest— Congress would be in the untenable position of being required to draft legislation before conducting inquiries or investigations, and would "be seriously handicapped in its efforts to exercise its constitutional function."  *Quinn v. United States*, 349 U.S. 155, 160-61 (1955); *see also McGrain*, 273 U.S. at 178.  Such a requirement would effectively constrain the legislative process and would deprive Congress of the ability to obtain the very information necessary to fully inform itself about whether legislation is necessary or not, *see, e.g.*, *Barenblatt*, 360 U.S. at 111, and, when legislation is determined to be necessary, to "legislate wisely and effectively." *McGrain*, 273 U.S. at 175.

Although the Committee is not required to identify specific pending legislation to justify either the legitimate legislative purpose of its investigations or the subpoena at issue, here, multiple bills related to Executive Branch conflicts of interests and senior official financial disclosures have been introduced in the House and referred to the Committee for its consideration.  In addition to the provisions of H.R. 1 discussed above, these bills include proposals to strengthen the investigative and enforcement authority of the Office of Government Ethics, *see* H.R. 745, 116th Cong. (2019); prohibit the President and Vice President and related entities from conducting business with the federal government, *see* H.R. 706, 116th Cong. (2019); extend anti-nepotism laws to the Executive Office of the President, *see* H.R. 681, 116th

Cong. (2019); and require public reporting of ethics waivers obtained by Executive Branch appointees, *see* H.R. 391, 116th Cong. (2019).

Plaintiffs have offered no legitimate reason to suggest that the subpoena to Mazars was not designed and is not expected to elicit information that will inform and aid the Committee, as well as the full House, in its advancement of pending legislation.  The information being sought will assist the Committee and the full House with considering the need for other legislation, including the potential for bills regarding whether and how to expand the scope, penalties, and periods covered by financial disclosure laws, and the adequacy of criminal laws governing the reporting of financial information to financial institutions.

2. *The Committee's Subpoena Seeks Information in Furtherance of a Valid Legislative Purpose*

Trump also asserts that the subpoena is unenforceable because it seeks information about the "conduct of a private citizen years before he was even a candidate for public office," a purpose that "has nothing to do with government oversight."  Pls.' Mem. at 11.  Trump's reasoning appears to be that the documents sought from Mazars are not pertinent to any legitimate Committee inquiry.  This argument is far off target.  Simply put, the Committee does not bear the burden of demonstrating the "pertinence" of the records it seeks.  That is not how investigations work—whether by Congressional Committees or by any other organ of government.

Any suggestion that this Court conduct a searching inquiry into the "pertinence" of the documents sought by the Committee's subpoena finds no support in law.  Even in the context of a subpoena enforcement action brought by a Congressional Committee against an unwilling subpoena recipient, no such requirement exists.  *Senate Select Comm. v. Packwood*, 845 F. Supp. 17, 20-21 (D.D.C. 1994) ("In determining the proper scope of a legislative subpoena [in such an

enforcement action], this Court may only inquire as to whether the documents sought by the subpoena are 'not plainly incompetent or irrelevant to any lawful purpose [of the Subcommittee] in the discharge of [its] duties.'" (quoting *McPhaul*, 364 U.S. at 381)).  And when, in such a case, "an investigative subpoena is challenged on relevancy grounds, the Supreme Court has stated that the subpoena is to be enforced 'unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the . . . investigation.'"  *Id.* (quoting *United States v. R. Enterps., Inc.*, 498 U.S. 292, 301 (1991)).

Moreover, "[t]here is no requirement that every piece of information gathered in [a Congressional] investigation be justified before the judiciary."  *McSurely*, 521 F.2d at 1041.  "This is particularly true in light of the fact that, at this stage of the proceedings, the Committee is acting as the 'legislative branch equivalent of a grand jury, in furtherance of an express constitutional grant of authority.'"  *Bean LLC*, 291 F. Supp. 3d at 45 (quoting *Packwood*, 845 F. Supp. at 21).  In fact, the Supreme Court has made clear that Congressional investigations may lead "up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  *Eastland*, 421 U.S. at 509.  Indeed, as Judge Leon recognized just last year in a case presenting similar legal questions, "this Court will not—and indeed, may not—engage in a line-by-line review of the Committee's requests."  *Bean LLC*, 291 F. Supp. 3d at 44.

Even if "pertinency" were the relevant standard (which it is not), plaintiffs cannot clear the high bar of establishing that the records compelled by the subpoena to Mazars are not pertinent to the Committee's investigations.  The Supreme Court has made clear that

"pertinency" is not an onerous requirement.[24]  In *McPhaul v. United States*, for example, the
Court held that pertinency was "clearly shown" when it was "reasonable to suppose" that the
requested records would reveal whether an entity under investigation was engaged in activities
within the scope of the Committee's investigation.  364 U.S. at 381.  In those circumstances,
even though the Committee could not know in advance whether the requested records would
establish any connection, "the records called for by the subpoena were not 'plainly incompetent
or irrelevant to any lawful purpose [of the Subcommittee] in the discharge of [its] duties,' but, on
the contrary, were reasonably 'relevant to the inquiry,'" and thus pertinency was established.
*McPhaul*, 364 U.S. at 381-82 (quoting first *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501,
509 (1943), then *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946)).[25]

　　　　Here, based on its review of the information provided by Cohen, the Committee is aware
of several specific instances where President Trump's reporting of assets and liabilities
materially differs from what was subsequently reported in his required financial disclosure
filings submitted as a candidate for office and as a federal official.  Those discrepancies justify
the Committee's effort to obtain more detailed financial information from Mazars and satisfy the
minimal showing for pertinency required by law.  The Committee took a reasonable approach to
deciding which records to request.

　　　　To the extent there is any question about why the Committee seeks records from before
Trump was a candidate for public office, that reason is simple:  Financial statements cannot

---

[24] This remains true even in the criminal context where the pertinency standard most
properly applies.  *See, e.g.*, *McPhaul*, 364 U.S. at 380-81; *McSurely*, 521 F.2d at 1041.

[25] Notably, the two cases quoted by the *McPhaul* Court, in describing the test for
pertinency in a prosecution for criminal contempt, both involved *administrative* subpoenas,
confirming that even in the context of a criminal prosecution, the standard applicable to
Congressional subpoenas is no less broad and flexible than that governing the sweeping
investigative subpoenas typically issued by administrative agencies.

properly be reviewed in a vacuum, but rather require a basis for comparison and the ability to track funds from year to year.  Given the nature of the Committee's legitimate inquiries, to fully understand the President's financial disclosures from 2015 to present, the Committee needs information about the President's relevant financial circumstances from previous years.  In light of the overall complexities of the President's vast financial holdings, and since the Committee is already aware of issues related to reporting about the Trump properties in Chicago and Las Vegas, the ability to conduct thorough and complete investigations requires the Committee to seek records going back to at least 2011.  Congress's investigative powers unquestionably include the ability to follow up on reasonable leads in areas within its legislative purview.

Furthermore, it is reasonable for the Committee to presume that the information contained in the financial statements sought from Mazars will illuminate other areas of inquiry for the Committee and aid the Committee's understanding, drafting, and consideration of legislation related to various matters within the House's legislative power.  Accordingly, there can be no doubt that, to the extent pertinency even cabins the Committee's ability to seek information, the material sought by the subpoena to Mazars is pertinent to the Committee's investigations.

Finally, Congress is not required to defer to material witnesses when making determinations regarding the relevance of requested materials.  This is simply not how investigations work—whether by Congress or any other investigative body.  "[I]t goes without saying that the scope of the Committee's authority was for the House, not a witness, to determine[.]"  *Barenblatt*, 360 U.S. at 124.  As courts have noted, "it is manifestly impracticable to leave to the subject of the investigation alone the determination of what information may or may not be probative of the matters being investigated."  *Packwood*, 845 F. Supp. at 21; *see also*

*Bean LLC*, 291 F. Supp. 3d at 44 (same).  This is particularly true here, where the Committee's investigations focus on understanding the details about the President's numerous financial dealings and his ongoing relationship with his private business enterprises.

Accordingly, as discussed above, the Court's examination on likelihood of success should be limited to whether the Committee's inquiry is authorized under House Rules, and whether plaintiffs have established that the Committee's subpoena is "plainly incompetent or irrelevant to any lawful purpose," *McPhaul*, 364 U.S. at 381, and that there is "no reasonable possibility that the category of materials the [Committee] seeks will produce information relevant to the general subject of the . . . investigation," *R. Enterps.*, 498 U.S. at 301; *see also, e.g.*, *McSurely*, 521 F.2d at 1041; *Packwood*, 845 F. Supp. at 20-21; *Bean LLC*, 291 F. Supp. 3d at 44.  Because plaintiffs have failed to meet this heavy burden, the motion for preliminary injunction should be denied.

### 3. The Committee Is Not Engaged in a Law-Enforcement Investigation

Plaintiffs assert that "an investigation into the accuracy of a private citizen's past financial statements is a quintessential law-enforcement task reserved to the executive and judicial branches."  Pls.' Mem. at 11.  The Committee's power to investigate is in many respects broader than that of law enforcement; it "is as penetrating and far-reaching as the potential power to enact and appropriate."  *Eastland*, 421 U.S. at 504 n.15 (quotation marks omitted).  Because Congress's power to investigate, which is "deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate," *Quinn*, 349 U.S. at 160, there is no basis for Trump's implicit assertion that the Committee lacks the power to investigate matters within its jurisdiction to obtain the financial records sought here.  *See generally R. Enterps.*, 498 U.S. at 299 (cautioning against "[r]equiring the Government to explain in too much detail the particular reasons underlying a subpoena").

As explained above, the Committee is investigating to determine, among other things, if there are deficiencies in the general legislative framework governing ethics and financial disclosure requirements in the Executive Branch and, specifically, how those laws relate and apply to the President and Vice President.  Those inquiries have the distinct purpose of assessing whether existing laws and regulations are adequate; if amendment, via legislation, is necessary; or if entirely new legislation is required.  Although the Committee's inquiries have already discovered discrepancies in President Trump's financial disclosure forms, its interest is not in prosecuting any individual involved.  While the Committee has, at times in the past, referred suspected criminal matters discovered in the course of its inquiries to the proper Executive Branch officials, the possibility that the Committee could find criminal activity here does not convert the Committee's inquiry into a law-enforcement task, nor does it invalidate the legitimate legislative purpose for the Committee's subpoena to Mazars.  *See Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ("[S]urely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, or when crime or wrongdoing is disclosed." (citation omitted)).

As Supreme Court and D.C. Circuit precedent makes clear, this Court is to presume not only "that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and we have no right to assume that the contrary was intended," *McGrain*, 273 U.S. at 178 (quotation marks omitted), but also "that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties," *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978).

In the absence of any evidence to the contrary—and plaintiffs have provided none—these presumptions further underscore that the Committee's investigations are valid and that the subpoena to Mazars should be enforced.

### 4.  *Trump's Assertion That the Committee Is Exposing for Exposure's Sake Lacks Merit*

Trump's last attempt to undermine the subpoena here is an argument that it is merely "a transparent attempt to 'expose' the President's finances 'for the sake of exposure.'"  Pls.' Mem. at 11 (quoting *Watkins*, 354 U.S. at 200).  Trump has provided nothing beyond political rhetoric and press statements to suggest that the Committee's subpoena to Mazars is intended for any other purpose than legitimate legislative inquiry.  But even if Trump had provided some basis to question the Committee's motive, the Court should not look behind the Committee's legitimate legislative purpose.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2418-20, 2423 (2018) (upholding President Trump's "travel ban" and explaining that the issue "is not whether to denounce the [President's] statements," but rather to "review[] a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility").

Based on the voluminous evidence in the public sphere, there is no foundation to question the legitimacy of the Committee's legislative purpose.  Supreme Court case law establishes that Congress's power to investigate is "broad" and "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes."  *Watkins*, 354 U.S. at 187; *see also Barenblatt*, 360 U.S. at 152 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").

