**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

                          Plaintiffs,

v.

MAZARS USA LLP,

                          Defendant,

and

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

                    Intervenor-Defendant.

Civil Action No. 1:19-cv-01136-APM

**<u>REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION</u>**

## INTRODUCTION

The most telling part of the Committee's opposition is what it does not say. Plaintiffs made the D.C. Circuit's decision in *Eastland* a central feature of their opening brief. *See* Mot. (Dkt. 11-1) 1-2, 5-7. For good reason. *Eastland* and this case have the same procedural posture: an affirmative lawsuit challenging the legitimate legislative purpose behind a congressional subpoena. *Eastland* and this case have the same facts: a congressional subpoena asking a third-party custodian to divulge the plaintiff's confidential information. And *Eastland* ordered the same relief that Plaintiffs seek here: an order blocking enforcement of the subpoena until the district court can resolve the merits at final judgment. Most of all, *Eastland* is a precedent of the D.C. Circuit that this Court must follow. *See Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 36-37 (D.D.C. 2018). Yet the Committee's opposition does not even mention the D.C. Circuit's decision in *Eastland*—let alone grapple with it. That is because there is no way to distinguish *Eastland* and, accordingly, it resolves Plaintiffs' right to a preliminary injunction.

The Committee instead devotes most of its opposition to convincing the Court that it will prevail on the merits. But Plaintiffs do not need to establish a likelihood of success on the merits to secure a preliminary injunction. In a case like this, where the dispute will be "mooted" absent interim relief, irreparable harm is "decisive" and the plaintiff only needs to identify "serious constitutional questions" about the subpoena's legality. *U.S. Servicemen's Fund v. Eastland*, 488 F.3d 1252, 1256-57 (D.C. Cir. 1973). This Court agrees. *See Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560-61 (D.D.C. 2018) (Mehta, J.). Accordingly, when "the other three factors strongly favor interim relief"—as they clearly do here—this Court will grant a preliminary injunction so long as the merits present "serious legal questions." *Id.* at 561.

Plaintiffs not only identify "serious legal questions," they are likely to prevail on them. As the Committee sees it, Congress can issue a subpoena on any matter, at any time, for any reason, and there is basically nothing a federal court can do about it. Except the Founding-era materials that the

Committee points to undermine that bold assertion. And the relevant precedents confirm that the Committee is wrong. Given its practical ramifications, moreover, any federal court should balk before accepting this unprecedented legal proposition. If the Committee is correct, and it actually has plenary authority to subpoena the President's personal financial records to investigate "potential conflicts of interest," then it has the same limitless power to subpoena the records of other executive-branch officials, members of Congress, and the federal judiciary.

But the Committee is incorrect. Congress has no freestanding oversight or investigative power; those powers are "justified solely as an adjunct to the legislative process," and they may not be deployed to pursue measures that exceed Article I's limitations. *Watkins v. United States*, 354 U.S. 178, 197, 187 (1957). The Committee is not immune from having its purposes challenged; courts can assess its stated, contemporaneous purposes to determine whether they are legitimate or unlawful. *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). And Plaintiffs can challenge the subpoena's pertinency and overbreadth; under governing law, subpoenas must always be "reasonably relevant" to a legitimate legislative purpose. *McPhaul v. United States*, 364 U.S. 372, 381-82 (1960) (cleaned up).

The subpoena cannot withstand even this elemental constitutional scrutiny. By his own words, Chairman Cummings acknowledged that he is seeking Plaintiffs' documents for law-enforcement— not legislative—purposes. The Committee's response that it could pass legislation after it reviews the President's financial documents proves too much. If Congress can justify a law-enforcement investigation by asserting that it could pass remedial legislation if it does not like what it finds, Congress would be free to invade the province of the executive and judicial branches. The Committee's reliance on H.R. 1 is equally problematic. H.R. 1 passed the House before this subpoena was issued; it will not pass the Senate (and thus will never return to the House); and, until this case, it appears that no member of Congress—let alone the Committee—articulated this rationale for the subpoena. No case requires this Court to accept a post-hoc argument created for the purpose of

litigation that contradicts the Committee's own statements and actions. Regardless, H.R. 1 and any similar proposal to regulate the President's finances would be unconstitutional. Congress cannot interfere with the Executive's execution of his duties, or add qualifications for President. *See Powell v. McCormack*, 395 U.S. 486, 522 (1969). These proposals would do both and thus cannot provide the Committee with the legitimate legislative purpose it needs to defend this subpoena.

Finally, the Committee barely mentions the remaining preliminary-injunction factors, which strongly support Plaintiffs' request. Not only is Plaintiffs' harm irreparable under *Eastland*, but it is premised on the key proposition animating Rule 65: "The purpose of a preliminary injunction is … to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The situation that Plaintiffs confront is no mystery. If this Court (or an appellate court) does not grant interim relief, their confidential documents will be disclosed before this case ever reaches final judgment. The Committee does not seriously contest this point. Nor does it seriously contest that the disclosure of confidential information constitutes irreparable harm. That is because this Court (and many others) have held that it does. *See Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) (Mehta, J.); *Airbnb, Inc. v. City of New York*, 2019 WL 91990, at *23 (S.D.N.Y. Jan. 3, 2019).

