## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE          Civil Action No. 1:19-cv-01136-APM
TRUST; and TRUMP OLD POST OFFICE
LLC,

                        Plaintiffs,


v.


MAZARS USA LLP,

                        Defendant,

and

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

              Intervenor-Defendant.

### SUPPLEMENTAL DECLARATION OF WILLIAM S. CONSOVOY

1.      I am an attorney at the law firm Consovoy McCarthy Park PLLC and counsel for

plaintiff President Donald J. Trump in his personal capacity.

2.      I am over the age of eighteen and under no mental disability or impairment. I have

personal knowledge of the following facts and, if called as a witness, would competently testify to

them.

3.      Exhibit A to this supplemental declaration is a true and accurate copy of a March 20,

2019 letter from Chairman Elijah E. Cummings to the Chairman and CEO of Defendant Mazars. As

of today, it can be downloaded from the House Committee on Oversight and Reform's website at

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-03-

20.EEC%20to%20Wahba-Mazars.pdf.

4.      Exhibit B is a true and accurate copy of a March 27, 2019 letter from Ranking Members Jim Jordan and Mark Meadows to Chairman Cummings. As of today, it can be downloaded from the House Committee on Oversight and Reform's Minority page at https://republicans-oversight.house.gov/wp-content/uploads/2019/03/2019-03-27-JDJ-MM-to-EEC-re-Mazars-Letter.pdf.

5.      Exhibit C is a true and accurate copy of an April 12, 2019 memorandum from Chairman Cummings to the Committee. As of today, a copy of the memorandum can be found online at https://www.politico.com/f/?id=0000016a-131f-da8e-adfa-3b5f319d0001.

6.      Exhibit D is a true and accurate copy of an April 15, 2019 cover letter and memorandum from Ranking Member Jordan to Chairman Cummings. As of today, it can be downloaded from the Committee's Minority page at https://republicans-oversight.house.gov/wp-content/uploads/2019/04/2019-04-15-JDJ-to-EEC-re-Mazars-Subpoena.pdf.

7.      Exhibit E is a true and accurate copy of an April 17, 2019 letter from Ranking Member Jordan to Chairman Cummings. As of today, it can be downloaded from the Committee's Minority page at https://republicans-oversight.house.gov/wp-content/uploads/2019/04/2019-04-17-JDJ-to-EEC-re-Mazars-subpoena.pdf.

8.      Exhibit F is an Axios article from November 12, 2018 titled "Democrats Load a 'Subpoena Cannon' with 85+ Trump Targets." As of today, it can be downloaded from Axios' website at https://www.axios.com/house-democrats-subpoenas-trump-administration-cf3ed351-ff11-4498-89f4-cee588145198.html.

9.      Exhibit G is a Vox article from January 3, 2019 titled "The 10 New Democratic House Committee Chairs Who Are About to Make Trump's Life Hell." As of today, it can be downloaded from Vox's website at https://www.vox.com/2019/1/3/18134919/congress-house-2019-committee-investigations-trump-impeachment.

10.     Exhibit H is a Politico article from January 7, 2019 titled "House Democrats Prepare a Fusillade of Trump Investigations." As of today, it can be downloaded from Politico's website at https://www.politico.com/story/2019/01/07/congress-house-democrats-trump-subpoenas-oversight-1082563.

11.     Exhibit I is a Washington Post article from March 28, 2019 titled "How Donald Trump Inflated His Net Worth the Lenders and Investors." As of today, it can be downloaded from the Washington Post's website at https://www.washingtonpost.com/graphics/2019/politics/trump-statements-of-financial-condition/?noredirect=on&utm_term=.384ed21f1a81.

12.     Exhibit J is a Politico article from May 1, 2019 titled "Democrats Weigh a 'Benghazi Trump' Strategy." As of today, it can be downloaded from Politico's website at https://www.politico.com/story/2019/05/01/democrats-hearings-impeachment-trump-benghazi-1295266.


Per 28 U.S.C. §1746, I declare under penalty of perjury that the above is true and correct to the best of my knowledge.


Executed on May 13, 2019.

_s/ William S. Consovoy_

# Exhibit A

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6143

Majority  (202) 225-5051
Minority  (202) 225-5074

http://oversight.house.gov

March 20, 2019

Mr. Victor Wahba
Chairman and Chief Executive Officer
Mazars USA LLP
135 West 50th Street
New York, N.Y.  10020

Dear Mr. Wahba:

The Committee is requesting documents related to services provided by your firm or its predecessor, WeiserMazars LLP, to Donald J. Trump and the Trump Organization.

On February 27, 2019, the President's former attorney, Michael Cohen, testified before the Committee that President Trump changed the estimated value of his assets and liabilities on financial statements prepared by your company—including inflating or deflating the value of assets depending on the purpose for which he intended to use the statements.

For instance, Mr. Cohen testified that President Trump provided inflated financial statements "to Deutsche Bank on one occasion where I was with them in our attempt to obtain money so that we can put a bid on the Buffalo Bills." Mr. Cohen also testified that the President provided financial statements with inflated assets to an insurance company.  Mr. Cohen further testified that President Trump may have deflated certain assets to "reduce his real estate taxes." He explained:  "What you do is you deflate the value of the asset, and then you put in a request to the tax department for a deduction."[1]

Mr. Cohen produced to the Committee financial statements from 2011, 2012, and 2013 that raise questions about the President's representations of his financial affairs on these forms and on other disclosures, particularly relating to the President's debts.  Several of these documents appear to have been signed by your firm.  However, they also included the following note:

The objective of a compilation is to assist Donald J. Trump in presenting financial information in the form of financial statements without undertaking to obtain or provide

---

[1] Committee on Oversight and Reform, *Hearing with Michael Cohen, Former Attorney to President Trump* (Feb. 27, 2019).

Mr. Victor Wahba
Page 2

any assurance that there are no material modifications that should be made to the financial statement.[2]

Some of the specific concerns raised by the financial statements include the following:

- Net Worth. In a nine-month period between June 30, 2012, and March 31, 2013, the value of the President's assets appears to have skyrocketed by $4.2 billion. The bulk of this increase—$4 billion—is attributable to a single line item for "Brand Value" that was absent in the President's financial statements for 2011 or 2012. It is unclear how this item was valued, why it was included in 2013 but not in prior years, and whether the President or someone else directed your firm to insert it.

- Omission of Chicago and Las Vegas Real Estate Assets and Liabilities. The 2012 Statement of Financial Condition prepared by your firm states:

  > The accompanying statement of financial condition does not include the following for Trump International Hotel & Tower Chicago and Trump International Hotel & Tower Las Vegas: 1) real property and related assets, 2) mortgages and loans payable, and 3) guarantees which Donald J. Trump may have provided.

  According to the first publicly filed financial disclosure made by then-Candidate Trump in 2015, President Trump incurred more than $75 million in debt connected to the Chicago property in 2012. According to the same financial disclosure, the President also valued assets connected to his Las Vegas holdings at more than $50 million.[3] It is unclear why certain debts connected to the Chicago property and assets related to the Las Vegas property were omitted and whether the omission was directed by President Trump or someone else.

- Valuation of "Real Estate Licensing Developments." Under a section entitled "Real Estate Licensing Developments," the 2011 financial statement states:

  > [T]his financial statement does not reflect the value of Donald J. Trump's worldwide reputation, except to the extent it has become associated with properties either operative or under development. ... The goodwill attached to the Trump name has proven financial value in that potential users of real property around the world have demonstrated willingness to pay a significant premium for ownership or use of a Trump related residence. ... Mr. Trump has formed numerous associations with others

---

[2] *See, e.g.,* WeiserMazars LLP, Donald J. Trump: Statement of Financial Condition (June 30, 2011) (on file with Committee).

[3] Office of Government Ethics, *OGE Form 278e for Donald J. Trump* (July 15, 2015) (online at www.documentcloud.org/documents/3035802-Donald-Trump-2015-Financial-Disclosure.html).

Mr. Victor Wahba
Page 3

for the purpose of developing properties and is currently negotiating with others. The estimated current value of $110,000,000 was based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals.

The 2012 financial statement includes the same note under "Real Estate Licensing Developments," but the "estimated current value" for the line item that year was $85,000,000.

- Other Liabilities. Also under the "Real Estate Licensing Developments" section, both the 2011 and 2012 financial statements state:

    Mr. Trump has pledged $19,760,000 of the fees derived on certain of these agreements to his former partner in the Trump World Tower at United Nations Plaza. This debt is reflected in this financial statement as a liability under the caption "Mortgages and loans payable secured by other assets."

According to contemporaneous reports during construction of Trump World Tower, the President's former partner was the Korean conglomerate Daewoo, which was dissolved following a widespread corruption investigation, as well as Deutsche Bank and another German financial institution.[4] It is unclear to whom President Trump owed this debt and whether he still owes it.

- Interest Rate from Deutsche Bank Reduced. According to the 2012 Statement of Financial Condition, President Trump obtained a $125 million loan from Deutsche Bank for the Trump National Doral at the rate of either the London Interbank Offered Rate (LIBOR) plus 2.25% or prime minus 0.50%. However, in the President's 2015 public financial disclosure—filed shortly after he became a federal candidate for office—the interest rate for the loans was listed at reduced rates: LIBOR plus 1.75% or prime minus 0.75%. Under the LIBOR formula, the reduction represents about $625,000 less in interest payments on the full principal owed by President Trump per year.

- Non-Interest-Bearing Membership Deposits. The 2011 and 2012 financial statements indicate that President Trump received significant membership deposits at his golf clubs that do not accrue interest but require repayment thirty years after receipt if the member resigns or certain terms are met. These deposits totaled $188 million in 2011 and $157 million in 2012. For several of the clubs, the statements explain: "The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero."

---

[4] *Trump Starts a New Tower Near the U.N.*, New York Times (Oct. 16, 1998) (online at www.nytimes.com/1998/10/16/nyregion/trump-starts-a-new-tower-near-the-un.html).

Mr. Victor Wahba
Page 4

To assist our review of these issues, please provide the following documents and information to the Committee by April 3, 2019:

With respect to Donald J. Trump, Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, the Trump Old Post Office LLC, the Trump Foundation, and any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing:

1.  All statements of financial condition, annual statements, periodic financial reports and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

2.  Without regard to time, all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the items described in Request Number 1;

3.  All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of items described in Request Number 1, or any summaries of such documents and records relied upon, or any requests for such documents and records; and

4.  All memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the items described in Request Number 1, including, but not limited to:

    a.  all communications between Donald Bender and Donald J. Trump or any employee or representative of the Trump Organization; and

    b.  all communications related to potential concerns that records, documents, explanations, or other information, including significant judgments, provided by Donald J. Trump or other individuals from the Trump Organization, were incomplete, inaccurate, or otherwise unsatisfactory.

Unless otherwise noted, the time period covered by this request is from January 1, 2009, to the present.

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X. In addition, House Rule X, clause 3(i) specifically charges the Committee with conducting oversight of "the operation of Government activities at all levels, including the Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the Committee's request. If you have any questions regarding this request, please contact Committee staff at (202) 225-5051.

Mr. Victor Wahba
Page 5

      Thank you for your prompt attention to this request.

             Sincerely,

             Elijah E. Cummings
             Chairman

Enclosure

cc:    The Honorable Jim Jordan, Ranking Member

## **Responding to Oversight Committee Document Requests**

1.   In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.   Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee.

3.   In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.   The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5.   Documents produced in electronic format should be organized, identified, and indexed electronically.

6.   Electronic document productions should be prepared according to the following standards:

   a.   The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

   b.   Document numbers in the load file should match document Bates numbers and TIF file names.

   c.   If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   d.   All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7.      Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8.      Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9.      When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

10.     The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11.     The pendency of or potential for litigation shall not be a basis to withhold any information.

12.     In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13.     Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14.     If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

15.     In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document:  (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16.     If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17.     If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

18.    This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19.    All documents shall be Bates-stamped sequentially and produced sequentially.

20.    Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff.  When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building.

