## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DONALD J. TRUMP, et al.** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-01136 (APM)** |
| | ) | |
| **COMMITTEE ON OVERSIGHT AND REFORM OF THE U.S. HOUSE OF REPRESENTATIVES, et al.** | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      INTRODUCTION

> *I do, therefore, . . . solemnly protest against these proceedings of the House of Representatives, because they are in violation of the rights of the coordinate executive branch of the Government, and subversive of its constitutional independence; because they are calculated to foster a band of interested parasites and informers, ever ready, for their own advantage, to swear before ex parte committees to pretended private conversations between the President and themselves, incapable, from their nature, of being disproved; thus furnishing material for harassing him, degrading him in the eyes of the country . . .*
>
> -    President James Buchanan[1]

These words, written by President James Buchanan in March 1860, protested a resolution adopted by the U.S. House of Representatives to form a committee—known as the Covode Committee—to investigate whether the President or any other officer of the Executive Branch had sought to influence the actions of Congress by improper means.  *See* Buchanan at 218–21.

---

[1] JAMES BUCHANAN, THE WORKS OF JAMES BUCHANAN VOLUME XII 225–26 (John Bassett Moore ed., J.B. Lippincott Company) (1911) [hereinafter Buchanan].

Buchanan "cheerfully admitted" that the House of Representatives had the authority to make inquiries "incident to their legislative duties," as "necessary to enable them to discover and to provide the appropriate legislative remedies for any abuses which may be ascertained." *Id.* at 221. But he objected to the Covode Committee's investigation of his conduct. He maintained that the House of Representatives possessed no general powers to investigate him, except when sitting as an impeaching body. *Id.* Buchanan feared that, if the House were to exercise such authority, it "would establish a precedent dangerous and embarrassing to all my successors, to whatever political party they might be attached." *Id.* at 226.

Some 160 years later, President Donald J. Trump has taken up the fight of his predecessor. On April 15, 2019, the Committee on Oversight and Reform of the House of Representatives issued a subpoena for records to Mazars USA LLP, a firm that has provided accounting services to President Trump. The subpoena called for Mazars to produce financial records and other documents relating to President Trump personally as well as various associated businesses and entities dating back to 2011—years before he declared his candidacy for office. The decision to issue the subpoena came about after the President's former lawyer and confidant, Michael Cohen, testified before the House Oversight Committee that the President routinely would alter the estimated value of his assets and liabilities on financial statements, depending on the purpose for which a statement was needed. For instance, Cohen said that the President provided inflated financial statements to a bank to obtain a loan to purchase a National Football League franchise. But when it came time to calculate his real estate taxes, the President would deflate the value of certain assets. To support his accusations, Cohen produced financial statements from 2011, 2012, and 2013, at least two of which were prepared by Mazars.

Echoing the protests of President Buchanan, President Trump and his associated entities are before this court, claiming that the Oversight Committee's subpoena to Mazars exceeds the Committee's constitutional power to conduct investigations. The President argues that there is no legislative purpose for the subpoena. The Oversight Committee's true motive, the President insists, is to collect personal information about him solely for political advantage. He asks the court to declare the Mazars subpoena invalid and unenforceable.

Courts have grappled for more than a century with the question of the scope of Congress's investigative power. The binding principle that emerges from these judicial decisions is that courts must presume Congress is acting in furtherance of its constitutional responsibility to legislate and must defer to congressional judgments about what Congress needs to carry out that purpose. To be sure, there are limits on Congress's investigative authority. But those limits do not substantially constrain Congress. So long as Congress investigates on a subject matter on which "legislation could be had," Congress acts as contemplated by Article I of the Constitution.

Applying those principles here compels the conclusion that President Trump cannot block the subpoena to Mazars. According to the Oversight Committee, it believes that the requested records will aid its consideration of strengthening ethics and disclosure laws, as well as amending the penalties for violating such laws. The Committee also says that the records will assist in monitoring the President's compliance with the Foreign Emoluments Clauses. These are facially valid legislative purposes, and it is not for the court to question whether the Committee's actions are truly motivated by political considerations. Accordingly, the court will enter judgment in favor of the Oversight Committee.

## II.    BACKGROUND

### A.    The 116th Congress and the House Oversight Committee

On January 3, 2019, the 116th Congress began with the Democratic Party controlling a majority of seats in the U.S. House of Representatives.  One of the House's first actions was to adopt the "Rules of the House of Representatives," which govern proceedings during the two-year term.  This vote took place on January 9, 2019.[2]  Rule X of the adopted House Rules, titled "Organization of Committees," establishes various standing committees and their respective jurisdictions.[3]  Among the standing committees with the broadest purview is the Committee on Oversight and Reform ("Oversight Committee").  Its subject areas of primary jurisdiction range from the lofty—"[o]verall economy, efficiency, and management of government operations"—to the mundane—"[f]ederal paperwork reduction."  House Rules at 8.  If there is a common thread running through the subjects within the Oversight Committee's jurisdiction, it is the oversight of the operations and administration of the Executive Branch.

Each of the House's standing committees possess "[g]eneral oversight responsibilities." *Id.* at 9.  Those responsibilities are meant to assist the House in (1) "its analysis, appraisal, and evaluation of" "the application, administration, execution, and effectiveness of Federal laws" and (2) "conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation," and (3) "its formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate." *Id.*  Some of the House's standing committees have "[s]pecial oversight functions." *Id.* at 10.  The Oversight

---

[2] Final Vote Results for Roll Call 19, Adopting the Rules of the House of Representatives for the One Hundredth Sixteenth Congress, http://clerk.house.gov/evs/2019/roll019.xml (last visited May 20, 2019).

[3] Rules of the House of Representatives, 116th Congress at 6 (Jan. 11, 2019), https://rules.house.gov/sites/democrats.rules.house.gov/files/116-1/116-House-Rules-Clerk.pdf (last visited May 20, 2019) [hereinafter House Rules].

Committee is one of them.  Its "special oversight function" is described as involving the "review and study on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President."  *Id.*  The Executive Office of the President consists of a small group of federal agencies that most immediately aid the President on matters of policy, politics, administration, and management.  The President's closest advisors typically are situated in the Executive Office.[4]

Rule X also vests the Oversight Committee with special authority to conduct investigations. According to the Rule, "the Committee on Oversight and Reform may *at any time* conduct investigations of *any matter* without regard to [other rules] conferring jurisdiction over the matter to another standing committee."  House Rules at 11 (emphasis added).  In other words, the Oversight Committee is empowered to investigate as to any subject matter, even in those areas that are expressly assigned to other committees.  No other committee possesses such sweeping investigative authority.

The Oversight Committee's broad investigative power is not new.  In each of the four preceding Congresses—all controlled by the Republican Party, including during the final six years of the Obama Administration—the House Oversight Committee enjoyed the same power "at any time [to] conduct investigations of any matter."[5]

---

[4] *See generally* Congressional Research Service, "The Executive Office of the President: An Historical Overview," Nov. 26, 2008, https://fas.org/sgp/crs/misc/98-606.pdf (last visited May 20, 2019).

[5] Rules of the House of Representatives, 115th Congress at 505 (2017), https://www.govinfo.gov/content/pkg/HMAN-115/pdf/HMAN-115.pdf, (last visited May 20, 2019); Rules of the House of Representatives, 114th Congress at 497 (2015), https://www.govinfo.gov/content/pkg/HMAN-114/pdf/HMAN-114.pdf  (last visited May 20, 2019);  Rules of the House of Representatives, 113th Congress at 496 (2013),  https://www.govinfo.gov/content/pkg/HMAN-113/pdf/HMAN-113-houserules.pdf (last visited May 20, 2019); Rules of the House of Representatives, 112th Congress at 492 (2011), https://www.govinfo.gov/content/pkg/HMAN-112/pdf/HMAN-112.pdf (last visited May 20, 2019).

### B.        The Oversight Committee's Investigation

From the start of the 116th Congress, the Oversight Committee, now led by a Democrat, moved aggressively to use its investigative powers.  It did not adopt a resolution or issue a public statement defining the scope of what it intended to investigate.  Instead, it sent a series of letters to the White House and elsewhere seeking various records regarding the President's personal finances, as well as records concerning his businesses and related entities.  For instance, days before the new Congress started, the incoming Chairman of the Oversight Committee, Representative Elijah Cummings, wrote the President's personal lawyer, Sheri Dillon, and the Executive Vice President and Chief Compliance Counsel of the Trump Organization, George Sorial, asking them to produce previously requested "documents regarding the Trump Organization's process for identifying payments from foreign governments and foreign-government controlled entities . . ."[6]  In a different letter, the Chairman asked the General Services Administration ("GSA"), the agency that manages federally owned and leased buildings, to produce records concerning the federal government's lease with the Trump Organization for the Old Post Office Building, which houses the Trump International Hotel in Washington, D.C.[7]  Chairman Cummings indicated that he sought these records for multiple reasons, including the concern that the lease might violate the Constitution's Emoluments Clauses.  Cummings' April

---

[6] Letter from the Honorable Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, to Sheri A. Dillon, Counsel to Donald Trump, and George A. Sorial, Exec. Vice President and Chief Compliance Counsel, Trump Org. (Dec. 19, 2018), https://tinyurl.com/Dec19CummingsDillonLetter (last visited May 20, 2019).