Indeed, the Supreme Court has consistently noted that the motivations underlying Congressional action are not to be second-guessed, even by the courts.  *Eastland*, 421 U.S. at

509 ("The wisdom of congressional approach or methodology is not open to judicial veto.");

*Watkins*, 354 U.S. at 200 ("But a solution to our problem is not to be found in testing the motives

of committee members for this purpose.  Such is not our function."); *McGrain*, 273 U.S. at 178

("We are bound to presume not only that the action of the legislative body was with a legitimate

object, if it is capable of being so construed, and we have no right to assume that the contrary

was intended." (quotation marks omitted)).

Accordingly, plaintiffs' motion for a preliminary injunction should be denied and this

Court should issue an order that the subpoena to Mazars is valid and enforceable.

## II.   Plaintiffs Have Failed to Establish a Likelihood of Irreparable Injury

Plaintiffs' interests in confidentiality over documents shared with Mazars does not

outweigh Congress's constitutionally based authority to employ compulsory process to obtain

information within its legislative and oversight purview.  Plaintiffs' other argument for

irreparable injury—that this Court must "urgently" intervene "because the due date for

compliance with the subpoena is only days away," Pls.' Mem. at 12—has been obviated by the

parties' agreement to postpone the return date on the Committee's subpoena until seven days

after this Court rules on the motion for preliminary injunction.  *See* Docket, Minute Order (Apr.

23, 2019).

Plaintiffs' failure to satisfy the stringent irreparable-injury requirement is a separate and

independent ground requiring denial of their motion, even leaving aside their inability to satisfy

the other three requirements for injunctive relief.  As the Supreme Court has emphasized,

regardless of a plaintiff's showing with respect to the other factors, "[o]ur frequently reiterated

standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is

likely in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted); *see also*

*Abdullah*, 753 F.3d at 197 ("When seeking a preliminary injunction, the movant has the burden

to show that all four factors, taken together, weigh in favor of the injunction." (quotation marks omitted)).

The D.C. Circuit has consistently "set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  In particular, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  This Circuit has also emphasized,

> the further requirement that the movant substantiate the claim that irreparable injury is "likely" to occur. *Bare allegations of what is likely to occur are of no value* since the court must decide whether the harm will *in fact* occur. *The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.*

*Wis. Gas*, 758 F.2d at 674 (first and third emphases added).

Plaintiffs fall short of meeting this demanding burden.  Any contractually based interest in the confidentiality of documents in Mazars's possession cannot and does not override the Committee's constitutionally based interest in obtaining information within its legislative and oversight jurisdiction.  To the extent that plaintiffs assert any irreparable harm from the disclosure of the subpoenaed financial documents at all, it is predicated on their inability to obtain meaningful judicial review of their constitutional claims regarding the subpoena's validity.  *See* Pls.' Mem. at 11-12 ("Plaintiffs have raised important constitutional claims.  Yet denying them interim relief may 'entirely destroy [their] rights to secure meaningful review.'" (citation omitted)).

Accordingly, plaintiffs' failure to assert any irreparable harm is fatal to their quest for a preliminary injunction.

### III.   The Balance of Equities Tips Heavily in Favor of the Committee

The balance of the equities overwhelmingly favors the Committee.  Trump summarily

asserts that he would be injured by Mazars's compliance with the subpoena. But there is no basis

for assuming such injury if Mazars produces financial records to the Committee in the same

manner that countless entities—including accounting firms, banks, and other financial

institutions—routinely produce financial records in response to civil discovery subpoenas,

government administrative subpoenas or civil investigative demands, grand jury subpoenas, and

the like.

By contrast, the Committee's interest in prompt compliance with its subpoena is of the

highest order.  As the Supreme Court has held, Congress's "power of inquiry—with process to

enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273

U.S. at 174.  "The power of inquiry" extends "over the whole range of the national interests

concerning which Congress might legislate." *Barenblatt*, 360 U.S. at 111.  "A legislative body

cannot legislate wisely or effectively in the absence of information respecting the conditions

which the legislation is intended to affect or change; and where the legislative body does not

itself possess the requisite information—which not infrequently is true—recourse must be had to

others who do possess it." *McGrain*, 273 U.S. at 175.  Trump's argument that the Committee

has "no urgent need for the subpoenaed documents," Pls.' Mem. at 13, is not only wrong—

because an undue delay would inflict the legally protectable harms of loss of information and

institutional diminution of the Committee's subpoena power, *see Committee on the Judiciary,*

*U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008)—it is also an

improper usurpation of the House's constitutional power to investigate and conduct oversight.

No outside entity, whether a subpoena recipient like Mazars or the subject of the records being

sought, is permitted to micromanage the Committee's investigations or dictate what is or is not

urgent.  *See Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto.").

Here, the Committee is investigating matters of immense national importance, and the information contained in Mazars's documents appears to be a key part of those investigations. The Committee's interest in obtaining information relevant to its investigations would be harmed by any injunctive relief in this case.  That the Committee's overarching investigations are within its legislative power should be the end of the inquiry.  *Cf. McSurely*, 521 F.2d at 1041 ("There is no requirement that every piece of information gathered in [a Congressional] investigation be justified before the judiciary.").  The balance of the equities thus favors denial of the motion for a preliminary injunction.

## IV.   The Public Interest Supports Enforcement of the Subpoena

For the same reasons, the public interest supports denial of relief.  There is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress."  *Exxon Corp.*, 589 F.2d at 594. Plaintiffs' contrary argument rests on the same flawed arguments refuted above and ignores the clear and compelling public interest in the speedy and efficient conduct of the Committee's investigations.  Even in the less-pressing context of administrative investigations, the D.C. Circuit has "recognized a strong public interest in having [such] investigations proceed expeditiously and without impediment."  *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quotation marks omitted). Likewise, the public interest in expeditious and unimpeded Congressional investigations is compelling.

## CONCLUSION

For the foregoing reasons, plaintiffs' request for a preliminary injunction should be denied, the Court should issue an order holding the subpoena valid and enforceable, and the case should be dismissed with prejudice.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 253492)
  *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
  *Deputy General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
  *Associate General Counsel*
BROOKS M. HANNER (D.C. Bar No. 1005346)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
douglas.letter@mail.house.gov

*Counsel for the Committee on Oversight and*
*Reform of the U.S. House of Representatives*

May 1, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, Sarah Friedman, and Lily Hsu, students at The George Washington University Law School, in preparing this brief.

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2019, I caused the foregoing document to be filed via this Court's

CM/ECF system, which I understand caused service on all registered parties.  I further certify

that I served a copy of the foregoing document by email on counsel for defendant Mazars USA

LLP:

Inbal P. Garrity
BlankRome
The Chrysler Building
405 Lexington Avenue
New York, NY 10175
igarrity@blankrome.com

/s/ *Douglas N. Letter*
Douglas N. Letter

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

*Plaintiffs*,

v.

MAZARS USA LLP,

*Defendant*,

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

*Intervenor-Defendant.*

Case No. 1:19-cv-01136-APM

### DECLARATION OF GRETA G. GAO

I, Greta G. Gao, pursuant to the provisions of 28 U.S.C. § 1746 declare and say:

1.     I am Counsel on the Committee for Oversight and Reform of the U.S. House of Representatives.  I have served in this capacity since January 2019.

2.     Attached as Exhibit A is a true and correct copy of a Letter from the Honorable Elijah E. Cummings, Chairman of the Committee on Oversight and Reform of the U.S. House of Representatives, to Emory A. Rounds III, Director of the Office of Government Ethics, dated January 22, 2019.

3.     Attached as Exhibit B is a true and correct copy of documents produced to the Committee by Michael Cohen, President Trump's former attorney, on February 27, 2019:

Donald J. Trump's Statements of Financial Condition, dated June 30, 2011 and June 30, 2012, as prepared by WeiserMazars LLP (now Mazars USA LLP), and Donald J. Trump's Summary of Net Worth as of March 31, 2013.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 1, 2019, in Washington, D.C.

Greta G. Gao

# Exhibit A

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
MINORITY  (202) 225–5074
http://oversight.house.gov

January 22, 2019

The Honorable Emory A. Rounds III
Director
Office of Government Ethics
1201 New York Avenue NW
Suite 500
Washington, D.C.  20005

Dear Director Rounds:

I am writing to request documents related to President Donald Trump's reporting of debts and payments to his personal attorney, Michael Cohen, to silence women alleging extramarital affairs with the President before the election.

As you know, the Ethics in Government Act requires all federal officials, including the President, to publicly disclose financial liabilities that could impact their decision-making.  On May 16, 2018, after reviewing President Trump's May 2018 personal financial disclosure forms, the Acting Director of the Office of Government Ethics (OGE) at the time, David J. Apol, wrote to Deputy Attorney General Rod Rosenstein, stating:

> OGE has concluded that, based on the information provided as a note to part 8, the payment made by Mr. Cohen is required to be reported as a liability.  OGE has determined that the information provided in that note meets the disclosure requirements for a reportable liability under the Ethics in Government Act.[1]

To assist our investigation of this matter, please provide the following documents by February 1, 2019:

1.      All communications with any White House employee or any nongovernment representative for the filer related to the determination made by OGE regarding Note 3 to Part 8 of President Trump's May 2018 OGE Form 278e, as referenced in the May 16, 2018, letter to the Department of Justice; and

---

[1] Letter from David J. Apol, Acting Director, Office of Government Ethics, to Rod J. Rosenstein, Deputy Attorney General, Department of Justice (May 16, 2018) (online at https://oge.app.box.com/v/OGELettertoDOJ).

The Honorable Emory A. Rounds III
Page 2

> 2.       All OGE materials related to the reporting of liabilities or payments made to or by
>          Michael Cohen on President Trump's June 2017 OGE Form 278e and May 2018
>          OGE Form 278e.

The Committee on Oversight and Reform is the principal oversight committee of the
House of Representatives and has broad authority to investigate "any matter" at "any time" under
House Rule X.  In addition, House Rule X, clause 3(i) specifically charges the Committee with
conducting oversight of "the operation of Government activities at all levels, including the
Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the
Committee's request.  If you have any questions regarding this request, please contact my staff at
(202) 225-5051.

Thank you for your prompt attention to this request.

Sincerely,

Elijah E. Cummings
Chairman

Enclosure

cc:     The Honorable Jim Jordan, Ranking Member

## Responding to Oversight Committee Document Requests

1.  In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee.

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5.  Documents produced in electronic format should be organized, identified, and indexed electronically.

6.  Electronic document productions should be prepared according to the following standards:

    a.  The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

    b.  Document numbers in the load file should match document Bates numbers and TIF file names.

    c.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    d.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7.  Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

10.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11.  The pendency of or potential for litigation shall not be a basis to withhold any information.

12.  In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13.  Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14.  If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

15.  In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document:  (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16.  If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17.  If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

18.  This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19.  All documents shall be Bates-stamped sequentially and produced sequentially.

20.  Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff.  When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff at a room of their designation.

21.  Upon completion of the production, submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.  The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or

otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3.   The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope.   The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

4.   The term "including" shall be construed broadly to mean "including, but not limited to."

5.   The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments,  branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.   The term "identify," when used in a question about individuals, means to provide the following information:  (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.   The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.   The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.   The term "individual" means all natural persons and all persons or entities acting on their behalf.

# Exhibit B

WeiserMazars LLP

# DONALD J. TRUMP

### Statement of Financial Condition

June 30, 2011





WeiserMazars

ACCOUNTING | TAX | ADVISORY

WeiserMazars LLP is an independent member firm of Mazars Group.

 

## INDEPENDENT ACCOUNTANTS' COMPILATION REPORT

To Donald J. Trump:

We have compiled the accompanying statement of financial condition of Donald J. Trump as of June 30, 2011. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America.

Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control irrelevant to the preparation and fair presentation of the financial statement.

Our responsibility is to conduct the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The objective of a compilation is to assist Donald J. Trump in presenting financial information in the form of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statement. We did become aware of departures from accounting principles generally accepted in the United States of America that are described in the following paragraphs.

Accounting principles generally accepted in the United States of America require that in order to reflect amounts to be received in the future at estimated current values the rights must be non-forfeitable, fixed and determinable and not require any future services. As discussed in Notes 3, 4, and 5, several of the values expressed have been based on future interests that, in some instances, are not for fixed or determinable amounts and, in some instances, are based on performance of future services.

Accounting principles generally accepted in the United States of America require that, with respect to each closely held business entity, summarized information about assets, liabilities and results of operations for the most current year be disclosed in the financial statements. In addition, the current estimated value of each closely held business should be recorded as a net investment (assets net of liabilities). Lastly, the ownership percentages of each closely held business should be disclosed. The accompanying statement of financial condition does not include the required summarized disclosures and reports some closely held business entities in a manner that separately states gross assets and liabilities and states certain cash positions separately from their related operating entity and does not disclose Mr. Trump's ownership percentage in certain closely held businesses.

WEISERMAZARS LLP
3000 MARCUS AVENUE – LAKE SUCCESS, NEW YORK – 11042
TEL: 516.488.1200 – FAX: 516.488.1238 – WWW.WEISERMAZARS.COM

WEISERMAZARS LLP IS AN INDEPENDENT MEMBER FIRM OF MAZARS GROUP.

1



 

Accounting principles generally accepted in the United States of America require that the receipt of non-interest bearing deposits in exchange for rights or privileges be recorded at the present value of the liability. As discussed in Note 3, the present value of the liability for non-interest bearing deposits received as a condition of membership in club facilities has not been included in the accompanying statement of financial condition.

Accounting principles generally accepted in the United States of America require that personal financial statements include a provision for current income taxes, as well as estimated income taxes on the differences between the estimated current values of assets and the estimated current amounts of liabilities and their tax bases. The accompanying statement of financial condition does not include such provisions.

Accounting principles generally accepted in the United States of America require that personal financial statements report cash and marketable securities as separate amounts. The accompanying statement of financial condition reports cash and marketable securities as a single amount.

Accounting principles generally accepted in the United States of America require that personal financial statements include all assets and liabilities of the individual whose financial statements are presented. The accompanying statement of financial condition does not include the following for Trump International Hotel & Tower Chicago and Trump International Hotel & Tower Las Vegas:  1) real property and related assets, 2) mortgages and loans payable, and 3) guarantees which Donald J. Trump may have provided.

The effects of the departures from accounting principles generally accepted in the United States of America as described above have not been determined.

Because the significance and pervasiveness of the matters discussed above make it difficult to assess their impact on the statement of financial condition, users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump if they had access to a revised statement of financial condition without the above referenced exceptions to accounting principles generally accepted in the United States of America.

*Weiser Mazars LLP*

CERTIFIED PUBLIC ACCOUNTANTS

Lake Success, N.Y
October 6, 2011

# DONALD J. TRUMP

## STATEMENT OF FINANCIAL CONDITION

### JUNE 30, 2011

(See Independent Accountants' Compilation Report)

### ASSETS

| | |
|---|---:|
| Cash and marketable securities | $ 258,900,000 |
| Escrow and reserve deposits and prepaid expenses | 9,100,000 |
| | |
| Real and operating properties: | |
| Trump Tower - 725 Fifth Avenue, New York, New York | 490,000,000 |
| NIKETOWN - East 57th Street, New York, New York | 263,700,000 |
| 40 Wall Street - New York, New York | 524,700,000 |
| Trump Park Avenue - New York, New York | 311,600,000 |
| Club facilities and related real estate - New York, Florida, New Jersey, California, Washington DC and Scotland | 1,314,600,000 |
| The Trump World Tower at United Nations Plaza - New York, New York | 21,400,000 |
| 100 Central Park South - New York, New York | 31,300,000 |
| Trump Plaza, commercial and retained residential portions - New York, New York | 28,200,000 |
| Trump Palace, Trump Parc and Trump Parc East Condominiums, commercial portions - New York, New York | 12,900,000 |
| Trump International Hotel and Tower - New York, New York | 27,400,000 |
| Properties under development - Westchester County, New York and Beverly Hills, California | 273,200,000 |
| | |
| Partnerships and joint ventures - (net of related debt): | |
| 1290 Sixth Avenue, New York, New York and 555 California Street, San Francisco, California | 720,900,000 |
| Miss Universe Pageants | 15,000,000 |
| Real estate licensing developments | 110,000,000 |
| Other assets | 184,100,000 |
| | |
| Total assets | $  4,597,000,000 |

**The accompanying notes are an integral part of this financial statement.**

## LIABILITIES AND NET WORTH

| | | |
|---|---|---:|
| Accounts payable, accrued expenses and retention payable | $ | 3,700,000 |
| Loans payable on real and operating properties: | | |
| Loan related to Trump Tower | | 27,770,000 |
| Secured lease bonds – NIKETOWN | | 53,080,000 |
| Loan related to 40 Wall Street | | 160,000,000 |
| Loans related to club facilities and related real estate | | 24,170,000 |
| Loan related to Trump Park Avenue | | 22,750,000 |
| Loan related to the commercial and retained residential portions of Trump Plaza | | 8,470,000 |
| Loan related to Trump International Hotel and Tower, New York | | 7,000,000 |
| Loan related to properties under development in Westchester County, New York | | 7,690,000 |
| Mortgages and loans payable secured by other assets | | 20,780,000 |
| | | 335,410,000 |
| Commitments and contingencies | | |
| Net worth | | 4,261,590,000 |
| Total liabilities and net worth | $ | 4,597,000,000 |

3

DONALD J. TRUMP

# NOTES TO STATEMENT OF FINANCIAL CONDITION

(See Independent Accountants' Compilation Report)

1.  **BASIS OF PRESENTATION:**

The accompanying statement of financial condition consists of the assets and liabilities of Donald J. Trump. Assets are stated at their estimated current values and liabilities at their estimated current amounts using various valuation methods.

Such valuation methods include, but are not limited to, the use of appraisals, capitalization of anticipated earnings, recent sales and offers, and estimates of current values as determined by Mr. Trump in conjunction with his associates and, in some instances, outside professionals. Considerable judgment is necessary to interpret market data and develop the related estimates of current value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized upon the disposition of the assets or payment of the related liabilities. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated current value amounts.

Accounting principles generally accepted in the United States of America ("GAAP") require personal financial statements include a provision for current income taxes, as well as estimated income taxes on the differences between the estimated current values of assets and the estimated current amounts of liabilities and their tax bases. The accompanying statement of financial condition does not include such provisions.

Certain immaterial personal assets and liabilities, such as automobiles, personal and household effects and personal payables have not been reflected in the accompanying financial statement.

Pursuant to GAAP, this financial statement does not reflect the value of Donald J. Trump's worldwide reputation. When attached to a real property interest, product lines or gaming venture, Mr. Trump's name conveys a high degree of quality and profitability. His persona rises to the level of an internationally recognized brand name. This prestige significantly enhances the value of the properties reflected in this financial statement, as well as that of his future projects. For example, the selling prices of condominium units at Trump Tower, The Trump World Tower at United Nations Plaza and Trump International Hotel and Tower – New York have been recorded at among the highest known levels per square foot. The goodwill attached to the Trump name has significant financial value that has not been reflected in the preparation of this financial statement (See Note 5).

4

## 2.  CASH AND MARKETABLE SECURITIES:

Cash and marketable securities represents amounts held by Donald J. Trump personally, and amounts in operating entities used for working capital, debt service and other business purposes. Included in this amount are common stock, mutual funds, a hedge fund, corporate notes and bonds, and a United States Treasury Security.

## 3.  REAL AND OPERATING PROPERTIES:

Donald J. Trump and entities that he owns or controls, owns real and operating properties. Estimates of the current value of the properties and related debt are determined on various bases, as described below.

**Trump Tower**

Donald J. Trump is currently the owner of 100% of the equity interests in the entities that own and operate the commercial and retail elements of the 68 story mixed-use property known as Trump Tower. The property also contains residential condominiums that are owned by the residents. The commercial and retail portions of the property are located at 725 Fifth Avenue between East 56th and East 57th Streets in New York City. It has been described as New York's most famous contemporary building and third most visited attraction with in excess of 4.5 million visitors annually. Trump Tower stands as a symbol of quality and success and is unequaled in the quality of its retail, professional office and private condominium space. Designed by renowned architect Der Scutt, this 68 story bronze glass structure on Fifth Avenue boasts 178,000 square feet of commercial space and 114,000 square feet of retail space. Some of the major tenants are Gucci America Inc., Industrial and Commercial Bank of China, T Capital Management and Star Branding (Tommy Hilfiger ventures).

Until The Trump World Tower at United Nations Plaza was constructed, Trump Tower was the tallest residential building and concrete structure in Manhattan.

The estimated current value of $490,000,000 is based on an evaluation by Mr. Trump in conjunction with his associates and outside professionals.

The interest that Mr. Trump's entities have in this property has been pledged as collateral with respect to a loan payable. As of June 30, 2011 the amount of this debt was $27,770,000. The note matures on February 1, 2013 and bears interest at the rate of 7.36%.

Funds in the amount of $500,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

## 3. REAL AND OPERATING PROPERTIES (CONTINUED):

### NIKETOWN

Donald J. Trump is currently the owner of 100% of the equity interests in the entities that are the lessees with respect to two long-term ground leasehold estates relating to the land and buildings located between Fifth and Madison Avenues and principally on 57th Street in New York City. On December 8, 1994, the premises were leased to NIKE Retail Services, Inc. The NIKETOWN retail store is a single integrated building with five floors containing approximately 65,000 square feet. NIKE Retail Services, Inc. characterizes its NIKETOWN stores as high-profile stores designed to showcase NIKE products. The building has direct access to both the Trump Tower Atrium and the IBM Through-Block Arcade.

The property is leased to NIKE Retail Services, Inc. for a term that will end on May 31, 2017. The lessee will then have the option to extend the lease, for three five-year terms beyond that date.

The interest that Mr. Trump's entities have in this property secures bonds that, as of June 30, 2011, had an unpaid value of $53,080,000. These are 7.125% secured lease bonds that are designed to be self-amortizing through scheduled payments, the last of which will take place on June 1, 2017. The bond payments are designed to be satisfied by the minimum rental payments under the terms of the NIKE lease. Funds in the amount of $1,740,000 have been escrowed pursuant to the terms of the bonds. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

The current value of $263,700,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect to be derived from rental activities pursuant to the lease described above, as well as the residual value of the property.

3. **REAL AND OPERATING PROPERTIES (CONTINUED):**

**40 Wall Street**

On November 30, 1995 entities, which are wholly owned by Donald J. Trump, became the lessee under a long-term ground lease, which was subsequently amended in 2007, for the property at 40 Wall Street in New York City.

This is a 72-story tower consisting of 1.3 million square feet. Mr. Trump has restored this property to its position as downtown Manhattan's premier office building.

The estimated current value of $524,700,000 is based upon a successful renegotiation of the ground lease and an evaluation made by Mr. Trump in conjunction with his associates and outside professionals of leases that have been signed or are currently the subject of negotiation, and a cap rate was applied to the resultant cash flow to be derived from the building's operations. Some of the major tenants are CNA Insurance, Countrywide Insurance, Walgreen's/Duane Reade, Hilton Hotels and American Precious Metals Exchange. In the evaluation of this property provision was made for ground rent payments when forecasting the anticipated cash flow.