The balance of equities and public interest are likewise one-sided. If the Court grants a preliminary injunction, the Committee will merely have to wait until final judgment to enforce the subpoena—assuming it wins. Mazars will be shielded from the legal jeopardy it faces if it complies with an invalid subpoena, *see United States v. Deloitte LLP*, 610 F.3d 129, 142 (D.C. Cir. 2010), and the public's interest "in assuring that the government remains within the limit of its constitutional authority" will be vindicated, *Nat'l Treasury Employees Union v. U.S. Dept. of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993). But if the Court denies a preliminary injunction, Plaintiffs will forever lose their chance to test the subpoena's constitutionality because their confidential financial information will be

disclosed, and the Committee will be rewarded for strategically seeking these documents from a third-party custodian instead of Plaintiffs themselves. That is why the D.C. Circuit granted interim relief in *Eastland*. That is why cases granting preliminary injunctions in circumstances like this are legion. And that is why this Court should follow suit and grant Plaintiff's motion.

## ARGUMENT

### I.  *Eastland* requires this Court to enter a preliminary injunction.

The answer to whether Plaintiffs are entitled to a preliminary injunction is straightforward: *Eastland* requires this Court to grant one. As explained, the D.C. Circuit's decision in *Eastland* reversed the denial of a TRO, reversed the denial of a preliminary injunction, and twice enjoined the enforcement of the challenged congressional subpoena.[1] 488 F.2d at 1256-57. The "decisive element" warranting interim relief was the "irreparable harm" that the plaintiff faced if the subpoena's due date arrived before the district court could resolve the merits at final judgment. *Id.* at 1256. Once the due date arrived, there was a "likelihood" that the third-party custodian "to whom plaintiffs have entrusted information" would produce it to Congress and "[the] case will be mooted." *Id.* Given this massive risk of irreparable harm, the plaintiff was entitled to interim relief so long as it identified "serious constitutional questions." *Id.* Because the plaintiff did, the D.C. Circuit stayed enforcement of the congressional subpoena until "final judgment" to "ensure that [this] question of importance is determined with the best available perspective, both as to underlying evidence and the appraisal thereof by the District Judge." *Id.* at 1257.

*Eastland* resolves Plaintiffs' motion for a preliminary injunction. Plaintiffs face the exact same irreparable harm as the plaintiff in *Eastland*: the likelihood that a neutral third-party custodian will divulge their confidential information to Congress if the subpoena's due date arrives before this Court

---

[1] The standards for granting a TRO, a preliminary injunction, and an injunction pending appeal are all the same. *See Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp. 2d 1, 7 n.5 (D.D.C. 1999); *Cigar Ass'n*, 317 F. Supp. 3d at 560.

can render final judgment. Thus, irreparable harm is the "decisive element" warranting interim relief here. *Id.* at 1256. *Eastland*'s holding that plaintiffs in these circumstances are entitled to interim relief binds this Court. While the Supreme Court ultimately reversed the D.C. Circuit's final decision on the merits, it never reviewed the D.C. Circuit's grants of interim relief. In fact, the Supreme Court *praised* the D.C. Circuit's handling of the preliminary issues in the case. It affirmed individuals' right to challenge a congressional subpoena to a third-party custodian, and it highlighted the risk that "compliance by the third person could frustrate any judicial inquiry" into the subpoena's legality. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 n.14 (1975). The only way to avoid that risk, of course, is to grant interim relief, as the D.C. Circuit did in *Eastland* and this Court should do here.

The Committee apparently agrees. Although Plaintiffs' opening brief thoroughly discussed *Eastland* and explained why it binds this Court, the Committee's opposition does not even mention the case. It makes no attempt to distinguish the D.C. Circuit's decision, or to challenge its ongoing validity. The Committee's silence should be the end of the matter. *See Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 301 (D.D.C. 2013) ("'It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'").

Though the Committee does not draw the connection itself (or do anything to develop the argument), perhaps the Committee's answer to *Eastland* comes in footnote 21 of its opposition. There, the Committee suggests that the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), fundamentally changed the standard for granting preliminary injunctions. After *Winter*, the Committee contends, a strict "likelihood of success" on the merits is always "an indispensable prerequisite to injunctive relief." Opp. 10 n.21.

This Court has rejected that interpretation of *Winter*. "Courts in this Circuit traditionally have analyzed" the four preliminary-injunction factors in a way that "allows a movant to remedy a lesser

showing of likelihood of success on the merits with a strong showing as to the other three factors."

*Cigar Ass'n*, 317 F. Supp. 3d at 560; *see, e.g.*, *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559

F.2d 841, 844 (D.C. Cir. 1977). When "the other three factors strongly favor interim relief," courts

will grant a preliminary injunction so long as the movant presents "a 'serious legal question'" on the

merits. *Cigar Ass'n*, 317 F. Supp. 3d at 560-61. Although "some judges of the D.C. Circuit have

questioned the continuing validity of [this] approach after *Winter*, the Circuit has yet to disavow it."

*Id.* at 561 (citations omitted). Thus, "the district judges in this Circuit continue to adhere to [it]," and

"[t]his court must do the same." *Id.* at 560. The vast majority of circuits agree with this Court's

approach to *Winter. See, e.g.*, *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,

598 F.3d 30, 35-38 (2d Cir. 2010); *In re Revel AC, Inc.*, 802 F.3d 558, 569-70 (3d Cir. 2015); *Hoosier*

*Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *All. for the*

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *accord* Wright & Miller, 11A Fed. Prac.

& Proc. Civ. §2948.3 (3d ed.).