21.    Upon completion of the production, submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.    The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases,  electronic

message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3.   The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope.   The singular includes plural number, and vice versa.  The masculine includes the feminine and neutral genders.

4.   The term "including" shall be construed broadly to mean "including, but not limited to."

5.   The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments,  branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.   The term "identify," when used in a question about individuals, means to provide the following information:  (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.   The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.   The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.   The term "individual" means all natural persons and all persons or entities acting on their behalf.

# Exhibit B

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225-5051
MINORITY   (202) 225-5074
http://oversight.house.gov

March 27, 2019

The Honorable Elijah E. Cummings
Chairman
2157 Rayburn House Office Building
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

We are in receipt of a letter dated March 20, 2019, from you to Mr. Victor Wahba of Mazars USA LLP, a global tax and accountancy firm, seeking documents relating to the finances of the President of the United States years before he entered office.[1] Your inquiry seems to examine facts relating to a transaction that never materialized involving the Buffalo Bills of the National Football League. Your letter cites testimony and material from Michael Cohen, a convicted perjurer who was your first announced witness of the 116th Congress, to request wide-ranging information about the President Trump's financial documents from six to eight years ago—well before the President was even a candidate for the presidency.

Under House Rule X, you have broad latitude to investigate "any matter at any time."[2] However, we rely on you to exercise your authority as Chairman with good judgment so that the Committee's work focuses on improving the overall economy, efficiency and effectiveness of the federal government or bettering the lives of the American people.

Your inquiry to Mr. Wahba about the private finances of citizen Donald J. Trump appears to depart from responsible and legitimate oversight. It appears instead that you seek material from Mr. Wahba solely to embarrass President Trump and to advance the relentless Democrat attacks upon the Trump Administration.

Mr. Chairman, our time is short. We should not waste our limited resources and energies on matters that do not improve the operations of the federal government or better the lives of our constituents. We urge you to reconsider your ill-conceived inquiry into the finances of President Trump when he was a private citizen.

The American people sent us here to make government work better for them. The 116th Congress is still young. There is still time to pivot away from your repeated partisan attacks on

---

[1] Letter from Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform, to Victor Wahba, Chairman and Chief Exec. Off., Mazars USA LLP (Mar. 20, 2019).
[2] House Rule X, clause 1(n).

The Honorable Elijah E. Cummings
March 27, 2019
Page 2

the President and his Administration, and instead focus on improving the operations of the
federal government for the American people.

Sincerely,

Jim Jordan
Ranking Member

Mark Meadows
Ranking Member
Subcommittee on Government Operations

# Exhibit C

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
MINORITY  (202) 225–5074
http://oversight.house.gov

**MEMORANDUM**

**April 12, 2019**

**To:**     **Members of the Committee on Oversight and Reform**

**Fr:**     **Chairman Elijah E. Cummings**

**Re:**     **Notice of Intent to Issue Subpoena to Mazars USA LLP**

This memorandum provides Committee Members with notice of my intent to issue a subpoena to Mazars USA LLP for documents the company has informed the Committee it cannot produce without a subpoena. Consistent with the bipartisan agreement reached at the Committee's organizational meeting on January 29, 2019, I am attaching a copy of the subpoena and providing 48 hours for Members to convey their views. Also consistent with the agreement, I am informing Committee Members that we will not have a business meeting to consider this subpoena. We will be in recess for the next several weeks, and the calendar does not permit scheduling a mark-up without causing undue delay to the investigation. Nevertheless, I am seeking feedback through a poll of individual Member offices, which are requested to provide any information they would like to be considered on their positions with respect to this subpoena.

## I.    NEED FOR SUBPOENA

On February 27, 2019, President Trump's longtime former attorney, Michael Cohen, testified before the Committee that the President altered the estimated value of his assets and liabilities on financial statements—including inflating or deflating the value of assets depending on the purpose for which he intended to use the statements.[1]

Recent news reports have raised additional concerns regarding the President's financial statements and representations.[2]

---

[1] Committee on Oversight and Reform, *Hearing with Michael Cohen, Former Attorney to President Donald Trump* (Feb. 27, 2019) (online at https://oversight.house.gov/legislation/hearings/with-michael-cohen-former-attorney-to-president-donald-trump).

[2] *Trump's Alleged Financial Fraud Creates an Important New Vulnerability*, MSNBC (Mar. 1, 2019) (online at www.msnbc.com/rachel-maddow-show/trumps-alleged-financial-fraud-creates-important-new-vulnerability); *How Donald Trump Inflated His Net Worth to Lenders and Investors*, Washington Post (Mar. 28, 2019) (online at www.washingtonpost.com/graphics/2019/politics/trump-statements-of-financial-condition/).

To corroborate these claims, Mr. Cohen produced to the Committee financial statements from 2011, 2012, and 2013, that raise serious questions about the President's representations, particularly relating to his debts.  Several statements were prepared by Mazars.

On March 20, 2019, the Committee sent a letter to Mazars requesting information on how these financial statements and other financial disclosures were prepared, including the financial statements themselves and communications relating to their preparation.[3]

On March 27, 2019, counsel to Mazars sent a response letter explaining that, pursuant to the company's legal obligations, Mazars cannot voluntarily turn over the documents "unless disclosure is made pursuant to, among other things, a Congressional subpoena."[4]

## II.     INTENT TO SEEK VIEWS OF MEMBERS

Based on this clear-cut record, I intend to issue a subpoena on Monday to obtain the documents sought by the Committee, and I intend to do so consistent with the bipartisan agreement reached during the Committee's organizational meeting on January 29, 2019.

According to that agreement, a subpoena "should be used only when attempts to reach an accommodation with a witness have reached an impasse or when necessary to obtain certain sensitive information, such as financial information, or through a so-called 'friendly' subpoena to protect a witness."  That condition has been met.

The agreement also states:  "The Chair intends to consult with the Ranking Member by providing his office with a physical copy of the subpoena at least two days (48 hours) before it is issued."  This condition will be met by Monday.

The agreement also states:  "when the Ranking Member objects, the Committee will have an open proceeding and a vote when feasible."  It also states that "[t]here will be exceptions to this policy," such as when "the calendar does not permit the Committee to schedule a markup." It also states:  "But even in this case, the Chair intends to be open with the Ranking Member and give him every opportunity to voice his opinion on the matter."

Consistent with this condition, I am providing this memorandum to all Members with background on the subpoena, and I encourage the Ranking Member and all other Committee Members to inform my office of their views and positions on this subpoena.  This is a courtesy I was never extended in the previous eight years during which I served as Ranking Member.

---

[3] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Victor Wahba, Chairman and Chief Executive Officer, Mazars USA LLP (Mar. 20, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-03-20.EEC%20to%20Wahba-Mazars.pdf).

[4] Letter form Jerry D. Bernstein, Counsel for Mazars USA LLP, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Mar. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Mazars%20response%20letter%20 03-27-2019_Redacted.pdf).

## III.   THE RANKING MEMBER'S UNPRECEDENTED ACTIONS

Finally, I want to address troubling actions taken by Ranking Member Jordan relating to this and other Committee investigations.  On March 27, 2019, Ranking Member Jordan sent a letter directly to Mazars—a custodian of records being sought by the Committee—as part of an effort to urge the company not to comply with the Committee's legitimate request or cooperate with the Committee's duly authorized investigation.[5]

It is not an understatement to call the Ranking Member's action unprecedented.  In my entire tenure in Congress, regardless of how much I and my Democratic colleagues may have disagreed with the Committee's actions, I never would have publicly encouraged noncompliance by a custodian of records.  Obviously, such actions undermine the authority of the Committee and impair its investigations.

In his letter to Mazars, Ranking Member Jordan wrote:  "We write to express to you our concerns with the Chairman's inquiry as exceeding the Committee's legislative authority under House Rule X."  He also wrote:  "his inquiry does not appear to have a valid legislative purpose and instead seems to seek information to embarrass a private individual."

However, the Ranking Member's letter to Mazars omitted the fact—cited repeatedly by Republican Chairmen—that under House Rule X, the Committee has broad latitude to investigate "any matter at any time."  His letter also omitted the fact that documents already obtained by the Committee—on their face—raise grave questions about whether the President has been accurate in his financial reporting.

The Ranking Member's letter also omitted multiple instances in which Republicans investigated the finances of "private individuals."  For example, Ranking Member Jordan personally attended the deposition of Sidney Blumenthal as part of the Benghazi investigation, during which Mr. Blumenthal was forced to answer questions about his salary and compensation from private sources—topics that had nothing to do with the attacks in Benghazi.[6]

Unfortunately, the Ranking Member's letter to Mazars is not an isolated incident.  He has written similarly troubling—and baseless—letters to recipients of other legitimate Committee requests, including on skyrocketing drug prices and agency compliance with the Freedom of Information Act.

---

[5] Letter from Ranking Member Jim Jordan, Committee on Oversight and Reform, and Ranking Member Mark Meadows, Subcommittee on Government Operations, to Victor Wahba, Chairman and Chief Executive Officer, Mazars USA LLP (Mar. 27, 2019) (online at https://republicans-oversight.house.gov/wp-content/uploads/2019/03/2019-03-27-JDJ-MM-to-Wahba-Mazars-re-EEC-Letter-to-Mazars.pdf).

[6] Select Committee on Benghazi, *Interview of Witnesses, Volume 4 of 11, Deposition of Sidney Blumenthal*, 114th Cong. (June 16, 2015) (online at www.govinfo.gov/content/pkg/CHRG-114hhrg22298/pdf/CHRG-114hhrg22298.pdf).

## IV.   CONCLUSION

The Committee has full authority to investigate whether the President may have engaged in illegal conduct before and during his tenure in office, to determine whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions, to assess whether he is complying with the Emoluments Clauses of the Constitution, and to review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities.  The Committee's interest in these matters informs its review of multiple laws and legislative proposals under our jurisdiction, and to suggest otherwise is both inaccurate and contrary to the core mission of the Committee to serve as an independent check on the Executive Branch.

Members who wish to provide information relating to their views on this subpoena may email them by 11 a.m. on Monday, April 15, 2019, to the Clerk's office.

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* _Mazars USA LLP_____

You are hereby commanded to be and appear before the

Committee on Oversight and Reform _____ ▾

_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 2157 Rayburn House Office Building, Washington DC 20515 _____
>
> Date: April 29, 2019 _____.                    Time: 12:00 (noon) _____

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____              Time: _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____              Time: _____

*To* any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this _____ day of _____, 20___.

_____

*Chairman or Authorized Member*

Attest:

_____

*Clerk*

## SCHEDULE A

With respect to Donald J. Trump, Donald J. Trump Revocable Trust, the Trump
Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings
LLC, the Trump Old Post Office LLC, the Trump Foundation, and any parent, subsidiary,
affiliate, joint venture, predecessor, or successor of the foregoing:

1.  All statements of financial condition, annual statements, periodic financial
    reports, and independent auditors' reports prepared, compiled, reviewed, or
    audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

2.  Without regard to time, all engagement agreements or contracts related to the
    preparation, compilation, review, or auditing of the documents described in Item
    Number 1;

3.  All underlying, supporting, or source documents and records used in the
    preparation, compilation, review, or auditing of documents described in Item
    Number 1, or any summaries of such documents and records relied upon, or any
    requests for such documents and records; and

4.  All memoranda, notes, and communications related to the preparation,
    compilation, review, or auditing of the documents described in Item Number 1,
    including, but not limited to:

    a.  all communications between Donald Bender and Donald J. Trump or any
        employee or representative of the Trump Organization; and

    b.  all communications related to potential concerns that records, documents,
        explanations, or other information, including significant judgments,
        provided by Donald J. Trump or other individuals from the Trump
        Organization, were incomplete, inaccurate, or otherwise unsatisfactory.

Unless otherwise noted, the time period covered by this subpoena includes calendar years
2011 through 2018.