[7] Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, et al., to Emily Murphy, Administrator, Gen. Servs. Admin. (Apr. 12, 2019), https://tinyurl.com/Apr12CummingsHorneLetter (last visited May 20, 2019) [hereinafter Cummings' April 12th GSA Letter].

12th GSA Letter at 1.[8]  These are but two examples of the types of records requests made by the Oversight Committee at the start of the 116th Congress.

The investigative demand that sparked this lawsuit was issued on January 8, 2019.  On that day, Chairman Cummings wrote to Pat Cipollone, the White House Counsel, asking the President to produce "documents related to President Trump's reporting of debts and payments to his personal attorney, Michael Cohen, to silence women alleging extramarital affairs with the President before the election."[9]  The prior year, in May 2018, the Office of Government Ethics had concluded that the President should have disclosed a payment made by Cohen as a liability on the President's public financial disclosure report.[10]  Chairman Cummings noted in the January 8th letter that the Oversight Committee "has jurisdiction over a wide range of matters, including the Ethics in Government Act of 1978," a law that requires "all federal officials, including the President, to publicly disclose financial liabilities that could impact their decision-making." Cummings' January 8th Letter at 1.  On February 1, 2019, the White House Counsel responded to

---

[8] This request for documents was not new.  During the early months of the Trump Administration, Representative Cummings, who was then the Ranking Member on the Oversight Committee, along with other Democratic members, asked GSA to produce records regarding the Old Post Office lease.  *See Cummings v. Murphy*, 321 F. Supp. 3d 92, 97–99 (D.D.C. 2018).  When GSA did not cooperate, the Members brought a lawsuit to force it to disclose the records. *See generally id.*  This judge handled that very matter and ruled that the Democratic members lacked standing to bring the case.  *See id.* at 101–17.  That decision is pending before the D.C. Circuit.

[9] Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, White House Counsel (Jan. 8, 2019), https://tinyurl.com/Jan8CummingsCipolloneLetter (last visited May 20, 2019) [hereinafter Cummings' January 8th Letter].  Then-Ranking Member Cummings made a request for similar records in September 2018, which went unanswered.  *See* Letter from the Honorable Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, to Donald F. McGahn II, White House Counsel, and George A. Sorial, Exec. Vice President and Chief Compliance Counsel, Trump Org. (September 12, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2018-09-12.EEC%20to%20McGahn-WH%20Sorial-TrumpOrg%20re%20Financial%20Disclosures%20Cohen%20Payments.pdf (last visited May 20, 2019).

[10] Letter from David J. Apol, Acting Dir., Office of Gov't Ethics, to Rod J. Rosenstein, Deputy Att'y Gen., Dep't of Justice (May 16, 2018), https://oge.gov/web/OGE.nsf/0/D323FD5ABB1FD2358525828F005F4888/$FILE/OGE%20Letter%20to%20DOJ%20(posting).pdf (last visited May 20, 2019).

Chairman Cummings that the President was prepared to consider making some documents available for review.[11]

Chairman Cummings wrote the White House Counsel again on February 15, 2019.  *See* Cummings' February 15th Letter.  He opened by stating that, by his January 8th letter, "the Committee launched an investigation into the failure of President Donald Trump to report hundreds of thousands of dollars in payments and liabilities to his former attorney, Michael Cohen, to silence women alleging extramarital affairs during the 2016 presidential campaign."  *Id.* at 1. Chairman Cummings explained that "[t]he Committee's interest in obtaining these documents is even more critical in light of new documents obtained by the Committee from the Office of Government Ethics (OGE) that describe false information provided by lawyers representing President Trump . . . "  *Id.*  The letter went on to detail a timeline of recent events starting with statements made by the President's lawyers to the Office of Government Ethics and to the public about a supposed purpose of the Cohen payments unrelated to the election; followed by the President's disclosure of the Cohen payments on his 2017 Financial Disclosure form as a liability of less than $250,000; and then revelations by federal prosecutors that the Cohen payments in fact exceeded the $250,000 reported by the President.  *Id.* at 2–6.  In the end, Chairman Cummings cited Congress's "plenary authority to legislate and conduct oversight regarding compliance with ethics laws and regulations" as the source of its authority to make the records demand, as well as its "broad authority to legislate and conduct oversight on issues involving campaign finance."  *Id.* at 7.

---

[11] Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, White House Counsel at 1 (Feb. 15, 2019),  https://tinyurl.com/Feb15CummingsCipolloneLetter [hereinafter Cummings' February 15th Letter].

### C.     Subpoena to Mazars USA LLP

On February 27, 2019, Michael Cohen appeared for a public hearing before the House Oversight Committee.[12]  By this time, Cohen had pleaded guilty to a host of federal felony charges, including tax evasion, campaign finance violations, and making false statements to Congress.[13] During his testimony, Cohen alleged that financial statements prepared by the President's accountants falsely represented the President's assets and liabilities.  *See* Cohen Testimony at 13, 19.  Specifically, Cohen stated that, in his experience, "Mr. Trump inflated his total assets when it served his purposes . . . and deflated his assets to reduce his real estate taxes."  *Id.*  Cohen supplied the Oversight Committee with portions of the President's Statements of Financial Condition from 2011, 2012, and 2013, some of which were signed by Mazars.[14]

Following Cohen's testimony, Chairman Cummings wrote to Mazars on March 20, 2019. The letter first summarized aspects of Cohen's testimony accusing the President of manipulating financial statements to suit his purposes; it then identified a half-dozen questions about assets and liabilities reflected in the President's Statements of Financial Condition that Cohen had provided to the Oversight Committee.  *See* Cummings' March 20th Letter at 1–3.  Chairman Cummings stated that these financial statements "raise questions about the President's representations of his financial affairs on these forms and on other disclosures, particularly relating to the President's debts."  *Id.* at 1.  The letter concluded by asking Mazars to produce four categories of documents

---

[12] *Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2019), https://tinyurl.com/CohenHearing (last visited May 20, 2019) [hereinafter Cohen Testimony].

[13] *See* Mark Mazzetti, et al., *Cohen Pleads Guilty and Details Trump's Involvement in Moscow Tower Project*, N.Y. TIMES, Nov. 29, 2018,  https://www.nytimes.com/2018/11/29/nyregion/michael-cohen-trump-russia-mueller.html (last visited May 20, 2019).

[14] *See* Letter from the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Victor Wahba, Chairman and Chief Exec. Officer, Mazars USA LLP (Mar. 20, 2019), https://tinyurl.com/Mar20CummingsLetter (last visited May 20, 2019) [hereinafter Cummings' March 20th Letter]; *see also* Cohen Testimony at 13.

with respect to not just the President, but also several affiliated organizations and entities, including the Trump Organization Inc., the Donald J. Trump Revocable Trust, the Trump Foundation, and the Trump Old Post Office LLC. *See id.* at 4. The records requested included statements of financial condition, audited financial statements, documents relied upon to prepare any financial statements, engagement agreements, and communications between Mazars and the President or employees of the Trump Organization. *See id.* The relevant time period identified for the requested records was "January 1, 2009, to the present." *Id.* In his initial letter to Mazars, Chairman Cummings did not articulate any legislative purpose for the records requested.

A week later, on March 27, 2019, Mazars responded that it "cannot voluntarily turn over documents sought in the Request."[15] Mazars cited various federal and state regulations and professional codes of conduct that prevented it from doing so. *See* Mazars March 27th Letter at 1.

On April 12, 2019, Chairman Cummings distributed a memorandum to Members of the Oversight Committee ("Memorandum"), advising them of his intent to issue a subpoena to Mazars.[16] Under a section titled "Need for Subpoena," Chairman Cummings cited to Cohen's testimony that the President had "altered the estimated value of his assets and liabilities on financial statements," as well as to the records Cohen had provided to support these claims. Cummings' April 12th Mem. at 1–2. He also referenced "[r]ecent news reports" raising "additional concerns regarding the President's financial statements and representations." *Id.* at 1. In the "Conclusion" section of the Memorandum, Chairman Cummings listed the purposes for seeking the Mazars-held records:

---

[15] Letter from Jerry D. Bernstein, BlankRome LLP, Outside Counsel to Mazars USA LLP, to the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform (Mar. 27, 2019), https://tinyurl.com/Mar27MazarsLetter (last visited May 20, 2019) [hereinafter Mazars March 27th Letter].
[16] Memorandum from Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Members of the Committee on Oversight and Reform (April 12, 2019), https://www.politico.com/f/?id=0000016a-131f-da8e-adfa-b5f319d0001 (last visited May 20, 2019) [hereinafter Cummings' April 12th Mem.].