The property is subject to a mortgage payable in the amount of $160,000,000 as of June 30, 2011. The interest rate on the note has been fixed through an interest rate swap agreement at a rate of 5.71% until the initial maturity date, November 10, 2017. During this time, if certain cash flow provisions are met, the loan requires principal payments. This loan may be extended for five years beyond that initial maturity date. The mortgage is collateralized by the lessee entity's interest in the property.

Funds in the amount of $5,020,000 have been escrowed pursuant to the terms of this mortgage. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

**Trump Park Avenue**

Donald J. Trump owns all but a fractional interest of an entity that has converted the former Delmonico Hotel at 59th Street and Park Avenue in New York City into a property that consists of 134 residential condominium units that range from one to seven bedrooms. Duplex penthouse units are located on the 31st and 32nd floors. The property also contains 30,000 square feet of commercial space.

Costas Kondylis, a prominent architect long associated with luxury architecture, was engaged to maintain the prewar aesthetic of the area by designing elegant apartment homes. Mr. Kondylis has previously designed such prominent properties as Trump International Hotel and Tower in New York City, The Trump World Tower at United Nations Plaza, and 610 Park Avenue that was a conversion of the former Mayfair Hotel. Trump Park Avenue is synonymous with an upscale international lifestyle characterized by graciousness and old world luxury skillfully blended with modernity at a truly unrivaled location.

7

## 3. REAL AND OPERATING PROPERTIES (CONTINUED):

### Trump Park Avenue (Continued)

As of June 30, 2011, 111 units have been delivered at prices that exceeded $1,850 per square foot.

The estimated current value of $311,600,000 is based upon an evaluation made by Mr. Trump in conjunction with his associates and outside professionals of the amount that he will earn as a result of the sale of the remaining condominium units, as well as the residual value of the commercial space.

Funds in the amount of $800,000 have been escrowed pursuant to the terms of the loans. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

The unsold condominium units have been pledged as collateral with respect to a loan payable. As of June 30, 2011 the amount of this debt was $22,750,000. The note, which is collateralized by the unsold condominium units, bears interest at the rate of 5.5% and matures on August 1, 2015.

### Club Facilities and Related Real Estate

Entities wholly owned by Mr. Trump have acquired certain properties for the purpose of developing them into club facilities. Several of these clubs will also contain residential units that they will sell. The estimated current value of $1,314,600,000 is based on an assessment of the cash flow that is expected to be derived from club operations, the sale of residential units after subtracting the estimated costs to be incurred, or recent sales of properties in a similar location. That assessment was prepared by Mr. Trump working in conjunction with his associates and outside professionals.

### The Mar-A-Lago Club in Palm Beach, Florida

Mr. Trump acquired this property in 1985 and transferred ownership to a wholly owned limited liability company in 1995. It is now an exclusive private club which consists of 117 rooms. Formerly known as the Marjorie Merriweather Post Estate, it features a 20,000 square foot Louis XIV style ballroom, world class dining, tennis courts, spa, cabanas and guest cottages. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $38,040,000.

## 3.  REAL AND OPERATING PROPERTIES (CONTINUED):

### Trump National Golf Club in Briarcliff Manor, New York

Mr. Trump, through a wholly owned entity, acquired Briar Hall Country Club, Briarcliff Manor, New York for $8,500,000. Trump National Golf Club opened for play on July 1, 2002. Construction of a 42,000 square foot clubhouse was completed during April 2005. Three hundred and fifty memberships are being offered. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $35,890,000.

The real property was subject to a mortgage payable of $8,600,000 that was repaid July 2010.

In addition to the golf club, this property, when fully developed, will contain 47 luxury condominium units, consisting of 16 townhouses that are fully developed and sold and 31 units to be developed as a mid-rise building. Selling prices ranged from $1,500,000 to $2,450,000 with regard to the townhouse units and will range from $500 to $835 per square foot with regard to units in the mid-rise building.

### Trump International Golf Club in Palm Beach County, Florida

Mr. Trump, through wholly owned entities, acquired a long-term leasehold interest in land that he developed into a first-class golf course along with a 45,000 square foot super-luxury clubhouse that is currently in operation. Sufficient land is under lease and the entity has developed an additional nine-hole course that is used in conjunction with the original eighteen holes, thus creating a twenty seven-hole world-class golf facility. Based on this expanded facility, the club is able to offer five hundred and fifty memberships. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $41,990,000.

The real property was subject to a mortgage payable of $6,300,000 that was repaid July 2010.

Funds in the amount of $215,000 have been escrowed with the county with regard to this property. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

9

## 3. REAL AND OPERATING PROPERTIES (CONTINUED):

### Trump National Golf Club in Los Angeles, California

Mr. Trump, through a wholly owned entity, acquired a property that he has developed into a world-class golf course and club on the bluffs of the southern most point of the Palos Verdes Peninsula in California. The course, originally designed by Pete Dye, has been totally redesigned by Mr. Trump and features panoramic views of the Pacific Ocean and Catalina Island from every hole. The course offers a world-class driving range and water features on a number of holes. The clubhouse boasts fine dining in two Zagat rated restaurants, a players' lounge, and a bar and banquet facility which can host special events for up to 350 people.

The real property was subject to a mortgage payable of $14,700,000 that was repaid March 2011.

In addition to the Club, Trump National Golf Club is presently zoned for 75 home sites with unparalleled ocean and golf course views. At June 30, 2011, there were 55 home sites that will sell for prices that range from $3,000,000 to $12,000,000.

### Trump National Golf Club in Bedminster, New Jersey

Mr. Trump, through a wholly owned entity, acquired a property consisting of 580 acres that has been developed into a world-class 36 hole golf course and club in Bedminster, New Jersey. The Club was designed by Tom Fazio and opened in the summer of 2004. The Club can currently accommodate 700 members. There are 6 cottages available for rental by members. In addition to the golf course, members have the use of an Olympic sized swimming pool, tennis courts, banquet facilities, casual dining facilities and a facility with ten single bedroom suites in addition to a state-of-the-art conference room and fitness facility. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $40,000,000.

The real property was subject to a mortgage payable of $8,200,000 that was repaid July 2010.

10

### 3. REAL AND OPERATING PROPERTIES (CONTINUED):

<u>Trump National Golf Club in Colts Neck, New Jersey</u>

Mr. Trump, through wholly owned entities, acquired Trump National Golf Club, Colts Neck. The club originally designed by Jerry Pate and refined by Tom Fazio II combines a world class golf course, with an aquatic facility, tennis complex and a 75,000 square foot clubhouse. The Club can accommodate 375 members. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $13,430,000.

The real property owned by the club is subject to a mortgage loan at June 30, 2011, in the amount of $14,770,000. The loan bears an interest of 6% and matures on September 9, 2028.

<u>Trump National Golf Club in Washington D.C.</u>

Mr. Trump, through wholly owned entities, acquired Trump National Golf Club, Washington, D.C. This club, just a short distance from the nation's capital, is comprised of two 18-hole courses built by Tom Fazio and Arthur Hills, respectively, and is located on over 600 acres with vast frontage on the beautiful historic Potomac River. Construction has been completed to expand the 50,000 square foot clubhouse with enlarged dining space. Additionally, the fitness, tennis and swimming facilities will be completely renovated and redesigned, creating amenities which will complement the state of the art facilities. Currently under construction is an underground cart facility. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2011 these deposits amounted to $16,980,000.

The real property owned by the club is subject to a purchase money promissory note that has a balance at June 30, 2011 of $9,400,000 and bears interest at the rate of 5.5%. The note will mature on May 1, 2029.

### 3.  REAL AND OPERATING PROPERTIES (CONTINUED):

Trump International Golf Club in Scotland

Mr. Trump, through wholly owned entities, has acquired 500 hectares of land on the north-east coast of Aberdeenshire.   The development received outline planning permission in December 2008 for a world class, Martin Hawtree designed championship links golf course suitable for hosting major events, a second future award winning 18-hole course, a luxury clubhouse, a state of the art driving range and golf academy, a tennis centre, an equestrian centre, a luxury five-star 450 room hotel with associated conference and banquet facilities, a full-service spa, a residential village consisting of 950 holiday homes and 500 single family residences and 36 golf villas.  In June 2010, Mr. Trump received detailed approval of the master plan and championship golf course design, which allows Mr. Trump to start construction.  Construction of the championship golf course started July 1, 2010 and will be completed by the end of 2011.  Trump International Golf Club in Scotland has already started to take tee time reservations in advance of the July 1, 2012 opening of the championship golf course. Mr. Trump recently received approval for the construction of an internal road system and is currently preparing to submit detailed applications for the clubhouse.  Trump International Golf Club in Scotland is currently completing various infrastructure improvements, such as the construction of a golf course maintenance facility.  Trump International Golf Club in Scotland is also improving other buildings onsite, such as Menie Park Lodge and MacLeod House.

Trump National Golf Club in Hudson Valley, New York

In 2009, entities wholly owned by Mr. Trump acquired the 300 acre Trump National Golf Club, Hudson Valley in Hopewell Junction, New York.   The 18 hole championship course, is framed by breathtaking views of the Stormville Mountains and is complimented by a traditional Adirondack-style clubhouse.  Improvements to the amenities include new 5,000 square foot men's and women's locker rooms for the members at the club.   Also, plans have begun for an Olympic sized swimming complex and six Har-Tru tennis courts. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero.  Through June 30, 2011 these deposits amounted to $1,260,000.

## 3. REAL AND OPERATING PROPERTIES (CONTINUED):

Trump National Golf Club - Philadelphia

In 2009, entities wholly owned by Mr. Trump acquired the 365 acre Trump National Golf    Club - Philadelphia.    With magnificent views of the Philadelphia skyline, Trump National Golf Club - Philadelphia, located in Pine Hill, New Jersey was designed by Tom Fazio.   The course has an 80,000 square foot Kentucky Blue grass two-tiered practice area.   The 43,000 square foot clubhouse offers a sophisticated yet elegant feel for members and guests.   Construction will begin this fall on the aquatic center.   Plans are currently underway for tennis courts and a bistro.   Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation.  The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero.   Through June 30, 2011 these deposits amounted to $860,000.

### The Trump World Tower at United Nations Plaza

Entities wholly owned by Donald J. Trump developed and constructed a super luxury residential condominium development at 845 United Nations Plaza in New York City. The 90-story tower has a gross area of 877,000 square feet and is 860 feet in height. The building is situated at the northwest corner of the United Nations Plaza with exposures to the United Nations Park, the East River, Midtown and Downtown Manhattan.    There are 370 super luxury condominium units with ceiling heights varying from 10 to 16 feet at the uppermost floors. As of June 30, 2011, 369 units have been sold.  In addition to the condominium units, a bar and a restaurant are on the ground floor level.  There is a valet parking facility for 75 cars below grade.  There is also a roof top antenna structure. Mr. Trump will retain and rent out these commercial spaces.

The estimated current value of $21,400,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect that he will derive from the sale of the final unit based on current pricing, as well as the residual value of the commercial space which will be retained by Mr. Trump.

## 3. REAL AND OPERATING PROPERTIES (CONTINUED):

### 100 Central Park South

Entities wholly owned by Mr. Trump have developed 100 Central Park South in New York City. The property, which is known as Trump Parc East Condominium, consists of an 81-unit luxury apartment house located at the corner of Central Park South and The Avenue of the Americas. The property also contains a commercial condominium unit that is currently leased to three retail tenants. Through June 30, 2011, units with a value of $53,060,000 have been sold.

The current value of $31,300,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect that he will derive from residential unit sales during periods subsequent to June 30, 2011 based on current pricing.

### Trump Plaza - Commercial and Retained Residential Portions

Entities wholly owned by Donald J. Trump developed Trump Plaza in 1983 which was sold pursuant to a cooperative offering plan. The property is located on Third Avenue between East 61st and East 62nd Streets in New York City. The assets reflected in this statement represent certain residual interests that entities wholly owned by Mr. Trump still own. These consist of two residential units, a long-term leasehold interest in two residential townhouses, each consisting of four residential units, a parking garage and commercial space.