The Court's approach is correct. District courts' power to award a preliminary injunction when

the movant presents "serious questions" on the merits and clearly prevails on the other factors has

deep historical roots. *See, e.g.*, *Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur*, 53 F. 98, 101

(6th Cir. 1892) (Jackson, J., joined by Taft, J.) (explaining that courts often "preserve [the] status quo

during the pendency of a suit … without expressing … any opinion'" on the merits when the movant

identifies "'a substantial question to be decided'" (quoting English authorities)). After all, the

preliminary injunction is rooted in "equity," which is characterized not by "rigidity" but by

"[f]lexibility," "mercy," and "practicality." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see Citigroup*,

598 F.3d at 35. *Winter* did not fundamentally change equity by imposing a rigid likelihood-of-success

requirement. The Supreme Court's decision did not even address the likelihood-of-success factor. 555

U.S. at 24, 31 & n.5; *see Citigroup*, 598 F.3d at 37; *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d

978, 993 n.7 (8th Cir. 2011). Nor did it abrogate the "serious questions" standard—something it would have done expressly, since that holding would have marked "'a dramatic reversal in the law'" and abandoned a standard that "the Supreme Court itself" has applied. *Wild Rockies*, 632 F.3d at 1134; *Citigroup*, 598 F.3d at 38. Hence, the D.C. Circuit's decisions applying the "serious questions" standard continue to bind this Court. *See Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 683-84 & n.7 (D.C. Cir. 2008) (explaining that circuit precedent remains binding until the Supreme Court "eviscerates" it, and that the Supreme Court's "doubts" are insufficient); *Hecht*, 321 U.S. at 330 (explaining that "a major departure from [a] long [equitable] tradition" should not be "lightly implied").

That *Winter* did not rewrite the rules of equity is confirmed by the Supreme Court's decision in *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017). There, the petitioners asked the Supreme Court to stay two preliminary injunctions that were blocking the enforcement of Executive Order 13,780. *Id.* at 2082-83. The Court largely stayed the injunctions. *See id.* at 2088-89. Tellingly, and utterly contrary to the Committee's theory of *Winter*, the Court granted an equitable stay without even addressing the petitioners' likelihood of success on the merits (a question that the six Justices in the majority surely disagreed about). The Court granted the partial stay based solely on the equities. *See id.* at 2087-88. To justify its focus on the equities, the Court disavowed the merits-or-bust reading of *Winter* that the Committee pushes here: "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Id.* at 2087 (citing *Winter*, 555 U.S. at 20, 24) (other citations omitted).

In short, the traditional rules of equity have not changed since the D.C. Circuit decided *Eastland*. That decision therefore resolves the irreparable-harm, balance-of-equities, and public-interest factors firmly in Plaintiffs' favor. And it means that Plaintiffs are entitled to a preliminary

injunction if their complaint raises "serious constitutional questions" about the subpoena's legality. *Eastland*, 488 F.2d at 1256-57.

Plaintiffs easily meet the "serious questions" standard. They do more than that, since they are *likely* to succeed on the merits. *See infra* II.A. But at the very least, this case presents novel and important questions about the outer limits of Congress' power to investigate. To quote the Committee's previous chairman, the subpoena to Mazars is completely "unprecedented"; never before has Congress used its investigative authority to "target ... the private financial information of the President of the United States." 4/15/2019 Ltr. from Rep. Jordan to Chairman Cummings, bit.ly/2H3WLEq. And because the Committee is targeting the President, this case raises serious separation-of-powers concerns that were not present in any of the cases that the Committee relies on in its opposition. *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (citing the "potentially great significance for the balance of power between the Legislative and Executive Branches" as the sole reason to stay an order requiring executive-branch officials to comply with a congressional subpoena).

Embracing the Committee's position in this case, moreover, would have massive ramifications for our republic. According to the Committee, a single committee chair can obtain a sitting President's entire life's worth of private financial records whenever he wants. The chair simply needs to say that he wants to check the veracity of "Presidential financial disclosures" or search for "potential conflicts of interest," Opp. 3—justifications he can *always* raise because he does not need any factual basis to start an investigation, Opp. 5, 13-14, he is not limited to information from the President's time in office, Opp. 19-20, and the courts cannot question his reasoning, Opp. 13-14, 17-18. And in Congress' quest for the President's information, it can threaten his accountants, bankers, family, friends, and even his "personal attorney[s]" with contempt. Opp. 4. At a minimum, then, the Committee's position means that nonstop investigations into the personal lives of Presidents (motivated by the hope of

finding politically damaging information) will be the new normal whenever the President is from a different political party than the House or Senate.

But the Committee's logic does not stop at the President. If Congress can conduct limitless, suspicion-free, judicially-unquestionable investigations to find "potential conflicts of interest," then it can subpoena *any* government official's private financial records. It could freely comb through the credit-card purchases, accounting documents, banking records, and investment portfolios of Cabinet heads, fellow Congressmen, political opponents, and even federal judges. This Court would do well to pause—and at least receive full briefing and argument on the merits of these serious constitutional questions—before it endorses the Committee's unchecked view of congressional subpoena power. Precedent and sound judgment demand it.