# Exhibit D

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225-5051
MINORITY  (202) 225-5074

http://oversight.house.gov

April 15, 2019

The Honorable Elijah E. Cummings
Chairman
Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, DC 20515

Dear Mr. Chairman:

On behalf of the Republican Members of the Committee, I write to strenuously object to the subpoena you intend to issue to Mazars USA LLP (Mazars). As explained in the attached memorandum, your intended action is an unprecedented abuse of the Committee's subpoena authority to target and expose the private financial information of the President of the United States. Your intended action is also a blatant violation of your promise to debate and vote on Committee subpoenas. Although there were nine legislative days following your receipt of Mazars's response letter—during which time you informed the media that you intended to subpoena Mazars—you purposefully waited for Members to return to their districts for the Easter district work period before moving forward to subpoena Mazars. This is not the fair and responsible oversight process you promised.

I urge you to seriously reconsider your intention to issue this subpoena. Your obsession with attacking the President and his family for political gain does nothing to improve the efficiency, economy, and operations of the federal government.

Sincerely,

Jim Jordan
Ranking Member

Enclosure

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225-5051
MINORITY  (202) 225-5074
http://oversight.house.gov

April 15, 2019

**MEMORANDUM**

**TO:**              Members of the Committee on Oversight and Reform

**FROM:**        Ranking Member Jim Jordan

**SUBJECT:**    Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP

---

On Friday, April 12, 2019, at 3:46 p.m., Chairman Elijah Cummings notified the Members of the Committee that he intends to issue a subpoena to Mazars USA LLP (Mazars), the global accounting firm that served private citizen Donald J. Trump.[1] This subpoena is a grave abuse of the Committee's authority and a violation of the Chairman's pledge to the Committee. Although the Rules of the House of Representatives grant Chairman Cummings broad oversight authority,[2] we rely on the Chairman to use it responsibly. The Chairman's decision to subpoena Mazars is not a responsible use of the Committee's oversight authority. It is also an unfortunate departure from the public promises that Chairman Cummings made just 76 days ago.

For these reasons, I reluctantly write to inform the Members of the Committee why I strongly object to Chairman Cummings's unprecedented subpoena to Mazars and his irresponsible and gravely dangerous course of conduct in a singular obsession of attacking President Trump and his family for political gain.

## I.    Chairman Cummings's Partisan Request for Sensitive, Personal Financial Information Is Derived Solely from Convicted Liar Michael Cohen.

On March 20, 2019, Chairman Cummings wrote to Mazars, seeking four broad categories of documents relating to the finances of eight business entities related to President Trump before he sought public office.[3] Chairman Cummings requested material from as early as January 1, 2009—years before President Trump was even a candidate for federal office.[4] The Chairman did

---

[1] Memorandum from Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform (Apr. 12, 2019) (on file with Committee).

[2] House Rule X.

[3] Letter from Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform, to Victor Wahba, Chairman and Chief Exec. Off., Mazars USA LLP (Mar. 20, 2019).

[4] *Id.*

1

Memorandum for Members of the Committee on Oversight and Reform
Re: Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP
April 15, 2019

not consult with the Republican Members of the Committee before initiating his inquiry, nor has he attempted to explain why his probe has any legitimacy.

The Chairman's March 20 letter and his April 12 memorandum cite testimony and material from Michael Cohen as justification for prying into the personal finances of President Trump.[5]  Cohen—Chairman Cummings's first announced witness of the 116th Congress—is a convicted liar and not a credible witness. Cohen's testimony was conceived and presented by Democrat political operative Lanny J. Davis, who boasted that he convinced the Chairman after some time to use the Committee for Cohen's attacks against the President. In fact, Davis recently wrote the Chairman seeking a letter of recommendation to keep Cohen out of jail. Chairman Cummings has said he is still considering Davis's request to help this convicted liar.[6]

At the February 27, 2019, Committee hearing, Cohen repeatedly lied to the Committee, perjuring himself at least seven additional times. Rather than using Cohen's false and misleading testimony as a basis for a broad fishing expedition into the President's personal finances, the Chairman should be referring Cohen to the Justice Department for lying to our Committee.

Chairman Cummings also misrepresented Mazars's response letter, dated March 27, 2019.[7] Although the Chairman represented in his memorandum—and to the media[8]—that Mazars sought a "friendly" subpoena, they did not. In actuality, attorneys for Mazars informed the Chairman that the "Mazars is unable to produce documents in response to the [r]equest" due to a number of federal and state laws.[9] Mazars never indicated that it sought a subpoena for this material.

## II.   Chairman Cummings's Partisan Request for Sensitive, Personal Financial Information Violates His Promises to the Committee.

Twelve days ago, on April 3, 2019, Chairman Cummings, in a free-wheeling press availability, announced to the media that he was preparing a subpoena to Mazars for this sensitive, personal information about President Trump's finances.[10] Instead of noticing a business meeting during the week of April 8 for the Committee to consider and debate this subpoena—when there was room in the Committee's calendar—he waited and waited until just after Members had left for the two-week Easter district work period to announce his intention to subpoena Mazars. This action violates the Chairman's promise to the Committee at our organization meeting.

---

[5] Memorandum from Elijah E. Cummings, *supra* note 1; Letter from Elijah E. Cummings, *supra* note 3.

[6] Tweet by Manu Raju, CNN (Apr. 9, 2019, 11:58 a.m.), https://twitter.com/mkraju/status/1115690562303094784?s=11.

[7] Letter from Jerry D. Bernstein, BlankRome, to Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform (Mar. 27, 2019).

[8] Chairman Cummings told the media: "The accounting firm told us that they will respond and they just want a subpoena so we…we've got to figure out how to accommodate them…but apparently it would mean a friendly subpoena, I assume." Rachael Bade, *Trump's accounting firm to respond to request for documents if subpoenaed, says Democratic lawmaker*, WASH. POST (Apr. 3, 2019).

[9] *Id.*

[10] Bade, *supra* note 8.

Memorandum for Members of the Committee on Oversight and Reform
Re: Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP
April 15, 2019

At the organizing meeting of the Committee on January 27, 2019, Chairman Cummings promised:

> If the ranking member objects to the issuance of a subpoena in writing, my preference is to bring the subpoena before the committee for a vote when that is feasible. Members deserve the opportunity to go on the record for some of the most important work they will do, and the public deserves the opportunity to see them do that work in the open. The chair prefers that when the ranking member objects the committee will have an open proceeding and a vote when feasible.[11]

In the Chairman's memorandum, he alleged that he adhered to this agreement because Congress is in recess.[12] However, Chairman Cummings received Mazars's letter on March 27 and he boasted to the press on April 3 that he would issue a subpoena. Between March 27 and today, the House was in session for nine legislative days, during which Chairman Cummings could have scheduled a business meeting or could have contacted me directly or via staff to discuss the matter. Instead, the Chairman did not say a word. The staff said not one word. Chairman Cummings purposefully waited for the Members to return to their districts to avoid public transparency and accountability surrounding his unilateral partisan actions.

The Chairman's maneuvering here is especially concerning against the backdrop of his public statements. For example, during the Committee's hearing on March 14, 2019, Chairman Cummings said: "I'm a man of my word, and I will continue to be that."[13] While I respect the Chairman personally, his actions here in willfully avoiding a public debate to consider this subpoena to Mazars violate his promises to the Committee.

### III.   Chairman Cummings Has Already Selectively Released Sensitive Committee Information to Attack the President for Political Gain.

I have concerns that if Chairman Cummings obtains highly sensitive, personal information about the President's finances, he will selectively release the information publicly in a misleading fashion to create a false narrative for partisan political gain. Chairman Cummings has done it before. We deserve better.

On April 1, 2019, in a sensational press release and memorandum, Chairman Cummings released cherry-picked excerpts of highly sensitive information obtained in a closed-door transcribed interview that he scheduled for 8:30 a.m. on a Saturday with no notice to Members.[14] Chairman Cummings released this information publicly without consulting Republican Members

---

[11] *Organizing Meeting, H. Comm. on Oversight & Reform,* 116th Cong. 33 (2019).

[12] Memorandum from Elijah E. Cummings, *supra* note 1.

[13] *Hearing with Secretary of Commerce Before the H. Comm. on Oversight & Reform,* 116th Cong. 180 (2019).

[14] Memorandum from Democratic Staff to Members of the H. Comm. on Oversight & Reform, *Summary of Interview with White House Whistleblower on Security Clearances* (Apr. 1, 2019).

Memorandum for Members of the Committee on Oversight and Reform
Re: Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP
April 15, 2019

or having a vote of the Committee. He released this information to generate headlines in his partisan investigation of the security clearance information relating to President Trump's senior advisers.

In addition, in a letter dated February 15, 2019, Chairman Cummings wrongly accused two respected lawyers of making false statements without ever speaking to them and by relying only on cherry-picked passages of incomplete, one-sided, handwritten notes of a conference call between lawyers for the President and officials at the Office of Government Ethics.[15] Chairman Cummings failed to include exculpatory information produced in the document production relating to the same teleconference. The Chairman then released this information publicly to embarrass these lawyers solely based on their representation of President Trump.

IV.     **Chairman Cummings's Partisan Request for Sensitive, Personal Financial Information Is Not a Responsible Use of the Committee's Oversight Power.**

The Supreme Court has cautioned that Congress does not have "general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress."[16] Yet this is precisely what Chairman Cummings intends to do with his subpoena to Mazars for sensitive, personal information about President Trump's finances.

Chairman Cummings has cited no specific law or legislative proposal for which he requires eight years of sensitive, personal financial information about President Trump. Chairman Cummings has offered no detailed explanation for how this sensitive, personal financial information is necessary to examine any of the potential conduct that he attributes to the President in his memorandum. Quite simply, Chairman Cummings seems to be seeking this sensitive, personal financial information in a pursuit to satisfy his preconceived and unsupported conclusions.

The Chairman's raw partisanship and political acts run the risk of devaluing and delegitimatizing the Committee's ability to receive unbiased documentary and testimonial information with which to perform our oversight duties.

V.     **Chairman Cummings's Unprecedented Investigations Attacking the President Reflect Poorly on this Committee.**

Finally, Chairman Cummings mischaracterized the letter that Representative Mark Meadows and I sent to Mazars in response to the Chairman's letter. Contrary to the Chairman's assertion, Mr. Meadows and I never urged the company not to comply with the Chairman's

---

[15] Letter from Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform, to Pat Cipollone, Counsel to the President, The White House (Feb. 15, 2019) (on file with the Committee); *see also* Office of Gov't Ethics, Jan. 31, 2019 Document Production at 0037-0038.

[16] Watkins v. United States, 354 U.S. 178, 187 (1957) ("There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress . . . .  Nor is the Congress a law enforcement or trial agency . . . .  No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress.").

Memorandum for Members of the Committee on Oversight and Reform
Re: Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP
April 15, 2019

request. The Chairman's assertion is merely a straw-man argument intended to deflect from his unprecedented attacks on the President.[17]

In our letter, Mr. Meadows and I informed Mazars about the concerns we had—and continue to have—with respect to the Chairman's unilateral, unchecked partisan inquiry. We have serious concerns with the nature and conduct of Chairman Cummings's investigations, as do many other Members. We will continue to inform the Committee's respondents of these concerns as we see appropriate.

What is unprecedented here is the extent to which Chairman Cummings and House Democrats have gone to attack the President for political gain. Chairman Cummings's subpoena for President Trump's sensitive, personal financial information goes hand-in-glove with Chairman Neal's request for President Trump's personal tax returns and with Chairman Nadler's expansive investigation into 81 entities with personal or business relationships with the President. These are all part of a coordinated and carefully managed campaign to use congressional oversight for partisan advantage—in fact, I recently became aware that Chairman Cummings has executed a secret Memorandum of Understanding with Chairwoman Maxine Waters to attack the President.

The Democrat obsession with the President and his family is gravely dangerous and counterproductive to the work of our Committee. The American people can now see that Democrats' pursuit of the truth is clouded by their obsession with attacking the President and the First Family. None of our actions would be necessary if not for Chairman Cummings's decision to pursue reckless, partisan investigations designed to attack the President and his family.

Chairman Cummings's unilateral subpoena of Mazars does nothing to make life better for our constituents or to improve the economy, efficiency, and effectiveness of the federal government. It is nothing but an exercise in raw partisan politics. This is not the fair and responsible oversight that Chairman Cummings promised.