> The Committee has full authority to investigate whether the President may have engaged in illegal conduct before and during his tenure in office, to determine whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions, to assess whether he is complying with the Emoluments Clauses of the Constitution, and to review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities. The Committee's interest in these matters informs its review of multiple laws and legislative proposals under our jurisdiction, and to suggest otherwise is both inaccurate and contrary to the core mission of the Committee to serve as an independent check on the Executive Branch.

*Id.* at 4. Chairman Cummings allowed 48 hours for Members to offer their views on issuing the subpoena. *See id.* The Committee's new Ranking Member, Congressman Jim Jordan, responded, declaring the action "an unprecedented abuse of the Committee's subpoena authority to target and expose the private financial information of the President of the United States."[17]

Notwithstanding the Ranking Member's objection, on April 15, 2019, the Oversight Committee issued the subpoena to Mazars that is the subject of this lawsuit. The subpoena sought the same four categories of records identified in the March 20th letter relating to the President and his affiliated organizations and entities. *See* Subpoena, ECF No. 9-2, Ex. A, at 3 [hereinafter Subpoena]; *see also* Cummings' March 20th Letter at 4. The subpoena, however, differed in one respect—it narrowed the relevant time period by two years to "calendar years 2011 through 2018."[18] Subpoena at 3.

---

[17] Letter from the Honorable Jim Jordan, Ranking Member, House Comm. on Oversight & Reform, to the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform at 1 (April 15, 2019), https://republicans-oversight.house.gov/wp-content/uploads/2019/04/2019-04-15-JDJ-to-EEC-re-Mazars-Subpoena.pdf (last visited May 20, 2019).

[18] At oral argument, Plaintiffs stated that paragraph 2 of the subpoena applies "without regard to time." Hr'g Tr. at 69. That paragraph, however, is for all engagement agreements or contracts related to items "described in Item Number 1," which is time-limited from 2011 to 2018. *See* Subpoena at 3.

### D.     Procedural History

#### 1.     *Plaintiffs Seek Injunctive Relief*

On April 22, 2019, President Trump, along with his affiliated organizations and entities (collectively "Plaintiffs"),[19] filed this lawsuit.  *See* Compl., ECF No. 1 [hereinafter Compl.].  They originally named as defendants Chairman Cummings; Peter Kenny, the Chief Investigative Counsel of the Oversight Committee; and Mazars.  Plaintiffs asked the court, among other things, to declare that the Oversight Committee's subpoena to Mazars "is invalid and unenforceable" and to issue a "permanent injunction quashing Chairman Cummings' subpoena."  Compl. at 13.  With their Complaint, Plaintiffs filed an Application for a Temporary Restraining Order and Motion for Preliminary Injunction.  *See* Pls.' App. for a TRO, ECF No. 9; Pls.' Mot. for Prelim. Inj., ECF No. 11; Stmt. of P&A in Support of Pls.' App. for a TRO and Mot. for Prelim. Inj., ECF Nos. 9-1, 11-1 [hereinafter Pls.' Stmt.].  The Application asked the court to enter an order "prohibiting Defendants from enforcing or complying with Chairman Cummings' subpoena so that the Court can decide Plaintiffs' motion for a preliminary injunction."  Pls.' Stmt. at 14.

Following discussions with the Oversight Committee, Plaintiffs consented to the Committee's intervention as a defendant in this matter and agreed to dismiss Chairman Cummings and Kenny as defendants.  *See* Consent Mot. of the Oversight Committee to Intervene, ECF No. 12; Joint Stip., ECF No. 15.  The parties settled on a briefing schedule on Plaintiffs' motion for preliminary injunction, which the court entered.  Minute Order, Apr. 23, 2019.  The Oversight Committee also agreed to postpone the date for Mazars to produce records until seven days after

---

[19] The complete list of affiliated organizations and entities includes:  The Trump Organization, Inc.; Trump Organization LLC; The Trump Corporation; DJT Holdings LLC; The Donald J. Trump Revocable Trust; and the Trump Old Post Office LLC.

the court ruled on Plaintiffs' motion.  *See id.*  That agreement made it unnecessary for the court to enter a temporary restraining order.

### 2.    *Consolidation under Rule 65(a)(2)*

Under the entered schedule, the parties were to appear before the court for oral argument on May 14, 2019.  Five days before the hearing and one day after the parties had completed briefing, the court entered an order announcing its intention to consolidate the hearing on the preliminary injunction with the "trial on the merits," as is permitted under Federal Rule of Civil Procedure 65(a)(2).  *See* Order, ECF No. 25 [hereinafter Order].  The court explained the reason for consolidation as follows:

> The sole question before the court—Is the House Oversight Committee's issuance of a subpoena to Mazars USA LLP for financial records of President Donald J. Trump and various associated entities a valid exercise of legislative power?—is fully briefed, and the court can discern no benefit from an additional round of legal arguments.  Nor is there an obvious need to delay ruling on the merits to allow for development of the factual record.

*Id.*  The court made the decision to consolidate conscious of the need to expedite these types of cases.  In *Eastland v. U.S. Servicemen's Fund*, the Supreme Court stated that motions to enjoin a congressional subpoena "be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch."  421 U.S. 491, 511 n.17 (1975); *see also Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978) (describing *Eastland* as emphasizing "the necessity for courts to refrain from interfering with or delaying the investigatory functions of Congress").  The court also was cognizant of the fact that the Constitution's Speech or Debate Clause forecloses Plaintiffs from compelling discovery from the Oversight Committee, its Members, or staff.  *See Eastland*, 421 U.S. at 503 (stating that "a private civil action, whether for an injunction or damages, creates a distraction and forces Members to

divert their time, energy, and attention from their legislative tasks to defend the litigation"); *see also Gravel v. United States*, 408 U.S. 606, 616–22 (1972).   Relatedly, the D.C. Circuit has recognized that evidence relevant to determining whether Congress has acted in its legislative capacity is likely to come largely, if not exclusively, from public sources.   *See Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (observing that relevant sources of evidence include "the resolution of the Congress authorizing the inquiry," "the opening statement of the Chairman at the hearings," and "statements of the members of the committee . . . or of the Staff Director") (citations omitted).   The court ordered the parties to submit any additional evidence to the court or lodge an objection to consolidation by May 13, 2019.   Order at 2.

Plaintiffs protested the court's consolidation order, but the Oversight Committee did not. *See* Pls.' Objections to Rule 65(a)(2) Consolidation, ECF No. 29 [hereinafter Pls.' Objections]; *see also* Oversight Committee's Resp. to the Court's May 9, 2019 Order, ECF No. 31.   Plaintiffs asserted that, in briefing only a motion for preliminary injunction, they were constrained in their arguments on the merits.   *See* Pls.' Objections at 4 ("Nor have the parties had the opportunity to fully brief the important constitutional questions that this case presents.").   They also maintained that they needed more time to obtain additional evidence, specifically (1) a memorandum of understanding negotiated between Chairman Cummings and a Chair of a different House Committee, which they believed the Ranking Member of the Oversight Committee would voluntarily disclose to them, and (2) communications between Mazars and the Oversight Committee.   *Id.* at 6–7.   Plaintiffs did not assert that they could obtain discovery from the Oversight Committee.   *See generally id.*

At the May 14th hearing, the court heard further argument from Plaintiffs on consolidation, and overruled their objection.   The court found that no additional briefing would aid in its decision-

14

making, as the parties had comprehensively presented the issues and cited all applicable precedent. *See* Hr'g Tr. at 34. Indeed, Plaintiffs could identify no new argument that they would make if given the chance to do so. *Id*. at 34–36. To allow for Plaintiffs' asserted need to gather additional evidence, the court left the record open until May 18, 2019. *Id*. at 75. Plaintiffs already had submitted some additional evidence after the consolidation order, which consisted of news reports of public statements of various Members of Congress. *See* Supp. Decl. of William S. Consovoy, ECF No. 30 [hereinafter First Supp. Decl.]. Plaintiffs added two more letters from the Ranking Member before the record closed. *See* Second Supp. Decl. of William S. Consovoy, ECF No. 34.[20]

### E.      Cross-Motions for Summary Judgment

The legal issues presented do not require the court to resolve any fact contests because the material facts are not in dispute.[21] Accordingly, having ordered consolidation under Rule 65(a)(2), the court treats the parties' briefing as cross-motions for summary judgment. *See Mar. for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015) (reviewing case consolidated under Rule 65(a)(2) as cross-motions for summary judgment); *Indep. Bankers Ass'n of Am. v. Conover*, 603 F. Supp. 948, 953 (D.D.C. 1985) (same).

---

[20] Plaintiffs did not offer any evidence from Mazars; nor did they submit the memorandum of understanding that they claimed in their Opposition was critical evidence. The Oversight Committee, however, did submit that memorandum of understanding to the court *in camera*. The court has considered the contents of the agreement in rendering its judgment.