The estimated current value of $28,200,000 is based upon an assessment made by Mr. Trump in conjunction with his associates and outside professionals expected to be derived from rental activities pursuant to the leases, as well as the residual value of the properties.

The interest that Mr. Trump's entities have in the two residential townhouses, the parking garage and the commercial space has been pledged as collateral with respect to a loan payable. As of June 30, 2011, the amount of this debt was $8,470,000. The note matures on August 11, 2014, and bears interest at the rate of 5.7%.

Funds in the amount of $105,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

14

3. **REAL AND OPERATING PROPERTIES (CONTINUED):**

**Trump Palace, Trump Parc and Trump Parc East Condominiums – Commercial Portions**

Entities wholly owned by Mr. Trump have developed the aforementioned properties and the only areas that remained unsold as of June 30, 2011 were:

- 31 storage units at Trump Palace Condominium
- 36 storage units and a parking garage at Trump Parc Condominium
- the commercial condominium elements at Trump Parc East Condominium

The estimated current value of $12,900,000 was based on an assessment made by Mr. Trump in conjunction with his associates of the value of the various properties described above.

**Trump International Hotel and Tower - New York, New York**

Donald J. Trump has redeveloped the former Paramount Building at One Central Park West in New York City from an office tower into a luxury residential and hotel condominium development.

Although all units in the property have been sold, entities wholly owned by Mr. Trump will continue to receive certain fees relating to on-going property operations.

The estimated current value of $27,400,000 was based upon on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the remaining compensation which he and entities which he owns will derive as a result of hotel and rental operations, as well as the value ascribed to the retained commercial condominium elements of the property. These are the garage facility, the restaurant and an easement with respect to the rooftop area, all of which are now owned by entities wholly owned by Mr. Trump.

The interest that Mr. Trump's entity has in this property has been pledged as collateral with respect to a loan payable. As of June 30, 2011, the amount of this debt was $7,000,000 with an interest rate of 6.18% and which matures on July 11, 2016.

Funds in the amount of $200,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses".

### 3. REAL AND OPERATING PROPERTIES (CONTINUED):

#### Properties Under Development in Westchester County, New York and Beverly Hills, California

Westchester County, New York

An entity wholly owned by Mr. Trump acquired a property known as The Mansion at Seven Springs in Bedford, New York which consists of over 200 acres of land, a mansion and other buildings. This property is zoned for 9 luxurious homes. It has been valued at $261,000,000 based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the projected net cash flow which he would derive as those units are constructed and sold, and the estimated fair value of the existing mansion and other buildings.

This property is the subject of a mortgage payable that had a balance due at June 30, 2011 of $7,690,000 with an interest rate of 5.25%. This mortgage will mature on July 1, 2014.

Funds in the amount of $60,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

Beverly Hills, California

Mr. Trump, through wholly owned entities, owns a home located in Beverly Hills, California. This property is located at the intersection of Canon, Rodeo, and Sunset in an area of Beverly Hills known as the "flats". The home is directly across the street from the world famous Beverly Hills Hotel on what many call the most desirable lot in the city due to its unmatched location.

The estimated current value of $12,200,000 is based on Mr. Trump's investment in the property.

# 4. PARTNERSHIPS AND JOINT VENTURES:

Estimates of the current value of Mr. Trump's interests in partnerships and joint ventures reflect his interest therein and are determined on various bases, as described below.

## 1290 Sixth Avenue in New York, New York and 555 California Street in San Francisco, California

Although condominium sales were complete and rental activity was robust at the 76-acre Trump Place development, located along the Hudson River between 59th and 72nd Streets in Manhattan, Mr. Trump's Hong Kong based partners made a decision to sell the rental buildings, undeveloped land, and the commercial space and reinvest the proceeds in two commercial properties. However, Mr. Trump considers the sale of the aforementioned properties to be well beneath the fair value of the properties, and is currently pursuing all remedies available to him to receive the full value of his share of the properties from his partners.

The estimated current value, net of debt, of $720,900,000 is based on an evaluation made by Mr. Trump in conjunction with his associates and outside professionals of leases that have been signed or are currently the subject of negotiation, and a cap rate was applied to the resultant cash flow to be derived from the building's operations.

## Miss Universe Pageants

In 1996, Donald J. Trump and CBS acquired all of the assets that together are the "Miss Universe Pageants." In 2002 NBC became a 50% joint venture participant in those activities, replacing CBS. The company produces the Miss Universe Pageant, the Miss USA Pageant, as well as the Miss Teen USA Pageant. The pageants have been redefined to present the combination of style and intelligence that define the woman of the new millennium.

The alliance with NBC has enabled the Miss Universe Organization to bring together women from around the world in the spirit of first-class competition. The resultant prime-time network television specials are broadcast live to a worldwide audience. As a result of this notoriety, site fees for Miss Universe events far exceed those paid to similar organizations. The estimated current value of $15,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals.

## 5. REAL ESTATE LICENSING DEVELOPMENTS

As stated in Note 1, this financial statement does not reflect the value of Donald J. Trump's worldwide reputation, except to the extent it has become associated with properties either operative or under development. His recognized persona has evolved to the extent that it has become an internationally recognized brand name. The resultant prestige significantly enhances the value of the properties with which he is associated. The goodwill attached to the Trump name has proven financial value in that potential users of real property around the world have demonstrated willingness to pay a significant premium for ownership or use of a Trump related residence. As a result, other developers of quality properties have approached Mr. Trump with proposals for joint ventures involving ways in which his organization's development skill and reputation will bring enhanced value to them.

Mr. Trump has formed numerous associations with others for the purpose of developing properties and is currently negotiating with others. The estimated current value of $110,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the cash flow that is expected to be derived by him from these associations as their potential is realized. In preparing that assessment, Mr. Trump and his management considered only situations which have evolved to the point where signed arrangements with the other parties exist and fees and other compensation which he will earn are reasonably quantifiable.

Terms of the agreements vary and might involve defined compensation per unit or contingent fees based on parameters such as selling prices or gross profit levels, upfront guaranteed fees, and a percentage of gross revenues. The process utilized by management to select the people and properties with which the Trump name will be associated is extremely selective; each must enhance Mr. Trump's reputation.

Mr. Trump has pledged $19,760,000 of the fees derived on certain of these agreements to his former partner in The Trump Word Tower at United Nations Plaza. This debt is reflected in this financial statement as a liability under the caption "Mortgages and loans payable secured by other assets".

## 6. OTHER ASSETS

**Trump Tower**

Mr. Trump owns a triplex apartment on the top three floors of Trump Tower (see Note 3).

## 6. OTHER ASSETS (CONTINUED):

### Other Properties in Palm Beach, Florida

Mr. Trump owns two homes that are located in Palm Beach, Florida, adjacent to Mar-a-Lago Club.

Mr. Trump's interests in these properties have been pledged as collateral with respect to two loans. One loan had a balance at June 30, 2011 of $310,000 and bears an interest rate of 1.75% per annum above the rate known as the six-month London Interbank Offering Rate as it is fixed at certain points in time and at June 30, 2011 was 2.1875%. This loan will mature on January 1, 2019. The other loan had a balance at June 30, 2011 of $710,000 and bears an interest rate of 1.50% per annum above the rate known as the six-month London Interbank Offering Rate as it is fixed at certain points in time and at June 30, 2011 was 1.9375%. This loan will mature on February 1, 2019.

### Corporate Aircrafts

Entities owned by Donald J. Trump own a Boeing 757 jet and a Sikorsky helicopter.

### Other

Mr. Trump and entities that he owns, control several other active businesses as well as other assets. The assets related to these interests include:

- an 1,100 acre vineyard in Charlottesville, Virginia along with a carriage museum, office building and several other buildings
- licenses to operate and manage the Wollman Rink which was reconstructed by Mr. Trump in 1986 and the landmark Carousel in Central Park
- an international talent/model agency
- a management company that supervises the operation of condominium properties, as . well as Mr. Trump's own properties
- receivables representing amounts earned to date and contract rights with regard to future performances on television
- loans to family members

Funds in the amount of $460,000 have been escrowed pursuant to the terms of Mr. Trump's contractual commitments at the Wollman Rink. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

7. **COMMITMENTS AND CONTINGENCIES:**

Mr. Trump also has personal responsibilities with respect to various employment contracts, construction contracts, loan agreements, purchase commitments and other commitments. These include recourse obligations concerning partnership indebtedness, guarantees relating to the completion and environmental acceptance of certain projects.

Mr. Trump and his affiliates are parties to various lawsuits and legal actions. At the present time, the outcome of those proceedings cannot be estimated. Mr. Trump believes that these legal actions will not have a material effect on his financial position.

Various taxing authorities are currently auditing Mr. Trump and certain of his affiliates. At the present time, the outcome of these examinations cannot be determined.

Mr. Trump periodically maintains funds on deposit in banking institutions in excess of FDIC insured amounts. He is at risk for any amounts exceeding the FDIC limitation.

8. **SUBSEQUENT EVENTS:**

Mr. Trump has evaluated subsequent events through October 6, 2011, the date the financial statement was available for issuance.

# DONALD J. TRUMP

**Statement of Financial Condition**

**June 30, 2012**

 

## INDEPENDENT ACCOUNTANTS' COMPILATION REPORT

To Donald J. Trump:

We have compiled the accompanying statement of financial condition of Donald J. Trump as of June 30, 2012. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America.

Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement.

Our responsibility is to conduct the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The objective of a compilation is to assist Donald J. Trump in presenting financial information in the form of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statement. We did become aware of departures from accounting principles generally accepted in the United States of America that are described in the following paragraphs.

Accounting principles generally accepted in the United States of America require that in order to reflect amounts to be received in the future at estimated current values the rights must be non-forfeitable, fixed and determinable and not require any future services. As discussed in Notes 3, 4, and 5, several of the values expressed have been based on future interests that, in some instances, are not for fixed or determinable amounts and, in some instances, are based on performance of future services.

Accounting principles generally accepted in the United States of America require that, with respect to each closely held business entity, summarized information about assets, liabilities and results of operations for the most current year be disclosed in the financial statements. In addition, the current estimated value of each closely held business should be recorded as a net investment (assets net of liabilities). The accompanying statement of financial condition does not include the required summarized disclosures and reports some closely held business entities in a manner that separately states gross assets and liabilities and states certain cash positions separately from their related operating entity.

1

WEISERMAZARS LLP
60 CROSSWAYS PARK DRIVE WEST, SUITE 301 – WOODBURY, NEW YORK – 11797
TEL: 516.488.1200 – FAX: 516.488.1238 – WWW.WEISERMAZARS.COM

WEISERMAZARS LLP IS AN INDEPENDENT MEMBER FIRM OF MAZARS GROUP.



 **MAZARS**


WeiserMazars

Accounting principles generally accepted in the United States of America require that the receipt of non-interest bearing deposits in exchange for rights or privileges be recorded at the present value of the liability. As discussed in Note 3, the present value of the liability for non-interest bearing deposits received as a condition of membership in club facilities has not been included in the accompanying statement of financial condition.

Accounting principles generally accepted in the United States of America require that personal financial statements include a provision for current income taxes, as well as estimated income taxes on the differences between the estimated current values of assets and the estimated current amounts of liabilities and their tax bases. The accompanying statement of financial condition does not include such provisions.

Accounting principles generally accepted in the United States of America require that personal financial statements report cash and marketable securities as separate amounts. The accompanying statement of financial condition reports cash and marketable securities as a single amount.