## II.     The traditional four factors for a preliminary injunction favor Plaintiffs.

### A.     Likelihood of Success on the Merits

According to the Committee, Congress has an "extremely broad," virtually "plenary" power to investigate "'*any matter*'" "'at *any time*'"—even "broader than that of law enforcement." Opp. 11, 5, 13, 21. Statements like these reveal that the Committee—not Plaintiffs—has "a fundamental misunderstanding of the powers of the Legislative Branch under the Constitutional scheme established by the Framers." Opp. 1. Under our Constitution, "[t]he powers of the legislature are defined, and limited." *Marbury v. Madison*, 5 U.S. 137, 176 (1803). The power to investigate is no exception. *See Eastland*, 421 U.S. at 504 n.15 ("[T]he power to investigate … is not unlimited."); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("[Congress'] power of inquiry … is not … without limitations."); *Watkins*, 354 U.S. at 187 ("[Congress'] power of inquiry … is not unlimited."); *Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[Congress'] power to investigate … is … subject to recognized limitations."); *McGrain v. Daugherty*, 273 U.S. 135, 173-74 (1927) ("[Congress] is invested … only with [a] limited power of inquiry."). All congressional subpoenas must have a legitimate legislative purpose, and Plaintiffs will likely establish that the Committee's subpoena to Mazars does not.

Before explaining why, however, it is important to correct three legal errors in the Committee's opposition:

*First*, the Committee sometimes suggests that its power to investigate does not depend on its power to legislate—that it has a free-floating power to conduct "oversight," to "check" the executive branch, or to "inform" the public. Opp. 1-2, 13, 15. That is wrong. Oversight, investigation, and transparency are not among the "legislative Powers" that the Constitution "vest[s]" in Congress. Art. I, §1; *see McGrain*, 273 U.S. at 161; *Kilbourn*, 103 U.S. at 182. The Constitution instead gives Congress the power to enact certain legislation, Art. I, §8, and so the power to investigate can be "justified solely as an adjunct to the legislative process," *Watkins*, 354 U.S. at 197; *accord Eastland*, 421 U.S. at 504 n.15 ("[T]he power to investigate is … defined by its source"—the power to legislate.); *McGrain*, 273 U.S. at 174 ("[T]he power of inquiry … is an … auxiliary to the legislative function."). "[T]here is no congressional power to expose for the sake of exposure," and the Committee's quote from Woodrow Wilson about Congress' "informing" power "cannot be inflated into a general power to expose" private information. *Watkins*, 354 U.S. at 200 & n.33; *accord United States v. Rumely*, 345 U.S. 41, 43-44 (1953) (explaining that Wilson's description of Congress' investigatory power is overbroad).[2]

---

[2] The Committee's belief that Founding-era history bolsters its view, Opp. 1, 12, is sorely mistaken. While Congress has long used compulsory process to regulate its *own members*, there was "very little use" of compulsory process "in early years" to aid the legislative process. *Watkins*, 354 U.S. at 192. "The Nation was almost one hundred years old before the first case reached [the Supreme] Court to challenge the use of compulsory process as a legislative device." *Id.* at 193. And that case was deeply skeptical of the power, stressing that it derives "no support from the precedents and practices of the two Houses of the English Parliament, nor from the adjudged cases." *Kilbourn*, 103 U.S. at 189. Worse, congressional investigations that examine "the lives and affairs of private citizens"—like the investigation here—did not emerge until "the decade following World War II." *Watkins*, 354 U.S. at 195. The Committee's main historical example—the House's 1792 investigation into the St. Clair incident, Opp. 12—disproves its position. The House began that investigation by demanding information from the Secretary of War (not a private citizen). President Washington and his cabinet (including Jefferson and Hamilton) rebuffed the House, unanimously agreeing that the President could broadly withhold information from Congress to further the public interest. The House yielded, changing its demand for the information to a mere request. *See* Michael W. McConnell, *The Way Trump Is Asserting the Rights of His Office Is Not Impeachable*, Wash. Post (May 1, 2019), wapo.st/2VOaveM.

At the very least, the Committee's assertion of a standalone power to oversee the President raises "serious constitutional questions" that Congress would have to "clearly" tee up in the Committee's authorizing resolution. *Tobin v. United States*, 306 F.2d 270, 275-76 (D.C. Cir. 1962). This Court, in other words, must "constru[e]" the Committee's jurisdiction "narrowly" to "obviate the necessity of passing on" these questions. *Id.* at 274-75; *accord Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Whether construed narrowly or broadly, nothing in the House Rules gives the Committee jurisdiction to conduct oversight of the President. While the Committee cites one House Rule permitting oversight of "'the Executive Office of the President,'" Opp. 12-13 (quoting House Rule X.3(i)), the subpoena to Mazars targets the President *himself*—it seeks information about *his* personal finances and businesses (something the Committee's opposition gives away by repeatedly lumping Plaintiffs together as "Trump"). But the President is not the "Executive Office of the President." *See Barnett v. Obama*, 2009 WL 3861788, at *18 (C.D. Cal. Oct. 29, 2009) ("The Executive Office of the President is an agency within the Executive branch and is a body separate from the President himself."), *aff'd*, 664 F.3d 774 (9th Cir. 2011); *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) ("[T]he 'Executive Office of the President' … does not include the Office of the President."); *Meyer v. Bush*, 981 F.2d 1288, 1299 (D.C. Cir. 1993) (same). Thus, the House Rules do not authorize the Committee's attempt to conduct roving oversight of the President, and this Court cannot allow the Committee to implicate these "[g]rave constitutional questions" by venturing beyond its statutory jurisdiction. *Rumely*, 345 U.S. at 48.