###

---

[17] Similarly, Chairman Cummings's absurd comparison of subpoenaing eight years of personal financial information about the President to asking a witness about his salary demonstrates how desperate the Chairman is to legitimize his unprecedented conduct.

# Exhibit E

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5051
MINORITY (202) 225–5074

http://oversight.house.gov

April 17, 2019

The Honorable Elijah E. Cummings
Chairman
Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, DC 20515

Dear Mr. Chairman:

 I am in receipt of the subpoena served to Mazars USA LLP (Mazars), dated April 15, 2019.[1] You issued this subpoena over my objection without having a debate or vote of the Committee, as you promised.[2] This is not fair and objective congressional oversight. Your subpoena is an act of raw partisan politics meant only to further your obsession with attacking the President of the United States.

 Although I now believe—following your actions on Monday—that you do not value any feedback from your Republican colleagues, allow me to respond to a few points from the memorandum you issued in defense of your decision to subpoena Mazars.

- **You did not adhere to the bipartisan agreement regarding Committee subpoenas.**[3] In your memorandum, you incorrectly asserted that you "fully complie[d] with all terms of the bipartisan agreement" because the Easter work period made it impossible to convene a business meeting.[4] The only reason, however, that the work period posed any challenge in convening a business meeting was because you waited until the work period to move forward with the subpoena. If you had noticed a business meeting on April 3— the same day that you told the media that would subpoena Mazars[5]—there would have been plenty of opportunity for Members to debate and vote on the proposed subpoena. Instead, by notifying Members at 3:46 p.m. on Friday and requesting feedback by 11:00

---

[1] Document Production Subpoena to Mazars USA LLP (Apr. 15, 2019).

[2] *See* Memorandum for Members of the H. Comm. on Oversight and Reform, Re: Chairman Cummings's Unprecedented Subpoena of Mazars USA LLP (Apr. 15, 2019).

[3] "If the ranking member objects to the issuance of a subpoena in writing, my preference is to bring the subpoena before the committee for a vote when that is feasible. Members deserve the opportunity to go on the record for some of the most important work they will do, and the public deserves the opportunity to see them do that work in the open. The chair prefers that when the ranking member objects the committee will have an open proceeding and a vote when feasible." *Organizing Meeting, H. Comm. on Oversight & Reform*, 116th Cong. 33 (2019).

[4] Memorandum from Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform, to Members of the Committee on Oversight & Reform, (Apr. 15, 2019) (on file with Committee).

[5] Rachael Bade, *Trump's accounting firm to respond to request for documents if subpoenaed, says Democratic lawmaker*, WASH. POST (Apr. 3, 2019, 4:43 PM) https://www.washingtonpost.com/politics/trumps-accounting-firm-to-respond-to-request-for-documents-if-subpoenaed-says-democratic-lawmaker/2019/04/03/94ff2ba2-564d-11e9-a047-748657a0a9d1_story.html?utm_term=.54e92108e3a3.

The Honorable Elijah E. Cummings
April 17, 2019
Page 2

a.m. on Monday, you allowed Members only a little over three business hours to consider your unprecedented subpoena. Of course, you also could have waited until Members returned from the work period to convene a business meeting and debate and vote on the subpoena.

- **You have not been transparent about Members' views on the subpoena.** In your memorandum, you named only two Members who wrote to you about your proposed subpoena: Rep. Armstrong and me. Both Rep. Armstrong and I opposed your subpoena to Mazars. It would appear, then, from your memorandum that you issued this subpoena over the objections of the only two Members you named.

- **You did not dispute the fact that your subpoena to Mazars is part of a coordinated and carefully managed campaign to use congressional oversight for political gain.** Although your memorandum baselessly disputed several facts that I made in a memorandum to Members, you accepted this fact. In addition, on the same day you issued your unilateral subpoena to Mazars, Chairwoman Waters and Chairman Schiff issued subpoenas to other financial institutions concerning President Trump's finances. Your secret memoranda of understanding with other committees strongly suggests that the timing of your issuance of the Mazars subpoena is not a coincidence.[6] You also did not dispute that you misrepresented the Mazars subpoena as a "friendly" subpoena in your comments to the media.

- **You still have not articulated how the sensitive, personal financial information you seek will advance a legitimate legislative purpose.** Instead, you offered conclusory statements about the Committee's jurisdiction to justify examining purely speculative conduct you attribute to the President.

The Supreme Court of the United States has explained that a congressional investigation cannot seek to "expose for the sake of exposure."[7] The Court explained that "the public is, of course, entitled to be informed concerning workings of its government. It cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private right of an individual."[8] I am disappointed that your obsession with attacking President Trump for political gain has led you to do precisely what the Supreme Court cautioned against. I sincerely hope that you will reconsider your approach and cease this abject partisanship.

Sincerely,

Jim Jordan
Ranking Member

---

[6] *See* letter from Jim Jordan, Ranking Member, H. Comm. on Oversight & Reform, to Elijah E. Cummings, Chairman, H. Comm. on Oversight & Reform (Apr. 15, 2019).
[7] *Id.*
[8] *Id.*

# Exhibit F



Subscribe to Axios Sports: the "sports page" for the 21st century

| Type your email | > |



 **Mike Allen** Nov 12, 2018

# Democrats load "subpoena cannon" with 85+ Trump targets



Illustration: Lazaro Gamio/Axios

House Democrats plan to probe every aspect of President Trump's life and work, from family business dealings, the Space Force and his tax returns to possible "leverage" by Russia, top Democrats tell us.

**What they're saying:** One senior Democratic source said the new majority, which takes power in January, is preparing a "subpoena cannon," like an arena T-shirt cannon.

 

*([See the list](.))*

**Incoming House Intelligence chairman** Adam Schiff (D-Calif.) told "Axios on HBO" that he expects Trump to resist the committees' requests, demands and subpoenas — likely pushing fights over documents and testimony as far as the Supreme Court.

- **Why it matters:** The fight will test the power of the presidency, Congress and the Supreme Court.

**Top Democrats,** who had largely avoided the subject during the campaign, now tell us they plan to almost immediately begin exploring possible grounds for impeachment. A public report by Robert Mueller would ignite the kindling.

- **Tom Steyer,** the liberal activist who spent more than $100 million during the campaign to build support for impeachment, said establishment leaders who are trying to postpone talk of impeachment are "the outliers": "80% of registered Democrats think ... we're right."

**Two of the most powerful incoming chairs** tell "Axios on HBO" that they are plotting action far beyond Russian interference in the 2016 elections.

**1) Schiff,** the top Democrat on the Intelligence Committee, told us he wants to help special counsel Robert Mueller and plans to release — with some redactions of classified material — transcripts of dozens of interviews the committee conducted during its own Russia probe.

- **Schiff says** these transcripts contain numerous possible contradictions with other testimony and facts that have come to light, meaning possible legal jeopardy for the witnesses, who have included White House officials and alumni.

- **"I want to make sure** that Bob Mueller has the advantage of the evidence that we've been able to gather," Schiff said. "But equally important: that Bob Mueller is in a position to determine whether people knowingly committed perjury before our committee."

- **Asked if there are** real questions about contradictions between the testimony of Roger Stone, a close ally of the Trump campaign, and emails that have surfaced since then, Schiff said: "That is certainly the case."





- *See a clip.*

**2) Incoming House Appropriations Chair Nita Lowey** of New York, a close ally of House Democratic Leader Nancy Pelosi, said "yes" to each of a long list of possible investigative targets, including the Space Force, hurricane relief in Puerto Rico, White House security clearances, White House use of personal email and more.

- **"We have our boxing gloves on,"** Lowey said. "I'm ready. And so is Nancy."

- *See the clip* of her answers.

**We reminded Lowey and Schiff** of a Jonathan Swan scoop from August, "Republicans secretly study their coming hell," reporting that House Republicans had built a spreadsheet of potential investigation targets, based on Democrats' public complaints and statements.

- **Both Lowey and Schiff** made it clear that the GOP list is just a starting point.

- **So look for probes** of James Comey's firing; Attorney General Jeff Sessions' ouster; the Muslim travel ban; family separation policy at the border; discussions of classified information at Mar-a-Lago; administration dealings with North Korea and Saudi Arabia; and so much more.

**Trump is already signaling** confrontation, saying at his post-election news conference that if Dems investigate him, the result will be "a warlike posture."

- **Asked if he'll investigate** the Democrats back, he replied: "Oh, yeah. Better than them."

**Be smart:** For 225+ years, federal courts have upheld the Constitution's mandate of Congress as an equal branch of government, providing checks and balances on the executive. So House Democrats have a high hand as they assume power.

**Go deeper:**

- Democratic hit list: At least 85 Trump investigation targets

- Republicans secretly study their coming hell

- Democrats to probe Trump for targeting CNN, Washington Post

# Exhibit G





Christina Animashaun/Vox

# The 10 new Democratic House committee chairs who are about to make Trump's life hell

2019 will be a year of investigations.

By Andrew Prokop, Ella Nilsen, Emily Stewart, Umair Irfan, Tara Golshan, Dylan Scott, Alex Ward, and Dara Lind | Jan 3, 2019, 9:20am EST

The Trump administration's free ride from Congress is over.

New Democratic House committee chairs are set to launch subpoena-powered investigations into the president's finances, Russian interference, and administration ethics scandals. After two years of low-energy Republican oversight, the Trump administration's policies and its basic competence in running the government will be under serious scrutiny for the first time.

Republicans have been supremely worried about this prospect for some time. "Winter is coming," one Trump ally **told the Washington Post** before the election. If the Democrats won the House, the source continued, "The White House will be under siege."

The siege is about to begin. The big game changer is that the majorities in congressional committees have the ability to approve subpoenas: to compel document production or in-person testimony, from government agencies and officials as well as private citizens.

The committees themselves can't bring criminal charges as a result of the investigations, but they can refer the conduct they find to the Justice Department. Just as consequentially, scandals they unearth could have political consequences in the media and at the ballot box.

Each committee will be led by a chair, and each chair will have some leeway to decide where to expend their committee's investigative resources. These are the key players who will do much to shape President Trump's 2019. So here's what we know about some of the most important incoming chairs, and their investigative ambitions.

### Intelligence Committee — Adam Schiff

*by Andrew Prokop*

Rep. Adam Schiff (D-CA) has already become well-known as Devin Nunes's rival and foil atop the House Permanent Select Committee on Intelligence. But once he becomes chair, Schiff will be one of the most important figures setting the Democratic House's investigatory agenda on Russia as well as other intelligence-related topics.



Rep. Adam Schiff (D-CA) stands for a TV interview at the US Capitol on November 29, 2018. | Alex Wong/Getty Images

Schiff plans to use his subpoena power to more intensely probe Trump's ties to Russia, since Democrats think their GOP predecessors' investigation of the subject was incurious, and concluded far too quickly. And one particular interest of his is in following the money.

"One of the issues that has continued to concern me [is] the persistent allegations that the Trumps, when they couldn't get money from US banks, were laundering Russian money," Schiff **recently said on the *Lawfare Podcast***. "If that is true, that would be a more powerful compromise than any salacious videotape or any aborted Trump Tower deal." To that end, House Intelligence Committee Democrats are trying to hire money laundering and forensic accounting experts, the **Daily Beast's Betsy Woodruff and Spencer Ackerman reported**.

That's not the only money trail Schiff is interested in. The California Democrat has also said that he plans to investigate Trump's financial ties to Saudi Arabia. "The president is not being honest with the country about the murder of Jamal Khashoggi," **Schiff said on CNN**. "Is his personal financial interest driving U.S. policy in the Gulf?" he asked. "Are there financial inducements that the president has not to want to cross the Saudis?"

Schiff also thinks the administration's North Korea policy is ripe for some oversight, and has questioned Trump's rosy assessment of Kim Jong Un's intentions. "The president keeps telling us that we can sleep well at night because North Korea is on the path to denuclearization, but I see no evidence of that," he recently **told Vox's Alex Ward**.