[21] Although the Oversight Committee's "motive" for issuing the subpoena to Mazars is a disputed fact, as discussed further below, it is not a "material" fact that would prevent deciding the case on cross-motions for summary judgment. *See Watkins v. United States*, 354 U.S. 178, 200 (1957). In addition, the Committee admitted "there is no legitimate dispute about the facts here. We're not saying that Congressman Cummings didn't say the things that he's quoted as saying . . ." Hr'g Tr. at 61–62.

### III.    LEGAL PRINCIPLES

#### A.    Congress's Broad Investigative Authority

Article I of the Constitution grants Congress all "legislative Powers."  U.S. Const. art. I,

§ 1.  Although Article I does not say so expressly, the power to secure "needed information . . .

has long been treated as an attribute of the power to legislate."  *McGrain v. Daugherty*, 273 U.S.

135, 161 (1927).  As the Supreme Court observed in *McGrain*, the power to investigate is deeply

rooted in the nation's history:  "It was so regarded in the British Parliament and in the colonial

Legislatures before the American Revolution, and a like view has prevailed and been carried into

effect in both houses of Congress and in most of the state Legislatures."  *Id.*  "There can be no

doubt as to the power of Congress, by itself or through its committees, to investigate matters and

conditions relating to contemplated legislation."  *Quinn v. United States*, 349 U.S. 155, 160 (1955).

Related to Congress's legislative function is its "informing function."  The Supreme Court

has understood that function to permit "Congress to inquire into and publicize corruption,

maladministration or inefficiency in agencies of the Government."  *Watkins v. United States*, 354

U.S. 178, 200 n.33 (1957).  "From the earliest times in its history, the Congress has assiduously

performed an 'informing function' of this nature."  *Id.* (citing James M. Landis, *Constitutional*

*Limitations on the Congressional Power of Investigation*, 40 HARV. L. REV. 153, 168–194

(1926)).   The informing function finds its roots in the scholarship of President Woodrow Wilson,

which the Court first cited in *United States v. Rumely*:

> It is the proper duty of a representative body to look diligently into
> every affair of government and to talk much about what it sees.  It
> is meant to be the eyes and the voice, and to embody the wisdom
> and will of its constituents.  Unless Congress have and use every
> means of acquainting itself with the acts and the disposition of the
> administrative agents of the government, the country must be
> helpless to learn how it is being served; and unless Congress both
> scrutinize these things and sift them by every form of discussion, the

> country must remain in embarrassing, crippling ignorance of the
> very affairs which it is most important that it should understand and
> direct.  The informing function of Congress should be preferred
> even to its legislative function.

345 U.S. 41, 43 (1953) (quoting WOODROW WILSON, CONGRESSIONAL GOVERNMENT: A STUDY IN

AMERICAN POLITICS, 303).  Thus, though not wholly distinct from its legislative function, the

informing function is a critical responsibility uniquely granted to Congress under Article I.  *See*

Landis, 40 HARV. L. REV. at 205 n.227 (describing the informing function as "implied and

inherent" within the legislative function).

In furtherance of these duties, Congress's power to investigate is "broad."  *Watkins*, 354

U.S. at 187.  "It encompasses inquiries concerning the administration of existing laws as well as

proposed or possibly needed statutes.  It includes surveys of defects in our social, economic or

political system for the purpose of enabling the Congress to remedy them."  *Id.*  In short, "[t]he

scope of the power of inquiry . . . is as penetrating and far-reaching as the potential power to enact

and appropriate under the Constitution."  *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).

But Congress's investigatory power is not unbounded.  The Constitution's very structure

puts limits on it.  For instance, the power to investigate may not "extend to an area in which

Congress is forbidden to legislate."  *Quinn*, 349 U.S. at 161.  Nor may Congress "trench upon

Executive or judicial prerogatives."  *McSurely v. McClellan*, 521 F.2d 1024, 1038 (D.C. Cir. 1975).

A prime example of such overreach is exercising the "powers of law enforcement; those powers

are assigned under our Constitution to the Executive and the Judiciary."  *Quinn*, 349 U.S. at 161.

The Supreme Court has recognized other limits.  Congress cannot "inquire into private affairs

unrelated to a valid legislative purpose."  *Id.*  Nor is there a "congressional power to expose for

the sake of exposure."  *Watkins*, 354 U.S. at 200.  "The public is, of course, entitled to be informed

concerning the workings of its government.  That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals." *Id.*[22]

## B.    Determining Whether Congress Has Acted Legislatively

When a court is asked to decide whether Congress has used its investigative power improperly, its analysis must be highly deferential to the legislative branch.  A number of guideposts mark the way forward.

To start, the court must proceed from the assumption "that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and [the court] ha[s] no right to assume that the contrary was intended."  *McGrain*, 273 U.S. at 178 (citation omitted).  It also "must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties."  *Exxon Corp.*, 589 F.2d at 589.  So, when it appears that Congress is investigating on a subject-matter in aid of legislating, "the presumption should be indulged that this was the real object."  *McGrain*, 273 U.S. at 178.

An important corollary to this presumption of regularity is that courts may not "test[] the motives of committee members" to negate an otherwise facially valid legislative purpose.  *Watkins*, 354 U.S. at 200; *see also Eastland*, 421 U.S. at 508 ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it.") (citation omitted).  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  *Barenblatt*, 360 U.S. at 132 (citation omitted).  Thus, it is not the court's role to decipher whether Congress's true purpose in pursuing an investigation is to aid legislation or something more sinister

---

[22] Other limitations on Congress's investigative powers can be found in the Bill of Rights.  *See Quinn*, 349 U.S. at 161.  Plaintiffs have not asserted that disclosure of the records sought from Mazars would implicate any "specific individual guarantees of the Bill of Rights."  *Id.*; *see generally* Pls.' Stmt.

such as exacting political retribution. *See McSurely*, 521 F.2d at 1038. If there is some discernable legislative purpose, courts shall not impede Congress's investigative actions. *See Watkins*, 354 U.S. at 200 ("Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.").

Although Congress's motives are off limits, courts can consider what Congress has said publicly to decide whether it has exceeded its authority. *See Shelton*, 404 F.2d at 1297. Relevant evidence includes the resolution authorizing the investigation, statements by Committee members, and questions posed during hearings. *See id.* At the same time, the mere absence of public statements identifying the investigation's purpose or subject matter is not, by itself, conclusive proof of an *invalid* purpose. *See McGrain*, 273 U.S. at 176–78. Congress is not required to announce its intentions in advance. *See id.* at 178. Similarly, it does not matter if the investigation does not produce legislation. *See Eastland*, 421 U.S. at 509. "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Id.*; *see also Townsend v. United States*, 95 F.2d 352, 355 (D.C. Cir. 1938) (Congress's "power to conduct a hearing for legislative purposes is not to be measured by recommendations for legislation or their absence."). The critical inquiry then is not legislative certainty, but legislative potential: If the subject matter of the investigation is "one on which legislation *could be had*," Congress acts within its legislative function. *McGrain*, 273 U.S. at 177 (emphasis added); *see also Eastland*, 421 U.S. at 504 n.15 ("The subject of any inquiry always must be one 'on which legislation could be had.'") (quoting *McGrain*, 273 U.S. at 177).

Once a court finds that an investigation is one upon which legislation could be had, it must not entangle itself in judgments about the investigation's scope or the evidence sought. Only an

investigative demand that is "plainly incompetent or irrelevant to any lawful purpose of the [committee] in the discharge of its duties" will fail to pass muster. *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (citation omitted) (cleaned up). Importantly, in making this assessment, it is not the judicial officer's job to conduct a "line-by-line review of the Committee's requests." *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d. 34, 44 (D.D.C. 2018). "There is no requirement that every piece of information gathered in such an investigation be justified before the judiciary." *McSurely*, 521 F.2d at 1041.

And, finally, courts must take care not to be swayed by the political conflicts of the day. Its role is not to act as a political referee. As the Supreme Court cautioned in *Tenney v. Brandhove*:

> In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.

341 U.S. 367, 378 (1951).

## IV.  ANALYSIS

With these principles in mind, the court proceeds to consider whether the Oversight Committee's subpoena to Mazars is "facially legislative in character," *McSurely*, 521 F.2d at 1038, or whether it exceeds Congress's power to investigate. To answer that question, the court first considers the legislative reasons offered by the Oversight Committee to justify the subpoena. It then addresses Plaintiffs' contentions why those reasons are invalid.

### A.  Legislative Purpose for Issuing the Subpoena to Mazars

Had the Oversight Committee adopted a resolution that spells out the intended legislative purpose and scope of its investigation, the court would have begun its inquiry there. Indeed, the

Supreme Court has considered congressional resolutions as a primary source from which to glean whether information "was sought . . . in aid of the legislative function." *McGrain*, 273 U.S. at 176; *see also Shelton*, 404 F.2d at 1297 (observing that relevant sources of evidence to "ascertain whether [an inquiry] is within the broad investigative authority of Congress" include "the resolution . . . authorizing the inquiry"). However, the Committee never adopted one. While a clearly drafted resolution would have made this court's task easier or might have preempted the challenge now brought altogether, it is not a constitutional prerequisite to start an investigation. *Cf. McGrain*, 273 U.S. at 178.