Accounting principles generally accepted in the United States of America require that personal financial statements include all assets and liabilities of the individual whose financial statements are presented. The accompanying statement of financial condition does not include the following for Trump International Hotel & Tower Chicago and Trump International Hotel & Tower Las Vegas: 1) real property and related assets, 2) mortgages and loans payable, and 3) guarantees which Donald J. Trump may have provided.

The effects of the departures from accounting principles generally accepted in the United States of America as described above have not been determined.

Because the significance and pervasiveness of the matters discussed above make it difficult to assess their impact on the statement of financial condition, users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump if they had access to a revised statement of financial condition without the above referenced exceptions to accounting principles generally accepted in the United States of America.

*Weiser Mazars LLP*

CERTIFIED PUBLIC ACCOUNTANTS

Lake Success, N.Y
October 12, 2012

2

# DONALD J. TRUMP

## STATEMENT OF FINANCIAL CONDITION

### JUNE 30, 2012

### (See Independent Accountants' Compilation Report)

### ASSETS

| | |
|---|---:|
| Cash and marketable securities | $ 169,700,000 |
| Escrow and reserve deposits and prepaid expenses | 10,780,000 |
| | |
| Real and operating properties: | |
| Trump Tower - 725 Fifth Avenue, New York, New York | 501,100,000 |
| NIKETOWN - East 57th Street, New York, New York | 279,500,000 |
| 40 Wall Street - New York, New York | 527,200,000 |
| Trump Park Avenue - New York, New York | 312,400,000 |
| Club facilities and related real estate - New York, Florida, New Jersey, California, Washington DC, North Carolina and Scotland | 1,570,300,000 |
| The Trump World Tower at United Nations Plaza - New York, New York | 18,200,000 |
| 100 Central Park South - New York, New York | 32,700,000 |
| Trump Plaza, commercial and retained residential portions - New York, New York | 30,100,000 |
| Trump Palace, Trump Parc and Trump Parc East Condominiums, commercial portions - New York, New York | 13,000,000 |
| Trump International Hotel and Tower - New York, New York | 27,600,000 |
| Mansion at Seven Springs - Bedford, New York | 291,000,000 |
| | |
| Partnerships and joint ventures - (net of related debt): | |
| 1290 Avenue of the Americas, New York, New York and 555 California Street, San Francisco, California | 823,300,000 |
| Miss Universe Pageants | 15,000,000 |
| Real estate licensing developments | 85,000,000 |
| Other assets | 303,500,000 |
| | |
| Total assets | $ 5,010,380,000 |

**The accompanying notes are an integral part of this financial statement.**

## LIABILITIES AND NET WORTH

| | | |
|---|---|---:|
| Accounts payable and accrued expenses | $ | 4,400,000 |
| Loans payable on real and operating properties: | | |
| Loan related to Trump Tower | | 26,890,000 |
| Secured lease bonds – NIKETOWN | | 46,390,000 |
| Loan related to 40 Wall Street | | 160,000,000 |
| Loans related to club facilities and related real estate | | 148,360,000 |
| Loan related to Trump Park Avenue | | 22,190,000 |
| Loan related to the commercial and retained residential portions of Trump Plaza | | 8,300,000 |
| Loan related to Trump International Hotel and Tower, New York | | 7,000,000 |
| Loan related to Mansion at Seven Springs | | 7,520,000 |
| Mortgages and loans payable secured by other assets | | 20,650,000 |
| | | 451,700,000 |
| Commitments and contingencies | | |
| Net worth | | 4,558,680,000 |
| Total liabilities and net worth | $ | 5,010,380,000 |

3

DONALD J. TRUMP

NOTES TO STATEMENT OF FINANCIAL CONDITION

(See Independent Accountants' Compilation Report)

1. BASIS OF PRESENTATION:

The accompanying statement of financial condition consists of the assets and liabilities of Donald J. Trump. Assets are stated at their estimated current values and liabilities at their estimated current amounts using various valuation methods.

Such valuation methods include, but are not limited to, the use of appraisals, capitalization of anticipated earnings, recent sales and offers, and estimates of current values as determined by Mr. Trump in conjunction with his associates and, in some instances, outside professionals. Considerable judgment is necessary to interpret market data and develop the related estimates of current value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized upon the disposition of the assets or payment of the related liabilities. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated current value amounts.

Accounting principles generally accepted in the United States of America ("GAAP") require personal financial statements include a provision for current income taxes, as well as estimated income taxes on the differences between the estimated current values of assets and the estimated current amounts of liabilities and their tax bases. The accompanying statement of financial condition does not include such provisions.

Certain immaterial personal assets and liabilities, such as automobiles, personal and household effects and personal payables have not been reflected in the accompanying financial statement.

Pursuant to GAAP, this financial statement does not reflect the value of Donald J. Trump's worldwide reputation. When attached to a real property interest, product lines or gaming venture, Mr. Trump's name conveys a high degree of quality and profitability. His persona rises to the level of an internationally recognized brand name. This prestige significantly enhances the value of the properties reflected in this financial statement, as well as that of his future projects. For example, the selling prices of condominium units at Trump Tower, The Trump World Tower at United Nations Plaza and Trump International Hotel and Tower – New York have been recorded at among the highest known levels per square foot. The goodwill attached to the Trump name has significant financial value that has not been reflected in the preparation of this financial statement (See Note 5).

4

2.   **CASH AND MARKETABLE SECURITIES:**

Cash and marketable securities represents amounts held by Donald J. Trump personally, and amounts in wholly-owned operating entities used for working capital, debt service and other business purposes. Included in this amount are common stock, mutual funds, a hedge fund, corporate notes and bonds, and United States Treasury Securities.

3.   **REAL AND OPERATING PROPERTIES:**

Donald J. Trump and entities that he owns or controls, owns real and operating properties. Estimates of the current value of the properties and related debt are determined on various bases, as described below.

**Trump Tower**

Donald J. Trump is currently the owner of 100% of the equity interests in the entities that own and operate the commercial and retail elements of the 68 story mixed-use property known as Trump Tower. The property also contains residential condominiums that are owned by the residents. The commercial and retail portions of the property are located at 725 Fifth Avenue between East 56th and East 57th Streets in New York City. It has been described as New York's most famous contemporary building and third most visited attraction with in excess of 4.5 million visitors annually. Trump Tower stands as a symbol of quality and success and is unequaled in the quality of its retail, professional office and private condominium space. Designed by renowned architect Der Scutt, this 68 story mixed use structure on Fifth Avenue includes commercial and retail space housing such tenants as Gucci America Inc., Industrial and Commercial Bank of China, T Capital Management and Star Branding (Tommy Hilfiger ventures).

Until The Trump World Tower at United Nations Plaza was constructed, Trump Tower was the tallest residential building and concrete structure in Manhattan.

The estimated current value of $501,100,000 is based on an evaluation by Mr. Trump in conjunction with his associates and outside professionals, applying a cap rate to the cash flow to be derived from the building operations.

The interest that Mr. Trump's entities have in this property has been pledged as collateral with respect to a loan payable. As of June 30, 2012 the amount of this debt was $26,890,000. The note matures on February 1, 2013 and bears interest at the rate of 7.36%. On August 30, 2012, the property was refinanced for $100,000,000, allowing Mr. Trump to take a distribution of over $73,000,000. The new loan which bears interest at 4.2% matures on September 9, 2022.

Funds in the amount of $2,790,000 have been escrowed pursuant to the terms of the loan in place as of June 30, 2012. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

### 3.   REAL AND OPERATING PROPERTIES (CONTINUED):

### NIKETOWN

Donald J. Trump is currently the owner of 100% of the equity interests in the entities that are the lessees with respect to two long-term ground leasehold estates relating to the land and buildings located between Fifth and Madison Avenues and principally on 57th Street in New York City. On December 8, 1994, the premises were leased to NIKE Retail Services, Inc. The NIKETOWN retail store is a single integrated building with five floors containing approximately 65,000 square feet.  NIKE Retail Services, Inc. characterizes its NIKETOWN stores as high-profile stores designed to showcase NIKE products.  The building has direct access to both the Trump Tower Atrium and the IBM Through-Block Arcade.

The property is leased to NIKE Retail Services, Inc. for a term that will end on May 31, 2017.  The lessee will then have the option to extend the lease, for three five-year terms beyond that date.

The interest that Mr. Trump's entities have in this property secures bonds that, as of June 30, 2012, had an unpaid value of $46,390,000.  These are 7.125% secured lease bonds that are designed to be self-amortizing through scheduled payments, the last of which will take place on June 1, 2017.  The bond payments are designed to be satisfied by the minimum rental payments under the terms of the NIKE lease.  Funds in the amount of $210,000 have been escrowed pursuant to the terms of the bonds. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

The current value of $279,500,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect to be derived from rental activities pursuant to the lease described above, as well as the residual value of the property.

### 3.  REAL AND OPERATING PROPERTIES (CONTINUED):

#### 40 Wall Street

On November 30, 1995 entities, which are wholly owned by Donald J. Trump, became the lessee under a long-term ground lease, which was subsequently amended in 2007, for the property at 40 Wall Street in New York City.

This is a 72-story tower consisting of 1.3 million square feet. Mr. Trump has restored this property to its position as downtown Manhattan's premier office building.

The estimated current value of $527,200,000 is based upon a successful renegotiation of the ground lease and an evaluation made by Mr. Trump in conjunction with his associates and outside professionals of leases that have been signed or are currently the subject of negotiation, and a cap rate was applied to the resultant cash flow to be derived from the building's operations. Some of the major tenants are CNA Insurance, Countrywide Insurance, Walgreen's/Duane Reade, Hilton Hotels and American Precious Metals Exchange. In the evaluation of this property provision was made for ground rent payments when forecasting the anticipated cash flow.

The property is subject to a mortgage payable in the amount of $160,000,000 as of June 30, 2012. The interest rate on the note has been fixed through an interest rate swap agreement at a rate of 5.71% until the initial maturity date, November 10, 2017. During this time, if certain cash flow provisions are met, the loan requires principal payments. This loan may be extended for five years beyond that initial maturity date. The mortgage is collateralized by the lessee entity's interest in the property.

Funds in the amount of $5,580,000 have been escrowed pursuant to the terms of this mortgage. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

#### Trump Park Avenue

Donald J. Trump owns all but a fractional interest of an entity that has converted the former Delmonico Hotel at 59th Street and Park Avenue in New York City into a property that consists of 134 residential condominium units that range from one to seven bedrooms. Duplex penthouse units are located on the 31st and 32nd floors. The property also contains 30,000 square feet of commercial space.

Costas Kondylis, a prominent architect long associated with luxury architecture, was engaged to maintain the prewar aesthetic of the area by designing elegant apartment homes. Mr. Kondylis has previously designed such prominent properties as Trump International Hotel and Tower in New York City, The Trump World Tower at United Nations Plaza, and 610 Park Avenue that was a conversion of the former Mayfair Hotel. Trump Park Avenue is synonymous with an upscale international lifestyle characterized by graciousness and old world luxury skillfully blended with modernity at a truly unrivaled location.

7

3.  REAL AND OPERATING PROPERTIES (CONTINUED):

Trump Park Avenue (Continued)

The estimated current value of $312,400,000 is based upon an evaluation made by Mr. Trump in conjunction with his associates and outside professionals of the amount that he will earn as a result of the sale of the remaining condominium units, as well as the residual value of the commercial space.

Funds in the amount of $950,000 have been escrowed pursuant to the terms of the loans. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

The unsold condominium units have been pledged as collateral with respect to a loan payable. As of June 30, 2012 the amount of this debt was $22,190,000. The note, which is collateralized by the unsold condominium units, bears interest at the rate of 5.5% and matures on August 1, 2015.

Club Facilities and Related Real Estate

Entities wholly owned by Mr. Trump have acquired certain properties for the purpose of developing them into club facilities. Several of these clubs will also contain residential units that they will sell. The estimated current value of $1,570,300,000 is based on an assessment of the cash flow that is expected to be derived from club operations, cash expenditures to improve certain facilities, the sale of residential units after subtracting the estimated costs to be incurred, or recent sales of properties in a similar location. That assessment was prepared by Mr. Trump working in conjunction with his associates and outside professionals.