**Second**, the Committee asserts that this Court cannot examine "the motivations underlying" the subpoena to Mazars. *See* Opp. 23-24, 14. That is an odd statement, since the governing legal standard requires courts to "determine whether a legitimate legislative *purpose* is present." *Eastland*, 421 U.S. at 501 n.14 (emphasis added). To apply that standard, "[t]he object of the particular inquiry in question must be examined." *Shelton*, 404 F.2d at 1297. Courts do this—without improperly second-

guessing legislators—by consulting objective "sources" of purpose, such as the text of the request and "statements of the members of the committee." *Id.*; *see also McGrain*, 273 U.S. at 180 (noting that the case would be different if Congress had "affirmatively" avowed "an inadmissible or unlawful object" for the investigation). Those sources are what Plaintiffs ask the Court to consult in this case. Further, courts must examine Congress' purpose to ensure that congressional investigations are not "confused with any of the powers of law enforcement … assigned under our Constitution to the Executive and the Judiciary." *Quinn*, 349 U.S. at 161. Thus, courts are deferential to Congress only after they ensure that it is not using investigations to transgress the separation of powers. *See McGrain*, 273 U.S. at 178 (deferring to Congress only after looking at "the subject-matter" of the investigation and determining that legislation rather than law enforcement "was the real object"); *Barenblatt*, 360 U.S. at 152 (stating that courts should defer to Congress "[s]o long as Congress acts in pursuance of its constitutional power" and checking to make sure that "'the primary purposes of the inquiry were in aid of legislative processes'").[3]

**Third**, the Committee implies that this Court cannot investigate whether a congressional subpoena is "pertinent" to its supposed legislative purpose, or narrow a subpoena's scope if it is overbroad. *See* Opp. 17-18, 14. That is wrong too. Pertinency "is a jurisdictional concept … drawn from the nature of a congressional committee's source of authority." *Watkins*, 354 U.S. at 206. It is both a defense to contempt and a ground for proactively enjoining a congressional subpoena. *See Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936) ("[I]f a Senate Committee were to attempt to force a telegraph company to produce telegrams not pertinent to the matters the committee was created to investigate, the company could be restrained at the instance of the sender of the telegrams."); *Bergman*

---

[3] And, like any litigant, the Committee is subject to the ordinary rules of waiver and forfeiture. *See United States v. Bullock*, 632 F.3d 1004, 1014 n.1 (7th Cir. 2011); *Cissell Mfg. Co. v. U.S. Dep't of Labor*, 101 F.3d 1132, 1143 (6th Cir. 1996). It thus would be inappropriate for this Court to invoke potential legislative purposes for the Mazars subpoena that the Committee chose not to brief.

*v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (enjoining a congressional subpoena on overbreadth and pertinency grounds). While Congress does not violate the law every time an investigation turns out to be a dead end, courts must ensure that subpoenas are "reasonably relevant" to their legitimate legislative purpose. *McPhaul*, 364 U.S. at 381-82 (cleaned up). And while courts give Congress some leeway to color outside the lines, they do not hesitate to narrow overbroad subpoenas "to the extent" they exceed the committee's statutory or constitutional authority. *Bergman*, 389 F. Supp. at 1130-31. If courts could not narrow congressional subpoenas, then Congress could easily circumvent the law by bundling a legitimate request with an illegitimate one. That is why "'[t]he burden is on the court to see that the subpoena is good in its entirety.'" *United States v. Patterson*, 206 F.2d 433, 434 (D.C. Cir. 1953).

Applying these principles, the Committee's subpoena to Mazars lacks a legitimate legislative purpose. The Court need look no further than Chairman Cummings' published, contemporaneous justifications to conclude that the subpoena is an unconstitutional attempt to exercise "the powers of law enforcement." *Quinn*, 349 U.S. at 161. In his initial request, Chairman Cummings conceded that he wanted to investigate whether President Trump "inflat[ed] or deflat[ed] the value of assets" and made accurate "representations of his financial affairs"—*i.e.*, whether he broke the law. 3/20/2019 Ltr. from Chairman Cummings to Mazars, bit.ly/2IxEelO. In his memorandum supporting the subpoena, Chairman Cummings flat-out admitted that he wanted to "investigate whether the President may have engaged in illegal conduct before and during his tenure in office" and "review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities."

4/12/2019 Memo. from Chairman Cummings to Committee, politi.co/2PJf5Wg. This is classic law enforcement.[4]

The Committee's opposition tries to recast these flagrantly illegal purposes using the language of legislation. It identifies two types of legislation that supposedly justify the Mazars subpoena: hypothetical legislation that would strengthen the financial-disclosure laws, and actual legislation like H.R. 1 that would constrain the President's finances.[5] *See* Opp. 16-17. Neither category satisfies the "legitimate legislative purpose" standard.

The Committee's first argument—that it can investigate whether Plaintiffs broke the law because, if they did, Congress could pass legislation strengthening the laws that they broke—is plainly insufficient. It would nullify the separation-of-powers principle, rooted in Articles II and III of the Constitution, that Congress cannot use investigations to exercise the "functions of the executive and judicial departments." *Watkins*, 354 U.S. at 187; *accord Quinn*, 349 U.S. at 161. Congress could use this reasoning to justify *any* federal law-enforcement investigation. That is why, "[i]n deciding whether [Congress'] purpose is within the legislative function, the mere assertion of a need to consider

---

[4] Chairman Cummings also said he wanted "to assess whether [President Trump] is complying with the Emoluments Clauses of the Constitution." 4/12/2019 Memo. at 4. But the Committee does not defend that rationale in its brief. Wisely so. The only role that the Constitution gives Congress over emoluments is *approving* them, *see* Art. I, §9—something House Democrats cannot say they will do given their ongoing lawsuit against the President on this issue, *see Blumenthal v. Trump*, No. 17-cv-1154-EGS (D.D.C.). Additionally, the Committee does not want to bring emoluments into this case because it would require the Committee to defend its atextual, ahistorical assumption that emoluments encompass arm's-length commercial transactions. *See generally* James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis of American English from 1760-1799*, 59 So. Texas L. Rev. 181 (2017).