### Oversight Committee — Elijah Cummings

*by Ella Nilsen*

The Committee on Oversight and Government Reform is the House's main watchdog for the executive branch. But for the past two years, the Republicans running it have spent little time on oversight of Trump's appointees.

With incoming chair Rep. Elijah Cummings (D-MD), that's about to change.



House Oversight Committee ranking member Rep. Elijah Cummings (D-MD) speaks to reporters about President Donald Trump's former National Security Adviser Gen. Michael Flynn on April 25, 2017. | Win McNamee/Getty Images

Cummings has a mountain of potential subjects to investigate in the Trump administration, from Trump and his family's own business entanglements with foreign governments to allegations of corruption and a revolving door in his administration.

"They'll have to make choices," former Democratic Rep. Henry Waxman, who previously chaired the committee, told me. "They have the ability to investigate anything."

Over the past few years in the minority, Cummings and his staff have filed well over 50 subpoena requests for the Trump administration to Republicans — but because, they were in the minority, Democrats remained powerless to issue these subpoenas themselves. These involved investigating the administration's response to Hurricane Maria, locating migrant children separated from their families by the Trump administration's policies, investigating the ethical issues of Trump's former Environmental Protection Agency chief Scott Pruitt, and more.

"We've got to address this issue of exposing President Trump and what he has done, and we've got to face the truth," Cummings told me recently. "The president is a guy who calls truth lies and lies truth. But at some point, he's also creating policy, and that's affecting people's day-to-day life."

### Judiciary Committee — Jerry Nadler

*by Ella Nilsen and Dara Lind*

If President Trump were to be impeached, the process would start in the House Judiciary Committee — which will be chaired by Rep. Jerry Nadler (D-NY).



House Judiciary Committee ranking member Rep. Jerry Nadler (D-NY) arrives for a Democratic caucus meeting at the US Capitol on November 14, 2018. | Chip Somodevilla/Getty Images

But Nadler is in no rush to get to that point. "It's too early," he told the **New York Times Magazine's Jason Zengerle** in November. He added that he would only begin the process if he believes an "appreciable fraction of the Trump voters" could become convinced. "You don't want to tear the country apart."

For now, Nadler plans to investigate what's been going on at the Justice Department since Attorney General Jeff Sessions's sudden firing and replacement with **Matthew Whitaker**. And he's indicated he may reopen questions related to the sexual assault allegations against Supreme Court Justice Brett Kavanaugh.

His committee also intends to take the lead on oversight of Trump's immigration policy. Oversight of the Department of Homeland Security is **fragmented**, but the Judiciary Committee has pretty broad jurisdiction over Trump's enforcement of immigration law. Given how aggressive the Trump administration has been in changing executive branch immigration policy, and how opaque or slapdash some of those moves have been, there is more than enough for Nadler to take up.

Democrats' **questioning of Homeland Security Secretary Kirstjen Nielsen** in December offered some hints about where Nadler and his committee would like to go, including the widespread **family separations** of late spring 2018 and the treatment of unaccompanied children in the custody of Health and Human Services.

Nadler's Judiciary Committee will also likely lend some investigative heft to Democratic appropriators' efforts to cut funding for Immigration and Customs Enforcement arrests and detention. Immigration detention has exploded over the past two years despite **Republican appropriators' efforts** to limit spending on it — so Democrats will likely ask questions about who is being detained, for how long, and why.

## Ways and Means Committee — Richard Neal

*by Tara Golshan*

Rep. Richard Neal (D-MA) hopes to get his hands on President Trump's tax returns. He's just not yet sure how or when, exactly, he's going to do it. "Our staff is working on it," Neal said in December.



Rep. Richard Neal (D-MA), Rep.-elect Lori Trahan (D-MA), and Rep. Jan Schakowsky (D-IL) arrive for the House Democrats' leadership elections in Longworth Building on November 29, 2018.  |  Tom Williams/CQ Roll Call

The Ways and Means Committee is one of the most powerful in the House, with jurisdiction over broad swaths of tax and health care. And Neal intends to scrutinize Trump

administration policies about the Affordable Care Act, protections for preexisting conditions, and prescription drug pricing.

But it's the long-running mystery of what's in Trump's long-concealed tax returns — which he **promised** to release during the campaign and then didn't — that Neal is asked about most often.

"One of the things that I'm going to try to convince him of is voluntarily relinquishing the documents," Neal **told the Amherst Wire**. "We're going to try, in this case, to convince him to do it, but at the same time prepare the legal case for asking for the documents."

That legal case may hinge on **an obscure law from 1924** that says the Ways and Means Committee chair can request to the Treasury Department to review any individual's tax returns in closed session.

**NBC News** reported that "committee sources could find no evidence" that this law "had ever been used" for this purpose — but that they're likely to try it anyway. But a spokesperson for Neal **told Politico** that they might not do so right away, because Neal "wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces him to do it."

And even if and when the request is made, don't expect Trump's tax returns to be handed over right away — Neal has said he expects a court battle over the matter, and there are further questions about how exactly he'd be able to make informations in the tax returns public.

### Financial Services — Maxine Waters

*by Emily Stewart*

As chair of the House Committee on Financial Services, Rep. **Maxine Waters** (D-CA) will have an opportunity to scrutinize broad swaths of the financial industry and agencies such as the Consumer Financial Protection Bureau and the Department of Housing and Urban Development. She's also indicated she plans to target the megabank **Wells Fargo** and the credit score company Equifax.



Rep. Maxine Waters (D-CA) exits a Democratic Caucus meeting to elect new leadership on Capitol Hill on November 28, 2018.  |  Zach Gibson/Getty Images

But, of course, she'll also take aim at President Trump. In a **letter to colleagues** after the 2018 midterms, Waters said she intends to follow the "Trump money trail," starting with **Deutsche Bank** — one of the few banks that still lend money to Trump and also **does business** with his son-in-law Jared Kushner — and "suspicious activity reports" filed with financial crimes officials.

As ranking member of the committee, Waters sent **letters** asking about Trump's financial ties with Russia and asked then-committee chair Jeb Hensarling (R-TX) to **subpoena** information on his ties to Deutsche Bank. As committee chair, she'll have the ability to conduct investigations — and issue subpoenas — on a number of matters related to the Trump administration and Trump family's finances, including potential ties to Deutsche Bank, **Citibank**, and Russia.

### Foreign Affairs Committee — Eliot Engel

*by Alex Ward*

Under Rep. Eliot Engel (D-NY), the Foreign Affairs Committee plans to dig into Trump's connections abroad and whether his business interests might be influencing the administration's policies.



Ranking member of the House Foreign Relations Committee Rep. Representative Eliot Engel (D-NY) in his office on Capitol Hill on November 15, 2018.  |  Brendan Smialowski/AFP/Getty Images

In addition to the obvious topic of Russia, the committee hopes to obtain more documents about the Trump Organization's **property in Panama**. Earlier this year, Trump's company **appealed** directly to Panama's president to stop its eviction from the building as managers. Some say that episode shows a clear conflict of interest between Trump's duty as president and his ties — since severed — to his namesake company.

But a Democratic congressional aide **listed** several other foreign policy topics the committee hopes to investigate, including:

- Greater oversight of the State Department and the US Agency for International Development (USAID). The committee is particularly interested in looking into reported **"loyalty tests,"** where officials are vetted for their loyalty to Trump.

- Updating **authorizations for the use of military force** abroad, which have remained untouched since 2002.

- Ending America's support for the **war in Yemen**, a move for which there is has been growing congressional support.

### Energy and Commerce — Frank Pallone

*by Dylan Scott*

Rep. Frank Pallone (D-NJ) is taking over the gavel at Energy and Commerce, a committee with some of the broadest jurisdiction in Congress — and his planned oversight agenda for

2019 reflects it. The Trump administration has given Pallone and his staff plenty of openings to burrow into the scandals and controversial policy decisions of the past two years.



Rep. Frank Pallone (D-NJ) announces House Democrats' new infrastructure plan during a news conference on February 8, 2018.  |  Chip Somodevilla/Getty Images

For starters, there's the environment. The incoming Democratic first-term members are animated by climate change, and Pallone's committee plans to examine how the Trump administration, led by a president who denies climate change even exists, is neglecting or even exacerbating the problem.

They will in turn spend a lot of time on the Environmental Protection Agency, which has rolled back Obama-era regulations governing coal and methane while also disbanding an air pollution review panel. Democrats have been agitating for a hearing on how the EPA handles toxic chemicals, based on **worrying press reports**, and will now have the freedom to **pursue the issue**.

Health care is the other huge topic that falls under the committee's purview. Pallone's office says they plan to probe various regulations and funding cuts from the Trump administration that seem designed to undermine the Affordable Care Act. They have also already requested — and can now set — a hearing on Trump's family separations policy and how health officials are planning to reunite children who were separating from their parents at the border.

Case 1:19-cv-01136-APM   Document 30   Filed 05/13/19   Page 49 of 79

## Natural Resources — Raúl Grijalva

*by Umair Irfan*

A few weeks after Democrats' midterm elections victory, Rep. Raúl Grijalva (D-AZ) — the incoming chair of the House Committee on Natural Resources — wrote that scandal-plagued Interior Secretary Ryan Zinke was "**unfit to serve**" and should step down.



Rep. Raúl Grijalva (D-AZ) speaks during a news conference regarding the separation of immigrant children at the US Capitol on July 10, 2018. | Alex Edelman/Getty Images

At first, Zinke **responded on Twitter** with defiance and innuendo about Grijalva's purported drinking habits. But just two weeks later, Grijalva got his way: **President Trump announced** that Zinke was out.

Grijalva plans to **investigate** both policy and ethics matters from Zinke's controversial tenure. On Zinke's watch, the Interior Department proposed the largest rollback of **federal land protections** in US history and opened nearly all US coastal waters to offshore drilling. Democrats say they want to investigate how the fossil fuel industry influenced these policies, as well as whether the agency properly considered the environmental implications of its decisions.

The committee also plans to scrutinize Zinke's temporary replacement, acting Interior Secretary **David Bernhardt**, a former fossil fuel lobbyist. "His years of lobbying on behalf of

clients who stand to profit from Interior policy decisions are cause for serious concern," Grijalva said in a statement to **Earther**.

## Veterans' Affairs — Mark Takano

*by Emily Stewart*

The Department of Veterans' Affairs has seen tumultuous times under the Trump administration — the president's first VA secretary was **forced out**, his **replacement nominee** withdrew amid scandal, and current VA Secretary Robert Wilkie **has faced controversies of his own** at the department.



Rep. Mark Takano (D-CA) leaves the Capitol after a series of votes on repeal and replace of Obamacare on May 4, 2017.  |  Bill Clark/CQ Roll Call Inc.

As incoming head of the House Committee on Veterans' Affairs, Rep. Mark Takano (D-CA) will have the opportunity to dig into what's been going on.

One of the potential items on his agenda for a probe will likely be the **ProPublica** report in August that found that three members of Trump's Mar-a-Lago resort — Marvel Entertainment chair Ike Perlmutter, Palm Beach doctor Bruce Moskowitz, and lawyer Marc Sherman — were essentially calling the shots at the VA, reviewing policy and personnel decisions from the get-go. Congressional Democrats requested emails and communications between the three and VA officials, but Secretary Wilkie refused to provide them, **citing ongoing litigation**.

Takano also told **the Hill** that he will also focus on ensuring the VA doesn't "slow walk" filling thousands of vacancies in its ranks. And, Takano is likely to continue to press the VA for answers on **delayed housing benefits payments to student veterans** under the Forever GI Bill. In November, he led a group of Democratic lawmakers in sending a **letter** to Wilkie asking for answers on the topic.

## Science, Space, and Technology — Eddie Bernice Johnson

*by Umair Irfan*

In December at an **American Geophysical Union** meeting, a conference of top physicists, geologists, and atmospheric scientists, Rep. Eddie Bernice Johnson (D-TX) told the gathering that climate change would be front and center for the **House Committee on Science, Space, and Technology**, which she will chair.