Without a resolution as a point of reference, the logical starting point for identifying the purpose of the Mazars subpoena is the memorandum to Members of the Oversight Committee written by Chairman Cummings on April 12, 2019. Chairman Cummings penned that Memorandum in anticipation of issuing the subpoena. It is therefore the best evidence of the Committee's purpose. The Memorandum lists four areas of investigation: (1) "whether the President may have engaged in illegal conduct before and during his tenure in office," (2) "whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," (3) "whether he is complying with the Emoluments Clauses of the Constitution," and (4) "whether he has accurately reported his finances to the Office of Government Ethics and other federal entities." Cummings' April 12th Mem. at 4. Each of these is a subject "on which legislation could be had." *McGrain*, 273 U.S. at 177.

Taking the reasons in reverse order, the accuracy of the President's financial reporting relates directly to the law that requires it: The Ethics in Government Act of 1978. *See* 5 U.S.C. App. 4 § 101 *et seq.* In his letter to the White House Counsel dated February 15, 2019, Chairman Cummings alluded to how documents relating to the accuracy of the President's disclosures fell

within the legislative purview of Congress:  "Since the earliest days of our republic, Congress has investigated how existing laws are being implemented and whether changes to the laws are necessary.  For decades, this has included laws relating to financial disclosures required of the President."  Cummings' February 15th Letter at 9.  As to the specific demand made on February 15th, which related to the payments by Michael Cohen and the President's failure to publicly report them as a liability, Chairman Cummings explained that "[t]hese documents will help the Committee determine why the President failed to report these payments and *whether reforms are necessary to address deficiencies with current laws, rules, and regulations*."  *Id.* (emphasis added).  This legislative rationale applies equally to the financial records requested by the Mazars subpoena.  Congress reasonably might consider those documents in connection with deciding whether to legislate on federal ethics laws and regulations.  For example, the discovery of additional disclosure violations by the President could influence whether Congress strengthens public reporting requirements or enhances penalties for non-compliance.  Thus, there can be little doubt that Congress's interest in the accuracy of the President's financial disclosures falls within the legislative sphere.

Investigating whether the President is abiding by the Foreign Emoluments Clause is likewise a subject on which legislation, or similar congressional action, could be had.  The Foreign Emoluments Clause prohibits the President from "accept[ing]" any "Emolument" from "any King, Prince, or foreign State" without the "Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8.  The Constitution thus expressly vests in Congress the unique authority to approve the President's acceptance of "Emoluments," however one defines that term.  *See generally Blumenthal v. Trump*, No. 17-1154 (EGS), 2019 WL 1923398 (D.D.C. Apr. 30, 2019).  Even under the President's favored interpretation, the Clause, at a minimum, "was intended to combat corruption and foreign

influence . . ." *Id.* at *8.  Surely, incident to Congress's authority to consent to the President's receipt of Emoluments is the power to investigate the President's compliance with the Clause. Without such power, Congress's constitutional function to approve or disapprove Emoluments would be severely and unduly constrained.  The Founders could not have intended that result.  A congressional investigation to carry out an expressly delegated Article I function, in addition to any legislation that might be had relating to that function, is plainly valid.[23]

So, too, is an investigation to determine whether the President has any conflicts of interest. As already discussed, it lies within Congress's province to legislate regarding the ethics of government officials.  Indeed, exposing conflicts of interest is one of the core objectives of the Ethics in Government Act.  As the D.C. Circuit has observed, "the Act shows Congress'[s] general belief that public disclosure of conflicts of interest is desirable despite its cost in loss of personal privacy." *Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C. Cir. 1982).  Obtaining records to shed light on whether the President has undisclosed conflicts of interests is therefore entirely consistent with potential legislation in an area where Congress already has acted and made policy judgments.

Finally, a congressional investigation into "illegal conduct before and during [the President's] tenure in office," Cummings' April 12th Mem. at 4, fits comfortably within the broad scope of Congress's investigative powers.  At a minimum, such an investigation is justified based on Congress's "informing function," that is, its power "to inquire into and publicize corruption,"

---

[23] To be clear, even if Congress's authority to approve the President's receipt of Emoluments is technically not a "legislative" act, the court doubts that the Supreme Court would read its precedent to foreclose Congress from investigating an Emoluments Clause violation based on a semantic distinction.  The fact is, no court has ever been asked to address the extent of Congress's power to police the Emoluments Clause.  Therefore, it should come as no surprise that there is no case holding that Congress may exercise its power to investigate in relation to that Clause. But just as Congress's authority to legislate is expressly rooted in Article I, so too is its power to consent to presidential receipt of Emoluments.  If Congress's power to investigate is incidental to its legislative function, it likewise must be incidental to carry out its Foreign Emoluments Clause function.

*Watkins*, 354 U.S. at 200 n.33.[24]   It is simply not fathomable that a Constitution that grants Congress the power to remove a President for reasons including criminal behavior would deny Congress the power to investigate him for unlawful conduct—past or present—even without formally opening an impeachment inquiry.   On this score, history provides a useful guide. *Cf. Tobin v. United States*, 306 F.2d 270, 275–76 (D.C. Cir. 1962) (relying on historical practice to determine the scope of a congressional investigation).   Twice in the last 50 years Congress has investigated a sitting President for alleged law violations, *before* initiating impeachment proceedings.   It did so in 1973 by establishing the Senate Select Committee on Presidential Campaign Activities, better known as the Watergate Committee, and then did so again in 1995 by establishing the Special Committee to Investigate Whitewater Development Corporation and Related Matters.   *See* S. Res. 60 (93rd Cong., 1st Session) (Feb. 7, 1973) [hereinafter Watergate Res.]; *see also* S. Res. 120 (104th Cong., 1st Session) (May 17, 1995).   The former investigation included within its scope potential corruption by President Nixon while in office, while the latter concerned alleged illegal misconduct by President Clinton before his time in office.   Congress plainly views itself as having sweeping authority to investigate illegal conduct of a President, before and after taking office.   This court is not prepared to roll back the tide of history.[25]

---

[24] Plaintiffs suggested at oral argument that Congress's informing function was limited to rooting out corruption only in "agencies" of the Government, and the President is not an "agency" of the government. *See* Hr'g Tr. at 9, 75. Although footnote 33 in *Watkins* refers to the informing function in connection with "agencies of the Government," *Watkins*, 354 U.S. 200 n.33, the original conception of that function as embraced by the Court in *Rumely* was not so limited, *see Rumely*, 345 U.S. 41. *Rumely* spoke more generally of shining a light on "every affair of government" and "the acts and the disposition of the administrative agents of the government," without qualification. *Id.* at 43. *Watkins'* reference to administrative agencies is therefore better understood as a case-specific statement—the investigation there involved the Attorney General—rather than a limiting principle. Plaintiffs' artificial line-drawing is antithetical to the checks and balances inherent in the Constitution's design.

[25] Even if an investigation into a sitting President's past or present illegal conduct lies beyond the Oversight Committee's reach, its investigation here still would be legitimate because the Committee identified three other justifications with a valid legislative purpose. *See McGrain*, 273 U.S. at 176–77 (rejecting lower court's opinion striking down a congressional investigation because the investigation "contemplat[ed] the taking of action other than legislative").

Before moving on to Plaintiffs' arguments, the court notes that the Oversight Committee has identified several pieces of actual legislation that, it asserts, are related to its overall investigation of the President.   *See* Oversight Committee's Opp'n to Pls.' Mot. for Prelim. Injunction, ECF No. 20, at 5–6.  The House has passed H.R. 1, which requires, among other things, the President and Vice President to file new financial disclosure forms within 30 days of taking office, and to divest all financial interests that would pose a conflict of interest by "either converting those interests to cash or investments that satisfy ethics rules or placing those interests in a qualified blind trust or disclosing information about business interests."  *Id.* at 6 (citing H.R. 1, 116th Cong., Title VIII (2019)).  Other bills cited by the Oversight Committee include H.R. 745, which would strengthen the Office of Government Ethics, and H.R. 706, which would prohibit the President and Vice President from conducting business directly with the Federal Government.  *See id.* (citing H.R. 745, 116th Cong. (2019); H.R. 706, 116th Cong. (2019)).  There is no mention of any of these bills in any written request from the Oversight Committee, let alone the April 12th Memorandum justifying the Mazars subpoena.  That absence is not fatal, however.  Again, the question for the court is whether the congressional investigation pertains to a subject matter on which legislation could be had, so Congress need not proactively identify any specific legislation to justify its activities.  Here, the bills identified by the Oversight Committee demonstrate Congress's intent to legislate, at the very least, in the areas of ethics and accountability for Executive Branch officials, including the President.  These are subjects, therefore, on which legislation could be had.