The Mar-A-Lago Club in Palm Beach, Florida

Mr. Trump acquired this property in 1985 and transferred ownership to a wholly owned limited liability company in 1995. It is now an exclusive private club which consists of 117 rooms. Formerly known as the Marjorie Merriweather Post Estate, it features a 20,000 square foot Louis XIV style ballroom, world class dining, tennis courts, spa, cabanas and guest cottages.

3.   **REAL AND OPERATING PROPERTIES (CONTINUED):**

### Trump National Golf Club in Briarcliff Manor, New York

Mr. Trump, through a wholly owned entity, acquired Briar Hall Country Club, Briarcliff Manor, New York for $8,500,000. Trump National Golf Club opened for play on July 1, 2002. Construction of a 42,000 square foot clubhouse was completed during April 2005. Three hundred and fifty memberships are being offered. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $33,800,000.

In addition to the golf club, this property, when fully developed, will contain 47 luxury condominium units, consisting of 16 townhouses that are fully developed and sold and 31 units to be developed as a mid-rise building. Selling prices ranged from $1,500,000 to $2,450,000 with regard to the townhouse units and will range from $500 to $835 per square foot with regard to units in the mid-rise building.

### Trump International Golf Club in Palm Beach County, Florida

Mr. Trump, through wholly owned entities, acquired a long-term leasehold interest in land that he developed into a first-class golf course along with a 45,000 square foot super-luxury clubhouse that is currently in operation. Sufficient land is under lease and the entity has developed an additional nine-hole course that is used in conjunction with the original eighteen holes, thus creating a twenty seven-hole world-class golf facility. Based on this expanded facility, the club is able to offer five hundred and fifty memberships. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $41,960,000.

Funds in the amount of $210,000 have been escrowed with the county with regard to this property. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

### 3.  REAL AND OPERATING PROPERTIES (CONTINUED):

Trump National Golf Club in Los Angeles, California

Mr. Trump, through a wholly owned entity, acquired a property that he has developed into a world-class golf course and club on the bluffs of the southern most point of the Palos Verdes Peninsula in California. The course, originally designed by Pete Dye, has been totally redesigned by Mr. Trump and features panoramic views of the Pacific Ocean and Catalina Island from every hole. The course offers a world-class driving range and water features on a number of holes. The clubhouse boasts fine dining in two Zagat rated restaurants, a players' lounge, and a bar and banquet facility which can host special events for up to 350 people.

In addition to the Club, Trump National Golf Club is presently zoned for 75 home sites with unparalleled ocean and golf course views. At June 30, 2012, there were 52 home sites available for sale.

Trump National Golf Club in Bedminster, New Jersey

Mr. Trump, through a wholly owned entity, acquired a property consisting of 580 acres that has been developed into a world-class 36 hole golf course and club in Bedminster, New Jersey. The Club was designed by Tom Fazio and opened in the summer of 2004. The Club can currently accommodate 700 members. There are 6 cottages available for rental by members. In addition to the golf course, members have the use of an Olympic sized swimming pool, tennis courts, banquet facilities, casual dining facilities and a facility with ten single bedroom suites in addition to a state-of-the-art conference room and fitness facility. Construction of the men's $5,000,000 locker room which houses 600 full length lockers has recently been completed. Plans are underway to renovate the woman's locker room and to begin construction on a new meeting/grill room. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until thirty years after receipt, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $48,280,000.

3.   **REAL AND OPERATING PROPERTIES (CONTINUED):**

<u>Trump National Golf Club in Colts Neck, New Jersey</u>

Mr. Trump, through wholly owned entities, acquired a property now known as Trump National Golf Club, Colts Neck. The club originally designed by Jerry Pate and refined by Tom Fazio II combines a world class golf course, with an aquatic facility, tennis complex and a 75,000 square foot clubhouse. The Club can accommodate 375 members. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $13,545,000.

The real property owned by the club is subject to a mortgage loan at June 30, 2012, in the amount of $14,270,000. The loan bears an interest of 6% and matures on September 9, 2028.

<u>Trump National Golf Club in Washington D.C.</u>

Mr. Trump, through wholly owned entities, acquired a property now known as Trump National Golf Club, Washington, D.C. This club, just a short distance from the nation's capital, is comprised of two 18-hole courses built by Tom Fazio and Arthur Hills, respectively, and is located on over 600 acres with vast frontage on the beautiful historic Potomac River. Construction has been completed to expand the 50,000 square foot clubhouse with enlarged dining space. Additionally, the underground cart facility and the fitness, tennis and swimming facilities have been renovated and redesigned, creating amenities which will complement the state of the art facilities. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $17,040,000.

The real property owned by the club is subject to a purchase money promissory note that has a balance at June 30, 2012 of $9,090,000 and bears interest at the rate of 5.5%. The note will mature on May 1, 2029.

11

3.   **REAL AND OPERATING PROPERTIES (CONTINUED):**

<u>Trump International Golf Club in Scotland</u>

Mr. Trump, through wholly owned entities, acquired 500 hectares of land on the north-east coast of Aberdeenshire. The development received outline planning permission in December 2008 for a world class, Martin Hawtree designed championship links golf course suitable for hosting major events, a second future award winning 18-hole course, a luxury clubhouse, a state of the art driving range and golf academy, a tennis centre, an equestrian centre, a luxury five-star 450 room hotel with associated conference and banquet facilities, a full-services spa, a residential village consisting of 950 holiday homes and 500 single family residences and 36 golf villas. In June 2010, Mr. Trump received detailed approval of the master plan and championship golf course design and construction commenced shortly thereafter. The first golf course was completed ahead of schedule and opened for business in July 2012. Golf tee time reservations are fully booked for the 2012 season and thousands of reservations have been placed for the upcoming 2013 season. The course has been the subject of worldwide media attention and has already been ranked in several "Top Ten" lists. Discussions with both the PGA European Tour and the Royal & Ancient concerning hosting various major professional golf tournaments are ongoing. All onsite infrastructure required to operate a golf course (including utilities and roads) are complete. The Golf House (clubhouse), which includes a pro shop and restaurant, is also open and fully operational. Renovations to the MacLeod House and the Menie Park Lodge are scheduled to be completed by the end of 2012, which will include 19 luxury suite accommodations and an additional restaurant.

<u>Trump National Golf Club in Hudson Valley, New York</u>

In 2009, entities wholly owned by Mr. Trump acquired a 300 acre property now known as Trump National Golf Club, Hudson Valley in Hopewell Junction, New York. The 18 hole championship course, is framed by breathtaking views of the Stormville Mountains and is complimented by a traditional Adirondack-style clubhouse. Improvements to the amenities include new 5,000 square foot men's and women's locker rooms for the members at the club. Also, construction of an Olympic sized swimming complex is substantially complete. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $1,230,000.

12

3, **REAL AND OPERATING PROPERTIES (CONTINUED):**

Trump National Golf Club - Philadelphia

In 2009, entities wholly owned by Mr. Trump acquired a 365 acre property now known as Trump National Golf Club - Philadelphia. With magnificent views of the Philadelphia skyline, Trump National Golf Club - Philadelphia, located in Pine Hill, New Jersey was designed by Tom Fazio. The course has an 80,000 square foot Kentucky Blue grass two-tiered practice area. The 43,000 square foot clubhouse offers a sophisticated yet elegant feel for members and guests. Construction will begin this fall on the aquatic center. Plans are currently underway for a bistro. Prior to June 1, 2010, one condition of membership was the contribution of a non-interest bearing deposit that does not require repayment until certain terms are met, and then only upon the member's resignation. The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero. Through June 30, 2012 these deposits amounted to $900,000.

Trump National Doral

On June 11, 2012, entities wholly owned by Donald J. Trump acquired the Doral Golf Resort & Spa in Miami, Florida. Home to a PGA event every year since its opening over 50 years ago, as newly named, Trump National Doral is located on over 650-acres of prime Miami real estate and includes ten lodges totaling 693 guestrooms; five pristine golf courses including the world renown Blue Monster; over 90,000 sq.-ft. of meeting space including the 24,000 sq.-ft. Legends Ballroom; a sprawling 48,000 sq.-ft. spa with 33 treatment rooms; the Jim McLean Golf School; six signature restaurants; multiple retail boutiques; and a private members' club. The hotel and spa portion of the property have plans for a spectacular multi-million renovation and will remain fully operational throughout the renovation, which is expected to conclude in the Fall 2013.

The property is subject to a loan payable in the amount of $125,000,000 as of June 30, 2012. The first tranche in the amount of $106,000,000 is due on June 10, 2017. The second tranche in the amount of $19,000,000 is due on June 10, 2014, but may be extended until June 10, 2017, under certain conditions. The interest rate on both tranches may be determined by the borrower at either libor plus 2.25% or prime minus .50%. The interest rate at June 30, 2012 was 2.7188%.

3.  REAL AND OPERATING PROPERTIES (CONTINUED):

Trump National Golf Club in Charlotte, North Carolina

Trump National Golf Club Charlotte is one of the newest additions to the award-winning Trump Golf portfolio.  This beautiful property located 30 minutes from Charlotte, fronts Lake Norman in the picturesque countryside of Mooresville.  The Greg Norman designed golf course has more than two-thirds of the holes directly along or over the water, which presents challenges to golfers of all skill levels.  The unique country-village designed property coupled with a state of the art Clubhouse, world-class tennis facilities, large swimming complex, fitness facility, game rooms and other amenities make Trump National Golf Club Charlotte the perfect private club for the entire family to enjoy.

**The Trump World Tower at United Nations Plaza**

Entities wholly owned by Donald J. Trump developed and constructed a super luxury residential condominium development at 845 United Nations Plaza in New York City. The 90-story tower has a gross area of 877,000 square feet and is 860 feet in height. The building is situated at the northwest corner of the United Nations Plaza with exposures to the United Nations Park, the East River, Midtown and Downtown Manhattan.  There are 370 super luxury condominium units with ceiling heights varying from 10 to 16 feet at the uppermost floors. As of June 30, 2012, 369 units have been sold.  In addition to the condominium units, a bar and a restaurant are on the ground floor level.  There is a valet parking facility for 75 cars below grade.  There is also a roof top antenna structure. Mr. Trump will retain and rent out these commercial spaces.

The estimated current value of $18,200,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect that he will derive from the sale of the final unit based on current pricing, as well as the residual value of the commercial space which will be retained by Mr. Trump.

**100 Central Park South**

Entities wholly owned by Mr. Trump have developed 100 Central Park South in New York City.  The property, which is known as Trump Parc East Condominium, consists of an 81-unit luxury apartment house located at the corner of Central Park South and The Avenue of the Americas.  The property also contains a commercial condominium unit that is currently leased to three retail tenants. Through June 30, 2012, units with a value of $53,060,000 have been sold.

The current value of $32,700,000 reflects the net proceeds which Mr. Trump in conjunction with his associates and outside professionals expect that he will derive from residential unit sales during periods subsequent to June 30, 2012 based on current pricing.

14

### 3. REAL AND OPERATING PROPERTIES (CONTINUED):

**Trump Plaza - Commercial and Retained Residential Portions**

Entities wholly owned by Donald J. Trump developed Trump Plaza in 1983 which was sold pursuant to a cooperative offering plan. The property is located on Third Avenue between East 61st and East 62nd Streets in New York City. The assets reflected in this statement represent certain residual interests that entities wholly owned by Mr. Trump still own. These consist of two residential units, a long-term leasehold interest in two residential townhouses, each consisting of four residential units, a parking garage and commercial space.