[5] The Committee's opposition also mentions, in passing, new legislation that would govern the "Vice President," the "Executive Office of the President," and "Executive Branch appointees." Opp. 16-17. Because the subpoena to Mazars seeks private financial information about the President and the President alone, it could only be justified by reference to legislation *specific to the President*. The Committee makes no attempt to explain how the President's personal financial records are possibly pertinent to legislation about *other* Executive Branch officials.

'remedial legislation' may not alone justify an investigation accompanied with compulsory process.'"
*Shelton*, 404 F.2d at 1297. That is the case here.

The Committee's reliance on H.R. 1 (and related bills) fares no better. Most obviously, H.R. 1
is a made-for-litigation, post-hoc rationalization for the Mazars subpoena—not an actual legislative
purpose behind it. Chairman Cummings has *never* cited H.R. 1 as a basis for the Mazars subpoena. To
Plaintiffs' knowledge, no other House Democrat has cited it either (and the Committee certainly does
not quote anyone making that connection). Until now, Democrats have not used H.R. 1 to justify the
Mazars subpoena because that justification is so obviously pretextual: H.R. 1 was already drafted
before the Democratic Party took control of the House, was introduced on the first day of the new
Congress, and was passed weeks *before* Chairman Cummings even made his first request to Mazars. *See*
Opp. 5 n.7. The Committee's suggestion that the Republican-controlled Senate might pass H.R. 1 and
send it back to the House before 2020, Opp. 6, stretches the term "legal fiction" past its breaking
point. *See* Mitch McConnell, *Behold the Democrat Politican Protection Act*, Wash. Post (Jan. 17, 2019),
wapo.st/2POmhjK (op-ed from Senate Majority Leader calling H.R. 1 an "outlandish" proposal that
will not pass the Senate). The Committee cites no case suggesting that a subpoena can be justified by
a post-hoc legislative purpose that is crafted by the House's lawyers in litigation, and that contradicts
the legislative purposes that the Chairman actually gave when he issued the subpoena.

More fundamentally, H.R. 1 and similar proposals to regulate the President's finances cannot
provide a legitimate legislative purpose for the Mazars subpoena because they are unconstitutional.
*See Quinn*, 349 U.S. at 161 ("[T]he power to investigate" does not "extend to an area in which Congress
is forbidden to legislate."). H.R. 1 has been dubbed "the most comprehensively unconstitutional bill
in modern American history," and is opposed on constitutional grounds by the ACLU and many other
groups. *See The Democrats' Election-Reform Bill Is an Unconstitutional, Authoritarian Power Grab*, Nat'l Rev.

(Mar. 10, 2019), bit.ly/2O1mtv3; 3/1/2019; Ltr. from ACLU to House Rules Cmte. on H.R. 1, bit.ly/2Tog7w4.

As to the President-specific provisions that the Committee focuses on in its opposition, they are plainly unconstitutional too. There is a reason that conflict-of-interest laws and financial statutes currently exclude the President. The Constitution vests "the executive Power" in the President and entrusts him alone to "take Care that the Laws be faithfully executed." Art. II, §1, cl. 1; *id.* §3. The Constitution also carefully defines the qualifications for President, *id.* §1, cl. 5, and prohibits Congress from changing or adding to them, *see Powell*, 395 U.S. at 522. If Congress enacted H.R. 1 or otherwise tried to regulate the President's finances or conflicts of interest, it would either "disable [the President] from performing some of the functions prescribed by the Constitution" or "establish a qualification for his serving as President (to wit, elimination of financial conflicts) beyond those contained in the Constitution." 9/20/1974 Ltr. from Acting Att'y Gen. Silberman to Chairman Cannon at 4, bit.ly/2DRBoEo. Either outcome would be unconstitutional.

For all these reasons, Congress lacks a legitimate legislative purpose for the Mazars subpoena. Plaintiffs are likely to succeed on the merits, and they have at least raised "serious questions" that warrant full merits briefing and argument.

## B.     Irreparable Harm

Any argument that Plaintiffs will not suffer irreparable harm absent an injunction necessarily contradicts *Eastland. See supra* I. But even setting *Eastland* aside, the harm that Plaintiffs will suffer if Mazars complies with the subpoena before this case is litigated to conclusion is quintessentially irreparable. Mot. 11-12. Instead of squarely confronting Plaintiffs' arguments, the Committee spends most of its cursory response rehearsing the definition of "irreparable." Opp. 24-25. But the Committee does not explain why the harm that Plaintiffs will suffer without a preliminary injunction—disclosure of their confidential financial information to the Committee—is not "'certain'" to occur. Opp. 25.

And instead of explaining why this certain injury is not "'great,'" the Committee argues that it does not "outweigh" or "override" Congress' interest in enforcing subpoenas. Opp. 24-25. Yet Congress' interest is relevant to the balance of equities, not to whether Plaintiffs will suffer irreparable harm.