Gen. William Shelton, head of the US Air Force Space Command, greets House Science, Space, and Technology Committee ranking member Rep. Eddie Bernice Johnson (D-TX) before a hearing on Capitol Hill on March 19, 2013.　| Chip Somodevilla/Getty Images

"As we look forward to next year, with a change in leadership on the Science Committee, you can expect to see a renewed focus on climate change," Johnson said.

It will be a stark shift from the tenure of her predecessor, retiring Rep. Lamar Smith (R-TX), who has denied that humans are **changing the climate** and spent years subpoenaing climate scientists for research documents, emails, and correspondence. Critics, including Johnson, described the subpoenas as "**harassment**."

Come January, Johnson said the committee will instead focus more on how federal agencies under the Trump administration are handling climate science and research matters — scrutinizing, for instance, the **EPA**'s ousting of science advisers and its proposals to limit the kinds of research that can be used to make regulations. ▪

FUTURE PERFECT

**Trump wants to change how poverty is calculated — to make fewer people eligible for benefits**

CULTURE

**Game of Thrones season 8: How the Golden Company could make or break Cersei**

HEALTH CARE

**The controversial abortion bills sweeping the country this week, explained**

View all stories in Explainers

# Exhibit H

POLITICO

# POLITICO



House Judiciary chairman Jerry Nadler has questioned President Donald Trump's appointment of Matthew Whitaker as acting Attorney General. | M. Scott Mahaskey/POLITICO

CONGRESS
## House Democrats prepare fusillade of Trump investigations
Trump Hotel, taxes, Cabinet members are all targets.

By **ADAM CANCRYN** | 01/07/2019 05:07 AM EST

Democrats want to investigate the Trump Hotel deal and President Donald Trump's taxes. They want to haul up conflicted Cabinet officials and dig into controversial changes to the census and food stamps. They want to put Education Secretary Betsy DeVos under oath and investigate child detentions at the border.

The threat of subpoenas, investigations and oversight hearings will dominate the new House Democratic majority's agenda, targeting the White House's most controversial policies and personnel, spanning immigration, the environment, trade and of course, the biggest question of all: Russian collusion.

"Over the last two years President Trump set the tone from the top in his administration that behaving ethically and complying with the law is optional," House Oversight Chairman Elijah Cummings said. "We're better than that."

But for House Democrats in control for the first time in nearly a decade, it's also a role full of pitfalls. Trump has already tried to brand the prospect of congressional oversight as nothing more than "harassment," and Democrats will also have to show they can legislate, govern and investigate at the same time in the House.

## Sign up here for POLITICO Huddle

✉ ly play-by-play of congressional news in your inbox.

> Your email...

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

"I joked for a while — but it's not funny anymore — I said we're going to have to build an air traffic control tower to keep track of all the subpoenas flying from here to the White House," said Rep. John Yarmuth (D-Ky.), chairman of the House Budget Committee. "So yeah, it could be brutal."

Two days into the new Congress, the atmosphere is already poisoned, with Democrats going off message calling for impeachment and Trump threatening to shut down the government for months.

But over the coming year, there will be more action in House committees than there was in the first two years of the Trump administration.

Here are some of the biggest targets for House Democrats:

**Mueller and the Justice Department**

Democrats stress they'll need to tread carefully when it comes to Russia-related investigations, for fear of interfering with special counsel Robert Mueller's probe. But that's not likely to stop the party from taking a deep look at the Justice Department and acting Attorney General Matt Whitaker — who assumed oversight of Mueller's activities after Trump forced out Jeff Sessions.

Critics have warned that Whitaker's appointment could be aimed at interfering with the investigation, with Judiciary Chairman Jerry Nadler (D-N.Y.) questioning at one point whether his appointment without Senate confirmation was even legal.

**Scandal-ridden Cabinet officials**

Cummings has singled out two former Trump officials who will be in his crosshairs early on: former Interior Secretary Ryan Zinke and former EPA Administrator Scott Pruitt.

"We're seeing gross abuses from agency heads," Cummings said about them soon after Democrats took charge of the chamber.


**CONGRESS**
**House Democrats unveil bill to obtain Trump's tax returns, put checks on White House**
By MAGGIE SEVERNS

Zinke is already under pressure from the Interior Department's internal watchdog, and soon he'll be hauled up to the Hill to account for his role in a range of ethical quandaries. Among them: a land deal with the then-chairman of Halliburton and whether Zinke's decision to block a tribal casino despite recommendations from career staff was inappropriately driven by political considerations — both issues that were first reported by POLITICO.

The DOJ is reportedly also looking into allegations that Zinke committed a crime by lying to IG investigators, which Zinke denies. One of his first stops could be in front of the House Natural Resources Committee, where Chairman Raúl Grijalva (D-Ariz.) said he wants a hearing even after Zinke resigned from the Trump administration.

EPA, meanwhile, may face subpoenas for Pruitt-related records it failed to produce for the previous investigation run by then-Chairman Trey Gowdy. The agency's inspector general is also still looking into a range of Pruitt's activities, including his travel, use of special hiring authorities to bring political officials on board and granting of raises to close aides.

But the first Cabinet official Cummings wants to talk to is Commerce Secretary Wilbur Ross. His committee will press Ross on allegations he misled Congress about a decision to add a question about citizenship to the 2020 census. Ross also has been dogged by ethical questions and reporting that exposed numerous conflicts of interests involving his personal financial interests.

**And another Cabinet member, Betsy DeVos**

As many as five House committees could take on DeVos over her rollback of for-profit college regulations, stalled student loan forgiveness processing and a rewrite of campus sexual assault policies.

Veterans Affairs Chairman Mark Takano (D-Calif.) is expected to scrutinize for-profit college issues, where DeVos has scaled back Obama-era rules aimed at curbing abuses for institutions that enroll tens of thousands of veterans each year.

Rep. Rosa DeLauro (D-Conn.), chairwoman of the appropriations subcommittee overseeing education funding, is also a top critic of the Education Department over DeVos' record on student debt issues.

Financial Services Chairwoman Maxine Waters (D-Calif.) has accused DeVos of a "full-on attack on civil rights protections for students — particularly students of color, students with disabilities, transgender students, and survivors of sexual assault." She's also criticized the Trump administration's moves to ease regulations on for-profit colleges, while Cummings has similarly looked at the collapse of a for-profit college chain.

And this past year, Cummings and Education and Labor Chairman Bobby Scott (D-Va.) expressed concern over DeVos' treatment of the union that represents her agency's employees, and pledged to scrutinize civil rights concerns tied to K-12 state plans.

**Trump's taxes**

Democrats are eager to get their hands on Trump's tax returns, a task that would fall to the House Ways and Means Committee. But newly minted Chairman Richard Neal (D-Mass.) doesn't plan to rush into anything. Neal wants to first build a public case that presidents should voluntarily release their returns, his spokesperson told POLITICO.

That approach won't sit well with other Democratic lawmakers and liberal activists, who have been clamoring to get a look at Trump's tax filings since the 2016 presidential campaign. Just two days after Democrats won the House in the midterm elections, more than 50 groups, including unions and government transparency advocacy groups, signed on to a full-page ad in The New York Times urging Democrats to make Trump's tax returns a Day One priority.



**POLITICS**
**How Will the Shutdown End?**
By POLITICO MAGAZINE

Whenever Democrats make their move, it is likely to spark a legal battle with Trump, who has guarded the secrecy of his tax practices.

Neal is also planning to use his oversight power to delve into the massive tax overhaul Republicans pushed through Congress in 2017, especially provisions that Democrats believe advantaged the wealthy and punished blue state taxpayers.

**The 'zero tolerance' border policy**

The deaths of two migrant children held in detention — Jakelin Caal, 7, and Felipe Gomez Alonzo, 8 — have heightened Democrats' urgency to investigate Trump's immigration decisions.

Three committees have ordered U.S. Customs and Border Protection to preserve evidence related to their deaths, and yet another is prepping a hearing later this month on the family separations that resulted from the Department of Justice's "zero tolerance" policy. That Energy and Commerce Committee session could renew the focus on the role the administration's health department is playing in housing and caring for migrants detained at the border.

DeLauro and Scott will play big roles in this space too, with DeLauro focusing on wage theft and the Labor Department's PAID program — a safe harbor created by the Trump administration for companies that may owe workers back pay. Scott told POLITICO in November he may hold hearings to investigate the limiting of businesses classified as "joint employers," jointly liable for labor violations committed by their franchisees or contractors.

**Obamacare 'sabotage'**



**LAW AND ORDER**
**Democrats Want to Investigate Trump. Here's Why They Should Be Careful.**
By AZIZ HUQ and TOM GINSBURG

Health care is likely to be an overriding focus for Democrats early on, after rising voter support for Obamacare helped catapult them into the House majority.

Speaker Nancy Pelosi (D-Calif.) has vowed to make protecting Americans with pre-existing conditions a top priority — a mission that gained even more prominence after a Texas court sided with a GOP-led lawsuit in ruling the entire health law should be thrown out.

Democrats are planning to dig into the Justice Department's unusual decision not to defend Obamacare against that suit, as well as press Trump health officials over their roles in the legal battle and various other policy actions they suspect have depressed Obamacare enrollment and threatened the law's stability.

**Controversial regulatory overhauls**

Health care-focused Democrats are targeting Trump's regulatory reforms, too, planning to go after policies freeing red states to tie employment to health benefits for the poor and creating skimpy alternatives to Obamacare coverage. Energy and Commerce Chairman Frank Pallone (D-N.J.) is likely to lead the inquiry into those moves, arguing that they're motivated by a desire to undermine the 2010 health law.

House Agriculture Democrats led by Collin Peterson could review a proposed rule that would more strictly enforce existing work requirements for the Supplemental Nutrition Assistance Program, formerly known as food stamps. The proposal, which Democrats oppose, would drop more than 750,000 people from the program over three years.

Rules Chairman Jim McGovern (D-Mass.), a leading food stamps defender on Capitol Hill, also promised he'd give the administration "one hell of a fight" if it proceeds with the proposed rule.

**Agency conduct**

Homeland Security Chairman Bennie Thompson told POLITICO he wants to hear from Secretary Kirstjen Nielsen about her agency's operations and who is making policy decisions. He's also identified staffing issues at the Federal Emergency Management Agency, which is under scrutiny over its response to Hurricane Maria in Puerto Rico.



**HEALTH CARE**
**Democrats won the House on Obamacare. Here's how they plan to defend it.**
By **ADAM CANCRYN** and **ALICE MIRANDA OLLSTEIN**

The Pentagon is in for some tough questions as well about its budget and big-ticket programs from Rep. Adam Smith — a longtime critic of Trump's military buildup. Democrats have blasted the lengthy list of far-flung U.S. military engagements aimed at fighting global terrorism, including U.S. involvement in Africa and Yemen.

"We need an overall strategy that better reflects the budget and not just this notion [that] somehow the more money we spend at the Pentagon, the safer we are," Smith told POLITICO.

His Armed Services Committee might also probe Trump's decision to deploy active-duty troops to the U.S.-Mexico border and ban on transgender people from serving in the military. Recent administration proposals to withdraw U.S. forces from Syria and shrink the military footprint in Afghanistan — and their rationale — could also come under close scrutiny from Democrats and Republicans alike.

Agriculture Secretary Sonny Perdue, meanwhile, has caught Democrats' eye with his efforts to move two USDA agencies out of the Washington area.

**Friendly fire over tariffs**

Trump's trade agenda could face pushback in both congressional chambers and on both sides of the aisle. Senate Finance Chairman Chuck Grassley (R-Iowa) has promised to revive legislation that would challenge Trump's authority to impose tariffs for national security reasons.

"I strongly disagree with the notion that imports of steel and aluminum, automobiles and auto parts somehow could pose a national security threat," he said in December.

A Democrat-controlled House will also likely play a major rule in scrutinizing the administration's new North American trade deal. U.S. Trade Representative Robert Lighthizer has begun quiet negotiations to win support from key Democrats in both the House and Senate, who are calling for the NAFTA replacement's provisions on labor enforcement to be strengthened.