## B.   Plaintiffs' Contentions

The court now turns to Plaintiffs' contentions.  Each of Plaintiffs' arguments for why the Mazars subpoena exceeds Congress's Article I investigative power fall into one of three general

categories.  First, by characterizing the Oversight Committee's investigation as one delving "into the accuracy of a private citizen's past financial statements," Plaintiffs contend that the Oversight Committee is engaged in "a quintessential law enforcement task reserved to the executive and judicial branches."  Pls.' Stmt. at 11.  Plaintiffs similarly contend that an investigation into the accuracy of the President's financial disclosures, his adherence to the Emoluments Clauses, and his present or past compliance with the law is "law enforcement" activity that encroaches on the prerogatives of the coordinate branches.  Hrg. Tr. at 7, 13–18, 25.  Second, Plaintiffs charge that the Oversight Committee's investigation "has nothing to do with government oversight," but is instead intended to expose for the mere sake of exposure "the conduct of a private citizen years before he was even a candidate for public office . . ."  Pls.' Stmt. at 11.  Finally, Plaintiffs maintain that the Oversight Committee has exceeded its authority, insofar as it is doing nothing more than "conduct[ing] roving oversight of the President," and the records sought from Mazars are not "pertinent" to any legitimate legislative purpose.  Pls.' Reply in Support of Pls.' Mot. for Prelim. Injunction, ECF No. 24 [hereinafter Pls.' Reply], at 11–12.  The court addresses each of these arguments in turn.

### 1.    *Usurpation of Executive and Judicial Functions*

Plaintiffs first assert that each of the four justifications for the Mazars subpoena identified by Chairman Cummings in the April 12th Memorandum falls outside the bounds of legislative power, because each seeks to determine whether the President broke the law, a function reserved exclusively to the Executive and Judicial branches.  *See id.* at 13–14.  That argument, however, rests on a false premise.  Just because a congressional investigation has the potential to reveal law violations does not mean such investigation exceeds the legislative function.  The Supreme Court's understanding of a "legislative" purpose is not so constrained.

To be certain, the Supreme Court has said that the "power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary." *Quinn*, 349 U.S. at 161; *see also Watkins*, 354 U.S. at 187 ("Nor is the Congress a law enforcement or trial agency."). But that limitation is not so absolute as to foreclose Congress from investigating any law violation by a private citizen, let alone a sitting President, so long as Congress is operating with a legislative purpose. As the Court explained in *Sinclair v. United States*:

> It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.

279 U.S. 263, 295 (1929). Thus, the Court has made clear that the mere prospect that a congressional inquiry will expose law violations does not transform a permissible legislative investigation into a forbidden executive or judicial function. *See McGrain*, 273 U.S. at 179–80 ("Nor do we think it a valid objection to the investigation that it might possibly disclose crime or wrongdoing on [the Attorney's General's] part."); *see also Townsend*, 95 F.2d at 355 (describing *McGrain* as holding that "the presumption should be indulged that the object of the inquiry was to aid the Senate in legislating . . . even though the investigation might possibly disclose crime or wrongdoing on the part of the then Attorney General, whose name was expressly referred to in the resolution").

Moreover, appellate courts have demanded exacting proof before declaring that Congress has impermissibly intruded into exclusive executive or judicial territories. According to the Supreme Court, "[t]o find that a committee's investigation has exceeded the bounds of legislative power it must be *obvious* that there was a usurpation of functions exclusively vested in the

Judiciary or the Executive." *Tenney*, 341 U.S. at 378 (emphasis added).  Similarly, the D.C. Circuit has said that Congress avoids trenching upon executive or judicial prerogatives "so long as [the investigative activity] remains facially legislative in character."  *McSurely*, 521 F.2d at 1038. Therefore, a congressional investigation that seeks to uncover wrongdoing does not, without more, exceed the scope of Congress's authority.

In this case, there is nothing "obvious" about the Oversight Committee's activities to support the conclusion that the subpoena to Mazars is a usurpation of an exclusively executive or judicial function.  Nothing "give[s ] warrant for thinking the [Oversight Committee is] attempting or intending to try [the President] at its bar or before its committee for any crime or wrongdoing." *McGrain*, 273 U.S. at 179.  Nor is there evidence before the court that the Oversight Committee initiated its investigative activities at the behest of federal or state law enforcement officials, or is coordinating its actions with such officials.  If anything, the evidence is to the contrary. The Executive Branch is clearly not coordinating with Congress, as it continues to resist calls to disclose records relating to the President's actions in areas arguably well within Congress's investigative powers.[26]  The Committee's stated purposes, therefore, do not usurp judicial or executive functions.

To support their position, Plaintiffs point out that (1) the Mazars subpoena arose out of the testimony of Michael Cohen—"an admitted perjurer," Pls.' Stmt. at 4; (2) the records sought relate primarily to the President's personal and financial interests years before he became a candidate, *id.* at 11; and (3) Chairman Cummings admitted that the Mazars subpoena was intended to

---

[26] *See, e.g.,* Carol D. Leonnig, et al., *No 'Do-Over' on Mueller Probe, White House Lawyer Tells House Panel, Saying Demands for Records, Staff Testimony Will be Refused*, WASH. POST, May 15, 2019, https://www.washingtonpost.com/politics/no-do-over-on-mueller-probe-white-house-lawyer-tells-house-panel-saying-demands-for-records-staff-testimony-will-be-refused/2019/05/15/1ad19728-7715-11e9-b3f5-5673edf2d127_story.html?utm_term=.b67bc595c86a (last visited May 20, 2019).

"investigate whether the President may have engaged in illegal conduct before and during his tenure in office," Cummings' April 12th Mem. at 4.  In addition, Plaintiffs cite to statements made by Chairman Cummings before he issued the Mazars subpoena.  For instance, in his March 20th letter to Mazars, Chairman Cummings focused solely on Michael Cohen's allegations that President Trump misrepresented his assets and liabilities and made no mention of a legislative purpose for obtaining the records.  *See* Cummings' March 20th Letter; *see also* First Supp. Decl. at 5–9.  Additionally, Plaintiffs offer a November 2018 *Vox* article that quotes Chairman Cummings as saying, "[w]e've got to address this issue of exposing President Trump and what he has done, and we've got to face the truth . . . The [P]resident is a guy who calls truth lies and lies truth.  But at some point, he's also creating policy, and that's affecting people's day-to-day life." First Supp. Decl. at 42.  Plaintiffs also provide a *Politico* article in which Chairman Cummings is quoted as saying, "[o]ver the last two years President Trump set the tone from the top in his administration that behaving ethically and complying with the law is optional . . . We're better than that."  *Id.* at 54.  None of these facts, individually or taken together, make for an "obvious" "usurpation of functions exclusively vested in the Judiciary or the Executive."  *Tenney*, 341 U.S. at 378.

History has shown that congressionally-exposed criminal conduct by the President or a high-ranking Executive Branch official can lead to legislation.  The Senate Watergate Committee provides an apt example.  That Committee's express mandate was to investigate "the extent, if any, to which illegal, improper, or unethical activities were engaged in by any persons, acting either individually or in combination with others, in the presidential election of 1972, or in any related campaign or canvass conducted by or [o]n behalf of any person seeking nomination or election as the candidate . . . for the office of President . . ."  Watergate Res. at 1–2.  As a

consequence of the Committee's work, Congress passed numerous pieces of legislation—among them, the Ethics in Government Act, the Congressional Budget and Impoundment Control Act of 1974, the War Powers Resolution, and the Independent Counsel Statute—with objectives to "open up the operation of the presidency to greater public oversight, subject[] the presidency to legal checks by other branches or institutions of government and, more generally, impose[] rule of law principles to more and more types of presidential decision making."   Michael A. Fitts, *The Legalization of the Presidency:  A Twenty-Five Year Watergate Retrospective*, 43 ST. LOUIS UNIV. LAW J. 725, 726 (1999).   The Teapot Dome Scandal provides another illustration.   That congressional investigation concerned the award of a no-bid contract to lease federal oil reserves in Wyoming.   Congress's investigation revealed that the Secretary of Interior had accepted bribes from the oil companies that were awarded the leases.   This discovery motivated Congress to enact several good-government reforms, including the Revenue Act of 1924 and the Federal Corrupt Practices Act of 1925.   *See* James Sample, *The Last Rites of Public Campaign Financing?,* 92 NEB. L. REV. 349, 363 (2013).   *See also* Lawrence A. Zelenak & Marjorie E. Kornhauser, *Shaping Public Opinion and the Law:  How a "Common Man" Campaign Ended a Rich Man's Law,* 73 LAW & CONTEMP. PROBS. 123, 126 (2010).   This court is in no position to say that an equally ambitious legislative agenda might not arise out of the current era of congressional investigations of the presidency.

2.     *Investigation of Private Affairs*

Plaintiffs next accuse the Oversight Committee of issuing the subpoena to Mazars simply to investigate the private affairs of a citizen.   *See* Pls.' Stmt. at 9, 11.   This argument fares no better than Plaintiffs' first.