The estimated current value of $30,100,000 is based upon an assessment made by Mr. Trump in conjunction with his associates and outside professionals expected to be derived from rental activities pursuant to the leases, as well as the residual value of the properties.

The interest that Mr. Trump's entities have in the two residential townhouses, the parking garage and the commercial space has been pledged as collateral with respect to a loan payable. As of June 30, 2012, the amount of this debt was $8,300,000. The note matures on August 11, 2014 and bears interest at the rate of 5.7%.

Funds in the amount of $110,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

**Trump Palace, Trump Parc and Trump Parc East Condominiums – Commercial Portions**

Entities wholly owned by Mr. Trump have developed the aforementioned properties and the only areas that remained unsold as of June 30, 2012 were:

- 31 storage units at Trump Palace Condominium
- 38 storage units and a parking garage at Trump Parc Condominium
- the commercial condominium elements at Trump Parc East Condominium

The estimated current value of $13,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates of the value of the various properties described above.

15

3. **REAL AND OPERATING PROPERTIES (CONTINUED):**

**Trump International Hotel and Tower - New York, New York**

Donald J. Trump has redeveloped the former Paramount Building at One Central Park West in New York City from an office tower into a luxury residential and hotel condominium development.

Although all units in the property have been sold, entities wholly owned by Mr. Trump will continue to receive certain fees relating to on-going property operations.

The estimated current value of $27,600,000 was based upon on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the remaining compensation which he and entities which he owns will derive as a result of hotel and rental operations, as well as the value ascribed to the retained commercial condominium elements of the property. These are the garage facility, the restaurant and an easement with respect to the rooftop area, all of which are now owned by entities wholly owned by Mr. Trump.

The interest that Mr. Trump's entity has in this property has been pledged as collateral with respect to a loan payable. As of June 30, 2012, the amount of this debt was $7,000,000 with an interest rate of 6.18% and which matures on July 11, 2016.

Funds in the amount of $210,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses".

**Mansion at Seven Springs**

An entity wholly owned by Mr. Trump acquired a property known as The Mansion at Seven Springs in Bedford, New York which consists of over 200 acres of land, a mansion and other buildings. This property is zoned for 9 luxurious homes. It has been valued at $291,000,000 based on an assessment made by Mr. Trump in conjunction with his associates of the projected net cash flow which he would derive as those units are constructed and sold, and the estimated fair value of the existing mansion and other buildings.

This property is the subject of a mortgage payable that had a balance due at June 30, 2012 of $7,520,000 with an interest rate of 5.25%. This mortgage will mature on July 1, 2014.

Funds in the amount of $80,000 have been escrowed pursuant to the terms of this loan. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

4.   PARTNERSHIPS AND JOINT VENTURES:

Estimates of the current value of Mr. Trump's interests in partnerships and joint ventures reflect his interest therein and are determined on various bases, as described below.

**1290 Avenue of the Americas in New York, New York and 555 California Street in San Francisco, California**

In May 2007, Donald J. Trump and Vornado Realty Trust became partners in two properties; 1290 Avenue of the Americas located in New York City and 555 California Street (formally known as Bank of America Center) located in San Francisco, California.

1290 Avenue of the Americas consists of an office tower and retail space containing approximately 2,000,000 leasable square feet housing such tenants as Microsoft, AXA Equitable, Cushman & Wakefield, and Columbia University.

555 California Street consists of one retail and two office buildings comprising approximately 1,700,000 leasable square feet along with a subterranean garage. Bank of America, Goldman Sachs, UBS Financial Services, Citigroup, and Wells Fargo are a few of the tenants.

Mr. Trump owns 30% of these properties.

The estimated current value, net of debt, of $823,300,000 is based on an evaluation made by Mr. Trump in conjunction with his associates and outside professionals. This valuation was arrived at by applying a rate cap to the net operating income and taking into consideration any debt and return of capital.

**Miss Universe Pageants**

In 1996, Donald J. Trump and CBS acquired all of the assets that together are the "Miss Universe Pageants." In 2002 NBC became a 50% joint venture participant in those activities, replacing CBS. The company produces the Miss Universe Pageant, the Miss USA Pageant, as well as the Miss Teen USA Pageant. The pageants have been redefined to present the combination of style and intelligence that define the woman of the new millennium.

The alliance with NBC has enabled the Miss Universe Organization to bring together women from around the world in the spirit of first-class competition. The resultant prime-time network television specials are broadcast live to a worldwide audience. As a result of this notoriety, site fees for Miss Universe events far exceed those paid to similar organizations. The estimated current value of $15,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals.

17

5.   **REAL ESTATE LICENSING DEVELOPMENTS:**

As stated in Note 1, this financial statement does not reflect the value of Donald J. Trump's worldwide reputation, except to the extent it has become associated with properties either operative or under development. His recognized persona has evolved to the extent that it has become an internationally recognized brand name. The resultant prestige significantly enhances the value of the properties with which he is associated. The goodwill attached to the Trump name has proven financial value in that potential users of real property around the world have demonstrated willingness to pay a significant premium for ownership or use of a Trump related residence. As a result, other developers of quality properties have approached Mr. Trump with proposals for joint ventures involving ways in which his organization's development skill and reputation will bring enhanced value to them.

Mr. Trump has formed numerous associations with others for the purpose of developing properties and is currently negotiating with others. The estimated current value of $85,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the cash flow that is expected to be derived by him from these associations as their potential is realized. In preparing that assessment, Mr. Trump and his management considered only situations which have evolved to the point where signed arrangements with the other parties exist and fees and other compensation which he will earn are reasonably quantifiable.

Terms of the agreements vary and might involve defined compensation per unit or contingent fees based on parameters such as selling prices or gross profit levels, upfront guaranteed fees, a percentage of gross revenues and various management agreements (ex. hotel, condo, food and beverage, etc.). The process utilized by management to select the people and properties with which the Trump name will be associated is extremely selective; each must enhance Mr. Trump's reputation.

Mr. Trump has pledged $19,760,000 of the fees derived on certain of these agreements to his former partner in The Trump World Tower at United Nations Plaza. This debt is reflected in this financial statement as a liability under the caption "Mortgages and loans payable secured by other assets".

6.   **OTHER ASSETS:**

**Trump Tower**

Mr. Trump owns a triplex apartment on the top three floors of Trump Tower (see Note 3).

18

6.   **OTHER ASSETS (CONTINUED):**

**Palm Beach, Florida**

Mr. Trump owns two homes that are located in Palm Beach, Florida, adjacent to Mar-a-Lago Club.

Mr. Trump's interests in these properties in Florida have been pledged as collateral with respect to two loans. One loan had a balance at June 30, 2012 of $270,000 and bears an interest rate of 1.75% per annum above the rate known as the six-month London Interbank Offering Rate as it is fixed at certain points in time and at June 30, 2012 was 2.4375%. This loan will mature on January 1, 2019. The other loan had a balance at June 30, 2012 of $620,000 and bears an interest rate of 1.50% per annum above the rate known as the six-month London Interbank Offering Rate as it is fixed at certain points in time and at June 30, 2012 was 2.3125%. This loan will mature on February 1, 2019.

**Beverly Hills, California**

Mr. Trump, through wholly owned entities, owns a home located in Beverly Hills, California. This property is located at the intersection of Canon, Rodeo, and Sunset in an area of Beverly Hills known as the "flats". The home is directly across the street from the world famous Beverly Hills Hotel on what many call the most desirable lot in the city due to its unmatched location.

**Corporate Aircrafts**

Entities owned by Donald J. Trump own a Boeing 757 jet and two Sikorsky helicopters.

**Trump Golf Links at Ferry Point**

Trump Golf Links at Ferry Point will be an 18 hole public golf course located in the Bronx, NY, with beautiful views of the Manhattan skyline. The Jack Nicklaus Signature Design is currently slated to open in 2014, which includes plans for a $10 million clubhouse, a state of the art driving range and practice facility with lights for nighttime use. Mr. Trump is working very closely with Mayor Bloomberg's office for this to become the greatest public golf course and facility in New York City.

6.  **OTHER ASSETS (CONTINUED):**

    **Other**

    Mr. Trump and entities that he owns, control several other active businesses as well as other assets. The assets related to these interests include:

    - a 2,000 acre vineyard in Charlottesville, Virginia along with a carriage museum, office building and several other buildings
    - licenses to operate and manage the Wollman Rink which was reconstructed by Mr. Trump in 1986 and the landmark Carousel in Central Park
    - an international talent/model agency
    - a management company that supervises the operation of condominium properties, as well as Mr. Trump's own properties
    - receivables representing amounts earned to date and contract rights with regard to future performances on television
    - loans to family members

    Funds in the amount of $640,000 have been escrowed pursuant to the terms of Mr. Trump's contractual commitments at the Wollman Rink, Carousel in Central Park and Trump Golf Links at Ferry Point. This asset is reflected in this financial statement under the caption "Escrow and Reserve Deposits and Prepaid Expenses."

7.  **ACCOUNTS PAYABLE AND ACCRUED EXPENSES:**

    Accounts payable and accrued expenses represents incidental amounts owed by Donald J. Trump personally, and amounts owed by wholly-owned operating entities.

8.  **COMMITMENTS AND CONTINGENCIES:**

    Mr. Trump also has personal responsibilities with respect to various employment contracts, construction contracts, loan agreements, purchase commitments and other commitments. These include recourse obligations concerning partnership indebtedness, guarantees relating to the completion and environmental acceptance of certain projects.

    Mr. Trump and his affiliates are parties to various lawsuits and legal actions. At the present time, the outcome of those proceedings cannot be estimated. Mr. Trump believes that these legal actions will not have a material effect on his financial position.

    Various taxing authorities are currently auditing Mr. Trump and certain of his affiliates. At the present time, the outcome of these examinations cannot be determined.

    Mr. Trump periodically maintains funds on deposit in banking institutions in excess of FDIC insured amounts. He is at risk for any amounts exceeding the FDIC limitation.

9.  **SUBSEQUENT EVENTS:**

    Mr. Trump has evaluated subsequent events through October 12, 2012, the date the financial statement was available for issuance.

20

## Donald J. Trump
## Summary of Net Worth
## As of March 31, 2013

### ASSETS

Cash & Marketable Securities - as reflected herein is **after** the acquisition of numerous assets (i.e. multiple aircraft, land, golf courses, etc), the paying off of significant mortgages for cash and before the collection of significant receivables.

| | |
|---|---:|
| Cash & Marketable Securities | 346,100,000 |
| Escrow and reserve deposits and prepaid expenses | 10,780,000 |

Real & Operating Properties owned 100% by Donald J. Trump through various entities controlled by him:

| | |
|---|---:|
| Commercial Properties (New York City) | 1,381,350,000 |
| Residential Properties (New York City) | 351,550,000 |
| Club facilities & related real estate | 1,570,300,000 |
| Property under Development | 291,000,000 |

Real Properties owned less than 100% by Donald J. Trump
1290 Avenue of the Americas - New York City
Bank of America Building - San Francisco, California

| | |
|---|---:|
| Total Value Net of Debt | 823,300,000 |
| Real Estate Licensing Deals | 74,140,000 |
| Miss Universe, Miss USA and Miss Teen USA Pageants | 15,000,000 |
| Other Assets (net of debt) | 302,610,000 |
| Brand Value | 4,000,000,000 |
| **Total Assets** | **9,166,130,000** |

### LIABILITIES

| | |
|---|---:|
| Accounts payable | 4,400,000 |

Loans and mortgages payable on Real and Operating Properties owned 100% by Donald J. Trump

| | |
|---|---:|
| Commercial Properties (New York City) | 321,690,000 |
| Residential Properties (New York City) | 22,190,000 |
| Club facilities | 148,360,000 |
| Property under development | 7,520,000 |
| **Total Liabilities** | **504,160,000** |

| | |
|---|---:|
| **NET WORTH** | **8,661,970,000** |