The Committee has to skip ahead to the balance of the equities because Plaintiffs' claim of irreparable harm is unassailable. Plaintiffs will suffer the very harm that a preliminary injunction is designed to avoid: having the status quo forever altered before the case reaches final judgment. "The purpose of a preliminary injunction," this Court has explained, is "'to preserve the relative positions of the parties *until a trial on the merits can be held*.'" *Bernier v. Obama*, 201 F. Supp. 3d 87, 92 (D.D.C. 2016) (Mehta, J.) (emphasis added) (quoting *Camenisch*, 451 U.S. at 395); *see CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."). Indeed, "the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." Wright & Miller, 11A Fed. Prac. & Proc. Civ. §2947. That will happen here because the Committee is going to enforce the subpoena "seven days after this Court rules on the motion for preliminary injunction," Opp. 24, thus requiring Mazars to divulge Plaintiffs' confidential documents before this Court can render final judgment on the merits. As the Committee itself recognizes, Plaintiffs will be denied "meaningful judicial review of their constitutional claims regarding the subpoena's validity" unless this Court grants a preliminary injunction. Opp. 25.

The Committee's only response is that Plaintiffs' otherwise irreparable harm "has been obviated by the parties' agreement to postpone the return date" until after this Court rules on the preliminary-injunction motion. Opp. 24. But that argument confuses a preliminary injunction under Rule 65(a) with a TRO under Rule 65(b). While "a temporary restraining order is intended to preserve

the status quo only until a preliminary injunction hearing can be held," "a preliminary injunction preserves the status quo *pending a final trial on the merits.*" *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (emphasis added). The Committee's agreement to "postpone the return date" obviated the need for a TRO, but not the need for a preliminary injunction. Movants do not seek preliminary injunctions so they can freeze the statute quo while they litigate preliminary injunctions. Respectfully, that makes no sense.

But even absent these case-mooting effects, Plaintiffs would still suffer irreparable harm once the Committee enforces the subpoena against Mazars. Contrary to the Committee's attempt to downplay it, Plaintiffs' harm is not a "contractually based interest in the confidentiality of documents in Mazars's possession." Opp. 25. It is the *disclosure* of confidential financial information to Congress. This Court has "recognized that the disclosure of confidential information is, by its very nature, irreparable 'because such information, once disclosed, loses its confidential nature.'" *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) (Mehta, J.); *see Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (Mehta, J.) (same); *Airbnb*, 2019 WL 91990, at *23 (same); Mot. 11-12 (collecting cases). That is why the Committee cannot point to a single case holding that the disclosure of confidential information is *not* irreparable.

In sum, Plaintiffs' have established irreparable harm three times over. Enforcement of the subpoena is "decisive" irreparable harm under *Eastland*, it will permanently alter the status quo before final judgment, and it will lead to the disclosure of confidential financial information. This factor strongly favors a preliminary injunction.

## C.     Balance of the Equities

Any argument that the balance of equities does not favor Plaintiffs cannot be reconciled with *Eastland*. The D.C. Circuit's balancing there is controlling here, and the facts of this case demonstrate why. As explained, without a preliminary injunction, Plaintiffs will forever lose the opportunity to

litigate to final judgment because their confidential documents will be disclosed to the Committee. But if a preliminary injunction is granted, the Committee will merely have to wait until the Court adjudicates the merits and issues a judgment in its favor to enforce the subpoena and to obtain Plaintiffs' documents. (Or the Committee will lose on the merits, which means it was never entitled to the documents in the first place.) This is not a close call. Mot. 12-13.

The Committee's counterarguments are unpersuasive. The Committee argues that "countless entities … routinely" comply with various types of subpoenas, Opp. 26, but that begs the question. The fact that subpoenas are routinely enforced offers no insight into the balance of equities *here*. The Committee next claims that "prompt compliance with its subpoena is" an interest "of the highest order." Opp. 26. But nonmovants always argue that they need confidential information immediately, and courts always hold that the movant's right to be heard dwarfs the minor inconvenience of receiving the information later. Mot. 13. As for the Committee's interests in maintaining its "institutional" right to enforce subpoenas and in avoiding a "loss of information," Opp. 26, these arguments have nothing to do with the balance of equities. The balance of equities turns not on which party will win in the end, but on which party will be harmed more by failing to preserve the status quo until final judgment. The Committee's interests in enforcing subpoenas and obtaining information will be fully vindicated (or not) at final judgment; whether Plaintiffs received a preliminary injunction will have nothing to do with it.

The closest the Committee comes to offering a responsive argument is its assertion that Plaintiffs' documents are a "key part" of an investigation of "immense national importance." Opp. 27. Yet the Committee never explains why that is so. Unsubstantiated assertions of need do not outweigh Plaintiffs' verified showing of irreparable harm. Nor is there an obvious need for urgency: H.R. 1 has already passed the House, the subpoena mostly seeks documents about events that occurred many years ago, the Committee waited several months into the 116th Congress before issuing the subpoena,

and the Committee already agreed to delay enforcement until this Court rules on the motion for preliminary injunction. Thus, the Committee's assertion that "its interest … would be harmed by *any* injunctive relief in this case" cannot be taken seriously. Opp. 27 (emphasis added).