*Adam Behsudi, Helena Bottemiller Evich, Toby Eckert, Caitlin Emma, Alex Guillén, Kimberly Hefling, Nick Juliano, Ian Kullgren, John Lauinger, Connor O'Brien, Rebecca Rainey, Jennifer Scholtes, Michael Stratford and Zachary Warmbrodt contributed to this report.*

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map


Terms of Service

Privacy Policy

———————————

© 2019 POLITICO LLC

# Exhibit I



Politics

# How Donald Trump inflated his net worth to lenders and investors

**By David A. Fahrenthold and Jonathan O'Connell**   March 28, 2019



When Donald Trump wanted to make a good impression — on a lender, a business partner, or a journalist — he sometimes sent them official-looking documents called "Statements of Financial Condition."

These documents sometimes ran up to 20 pages. They were full of numbers, laying out Trump's properties, debts and multibillion-dollar net worth.

But, for someone trying to get a true picture of Trump's net worth, the documents were deeply flawed. Some simply omitted properties that carried big debts. Some assets were overvalued.

And some key numbers were wrong.

**TRUMP'S 'STATEMENTS OF FINANCIAL CONDITION'**

See the full documents here

- **2011 statement**
- **2012 statement**
- **2013 statement**

For instance, Trump's financial statement for 2011 said he had 55 home lots to sell at his golf course in Southern California. Those lots would sell for $3 million or more, the statement said.

But Trump had only 31 lots zoned and ready for sale at the course, according to city records. He claimed credit for 24 lots — and at least $72 million in future revenue — he didn't have.

He also claimed his Virginia vineyard had 2,000 acres, when it really has about 1,200. He said Trump Tower has 68 stories. It has 58.

## GIVES INCORRECT NUMBER OF HOME LOTS IN CALIFORNIA

> In addition to the Club, Trump National Golf Club is presently zoned for 75 home sites with unparalleled ocean and golf course views. At June 30, 2011, there were 55 home sites that will sell for prices that range from $3,000,000 to $12,000,000.

At that point, only 36 lots were actually approved for sale, and by this point 5 had already been sold. That left 31 – not 55 – available for sale. Since Trump was promising he could sell them for at least $3 million each, there was a $72 million gap between his claims and reality.

## ADDS 10 STORIES TO TRUMP TOWER

> Trump Tower stands as a symbol of quality and success and is unequaled in the quality of its retail, professional office and private condominium space. Designed by renowned architect Der Scutt, this 68 story bronze glass structure on Fifth Avenue boasts 178,000 square feet of commercial space and 114,000 square feet of retail space. Some of the major tenants are Gucci America Inc., Industrial and Commercial Bank of China, T Capital Management and Star Branding (Tommy Hilfiger ventures).

Trump Tower only has 58 stories, but Trump re-numbered the floors to make it seem taller.

Now, investigators on Capitol Hill and in New York are homing in on these unusual documents in an apparent attempt to determine whether Trump's familiar habit of bragging about his wealth ever crossed a line into fraud.

The statements are at the center of at least two of the inquiries that continue to follow Trump, unaffected by the end of special counsel Robert S. Mueller III's investigation. On Wednesday, the House Committee on Oversight and Reform said it had requested 10 years of these statements from Trump's accounting firm, Mazars USA.

And earlier this month, the New York state Department of Financial Services subpoenaed records from Trump's longtime insurer, Aon. A person familiar with that subpoena, who spoke on the condition of anonymity to describe an ongoing investigation, said "a key component" was questions about whether Trump had given Aon these documents in an effort to lower his insurance premiums.

Both inquiries stemmed from testimony last month by Trump's former lawyer Michael Cohen, who told Congress that Trump had used these statements to inflate his wealth — and then sent them to his lenders and his insurers.



Michael Cohen, former personal attorney to President Trump, testified before the House Oversight Committee on Feb. 27 and submitted some of Trump's financial statements as exhibits. (Matt McClain/The Washington Post)

"Mr. Trump is a cheat," Cohen said, in describing what the statements showed.

Cohen told Congress that statements were given to Deutsche Bank, as Trump sought a loan to buy the NFL's Buffalo Bills. Since then, Deutsche Bank and another Trump lender have also received subpoenas, from the New York State attorney general.

The statements may additionally draw the interest of the House Financial Services Committee, which is scrutinizing Deutsche. A committee spokesman declined to comment.

The White House declined to comment for this report.

The Trump Organization also declined to comment about the statements or answer questions about specific errors the statements contained. Donald Trump Jr. and Eric Trump, the president's sons who are running his business, noted on social media that Cohen has provided false testimony about other topics.

Mazars USA, the accounting firm, issued a brief statement Wednesday after the House Oversight letter became public, saying that it "believes strongly in the ethical and professional rules and regulations that govern our industry, our work and our client interactions." It declined to comment further about Trump.

The Washington Post reviewed copies of these documents for 2002, 2004, 2011, 2012 and 2013 — obtaining them from court files, from people who received them from Trump's company, and from Cohen. Cohen also provided copies of documents from 2011, 2012 and 2013 to Congress.



Recently unveiled financial statements from 2011 to 2013 paint a misleading picture of Donald Trump's net worth. Here's why that's significant. (Monica Akhtar, Brian Monroe/The Washington Post)

Since the 1980s, Trump has defined himself by his wealth, but he has often avoided providing proof to back up his boasts or provided documents that inflated the real values. As president, Trump has declined to release his tax returns, unlike every president since Jimmy Carter.

Trump is far from the first real estate developer to inflate his projects or wealth. But there are laws against defrauding insurers and lenders with false information. Financial and legal experts said it's unclear at this point whether Trump will face any legal consequences. They said it depends on whether Trump intended to mislead or whether the misstatements caused anyone to give him a financial benefit.

"How much would [the errors] impact an investor?" said Kyle Welch, an assistant professor of accountancy at George Washington University. "If it's systematic and it's across the board, and it's all in one direction, that's where you have a problem."

Welch said Trump could be protected by disclaimers that his own accountants added to the statements, warning readers that they weren't seeing the full picture. And in an odd way, Welch said, Trump could be helped by the sheer scale of the exaggerations. They were so far off from reality, Welch wondered whether any real bank or insurer could have been fooled.

Welch said he'd never seen a document stretch so far past the normal conventions of accounting.

"It's humorous," Welch said. "It's a humorous financial statement."

Investigators for the New York State Department of Financial Services, which sent subpoenas to Aon, and the New York State attorney general — who subpoenaed Deutsche Bank — declined to comment. Aon and Deutsche Bank also declined to comment, beyond saying they plan to cooperate with investigators.

The story of Trump's "statements of financial condition" — in essence, sales brochures for Trump the man, given out by Trump the company — goes back to the early 1980s, according to past testimony from Trump's accountants and staffers.

In 2007, a Trump lawyer named Michelle Lokey said she had sent these statements out to Trump's lenders, for projects in Chicago and Las Vegas, because Trump had personally guaranteed those loans. That meant that if Trump's company defaulted on its obligations, the lenders could come after Trump's personal assets.



Trump International Hotel & Tower in Chicago was one of the two properties that were not included in some Trump financial statements. Both buildings were carrying mortgages. (Joshua Lott for The Washington Post)

"Therefore they'd want information on his net worth?" an attorney asked Lokey.

"I assume," she said.

The statements were prepared by Trump's longtime accountants, a firm now called Mazars. In other contexts — such as when one of Trump's companies was seeking to secure a federal contract — this firm prepared rigorously audited financial statements.

This was a different sort of job.

When compiling these statements of financial condition, those accountants have said they did not verify or audit the figures in the statements. Instead, when Trump provided them data, they wrote it down without checking to see whether it was accurate.

"In the compilation process, it is not the role of the accountant to assess the values," said Gerald J. Rosenblum, one of the accountants. "The role is to accept those values and move them forward."

An attorney asked: Do the values have to be logical?

"The value per se does not have to be logical," Rosenblum said. He and Lokey were deposed as part of a lawsuit in which Trump sued a New York Times reporter for allegedly lowballing his net worth. Trump's suit against the reporter was later dismissed.

In 2014, Trump used the same accounting firm to prepare financial information for his most expensive development project in decades, his $200 million transformation of the historic Old Post Office Pavilion in downtown Washington into a Trump International Hotel.

But in that case, Mazars vouched for the accuracy of the information, writing that the firm "is responsible for the preparation and fair presentation of these financial statements" using industry standard accounting rules. This was a formal audit of finances related just to Trump's D.C. hotel, rather than a summation of all of his assets based on Trump's own estimates.

The statements Cohen provided to The Post — and to Congress — begin in 2011. Two of them are 20-page "Statements of Financial Condition" signed by Trump's accountants.

In his testimony to Congress, Cohen said these statements included Trump's self-appraisals of his buildings' value — which aimed to impress, instead of aiming for reality. Cohen said Trump would take real measures of value, such as the amount of money his tenants paid in rent, and simply inflate it until he got a number he liked.

"If you're going off of your rent roll, you go by the gross rent roll times a multiple," Cohen said. "And you make up the multiple."

The documents begin with two-page disclaimers, warning of various ways in which the statements don't follow normal accounting rules. The accountants note that Trump is the source of many buildings' valuations — and that, contrary to normal accounting rules, he had inflated them by counting future income that wasn't guaranteed.

## ACCOUNTANT'S WARNING

To Donald J. Trump:

We have compiled the accompanying statement of financial condition of Donald J. Trump as of June 30, 2012. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America.

Trump calls this a "statement of financial condition." But right away, his accounting firm is warning readers that it hasn't checked anything in this document to be sure it's accurate.

The accountants also note that Trump had told them to simply omit two of his major hotels, in Chicago and Las Vegas. Both buildings were carrying mortgages. That omission means that some of Trump's actual debt load was hidden from anyone reading the statement.

"Users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump" if they had more information, the statement concludes.

Legal experts interviewed by The Post said that sort of broad disclaimer might shield Trump from allegations that he misled his lenders and insurers. After all, his own accountants told readers they weren't getting the full story.

"The transparent disclaimers — even if frustrating — typically wipe out a basis" for bringing charges of fraud, said Jacob Frenkel, a former federal prosecutor who is now a private attorney at Dickinson Wright.

In 2012, Trump's statement said he owned a 2,000-acre vineyard in Virginia. But land records in Virginia show the Trump family owns about 1,200 acres. The Trump winery's own website says 1,300 acres.

## EXAGGERATES SIZE OF VINEYARD

> Mr. Trump and entities that he owns, control several other active businesses as well as other assets. The assets related to these interests include:
>
> - a 2,000 acre vineyard in Charlottesville, Virginia along with a carriage museum, office building and several other buildings

The vineyard sits on a 1,205 acre property, of which only about 227 acres are planted with grapes.

In 2011, the statements said that Trump's Seven Springs estate in Westchester County, N.Y., was "zoned for nine luxurious homes." In the statement, Trump said those homes would yield significant cash flow as he built them and sold them. That led him to value the property at $261 million — far more than the roughly $20 million value assigned by local assessors.

## EXAGGERATES VALUE OF WESTCHESTER COUNTY ESTATE

> Westchester County, New York
>
> An entity wholly owned by Mr. Trump acquired a property known as The Mansion at Seven Springs in Bedford, New York which consists of over 200 acres of land, a mansion and other buildings. This property is zoned for 9 luxurious homes. It has been valued at $261,000,000 based on an assessment made by Mr. Trump in conjunction with his associates and outside professionals of the projected net cash flow which he would derive as those units are constructed and sold, and the estimated fair value of the existing mansion and other buildings.

At the time, local officials assessed the land's value at about $20 million, a fraction of the value Trump assessed.

At the time, Trump had received preliminary "conceptual approval" to build homes on the site. But local officials said he never finished the last step in the approval process to build the homes or sell the lots.

None of the homes was built.

The 2013 statement that Cohen provided — and which he said was also given to Deutsche Bank, in pursuit of a loan to buy the Bills — is different from the other two.