More than a century ago, in *Kilbourn v. Thompson*, the Supreme Court stated that Congress does not possess "the general power of making inquiry into the private affairs of the citizen." 103 U.S. 168, 190 (1880). In the ensuing decades, the Supreme Court repeatedly has affirmed that constraint on Congress's investigative powers. *See, e.g., McGrain*, 273 U.S. at 173–74; *Quinn*, 349 U.S. at 161; *Eastland*, 421 U.S. at 504 n.15. But *Kilbourn* is the high-water mark for that limiting principle. In the nearly 140 years since *Kilbourn*, neither the Supreme Court nor any circuit court has found a congressional investigation unconstitutional because it invades the "private affairs of the citizen." Indeed, years later, in the context of warning courts to be wary of declaring a congressional inquiry unconstitutional, the Supreme Court acknowledged *Kilbourn*'s shortcomings:

> Experience admonishes us to tread warily in this domain. The loose language of *Kilbourn v. Thompson*, 103 U.S. 168, the weighty criticism to which it has been subjected, *see, e.g.*, Fairman, Mr. Justice Miller and the Supreme Court, 332–334; Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153, the inroads that have been made upon that case by later cases, *McGrain v. Daugherty*, 273 U.S. 135, 170–171, and *Sinclair v. United States*, 279 U.S. 263, strongly counsel abstention from adjudication unless no choice is left.

*Rumely*, 345 U.S. at 46 (alternations added). Accordingly, although the notion from *Kilbourn* that Congress does not have the general power to investigate into personal affairs remains alive today, the case is largely impotent as a guiding constitutional principle. *See* Landis, 40 HARV. L. REV. at 220 ("But no standard for judgment can be developed from *Kilbourn v. Thompson*. Its result contradicts an unbroken Congressional practice continuing even after the decision, with the increasing realization that committees of inquiry are necessary in order to make government effectively responsible to the electorate.").

How then to measure whether Congress has ventured into impermissible territory of investigating the personal affairs of a private citizen?  The Supreme Court has provided some guidance.  In *Quinn*, the Court said that Congress cannot use its investigative power "to inquire into private affairs *unrelated* to a valid legislative purpose."  349 U.S. at 161 (emphasis added).  Similarly, in *Watkins*, the Court stated that:  "The public is, of course, entitled to be informed concerning the workings of its government.  That cannot be inflated into a general power to expose where *the predominant result can only be* an invasion of the private rights of individuals."  354 U.S. at 200 (emphasis added).  Thus, the question the court must ask is whether the Oversight Committee's investigation into the President's personal affairs is fully divorced from any legislative purpose.

Indulging in the presumption that when Congress acts it does so for a proper reason, the court cannot say that the records sought from Mazars are "unrelated to a valid legislative purpose" or that the "predominant result can only be an invasion of" the President's private affairs.  As discussed above, legislation could stem from the Oversight Committee's investigation of the President's personal and corporate finances and the possible conflicts of interest under which he is operating.  Thus, the potential presence of some intent to "ridicule, harass, or punish" the President cannot overcome this facially valid legislative purpose.  *McSurely*, 521 F.2d at 1038.

In their Complaint and in their supplemental evidentiary submissions, Plaintiffs reference various statements from Democratic Members of Congress and congressional aides to the effect that Democrats are intending to use their subpoena power to exact political retribution.  *See* Compl. ¶¶ 27–30; *see also* First Supp. Decl. at 35–79.  For instance, one Congressman is quoted as saying, "We're going to have to build an air traffic control tower to keep track of all the subpoenas flying from here to the White House."  Compl. ¶ 29.  Another unnamed Democratic official said that

House Democrats were preparing a "subpoena cannon" to fire at the President. *Id.* Plaintiffs urge that these and similar statements reveal that the Democrats' true motive is to embarrass and harass the President, which cannot be cured by the Committee's "retroactive rationalizations" in the April 12th Memorandum. Hr'g Tr. at 8.

Even if the court were to take these statements at face value—at best, a dubious evidentiary proposition given that these individuals do not control the actions of the Oversight Committee— they make no material difference. The case law makes clear that "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200. In *Watkins*, the petitioner "marshalled an impressive array of evidence that some Congressmen have believed that" their duty "was to bring down upon himself and others the violence of public reaction because of their past beliefs, expressions and associations." *Id.* at 199. This evidence did not, however, carry the day with the Supreme Court because Congress also had a legitimate legislative purpose for its investigation. *Id.* at 200. Likewise, in *McGrain*, the Court rejected a lower court's decision echoing the arguments Plaintiffs advance here: "The extreme personal cast of the original resolutions; the spirit of hostility towards the then Attorney General which they breathe; that it was not avowed that legislative action was had in view until after the action of the Senate had been challenged; and that the avowal then was coupled with an avowal that other action was had in view—are calculated to create the impression that the idea of legislative action being in contemplation was an afterthought." *McGrain*, 273 U.S. at 176. The Court held that the lower court was "wrong," because "the subject [of the investigation] was one on which legislation could be had." *Id.* at 177.

In short, as long as there is a facially valid legislative purpose for the investigation, Congress acts within its constitutional authority.  That is the case here.[27]

### 3.  *Pertinency of the Records Request*

Plaintiffs' third and final challenge rests on the "pertinency" of the records requested from Mazars.  *See* Pls.' Reply at 12–14.  This argument takes multiple forms, none of which are persuasive.

To begin, according to Plaintiffs, for the Mazars subpoena to be valid the records sought must be "'reasonably relevant' to [the subpoena's] legitimate legislative purpose," and the records demanded fail that test.  *Id.* at 13 (citing *McPhaul*, 364 U.S. at 381–82).  This argument suffers from two problems.  The first is that Plaintiffs conflate the concept of "pertinency" with the notion of "relevancy" as used in civil proceedings.  "Pertinency" does not require the court to ask, as it would in a civil discovery dispute, whether the documents requested are likely to yield useful evidence.  Instead, pertinency "is a jurisdictional concept . . . drawn from the nature of a congressional committee's source of authority."  *Watkins*, 354 U.S. at 206.  The concept appears most often in the context of a *criminal* conviction for contempt of Congress, in which a person has refused to comply with a subpoena or answer questions posed at a hearing.  Pertinency, in this setting, is an element of criminal contempt.  *See* 2 U.S.C. § 192 (making it a misdemeanor for a person summoned as a witness before Congress either to not appear or, if "having appeared, [to] refuse[] to answer any question *pertinent* to the question under inquiry . . .") (emphasis added).  The pertinency inquiry therefore asks whether the question posed to a witness is one that fell within

---

[27] For this same reason, the forceful dissenting statements of the Ranking Member of the Oversight Committee, Congressman Jim Jordan, do not change the court's calculus.  The Ranking Member views the Committee's investigation as without legislative purpose, and its sole design to harass and embarrass the President.  *See* Second Decl. of William S. Consovoy, ECF No. 34; Ex. B, Letter from the Honorable Jim Jordan, Ranking Member, House Comm. on Oversight & Reform, to the Honorable Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform (May 15, 2019).  But, again, so long as lawmaking could follow from the Committee's investigation, any attendant political purpose does not make the inquiry unconstitutional.

the scope of the Committee's investigative authority, which typically is defined by the resolution authorizing the investigation.  *See Watkins*, 354 U.S. at 207–10; *Sinclair*, 279 U.S. at 292 (stating that, under the contempt statute, "a witness rightfully may refuse to answer where the bounds of the power are exceeded or where the questions asked are not pertinent to the matter under inquiry").  This is not a contempt case and therefore the pertinency inquiry, properly understood, has no role here.

But even if the court were to treat pertinency as akin to a relevance determination, that test is satisfied here.  The standard adopted by the Supreme Court is a forgiving one.  The subpoenaed records need only be "not plainly incompetent or irrelevant to any lawful purpose [of the Committee] in the discharge of its duties."  *McPhaul*, 364 U.S. at 381 (cleaned up).  Here, the Oversight Committee has shown that it is not engaged in a pure fishing expedition for the President's financial records.  It is undisputed that the President did not initially identify as liabilities on his public disclosure forms the payments that Michael Cohen made to alleged mistresses during the presidential campaign.[28]  Furthermore, Michael Cohen has pleaded guilty to campaign finance violations arising from those payments.[29]  These events, when combined with Cohen's testimony and the financial statements he supplied, make it reasonable for the Oversight Committee to believe that the records sought from Mazars might reveal other financial transgressions or improprieties.  As already discussed, it is not unreasonable to think that the Mazars records might assist Congress in determining whether ethics statutes or regulations need updating to strengthen Executive Branch accountability, promote transparency, and protect against Executive Branch officials operating under conflicts of interest.  Additionally, the Mazars records

---

[28] Letter from David J. Apol, *supra* n.10.

[29] *See* Mark Mazzetti, et al., *Cohen Pleads Guilty and Details Trump's Involvement in Moscow Tower Project*, N.Y. TIMES, Nov. 29, 2018, https://www.nytimes.com/2018/11/29/nyregion/michael-cohen-trump-russia-mueller.html (last visited May 20, 2019).

could provide the Oversight Committee with clues about the President's foreign interests or sources of foreign income, if any, which would assist in determining Congress's obligations under the Foreign Emoluments Clause.  This concern is not a new one.  In other letters seeking records, one sent to the Trump Organization and the other to the GSA, Chairman Cummings expressly stated that the records sought would be useful in assessing the President's compliance with the Foreign Emoluments Clause.  *See* n. 7 & 8, *supra*.  The records from Mazars likewise could advance this legislative purpose.  Pertinency, to the extent it may apply, is thus satisfied.

Two more arguments remain.  First, Plaintiffs insist that the Oversight Committee cannot be seeking pertinent material because the legislative actions contemplated "extend to an area in which Congress is forbidden to legislate," *Quinn*, 349 U.S. at 161.  *See* Pls.' Reply at 15–16.  For example, Plaintiffs argue that H.R. 1 is unconstitutional insofar as it adds qualifications for the presidency beyond those contained in Article II of the Constitution.  *See id.* at 16.  More broadly, Plaintiffs maintain that *any* regulation of the "President's finances or conflicts of interest" would be unconstitutional for the same reason.  *Id*.

Plaintiffs' contention flies in the face of decades of legislation covering the President.  For example, the Ethics in Government Act requires the President to report the source, type, and amount of certain income and assets to the Office of Government Ethics.  *See* 5 U.S.C. App. 4 §§ 101(a), (f); *id.* §§ 102(a), (b); *id.* § 103(b).  The Stop Trading on Congressional Knowledge Act of 2012 provides that no "executive branch employee," including the President, may use "nonpublic information derived from such person's position" "as a means for making a private profit," and further states that "executive branch employees," including the President, "owe[] a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from [their]

position." Pub. Law No. 112-105 § 9.  And, the Presidential Records Act "directs the President to 'take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records.'" *Armstrong v. Bush*, 924 F.2d 282, 285 (D.C. Cir. 1991) (citing 44 U.S.C. § 2203).   Plaintiffs' argument, if accepted, would wipe out some, and perhaps all, of these statutes.

But there is an even more fundamental problem with Plaintiffs' position.  It is not the court's role in this context to evaluate the constitutionality of proposed or contemplated legislation. Doing so would go beyond its limited powers.  The Supreme Court said as much in *Rumely*: "Whenever constitutional limits upon the investigative power of Congress have to be drawn by this Court, it ought only to be done after Congress has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits.  Experience admonishes us to tread warily in this domain."  345 U.S. at 46.  Consequently, courts must avoid declaring an investigation by Congress unconstitutional, unless "no choice is left."  *See id.*  In this case, not only is there no need to confront difficult constitutional questions, it would be improper to do so. Federal courts do not "render advisory opinions.  For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite."  *United Pub. Workers of Am. (C.I.O.), et al., v. Mitchell, et al.*, 330 U.S. 75, 89 (1947) (citations omitted).  The court here faces only abstract constitutional questions about prospective legislation that is not yet law.  The court cannot declare a congressional investigation unconstitutional in such ill-defined circumstances.[30]

---

[30] The D.C. Circuit's decision in *Tobin* does not compel a different result.  306 F.2d 270 (D.C. Cir. 1962).  If anything, *Tobin* advises courts to sidestep important constitutional issues unless squarely presented and unavoidable.  In *Tobin*, the setting was review of a contempt conviction, which the Circuit found "is not the most practical method of inducing courts to answer broad questions broadly."  306 F.2d at 274.  This case is even less amenable to resolving an important

Finally, Plaintiffs suggest that the court has the authority to "narrow overbroad [congressional] subpoenas," and should consider doing so here. Pls.' Reply at 13. But the federal courts enjoy no such power. "A legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress." *Townsend*, 95 F.2d at 361 (citation omitted). "There is no requirement that every piece of information gathered in such an investigation be justified before the judiciary." *McSurely,* 521 F.2d at 1041. The court therefore cannot "engage in a line-by-line review" of the Mazars subpoena and narrow its demands. *Bean LLC*, 291 F. Supp. 3d at 44; *see also Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17, 20 (D.D.C. 1994) ("This [c]ourt . . . has no authority to restrict the scope of the Ethics Committee's investigation.").

## V.     REQUEST FOR STAY PENDING APPEAL

At the May 14th oral argument, Plaintiffs asked the court to stay the return date of the subpoena beyond the seven days already agreed upon by the parties, pending final appellate review by the D.C. Circuit. *See* Hr'g Tr. at 77–78. The court declines to do so.

Federal Rule of Civil Procedure 62(c) authorizes a district court to issue an injunction pending appeal. Fed. R. Civ. P. 62(c). To obtain a stay pending appeal, the moving party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843

---

constitutional issue than *Tobin*. There is no conviction or piece of legislation before the court to evaluate. Assessing the constitutionality of a not-yet-enacted statute would be the equivalent of answering a hypothetical question on a law school exam. This court cannot engage in such an exercise.

(D.C. Cir. 1977)).   The court balances these factors on a "sliding scale," such that "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *see also Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018).

As to the first factor, Plaintiffs have not shown that their challenge to the Mazars subpoena presents "serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation and thus for more deliberative investigation." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting *Holiday Tours*, 559 F.2d at 844). None of the three grounds upon which Plaintiffs challenge the subpoena rests on "potentially persuasive authority." *John Doe Co. v. Consumer Financial Protection Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017).   Indeed, Plaintiffs have cited no case since *Kilbourn* from 1880 in which the Supreme Court or the D.C. Circuit has interfered with a congressional subpoena—because it either intrudes on the law enforcement prerogatives of the Executive or Judicial branches, seeks personal information unrelated to a legislative purpose, or demands records that lack "pertinency." This case does not merit becoming the first in nearly 140 years.[31]

As for irreparable harm, this court has recognized that "the disclosure of confidential information is, by its very nature, irreparable 'because such information, once disclosed, loses its confidential nature.'" *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) (citations omitted).   That concern is somewhat mitigated here, however, because of the recipient of the records.   Unlike *Robert Half Int'l*, where the challenged disclosure was to a market competitor, the disclosure here is made to Congress, and the D.C. Circuit has held that "courts

---

[31] This case is unlike *Eastland* in which the D.C. Circuit by a 2-1 margin granted a stay to enforce subpoenas issued by Congress.  *See United States Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1256–57 (D.C. Cir. 1974), rev'd on other grounds, *Eastland*, 421 U.S. at 491.  The court granted the stay because the case presented "serious constitutional questions . . ." *Id.* at 1256.  No such "serious constitutional questions" are presented here.

must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon*, 589 F.2d at 589 (citation omitted).  That said, the court is not naïve to reality—a reality confirmed by the fact that the Oversight Committee has said that the decision whether to make the records public lies within its discretion.  *See* Hr'g Tr. at 59. Thus, there is a chance that some records obtained from Mazars will become public soon after they are produced.  The second factor of irreparable harm therefore favors a stay.

The final two factors—the balance of equities and the public interest—merge when, as here, "the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors tip the balance in favor of denying a stay.  In *Exxon*, the plaintiff had challenged Congress's right to obtain records from the Federal Trade Commission that contained its trade secrets. 589 F.2d at 586–87.  The district court denied the plaintiff's request for injunctive relief.  In affirming that decision on appeal, the D.C. Circuit held that the public interest favored Congress having access to the records.  The court stated that the plaintiff's burden to obtain injunctive relief was "considerably heightened by the clear public interest in maximizing the effectiveness of the investigatory powers of Congress . . . It would, then, require an extremely strong showing by the appellants to succeed in obtaining an injunction in light of the compelling public interest *in denying such relief*."  *Id.* at 594 (emphasis added).  The court concluded:  "To grant the injunction appellants request, this court would be required to interfere with the operation of Congress, and also to depart from traditional doctrine concerning the availability of equitable relief."  *Id.* The same would be true in this case.[32]

---

[32] The court acknowledges that this case differs from *Exxon* in one respect.  Unlike *Exxon*, this case does involve records whose public disclosure might give rise to "private injury."  589 F.2d at 594.  It is unclear, however, what proportion of the records at issue in this case are truly "personal," as opposed to corporate records.  The fact of some uncertain amount of private injury does not change the court's calculus.

The court is well aware that this case involves records concerning the private and business affairs of the President of the United States.  But on the question of whether to grant a stay pending appeal, the President is subject to the same legal standard as any other litigant that does not prevail. Plaintiffs have not raised a "serious legal question[] going to the merits."  *Population Inst.*, 797 F.2d at 1078.  And, the balance of equities and the public interest weigh heavily in favor of denying relief.  The risk of irreparable harm does not outweigh these other factors.  The court, therefore, will not stay the return date of the subpoena beyond the seven days agreed upon by the parties.

## VI.     CONCLUSION

For the foregoing reasons, the court will enter judgment in favor of the House Oversight Committee and against Plaintiffs.  The court denies Plaintiffs' request for a stay pending appeal. A separate final order accompanies this Memorandum Opinion.

Dated:  May 20, 2019

Amit P. Mehta
United States District Court Judge