Further, when balancing the equities, the Court should consider the Committee's conduct in this litigation. Instead of subpoenaing Plaintiffs directly, the Committee subpoenaed Mazars, a neutral third-party custodian, to divulge their information. The strategy, of course, was to get the documents without giving Plaintiffs an opportunity for judicial review. Plaintiffs had to file this lawsuit and seek emergency interim relief to safeguard their rights. Now that they have, the Committee could have moved to expedite merits review if it was genuinely concerned with getting Plaintiffs' information as fast as possible. That it did not do so is telling. It either betrays the Committee's unsubstantiated claim of national importance or confirms that the Committee is banking on securing these documents before Plaintiffs can obtain judicial review on the merits.

The truth of the matter is that the Committee rejects the idea of *any* court preliminarily enjoining *any* subpoena in *any* case for *any* reason. According to the Committee, delaying enforcement of the subpoena until the Court can resolve its legality is "an improper usurpation of the House's constitutional power to investigate and conduct oversight" and would wrongly allow "an outside entity … to micromanage the Committee's investigations or dictate what is or is not urgent." Opp. 26-27. That view is misguided and comes perilously close to claiming that Congress is immune from judicial review. In other words, the Committee does not believe—and is not really arguing—that the equities tip in its favor. The Committee believes that its subpoena power overrides Rule 65, and that even the most irreparable injury must yield to Congress' "interest in obtaining information relevant to its investigations." Opp. 27. There is no legal support for that proposition.

Finally, Defendant Mazars would also benefit from interim relief, which further justifies granting Plaintiffs' motion. As explained, Mazars faces legal jeopardy if it complies with the

Committee's subpoena and then this Court (or an appellate court) later holds that the subpoena was invalid. Mot. 7-8. Notably, the Committee does not even address this important issue. But this Court cannot ignore it. Congress has no power and thus no interest in forcing a third-party custodian to comply with a subpoena before its validity is litigated. *See Deloitte*, 610 F.3d at 142. Granting the preliminary injunction ensures that Mazars may "await a court ruling on [Plaintiffs'] challenge" to the Committee's subpoena before complying. *United States v. AT&T Co.*, 567 F.2d 121, 129 (D.C. Cir. 1977). Congress' interests thus pale in comparison to the harms that both Plaintiffs and Mazars will suffer absent interim relief. This tips the balance decisively in favor of a preliminary injunction.

### D.      Public Interest

Because the Committee is a governmental defendant, the balance of equities and public interest largely merge in this case. Mot. 12. The public interest thus favors granting the motion for the reasons already identified. To be sure, there is a public interest in the enforcement of valid subpoenas. Opp. 27. But that is not nearly as powerful as the public interests in ensuring that Congress follows the Constitution and in protecting the confidentiality of Plaintiffs' information.

"Applying the law in a way that violates the Constitution is *never* in the public's interest." *Minney v. U.S. Office of Personnel Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015); *see Nat'l Treasury Employees Union*, 838 F. Supp. at 640 ("[T]he public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (same). This case is no exception. No public interest is advanced by allowing the Committee to enforce an unconstitutional subpoena. If anything, ensuring that the Committee follows the Constitution is especially important given the serious separation-of-powers issues that this particular subpoena raises.

"The public," moreover, "has an interest in enforcing contractual agreements and ensuring the confidentiality of a private business's information." *Robert Half*, 315 F. Supp. 3d at 435; *see Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (Mehta, J.) ("Granting the preliminary injunction clearly is in the public interest. The public … has a powerful interest in maintaining the privacy of [confidential] information."); *Saini v. Intern. Game Technology*, 434 F. Supp. 2d 913, 925 (D. Nev. 2006) ("[T]here is a public interest in enforcing confidentiality agreements."). This subpoena seeks confidential financial information protected by law. No public interest is served by disclosing it to the Committee during the pendency of this action.

By contrast, any harm to the public interest from delaying Congress' receipt of the information is negligible. The Committee may believe that there is a "public interest in expeditious and unimpeded Congressional investigations," Opp. 27, but this Court disagrees. "Although … the public has an interest in ensuring that the [government] can exercise its authority," this Court has reasoned, "Defendants offer no persuasive argument that there is an immediate public interest in enforcing … [now] rather than after a full hearing." *Cigar Ass'n*, 317 F. Supp. 3d at 563. So too here. The public interest will not be disserved if the Committee must wait to enforce its subpoena until after a full hearing on whether that subpoena was validly issued.

## CONCLUSION

Plaintiffs respectfully ask this Court to enter a preliminary injunction prohibiting Defendants from enforcing or complying with the subpoena until the Court issues a final judgment.

Respectfully submitted,

Dated: May 8, 2019                          _s/ William S. Consovoy_____

Stefan C. Passantino (D.C. Bar #480037)     William S. Consovoy (D.C. Bar #493423)
MICHAEL BEST & FRIEDRICH LLP                Cameron T. Norris
1000 Maine Ave. SW, Ste. 400               CONSOVOY MCCARTHY PARK PLLC
Washington, D.C. 20024                      3033 Wilson Blvd., Ste. 700
(202) 747-9582                              Arlington, VA 22201
spassantino@michaelbest.com                 (703) 243-9423
                                            will@consovoymccarthy.com
*Counsel for The Trump Organization, Inc., Trump*   cam@consovoymccarthy.com
*Organization LLC, The Trump Corporation, DJT*
*Holdings LLC, The Donald J. Trump Revocable*   Patrick Strawbridge
*Trust, and Trump Old Post Office LLC*          CONSOVOY MCCARTHY PARK PLLC
                                            Ten Post Office Square
                                            8th Floor South PMB #706
                                            Boston, MA 02109
                                            patrick@consovoymccarthy.com

                                            *Counsel for President Donald J. Trump*