It is just two pages long, with a slightly different title: "Summary of Net Worth." It does not include the usual disclaimer from Trump's accountants, so readers aren't told that the debts from Trump's Chicago and Las Vegas hotels are missing.

**TWO BUILDINGS ARE MISSING**

Accounting principles generally accepted in the United States of America require that personal financial statements include all assets and liabilities of the individual whose financial statements are presented. The accompanying statement of financial condition does not include the following for Trump International Hotel & Tower Chicago and Trump International Hotel & Tower Las Vegas: 1) real property and related assets, 2) mortgages and loans payable, and 3) guarantees which Donald J. Trump may have provided.

Here, Trump is exaggerating his wealth by leaving two major parts of his portfolio out. His buildings in Las Vegas and Chicago – both of which had loans attached to them – are simply left out of this statement. Without them, readers can't get a full picture of how much he owes, and to whom.

This document also includes a new "asset" that wasn't there before.

It says that Trump's brand value — his name, essentially — was worth $4 billion, and that it ought to be counted among his assets as if it were a building or a resort. With his brand included, Trump's net worth jumped from $4.6 billion to $8.6 billion.

**Trump's $4 billion asset**

Trump added "brand value" as an asset in 2013, valued at $4 billion, doubling his net worth from previous years.

Total assets in 2013:
**$9.2B**

$9B

Brand value



For Trump, the Bills would have been a financial prize far larger than any he had won in the recent past: Bids were expected to be around $1 billion.

In public, Trump had bragged that he was ready to pay $1 billion in cash. But privately, one of his lieutenants told a business contact that they were struggling with the bid.

"We are looking at the Bills but Allen and I are having trouble making the numbers work!!!" wrote Ron Lieberman, an executive vice president at the Trump Organization, in an email to a contact in the New York City parks department. "Allen" likely meant Allen Weisselberg, Trump's longtime chief financial officer.

Lieberman's email was released this year in response to a public-records request from a nonprofit group, NYC Park Advocates. Lieberman and Weisselberg did not respond to requests for comment this week.

Whatever Trump sent to Deutsche Bank, it seems to have been enough: The New York Times reported that Deutsche Bank agreed to vouch for Trump's bid for the Bills, citing an unnamed executive. But Trump lost a bidding war, and somebody else bought the team.



**Jonathan O'Connell**
Jonathan O'Connell is a reporter focused on economic development, corporate accountability and the Trump Organization.


**David A. Fahrenthold**

David A. Fahrenthold is a reporter covering the Trump family and its business interests. He has been at The Washington Post since 2000, and previously covered Congress, the federal bureaucracy, the environment and the D.C. police.

   💬 **2.1K Comments**

---

**Credits**

Graphics by Leslie Shapiro and Reuben Fischer-Baum; Design by Jason Bernert and Joanne Lee

---

**More stories**

## Trump's legal troubles are far from over even as Mueller probe ends



Nearly every organization Trump has run in the past decade remains under investigation by state or federal authorities.

---

## As the 'King of Debt,' Trump borrowed to build his empire. Then he began spending hundreds of millions in cash.



The reversal in strategy is unusual for the real estate industry.

---

## Trump 'inflated his total assets when it served his purposes,' Cohen alleges in his hearing, citing financial documents

# Exhibit J

# POLITICO



# POLITICO



Democrats are laying the groundwork for more high-profile hearings as the 2020 presidential race heats up. | Brendan Smialowski/AFP/Getty Images

CONGRESS

## Democrats weigh a 'Benghazi Trump' strategy

The White House is refusing to hand over documents and impeachment proceedings seem unlikely, so the Democrats are turning to hearings to bludgeon the president.

By **DARREN SAMUELSOHN** and **ANDREW DESIDERIO** | 05/01/2019 05:04 AM EDT

Democrats may not be able to saddle President Donald Trump with impeachment proceedings or pry documents from his administration, but they have another means of bludgeoning him: hearings, hearings and more hearings.

It's a counterstrategy to the president's all-out resistance to congressional investigations, la

A 

Listen to Story

counsel Robert Mueller are all but guaranteed to draw blanket media attention. And even if the boldfaced names don't show up, party leaders recognize that the spectacle of empty chairs and drawn-out legal fights could dog Trump and create negative narratives during the 2020 presidential race.

"Let's face it: Most Americans are not going to read a 400-plus-page report," said Georgia Rep. Hank Johnson, a senior Democrat on the House Judiciary Committee, referencing the special counsel's underline report summarizing the nearly two-year Russia probe. "They would much rather see something on TV that they can make conclusions for themselves about. That's the age we're living in. It's almost entertainment."

Democrats say a spate of hearings will also highlight Trump's efforts to stonewall their myriad probes. The president has resisted at least half a dozen subpoenas from House committees and launched an underline unprecedented series of federal lawsuits to invalidate some of the information requests.

## POLITICO Playbook newsletter

✉ up today to receive the #1-rated newsletter in politics

|                |
|----------------|
| Your email...  |

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

The approach is almost as much political as it is tactical. It gives Democrats a chance to navigate around the thorny impeachment question while still showcasing their majority and flexing their investigative chops. And they might even uncover some wrongdoing along the way just as the 2020 presidential race heats up.

"There's a big sentiment amongst some that they should 'Benghazi' Trump," said Julian Epstein, a former senior House Democratic aide, referring to how Republicans spent two

years relentlessly holding <u>hearings</u> about the 2012 terrorist attack in Libya, a process that revealed Secretary of State Hillary Clinton's private email server. The unexpected discovery <u>haunted</u> Clinton's 2016 presidential campaign.

Epstein, who served as chief counsel for the House Judiciary Democrats during the Bill Clinton impeachment fight, said a spate of hearings has two purposes: creating a political weapon to weaken the president going into 2020 and satisfying a party base frustrated that the House hasn't moved to impeach the president.

"Democrats are trying to figure out what their off-ramp is here," he said.

One, he said, is the hearing-laden "Benghazi" approach. Another is a censure resolution that passes on the House floor, effectively serving as a formal wrist slap for Trump. "They don't have a lot of good options," Epstein said.

Trump and his administration have been eager to play the political card, too.

White House officials have either refused to turn over documents or delayed producing them to 12 House committees, according to Democratic aides. Several administration officials have ignored requests for interviews and testimony. Barr, for example, is <u>resisting plans</u> to appear Thursday before the House Judiciary Committee because Democrats want to allow the panel's Republican and Democratic staff counsels to ask the attorney general an additional hour of questions about the Mueller investigation.

The president and his allies argue that Trump has the authority to fight House Democrats because they were openly taunting him with plans to launch their investigations and discussing impeachment since well before last year's midterm elections returned them to power.

---

CONGRESS
### Pelosi holds firm as some fear impeachment window closing
By **HEATHER CAYGLE**, **KYLE CHENEY** and **ANDREW DESIDERIO**

---

"By the time you hear all that, you say, 'What am I, a sucker? I'm going to go in front of these people who want to hang me?'" Rudy Giuliani, the president's personal lawyer, told POLITICO. "This is a complete political game now. It's even being calculated by them based on are they going to get hurt or not by carrying it on."

Still, Democrats continue to lay the groundwork for more high-profile hearings.

On the Oversight panel, they <u>issued</u> a subpoena to a former White House official to testify about potential security clearance abuses. The gathering would shed a spotlight on allegations that staffers, including Trump son-in-law and senior presidential adviser Jared Kushner, were granted clearances after initially being denied.

Over at the Judiciary Committee, Democrats are angling to hold what might be the most blockbuster hearing — with Mueller himself. They've subpoenaed the Justice Department for Mueller's full report and his underlying evidence and are in <u>talks</u> to get the special counsel to testify as early as next week. They've also authorized subpoenas for a slate of former top Trump aides, including Hope Hicks, Reince Priebus and Steve Bannon — all of whom would create spectacle hearings that resonate beyond the Beltway.

And one attention-grabbing hearing could be rescheduled in the coming weeks. Felix Sater, the chief negotiator for Trump's failed election-year attempts to build a Trump Tower in Moscow, had previously agreed to testify, but his appearance was pushed off until after the Mueller report came out.

"We need to put some color around the Mueller report and really come to a conclusion in concert with the American people over what the proper response is," said Rep. Jim Himes (D-Conn.), a member of the Intelligence Committee.

"And until people are more familiar with the details of what occurred, it's hard to come to a unified notion," Himes added. "Certainly, in my district and around the country, there's ambivalence about the right mechanism of accountability for the president. Just as in the 1970s, we need to do more work and better understand what occurred."

With the never-ending gush of news, each hearing could come on the heels of revelations, giving lawmakers a rare chance to publicly press key players. For instance, just hours before Barr was set to testify before the Senate on Wednesday, it came out that Mueller had sent him a letter expressing frustration with the attorney general's initial characterization of his report.

Within minutes, Sen. Amy Klobuchar (D-Minn.), a presidential candidate who will question Barr as a member of the Senate Judiciary Committee, had tweeted: "Barr will have to answer for this at our hearing. Updating my questions!"

The high-profile hearing formula has worked for Democrats in the past.

When Michael Cohen, Trump's former personal attorney and fixer, testified in February, it was appointment viewing. Trump fumed at the revelations from the public hearing, and

Cohen's appearance launched new avenues of investigation. Both House Democrats and New York authorities subpoenaed documents related to Trump's financial records based on Cohen's answers.

Some Democrats who have been in the oversight trenches argued that the strategy shouldn't be viewed through a 2020 lens, though.

"Their responsibility is to be methodical and follow the facts," said Phil Schiliro, the former Obama White House legislative director and a veteran House Democratic aide under then-Oversight Chairman Henry Waxman. "That's not something that happens quickly."

Even House Democrats are fretting about their limited time to notch victories as they square off against a Trump White House willing to push many oversight battles into the courts.

**MUELLER INVESTIGATION**
### Mueller complained to Barr about Russia report memo
By **NATASHA BERTRAND**, **DARREN SAMUELSOHN**, JOSH GERSTEIN and **KYLE CHENEY**

California Rep. Eric Swalwell, a 2020 White House hopeful who serves on both the Judiciary and Intelligence committees, said in an interview that it wouldn't take much for Trump to "run out the clock" on Democratic document and testimony demands.

Others warned that Democrats might appear overzealous and even create sympathetic witnesses during a parade of highly publicized hearings.

"Do you really want to put Hope Hicks on TV? She's going to win that," said a Washington-based defense attorney who worked on the Mueller investigation.

Several Republicans say that Democrats would have more options for getting materials from Trump's administration, and even underlying materials at the center of Mueller's investigation, if they open formal impeachment proceedings. So far, that's a step Democratic leadership has been reluctant to endorse.

"I don't know, frankly, if it's such a bad thing for Democrats to do that. Once you get these things and you explore it, who knows where it goes?" said Tom Davis, a former Virginia GOP congressman who chaired the House Oversight Committee.

William Moschella, who ran the Justice Department's congressional affairs office during the George W. Bush administration, said the Democratic clamor for documents and

testimony "seems to be adding fuel to the impeachment fire" even as party leaders try to stay away from the topic.

"The Hill must know that these various unorthodox requests are going to be rebuffed, and when they are, members are going to claim that those refusals are evidence of obstruction and that they must defend the institutional integrity of the House," he said. "To mix metaphors, these things have a way of snowballing."

Democrats counter that Trump's run-out-the-clock strategy will damage his reelection chances.

Democrats expect they'll prevail in court against Trump's efforts to invalidate their subpoenas, including those seeking Trump's financial information.

"If we get the information, he's seen as violating the law or supporting a position that is contrary to the law, and we get the information anyway, that's not a winning strategy for him," said Rep. Stephen Lynch (D-Mass.), a senior member of the Oversight panel.

And it's those same battles that Democrats say could still produce the kinds of smoking guns could be found in the heat of the 2020 campaign.

"I don't think it serves him to delay all this," Swalwell said, "because if he knows his history, he will see that the courts are going to rule against him, and the courts take time to make their rulings and so the rulings could come out at a time when Americans are thinking about who they want to lead them."

*Kyle Cheney contributed to this report.*

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition