# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

Plaintiffs,

v.

MAZARS USA LLP,

Defendant,

and

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

Intervenor-Defendant.

Civil Action No. 1:19-cv-01136-APM

**ORAL HEARING SCHEDULED
JUNE 18, 2021**

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
## SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................................ii

Introduction ...........................................................................................................................1

Background ............................................................................................................................2

    I.   The Mazars Subpoena ..................................................................................................2

    II.  Initial Proceedings in this Court ..................................................................................6

    III. Initial Proceedings in the D.C. Circuit ......................................................................6

    IV. Proceedings in the Supreme Court .............................................................................8

    V.   Remand Proceedings in the D.C. Circuit ..................................................................9

Legal Standard .....................................................................................................................11

Argument .............................................................................................................................11

    I.   The subpoena fails the *Mazars* test. .........................................................................11

        A.  Based on the Cummings memo, the subpoena violates *Mazars*. ........................13

        B.  Even considering the Maloney memo, the subpoena violates *Mazars*. ..............15

        C.  Even treating the subpoena as an entirely new demand, it violates *Mazars*.......28

    II.  The subpoena lacks a legitimate legislative purpose........................................................30

        A.  Legislation is not the subpoena's primary purpose............................................31

        B.  Any legislation pertinent to the subpoena would be invalid. .............................33

        C.  The subpoena is overbroad.............................................................................35

Conclusion ...........................................................................................................................36

Certificate of Service ............................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Barenblatt v. United States,*
  360 U.S. 109 (1959) ...........................................................................................30

*Bergman v. Senate Special Comm. on Aging,*
  389 F. Supp. 1127 (S.D.N.Y. 1975) ............................................................. 18, 34

*Blumenthal v. Trump,*
  373 F. Supp. 3d 191 (D.D.C. 2020) ............................................................. 16, 17

*Campbell v. Davidson,*
  233 F.3d 1229 (10th Cir. 2000) ......................................................................34

*Cheney v. U.S. Dist. Court for D.C.,*
  542 U.S. 367 (2004) ........................................................................................16

*Clinton v. Jones,*
  520 U.S. 681 (1997) ........................................................................................26

*Comm. on Judiciary v. Miers,*
  542 F.3d 909 (D.C. Cir. 2008) .................................................................... 11, 12

*Comm. on Judiciary v. Miers,*
  558 F. Supp. 2d 53 (D.D.C. 2008) ...................................................................12

*Comms. of U.S. House of Reps. v. Trump,*
  141 S. Ct. 197 (July 20, 2020) ...........................................................................9

*Dodge v. Woolsey,*
  59 U.S. 331 (1855) ..........................................................................................25

*Durning v. Citibank, N.A.,*
  950 F.2d 1419 (9th Cir. 1991) .........................................................................30

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) ........................................................................................29

*Gojack v. United States,*
  384 U.S. 702 (1966) ........................................................................................13

*Gordon v. United States,*
  117 U.S. 697 (1864) ........................................................................................33

*Griffin v. Padilla,*
  408 F. Supp. 3d 1169 (E.D. Cal. 2019) ...........................................................34

*Kendall v. U.S. ex rel. Stokes,*
  37 U.S. 524 (1838) ..........................................................................................33

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880) ........................................................................................30

\*Chief authority

*Maloney v. Murphy*,
   984 F.3d 50 (D.C. Cir. 2020)..............................................................................................5

*McGrain v. Daugherty*,
   273 U.S. 135 (1927) ............................................................................................... 29, 30

*Mundo Verde Pub. Charter Sch. v. Sokolov*,
   315 F. Supp. 3d 374 (D.D.C. 2018) ..................................................................................30

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) ............................................................................................... 16, 28

*O'Connor v. Donaldson*,
   422 U.S. 563 (1975) ..........................................................................................................30

*Pub. Citizen, Inc. v. DOJ*,
   111 F.3d 168 (D.C. Cir. 1997)..........................................................................................28

*Quinn v. United States*,
   349 U.S. 155 (1955) ..........................................................................................................29

*Rumely v. United States*,
   197 F.2d 166 (D.C. Cir. 1952)..........................................................................................26

*Saulsberry v. Barr*,
   468 F. Supp. 3d 340 (D.D.C. 2020) ..................................................................................11

*Schaefer v. Townsend*,
   215 F.3d 1031 (9th Cir. 2000) ..........................................................................................34

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ......................................................................................................33

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
   498 F.2d 725 (D.C. Cir. 1974) (en banc) ........................................................ 17, 21, 24, 32

*\*Shelton v. United States*,
   327 F.2d 601 (D.C. Cir. 1963)........................................................... 12, 13, 14, 30, 35

*Trump v. CREW*,
   No. 20-330, 2021 WL 231541 (U.S. Jan. 25, 2021) ........................................................28

*Trump v. D.C.*,
   No. 20-331, 2021 WL 231542 (U.S. Jan. 25, 2021) ........................................................28

*Trump v. Deutsche Bank AG*,
   943 F.3d 627 (2d Cir. 2019) ................................................... 8, 13, 14, 27, 28, 32, 34

*\*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ..................................................1, 2, 3, 8, 9, 11, 13, 14, 15, 16,
                             17, 18, 19, 20, 21, 22, 23, 24, 25,
                         26, 27, 28, 29, 30, 31, 32, 33, 34, 35

*Trump v. Mazars USA, LLP*,
   832 F. App'x 6 (D.C. Cir. Dec. 30, 2020) ................................................................ 10, 11

*Trump v. Mazars USA, LLP,*
  941 F.3d 1180 (D.C. Cir. 2019) ............................................................................7

*Trump v. Vance,*
  140 S. Ct. 2412 (2020) ..........................................................................................5

*Trump v. Vance,*
  977 F.3d 198 (2d Cir. 2020) ..................................................................................5

*U.S. Term Limits, Inc. v. Thornton,*
  514 U.S. 779 (1995) ....................................................................................... 33, 34

*United States v. AT&T Co. (AT&T I),*
  551 F.2d 384 (D.C. Cir. 1976) ..............................................................................18

*United States v. AT&T Co. (AT&T II),*
  567 F.2d 121 (D.C. Cir. 1977) ..............................................................................23

*United States v. Nixon,*
  418 U.S. 683 (1974) ..............................................................................................16

*United States v. Patterson,*
  206 F.2d 433 (D.C. Cir. 1953) ....................................................................... 19, 34

*United States v. Rumely,*
  345 U.S. 41 (1953) ......................................................................................12, 14, 32

*Wash. Post Co. v. U.S. Dep't of Health & Human Servs.,*
  690 F.2d 252 (D.C. Cir. 1982) ..............................................................................16

*\*Watkins v. United States,*
  354 U.S. 178 (1957) ......................................................................12, 13, 14, 29, 34

*Wilkinson v. United States,*
  365 U.S. 399 (1961) ..............................................................................................32

**Other Authorities**

*2011 Year-End Report on the Federal Judiciary*,
   bit.ly/2Ku5ZvM ...............................................................................................33

5 U.S.C. §7342(a) ....................................................................................... 17, 19

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*,
   6 O.L.C. Op. 156 (1982) ..............................................................................19

Fed. R. Civ. P. 56(a) ......................................................................................11

GSA, *Electronic Reading Room*,
   bit.ly/2FPwf3Z ...........................................................................................22

GSA, OIG, *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease*
   (Jan. 16, 2019), bit.ly/3iSqi4G ..................................................................21

GSA, *Old Post Office – Certificate of Financial Status*
   (Aug. 2013), bit.ly/33KDQZA ...................................................................22

H. Res. 8 §2.10(c) (Jan. 4, 2021) ...................................................................10

H.R. 1 .........................................................................................................5, 35

House Rule II, cl. 8(c) ............................................................................. 10, 12

House Rule X, cls. 2, 4 ...................................................................................25

Ltr. from Cummings to GSA
   (Apr. 12, 2019), bit.ly/3iHWdER ..............................................................19

Ltr. from Post to Cummings
   (Aug. 22, 2019), bit.ly/35UGT3S ..............................................................22

U.S. Const., Art. II, §1, cl. 5 ..........................................................................33

# INTRODUCTION

The Mazars subpoena was not built to withstand the *Mazars* test. When the Oversight Committee issued the subpoena, it did not think it was subpoenaing the President. Nor did it accept any real limits on its subpoena power. The Committee said it could investigate "any matter" at "any time." SMF ¶¶25, 32. The Committee thought it had independent "oversight" and "informing" powers that let it investigate alleged "illegal conduct" by the President, independent from any legislation. SMF ¶65. And the Committee denied that its requests even needed to be *pertinent* to its goals. SMF ¶64. The Supreme Court disagreed in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020)— where all nine Justices agreed that this subpoena is unprecedented, that this request for the President's papers threatens the separation of powers, and that Congress had to (at least) clear several new hurdles before issuing it. Yet in the aftermath of *Mazars*, the Committee *did not change one word* of its subpoena. Instead of narrowing or withdrawing its demands, the Committee claims that its subpoena can survive a standard that hadn't been announced—and that the Committee flatly rejected—when the subpoena was drafted. This is not a winning strategy.

Sensing this, the Committee might argue that the *Mazars* standard no longer applies. But this, too, is not a winning strategy. After the last Congress adjourned, the Committee did not issue a new subpoena (in any meaningful sense); it took advantage of a House Rule that lets it revive an old subpoena. As the Committee's counsel concedes, nothing about the subpoena, its original justifications, or this lawsuit has changed. The Mazars subpoena remains a demand for the President's information, based on President-specific justifications, subject to President-specific defenses. If the Court disagrees, then the Committee should *definitely* lose. The Committee's justifications concerning the Trump Presidency cratered once he stopped being President, but the separation-of-powers concerns with these sorts of subpoenas did not. Because the Mazars subpoena is unconstitutional however the Court looks at it, Plaintiffs are entitled to summary judgment.

## BACKGROUND

The Mazars subpoena was issued in the spring of 2019—not long after the Democratic Party had taken over the House, when Michael Cohen was the political topic of the day. Since then, the subpoena's constitutionality has been reviewed by this Court, the D.C. Circuit, the Supreme Court, and the D.C. Circuit again. This history is summarized below.

## I.    The Mazars Subpoena

The Mazars subpoena is, and always was, about allegations from "the President's former personal attorney Michael Cohen." *Mazars*, 140 S. Ct. at 2028. Cohen alleged that President Trump had not "accurately represented his financial affairs" in the past. *Id.* To explore these accusations, the Oversight Committee held a hearing in February 2019, with Cohen as the star witness. SMF ¶¶2, 7-8. Cohen testified that, as a private citizen, President Trump had "inflated" and "deflated" his assets to obtain a bank loan, to reduce his real-estate taxes, and to reduce his insurance premiums. SMF ¶8. Cohen "produced financial statements from 2011, 2012, and 2013, at least two of which were prepared by Mazars." 380 F. Supp. 3d 76, 82 (D.D.C. 2019).

Committee members were not shy about why they wanted to hear Cohen's testimony. According to Chairman Cummings, his accusations raised "grave questions about the legality of Donald Trump's—President Donald Trump's conduct." SMF ¶9. Many Committee members echoed this desire to expose criminal wrongdoing. *See* SMF ¶¶10-15, 2, 38.

Investigating crimes was not the Committee's only goal. Ever since Candidate Trump declined to disclose his tax returns, elected Democrats worked hard to expose his private financial information. California tried to keep him off the ballot unless he disclosed his tax returns. SMF ¶43. New York changed its laws in the hopes of exposing his state tax returns. SMF ¶48. House Democrats subpoenaed tax documents, accounting documents, and banking documents from President Trump, his businesses, and even his family. SMF ¶¶44-45, 40. Democratic officials were sure that making this

information public would damage President Trump politically—by proving he hadn't paid enough taxes, wasn't as rich as he claimed, wasn't successful in business, had too much debt, committed financial improprieties, had ties to Russia and China, and the like. *See* SMF ¶¶38, 46-47, 49-63. The Justice Department's Office of Legal Counsel issued a formal opinion that carefully documented this "prolonged campaign to force public disclosure" of the President's financial information. SMF ¶47.

After the Cohen hearing, Chairman Cummings issued a document request to Mazars. The request raised various "concerns" with the financial statements produced by Cohen. SMF ¶¶18-20. The request "made no mention of a legislative purpose for obtaining the records." 380 F. Supp. 3d at 98. It instead listed supposed discrepancies on the financial statements, many concerning representations that would have been made years before President Trump was even a candidate for public office. SMF ¶¶21-23. Chairman Cummings sought Mazars' help reviewing "these issues"—the same "questions about the President's financial affairs" that Cohen had raised in his testimony. SMF ¶24.

After Mazars told Chairman Cummings that it couldn't divulge its clients' confidential information without a valid subpoena, SMF ¶26, the Chairman turned his document request into a subpoena. SMF ¶27. Issued on April 15, 2019, the subpoena ordered Mazars to produce various categories of the President's information "from 2011 to 2018, including statements of financial condition, independent auditors' reports, financial reports, underlying source documents, and communications between Mazars and the President or his businesses"—as well as "all engagement agreements and contracts '[w]ithout regard to time.'" *Mazars*, 140 S. Ct. at 2027-28. The starting date of 2011 mirrored Cohen's allegations. As did the request for communications reflecting "potential concerns" that President Trump's information was "incomplete, inaccurate, or otherwise unsatisfactory." SMF ¶40.

Chairman Cummings "explained the basis for the subpoena in a memorandum to the Oversight Committee." *Mazars*, 140 S. Ct. at 2028. The memorandum again pointed to Cohen's testimony that the President "inflat[ed] or deflat[ed] the value of assets." SMF ¶28. It also raised "additional concerns regarding the President's financial statements and representations," citing two news articles that accused President Trump of financial improprieties when he was a private citizen. SMF ¶29. Reflecting the subpoena's goals of law enforcement and exposure, the memorandum said the Committee was investigating four things: "whether the President may have engaged in illegal conduct before and during his tenure in office," "whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," "whether he is complying with the Emoluments Clauses of the Constitution," and "whether he has accurately reported his finances to the Office of Government Ethics and other federal entities." SMF ¶30. The memorandum ended with a conclusory sentence about legislation, asserting that "[t]he Committee's interest in these matters informs its review of multiple laws and legislative proposals under our jurisdiction." SMF ¶31.

The Cummings memo did not say that the Committee needed the President's information for H.R. 1—an election-reform bill that the Committee's lawyers have cited in this litigation. SMF ¶¶31-33. H.R. 1 does contain provisions that would require Presidents to make additional financial disclosures. But H.R. 1 was drafted before Chairman Cummings was even Chairman. SMF ¶3. The House had already conducted a hearing on the bill in February, where no one complained that they needed to see the President's financial information. SMF ¶¶5-6. And the House had already *passed* H.R. 1 in March. SMF ¶33. Just recently, the House passed H.R. 1 again—without seeing the President's information (or even holding a hearing). SMF ¶¶70-71. The Senate conducted a hearing on the bill two weeks ago. SMF ¶72. No one complained about not seeing the documents requested in the Mazars subpoena. SMF ¶73. The Senate has never subpoenaed Mazars, and neither the House nor the Senate has ever subpoenaed Plaintiffs for the Mazars documents. SMF ¶¶74-75.

Nor did the Cummings memo mention GSA's lease with the Trump International Hotel in D.C.—another issue that the Committee's lawyers have raised in this litigation. While Committee members have been interested in the lease, they pursued those interests in *separate* investigations. Committee Democrats were first concerned that President Trump was violating section 37.19 of the lease, which states that no "elected official of the Government of the United States ... shall be admitted to any share or part of [the] Lease." *See Maloney v. Murphy*, 984 F.3d 50, 56-57 (D.C. Cir. 2020). When GSA concluded otherwise, the Committee received a briefing from GSA, reviewed an inspector general's report, held a hearing, and heard from expert witnesses. *See* Maloney Memo. (Supp. Add. to CADC Doc. #1859172) 17-19. After Democrats gained a majority of the House, they sent GSA a detailed document request. SMF ¶36. GSA responded with over 15,000 pages of documents. SMF ¶37. To Plaintiffs' knowledge, the current House has made no requests to GSA about the lease. The current House did pass H.R. 1, however, which would bar contracts between the President and the federal government. *See* H.R. 1, §8014.

Finally, it's important to note that the Committee's subpoena to Mazars is not the only "Mazars subpoena." In August 2019, the District Attorney of New York County "essentially copied" the Committee's subpoena and sent it to Mazars as a grand-jury subpoena. *Trump v. Vance*, 140 S. Ct. 2412, 2420 n.2 (2020). According to the District Attorney, his subpoena's purpose was "investigating potential crimes under New York law," and it was prompted by the alleged improprieties that Cohen identified in his Committee testimony. *See* Appellee's Br. (Doc. 116) 1-5, *Trump v. Vance*, No. 20-2766 (2d Cir. Sept. 21, 2020). The Second Circuit agreed that the District Attorney's subpoena was well-tailored to a criminal "investigation into possible financial or corporate misconduct" in New York County. *Trump v. Vance*, 977 F.3d 198, 212 (2d Cir. 2020).

## II.    Initial Proceedings in this Court

Plaintiffs quickly challenged the Committee's subpoena in this Court. Doc. 1. After Plaintiffs moved for a TRO and a preliminary injunction, Docs. 9, 13, the Committee agreed to stay the subpoena until this Court reached a decision (plus seven days). That agreement "made it unnecessary for the court to enter a temporary restraining order." 380 F. Supp. 3d at 88. This Court ultimately treated the parties' briefing on the preliminary injunction as cross-motions for summary judgment. *Id.* at 90.

The Court entered summary judgment for the Committee. Because the Cummings memo is "the best evidence of the Committee's purpose," the Court evaluated its "four areas of investigation" and approved each one. *Id.* at 93-96. And because the Mazars subpoena was "facially" legislative— meaning "legislation could stem" from it—this Court would not invalidate it for having an invalid purpose like law enforcement or exposure. *Id.* at 101. This Court also denied that it could "evaluate the constitutionality" of the potential legislation the Committee was studying. *Id.* at 102-03. And it denied that it could review the subpoena's "pertinency," though it also did so and found that standard satisfied. *Id.* at 101-02. This Court declined to enter a stay pending appeal. *See id.* at 104-05.

## III.    Initial Proceedings in the D.C. Circuit

Plaintiffs quickly appealed. Doc. 37. The Committee agreed to stay the subpoena while the appeal was pending. CADC Doc. #1789081. After briefing, oral argument, and three additional months, the D.C. Circuit issued its opinion in October 2019.

In a 2-1 decision, the D.C. Circuit upheld the Mazars subpoena. 940 F.3d 710 (D.C. Cir. 2019). The D.C. Circuit disagreed with some aspects of this Court's decision, agreed with others, and affirmed this Court's bottom-line judgment. According to the D.C. Circuit, Congress *does* need to prove that its subpoenas are "pertinent" to "constitutional" legislation. *Id.* at 732, 739-40. The Mazars subpoena is not pertinent to "laws that apply to ordinary Executive Branch employees"; and laws

requiring Presidents to "divest[] from financial interests or recus[e] from conflicted matters" are probably unconstitutional. *Id.* at 732-33. So the "litmus test" for the Mazars subpoena, the D.C. Circuit reasoned, is legislation that requires "the President" to "*disclose* financial information." *Id.* at 733. The D.C. Circuit concluded that some presidential-disclosure laws are constitutional, *id.* at 734-37, and that the Mazars subpoena was "reasonably relevant" to potential amendments to the Ethics in Government Act, *id.* at 740-42. The D.C. Circuit rejected the Justice Department's argument that, under *Watkins*, the Committee needed to specifically identify its legislative objectives in advance. *Id.* at 730-31. And though the D.C. Circuit did not give the Committee any presumption of regularity, it rejected Plaintiffs' argument that the Committee was pursuing impermissible, nonlegislative purposes. *Id.* at 725-29.

Judge Rao dissented. She laid out how "the Committee has emphasized repeatedly and candidly its interest in investigating allegations of illegal conduct by the President." *Id.* at 767-70. Given these statements and the nature of the subpoena, Judge Rao concluded that law enforcement is the subpoena's "gravamen." *Id.* at 774; *see id.* at 770 (rejecting the notion that Chairman Cummings' "mere statement of a legislative purpose" was "'more important'" than his stated goal of exposing misconduct). Judge Rao noted that, while courts give Congress the benefit of the doubt when its subpoenas target private misconduct (since Congress cannot punish private individuals), that presumption is not warranted when Congress's subpoenas target presidential misconduct (since Congress can "impeach," "try," "convict[]," and "remove the President from office"). *Id.* at 771-72.

The D.C. Circuit declined to enter a stay pending certiorari or to rehear the case en banc. CADC Doc. #1814803. Judges Katsas and Rao, each joined by Judge Henderson, dissented. *Trump v. Mazars USA, LLP*, 941 F.3d 1180 (D.C. Cir. 2019). Bizarrely, at this post-decision stage of the litigation, the Committee started arguing that the Mazars subpoena was an exercise of the House's "impeachment" power. CADC Doc. #1811186 at 5; CADC Doc. #1813409 at 11; CADC Doc.

#1813835 at 13. Judge Rao explained why that argument was both inconsistent with the Committee's prior arguments and untrue. 941 F.3d at 1182 (Rao, J., dissenting).

## IV.    Proceedings in the Supreme Court

After the D.C. Circuit denied a stay pending certiorari, Plaintiffs asked the Supreme Court for the same relief. The Committee told the Court that it did not oppose a "short ten-day administrative stay," House Ltr. to Clerk (Nov. 18, 2019), bit.ly/3flBnMA, but the Chief Justice entered an administrative stay with no time limit, 2019 WL 6109626 (Nov. 18, 2019). The Supreme Court then granted Plaintiffs' stay application and their petition for certiorari. 140 S. Ct. 581 (Nov. 25, 2019). The Court issued its opinion seven months later, in July 2020.

The proceedings in the Supreme Court involved not just the Mazars subpoena, but also three other subpoenas issued by the House Intelligence and Financial Services Committees. Those subpoenas were issued to two banks, Deutsche Bank and Capital One. Like the Mazars subpoena, the bank subpoenas sought many years' worth of the President's financial information. *Mazars*, 140 S. Ct. at 2026-27. The Second Circuit upheld the bank subpoenas "in substantial part," but invalidated them as applied to "sensitive" documents and documents with only "an attenuated relationship to the Committees' legislative purposes." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 676, 667 (2d Cir. 2019), *vacated sub nom.*, *Mazars*, 140 S. Ct. 2019. (Dissenting, Judge Livingston would have sent the entire subpoena back to the district court. *See id.* at 699-700.) The Supreme Court stayed the Second Circuit's decision, granted certiorari, and consolidated the congressional-subpoena cases together. 140 S. Ct. 660 (Dec. 13, 2019).

Ultimately, the House got zero votes at the Supreme Court. In a 7-2 decision, the Court vacated the D.C. Circuit's decision and remanded for further proceedings. *Mazars*, 140 S. Ct. at 2036. (The two dissenting Justices also voted against the House. *See id.* at 2037-47 (Thomas, J., dissenting); *id.* at 2048-49 (Alito, J., dissenting).) The Court acknowledged Congress's normally "'broad'" authority

to issue subpoenas "in order to legislate." *Id.* at 2031. But this case was not normal. Until now, the Supreme Court had "never considered a dispute over a congressional subpoena for the President's records." *Id.* at 2031. These subpoenas, the Court held, "implicate weighty concerns regarding the separation of powers." *Id.* at 2034-35. The Court faulted "the House[]" and "the courts below" for "treat[ing] these cases much like any other," applying "precedents that do not involve the President's papers" and taking inadequate "account of the significant separation of powers issues." *Id.* at 2033.

Given the "special considerations" at play, the Supreme Court devised a "balanced approach" for assessing subpoenas "directed at the President's personal information." *Id.* at 2035. This new test has four, nonexhaustive factors. First, Congress's legislative purpose must warrant "the significant step" of requesting the President's papers. *Id.* Second, Congress's subpoena can be "no broader than reasonably necessary." *Id.* at 2036. Third, Congress must "identif[y]" its aims and "explain[]" why the President's information will advance them with "evidence" that is "detailed and substantial." *Id.* Fourth, Congress's subpoena cannot overly "burden[]" the President. *Id.* The Court noted that "[o]ther considerations may be pertinent as well," *id.*, and that the preexisting limitations on congressional subpoenas also apply, *id.* at 2032-33.

After the Supreme Court issued its decision, the Committee asked the Court to speed up its judgment. "Immediate issuance of this Court's judgments," the Committee argued, "would accelerate the proceedings in the lower courts so that the [House] may obtain the materials necessary to undertake any needed legislative reforms as quickly as possible." Cmtes' App. for Immediate Issuance of Judgments 4, bit.ly/2PtVcqE. The Supreme Court declined. *Comms. of U.S. House of Reps. v. Trump*, 141 S. Ct. 197 (July 20, 2020).

## V.   Remand Proceedings in the D.C. Circuit

On remand from the Supreme Court, the D.C. Circuit asked the parties to submit supplemental briefs. CADC Doc. #1855776. When the Committee filed its supplemental brief, it

attached a 58-page, single-spaced memo from Chairwoman Maloney. The Maloney memo argued that the Committee's investigation had "three tracks": financial-disclosure laws, the GSA lease, and emoluments. Maloney Memo. 4-5. (Gone was Chairman Cummings' interest in exposing "illegal conduct before and during [President Trump's] tenure in office." SMF ¶30.) The Maloney memo then attempted to explain how the Mazars subpoena, as *originally* drafted, satisfied the Supreme Court's new test. Chairwoman Maloney had apparently made no changes to the Mazars subpoena, even though the Intelligence and Financial Services Committees narrowed their subpoenas (and withdrew one) in light of the Supreme Court's decision. SMF ¶¶77-80.

After receiving the parties' supplemental briefs, the D.C. Circuit ordered the parties to brief three additional questions. CADC Doc. #1860266. One was "[w]hat weight, if any, should the court give Chairwoman Maloney's memorandum given that it post-dates the subpoena's issuance?" *Id.* Plaintiffs answered "none." CADC Doc. #1862695 at 2, 11-16. The D.C. Circuit explored this issue and others at an oral argument in October 2020.

But the D.C. Circuit ultimately declined to reach the merits. It remanded the case based on a letter that the Committee filed in December 2020. In that letter, the Committee stressed that the Mazars subpoena "has not changed," that the Committee "'fully intends to continue this investigation … in the next Congress,'" and that the Chairwoman "will reissue the subpoena at the start of the next Congress." CADC Doc. #1876578. Based on these statements, the D.C. Circuit vacated this Court's decision and remanded for further proceedings "consistent with the Supreme Court's opinion." *Trump v. Mazars USA, LLP*, 832 F. App'x 6, 7 (D.C. Cir. Dec. 30, 2020). The D.C. Circuit expressed no view on "the merits of the parties' arguments" or "whether this case will become moot." *Id.*

The 116th Congress ended, and the 117th Congress began, on January 3, 2021. As promised, Chairwoman Maloney "reissue[d]" the Mazars subpoena on February 25. SMF ¶¶88, 84. Because the Committee was simply "continuing its investigation" from the last Congress, the subpoena remained

"identical" in scope, and its purposes were the same "reasons previously set forth." SMF ¶85-87. In fact, the Mazars subpoena was issued under a new House Rule that allows committee chairs to "ensure continuation of … litigation" by reissuing prior subpoenas, thus acting as "the successor in interest" to the "prior Congress." House Rule II, cl. 8(c); *see* H. Res. 8 §2.10(c) (Jan. 4, 2021). As the House's counsel told the Southern District of New York, this Rule ensures these subpoena cases are "not moot." SMF ¶¶82-83. The prior subpoenas expired only as "a technical matter"; their reissuance means that the "litigation that has been ongoing can keep going without interruption." SMF ¶82-83.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and Plaintiffs are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That should be true here because the Committee will not dispute anything in Plaintiffs' statement of material facts. *Cf.* 380 F. Supp. 3d at 90 n.21. If anything is disputed, this Court cannot "'make credibility determinations or weigh the evidence'" and must "view[] the facts in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Saulsberry v. Barr*, 468 F. Supp. 3d 340, 342 (D.D.C. 2020).

## ARGUMENT

The D.C. Circuit remanded so this Court could assess the Mazars subpoena under the Supreme Court's *Mazars* decision. 832 F. App'x at 7. It also vacated this Court's prior opinion, meaning the questions resolved during the first round of this litigation are back on the table. *Id.* Because the Mazars subpoena violates both the *Mazars* test and the traditional limits on legislative subpoenas, this Court should enter judgment for Plaintiffs.

## I.     The subpoena fails the *Mazars* test.

This case remains a dispute about an April 2019 subpoena "for the President's information." *Mazars*, 140 S. Ct. at 2035. After the November election, the D.C. Circuit instructed this Court to conduct further proceedings "consistent with the Supreme Court's [*Mazars*] opinion." 832 F. App'x

at 7. When the 116th Congress ended, the Committee could have argued that this case was now "moot"—that the Mazars subpoena had expired and that any new subpoena would require new justifications and a new lawsuit. *Id.* But it didn't. The House has long taken the position that its subpoenas survive Congress's expiration, either because "the successor Congress can assert the prior Committee's investigatory interest," *Comm. on Judiciary v. Miers*, 542 F.3d 909, 912 (D.C. Cir. 2008) (Tatel, J., concurring), or because subpoena disputes are "capable of repetition yet evading review," *id.*; *see Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 98 (D.D.C. 2008). The House Rules now codify this view. *See* House Rule II, cl. 8(c).

Chairwoman Maloney used this new rule to revive the Mazars subpoena, to carry the investigatory mantle of the prior Congress, and to keep this case alive. SMF ¶¶81-89. That's why this case never became moot, why Plaintiffs didn't need to amend their complaint, why the text of the subpoena didn't change, and why the Committee is asserting the same President-specific interests as before. SMF ¶¶81-89. As the Committee's counsel told this Court, "The subpoena that was re-issued is the same as the subpoena that was issued now almost two years ago." Status Conf. Tr. 4 (Mar. 4, 2021). Because the Committee chose to revive a subpoena to the President and continue justifying it on President-specific grounds, it must answer President-specific defenses, including *Mazars.*

However this Court looks at the Mazars subpoena, the Committee cannot satisfy the *Mazars* test. When it was issued, the subpoena failed *Mazars* because the Cummings memo is woefully insufficient. When the Committee added the Maloney memo, the subpoena still failed *Mazars* because that retroactive rationalization is neither relevant nor persuasive. Even if the Court ignores the Committee's position on mootness and treats this subpoena as a brand-new request to a *former* President, the *Mazars* test still applies and the case for the subpoena weakens further.

### A.    Based on the Cummings memo, the subpoena violates *Mazars*.

Under the governing law, the Mazars subpoena must rise or fall based on the Cummings record. The legality of congressional inquiries must be evaluated "as of the time" they are made, *United States v. Rumely*, 345 U.S. 41, 48 (1953)—here, "when the subpoena was issued." *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963). Congress's authority "cannot be enlarged by subsequent action," *Rumely*, 345 U.S. at 48, and courts refuse to "engage in a process of retroactive rationalization[, l]ooking backward … to uphold the Committee's actions," *Watkins v. United States*, 354 U.S. 178, 204 (1957). Citizens have a "right … to have the [Chair] responsibly consider whether or not [they] should be subpoenaed *before* the subpoena issue[s]." *Shelton*, 327 F.2d at 607 (emphasis added); *accord Gojack v. United States*, 384 U.S. 702, 715 n.12 (1966) (rejecting the notion that a congressional committee could accomplish a "retroactive authorization of the investigation").

This rule against post-hoc rationalizations applies with special force to congressional subpoenas for the President's papers. In the first appeal, the D.C. Circuit rejected the Justice Department's argument that Congress must "state 'with sufficient particularity' the legislation it is considering *before* it" subpoenas the President. 940 F.3d at 731. That rule comes from *Watkins*, the court reasoned, and *Watkins* is limited to the context of witnesses convicted of contempt of Congress. *Id.* at 730. But the Supreme Court disagreed: Relying on *Watkins*, it held that Congress must "adequately identif[y] its aims and explain[] why the President's information will advance its consideration of the possible legislation." 140 S. Ct. at 2036 (citing *Watkins*, 354 U.S. at 201, 205-06, 214-15). The cited portions of *Watkins* explain that "[o]nly the legislative assembly *initiating* an investigation can assay the relative necessity of specific disclosures." 354 U.S. at 206 (emphasis added); *accord id.* at 205 (similar). And the "time" when Congress "must describe what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it," *Watkins* explains, is "upon objection" by the target. *Id.* at 214-15. Here, that time was the spring of 2019.

For similar reasons, the Second Circuit was wrong to suggest that the Committee can submit new evidence all the way up until Mazars complies. *See Deutsche Bank*, 943 F.3d at 655. The Second Circuit assumed that the third-party custodian, not the President, is the recipient whose "'objection'" triggers the Committee's duty to explain itself. *Id.* at 656 (quoting *Watkins*, 354 U.S. at 214-15). But the Supreme Court was clear that subpoenas like this one are "directed at the President" and seek "the President's information"; treating Mazars as the recipient of the subpoena trades "'substance'" for "'shadows.'" 140 S. Ct. at 2034-35. In addition to this error, the Second Circuit disagreed with the D.C. Circuit's decision in *Shelton* (something this Court cannot do). *Deutsche Bank*, 943 F.3d at 655. And the Second Circuit acknowledged that a committee could not submit "'self-serving declarations'" after litigation begins, or attempt to "alter … the stated purposes of the Committees' investigations that existed at the time the subpoenas were issued"—precisely what the Maloney memo does. *Id.*; *cf.* 940 F.3d at 747 ("The Trump Plaintiffs may very well be right that the authority of a congressional committee to issue subpoenas 'cannot be enlarged by subsequent action of Congress.'").

This Court should thus exclude the Maloney memo from its consideration. That memo wasn't drafted until 16 months after the Mazars subpoena "was issued" and Plaintiffs "object[ed]" to it. *Shelton*, 327 F.2d at 607; *Watkins*, 354 U.S. at 214. The memo is plainly a "subsequent" attempt to "retroactive[ly] rationaliz[e]" the subpoena. *Rumely*, 345 U.S. at 48; *Watkins*, 354 U.S. at 204. It replaces two conclusory sentences in the Cummings memo with nearly 60 single-spaced pages of detailed analysis. It cites numerous sources, "new developments" that didn't exist when the subpoena issued, and events that hadn't happened yet. Maloney Memo. 33. And it makes the odd assertion that the Mazars subpoena somehow satisfies a standard that the Committee, when it issued the subpoena, insisted was not the law. The Maloney memo thus has "the usual infirmity of post litem motam, self-serving declarations." *Rumely*, 345 U.S. at 48.

Without the Maloney memo, the Mazars subpoena cannot stand. When the subpoena issued, Chairman Cummings "explained [its] basis" in his "memorandum to the Oversight Committee." *Mazars*, 140 S. Ct. at 2028. That memo remains "the best evidence of the Committee's purpose" and the only place it plausibly justified the subpoena in legislative terms. 380 F. Supp. 3d at 93. But the Cummings memo comes nowhere close to the "detailed and substantial … evidence" that *Mazars* requires. 140 S. Ct. 2036. After identifying four *impermissible* purposes, the Cummings memo flatly states that "the Committee's interest in these matters informs the Committee's review of multiple laws and legislative proposals under [its] jurisdiction." SMF ¶31. That's it. The memo makes no attempt to explain "why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. 2036. It is instead the kind of "'vague' and 'loosely worded'" explanation that the Supreme Court rejected. *Id.* The Committee has never seriously argued that it can satisfy the *Mazars* test without the Maloney memo. Because that self-serving, made-for-litigation document has no weight, the Mazars subpoena is invalid.

**B.**     **Even considering the Maloney memo, the subpoena violates *Mazars*.**

The Maloney memo, even accepting it at face value, does not help the Committee satisfy the *Mazars* test. The memo offers three investigative "tracks" that the Mazars subpoena supposedly furthers: amendments to presidential financial-disclosure laws; concerns about the GSA lease for the Trump Hotel; and concerns about President Trump's compliance with the Foreign and Domestic Emoluments Clauses. Maloney Memo. 4-5. Taking these topics in reverse order, none satisfies the Supreme Court's new standard.

**i.**     **Emoluments**

The Committee claims that it wants to investigate President Trump's compliance with the Constitution's Foreign and Domestic Emoluments Clauses. This emoluments rationale fails all four of the *Mazars* criteria.

*First*, the Committee has not "adequately identifie[d]" the legislation that it is considering or "explain[ed] why" that legislation requires President Trump's papers. *Mazars*, 140 S. Ct. at 2036. The Committee's unexplained nod toward unknown legislation it might pass to undo any number of policies supported by the President, *see* Maloney Memo. 30-31, is precisely the kind of "'vague' and 'loosely worded'" evidence that the Supreme Court deemed insufficient, *Mazars*, 140 S. Ct. at 2036. And the Committee has provided no "detailed" or "substantial" explanation of the disclosure laws or other remedial legislation that it's considering. *Id.*

Those details are vital because such laws would directly regulate the President and thus "raise[] sensitive constitutional issues." *Id.* As the D.C. Circuit noted, even disclosure laws can "go too far" and "begin to 'prevent the Executive Branch from accomplishing its constitutionally assigned functions.'" 940 F.3d at 735 (cleaned up; quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977)). And a disclosure law aimed at uncovering emoluments would have to target actual "emoluments"—a term that Chairwoman Maloney and other Committee members incorrectly define to include all business transactions. *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 195 (D.D.C.), *vacated*, 949 F.3d 14 (D.C. Cir. 2020); *see* Maloney Memo. 23 (defining "emoluments" to encompass "any benefits" and "any payments"). Despite these constitutional landmines, the Committee provides no details about the legislation it's considering, leaving this Court unable to ensure that the subpoena "advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036.

*Second*, the emoluments rationale cannot justify the "significant step" of subpoenaing a President's papers. *Id.* at 2035. Courts must "carefully assess" the need to involve a President and can uphold subpoenas for his records only as a last resort, "'avoid[ing]'" that result "'whenever possible.'" *Id.* (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389-90 (2004) (in turn quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974))). The Committee does not come close to meeting this standard. Logically and historically, the Committee does not need a "full accounting" of President Trump's

16

financial history to decide whether it wants Presidents to disclose emoluments, whether it wants to define "foreign State" via a "multi-factor test" or "a bright line" rule, or whether it wants to categorically consent to "incidental or *de minimis* payment." Maloney Memo. 30-31.

More broadly, financial-disclosure laws rest on "Congress' *general* belief that public disclosure … is desirable." 940 F.3d at 730 (emphasis added; quoting *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C. Cir. 1982)). They are based on "predictive policy judgments" that do not require "'full disclosure of all the facts'" or "every scrap of potentially relevant evidence." *Mazars*, 140 S. Ct. at 2036. All agree that Congress has intelligently drafted and enacted disclosure laws in the past without issuing subpoenas for (or even considering the details of) any President's finances. *E.g.*, 5 U.S.C. §7342(a)(1)(E); 940 F.3d at 734-35 (citing examples); 380 F. Supp. 3d at 102-03 (same).

The Mazars subpoena is especially unjustified given what the Committee already claims to know. Again, Chairwoman Maloney and others (incorrectly) define "emolument" to mean *any* profit, gain, or advantage that a government gives to the President or his businesses; given President Trump's "'vast business holdings,'" there is no doubt in their minds that he "accepted … Emoluments." *Blumenthal*, 373 F. Supp. 3d at 194-95. By the Committee's logic, President Trump received vast quantities of "emoluments" every day. The Committee does not need a line-by-line breakdown of each payment (let alone documents predating his term in office) to decide whether it wants to, for example, require Presidents to disclose such payments to the public.

Even if it needed more, the Committee already has troves of detailed information about these payments. The Maloney memo cites "numerous press reports" that identify specific transactions and customers. Maloney Memo. 24; *see* Maloney Memo. 24 & nn.99-100, 20 & nn.101-06, 25-26 & n.107, 26 n.112, 33-36. The memo also cites detailed information that the Committee has successfully obtained from the executive branch. *See* Maloney Memo. 29 & n.122, 29-30 & n.124. This extensive information is more than enough for the Committee to legislate. While a court or jury might want a

"robust evidentiary record" and "full accounting" of the President's finances, Maloney Memo. 30-31, there is "no comparable need in the legislative process," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc).

Additionally, if the Committee truly needed the President's financial information, it could have asked Plaintiffs themselves—instead of "sidestep[ing]" them by subpoenaing a neutral third-party custodian. *Mazars*, 140 S. Ct. at 2035. The Supreme Court repeatedly stressed the importance of the traditional accommodation process that occurs when Congress requests executive records from the executive itself. *See id.* at 2029-31, 2034, 2035. While then-Chairman Cummings did request documents from the White House, 940 F.3d at 715-16, his request sought entirely different documents from the Mazars subpoena. And instead of engaging in the "'hurly-burly'" of "negotiation and compromise," the Committee quickly "walk[ed] away from the bargaining table" and "'evad[ed]'" the accommodation process by subpoenaing a third-party custodian. *Mazars*, 140 S. Ct. at 2029, 2031, 2034-35. The Committee cannot argue that the Mazars subpoena is warranted until it first makes a good-faith effort to seek the information from Plaintiffs themselves—a tried-and-true process that has "managed for over two centuries to resolve such disputes" without judicial interference. *Id.* at 2031. While accommodation might require the Committee to compromise, "a compromise worked out between the branches is most likely to meet their essential needs and the country's constitutional balance." *United States v. AT&T Co.* (*AT&T I*), 551 F.2d 384, 394 (D.C. Cir. 1976).

***Third***, the Mazars subpoena is "broader than reasonably necessary" to further the Committee's emoluments rationale. *Mazars*, 140 S. Ct. at 2036. Even under the Committee's incorrect definition of "emolument," the President could not have received any emoluments until he became President in January 2017. Yet the Mazars subpoena seeks financial documents starting in 2011, years before President Trump was even a candidate for public office.

Even considering documents from 2017-2018, the subpoena is not cabined to documents that would reveal what the Committee would call "emoluments." *See Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (invalidating a congressional subpoena as overbroad because the committee claimed to be investigating "nursing home activities" but requested "'any' and 'all' financial records" from a businessman over six years). The Committee agrees: the only relevant documents that Mazars might have, it concedes, are "the Trump Washington, D.C. … hotel's ledger, receipts, and other financial and accounting documents showing the hotel's revenue from foreign governments or the U.S. government." Maloney Memo. 30; *see also* Maloney Memo. 49 (seeking "audited hotel statements"). But the Mazars subpoena is not limited to those documents. Nor does the Mazars subpoena look like the Committee's other requests about emoluments, which were far narrower. *See, e.g.*, Ltr. from Cummings to GSA (Apr. 12, 2019), bit.ly/3iHWdER. Indeed, the Committee has never made any real attempt to argue that its emoluments rationale could sustain the entire Mazars subpoena. And yet, "'[t]he burden is on the court to see that the subpoena is good in its entirety.'" *United States v. Patterson*, 206 F.2d 433, 434 (D.C. Cir. 1953).

*Fourth*, the burdens imposed on the Presidency further undermine the Mazars subpoena. *Mazars*, 140 S. Ct. at 2036. The subpoena seeks, in the Committee's words, "a full … understanding of the President's personal and business financial affairs," the President's "complete financial information," and a "robust evidentiary record regarding the President's finances." Maloney Memo. 45, 43, 31. That lack of "specificity" is itself an "'unnecessary intrusion into the operation of the Office of the Presidency.'" *Mazars*, 140 S. Ct. at 2036. That the Committee "somewhat" cabined the subpoena's timeframe, 940 F.3d at 717, and targeted a third-party custodian does not reduce these burdens. No President is going to physically assemble documents himself. The Committee's decision to subpoena a third party only *increased* the burden by requiring this extensive, emergency-posture litigation, rather than the traditional accommodation process. Although these kinds of burdens

"generally do not cross constitutional lines" when imposed by courts, they are significant when imposed by Congress—the President's "rival political branch." *Mazars*, 140 S. Ct. at 2036.

Beyond these specific burdens, this Court must weigh the long-term consequences that upholding this subpoena would have on the "ongoing relationship" and "institutional" balance between the legislative and executive branches. *Id.* According to the Committee, the Emoluments Clauses apply to the President and millions of federal employees, 5 U.S.C. §7342(a); 6 O.L.C. Op. 156 (1982), and the definition of "emoluments" is incredibly broad. The Committee's emoluments rationale thus would allow Congress to subpoena the financial records of *any* President or *any* federal employee. The Committee needs to see everyone's financial records, it would say, to determine whether they are receiving emoluments and whether Congress should consent to them or pass new disclosure laws. That readymade rationale would create a powerful "institutional advantage" for Congress vis-à-vis the executive branch. *Mazars*, 140 S. Ct. at 2036.

    **ii.**    **GSA Lease**

The Maloney memo next defends the Mazars subpoena as part of an investigation into "President Trump's lease agreement with the General Services Administration (GSA) for the Trump Old Post Office Hotel." Maloney Memo. 5. Notably, the GSA lease was not even mentioned in the Cummings memo—unsurprisingly, since it was the subject of a separate investigation and document requests. In any event, this rationale is unpersuasive. The defects with the Committee's emoluments rationale largely apply here as well. *Supra* I.B.i. A few additional defects bear mention.

***First***, the Committee has not "adequately identif[ied]" the "particular legislative objective" that justifies a subpoena to the President. *Mazars*, 140 S. Ct. at 2036. Neither "conflicts of interest" nor "breaches of leases" are legislation. *See* Maloney Memo. 10, 23. The Committee also claims to be considering, in the vaguest possible terms, potential legislation to ensure responsible stewardship of taxpayer dollars and GSA's proper review and management of the President's lease. *See* Maloney

Memo. 49 (discussing vague "legislative reforms to ensure that proper rents are collected and taxpayer interests are protected"); *id.* at 23 (discussing vague reforms to "tighten" preexisting requirements for bidders and leaseholders). Such assertions lack the "detail[]" necessary to justify a subpoena for a President's papers. *Mazars*, 140 S. Ct. at 2036. And the Mazars subpoena would "produce no relevant 'information about'" laws that "apply to ordinary Executive Branch employees." 940 F.3d at 733.

      ***Second***, the Committee has not substantiated why its lease rationale warrants a subpoena to a President, let alone a subpoena of this breadth. *Mazars*, 140 S. Ct. at 2035-36. Consider each subtopic that the Committee claims to be investigating.

      The Committee says it's studying whether President Trump breached the lease with GSA the moment he took office, as well as the decision-making process that led GSA to conclude he did not. Maloney Memo. 16-18. This inquiry turns on the proper reading of section 37.19 of the lease—specifically, whether its prohibition of federal officials being "admitted to" the lease applies to President Trump, who entered the lease years before he was a federal official. *See* GSA, OIG, *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease* 21 (Jan. 16, 2019), bit.ly/3iSqi4G. That purely legal dispute has *nothing* to do with the contents of President Trump's financial records. And the only entity with knowledge of GSA's decision-making process is GSA itself. Indeed, the Committee has thoroughly explored this topic with GSA already: It conducted a briefing with a GSA deputy commissioner, has the benefit of a detailed report from GSA's inspector general, and held a hearing where it heard testimony from witnesses. Maloney Memo. 17-19. It has no possible need for reams of information about the President's finances, particularly documents that have no relation to the Old Post Office hotel or documents from before he took office.

      The Committee has also claimed to be studying legislation that would prohibit contracts between the President and the federal government. Maloney Memo. 23. "[I]t is a major conflict of interest," the Committee asserts, if the President, who appoints and can remove the head of GSA, is

also "the landlord, the tenant, the judge, and the jury" under a federal lease. Maloney Memo. 19. In fact, this conflict of interest is "obvious." Maloney Memo. 23. But if the alleged conflict is "obvious" and stems from President Trump's mere authority over GSA, then the Committee has no need to comb through his personal finances. The decision to ban these types of contracts requires a "political" and "policy judgment" about supposedly inherent conflicts, not a "precise reconstruction" of President Trump's financial history. *Mazars*, 140 S. Ct. at 2036; *Senate Select*, 498 F.2d at 732. Indeed, after hearing testimony from "an ethics expert," the House *passed* this precise reform in H.R. 1—well before the Mazars subpoena was even issued. Maloney Memo. 19. And it has since passed the same reform *again* without seeing (or seeming to miss) President Trump's papers. The Committee admits, after all, that the public record already reflects how much revenue President Trump earned under the lease. Maloney Memo. 18.

Finally, the Committee claims it needs the President's financial information to study GSA's process for awarding and managing leases. Maloney Memo. 10, 23. The Committee asserts that President Trump might have misrepresented his finances when he bid on the lease in 2011 and when he certified that his "financial status had not adversely changed" on five occasions between 2013 and 2016. Maloney Memo. 15, 20; *see, e.g.*, GSA, *Old Post Office – Certificate of Financial Status* (Aug. 2013), bit.ly/33KDQZA. This baseless speculation derives solely from Michael Cohen's vague testimony about *entirely different* financial statements and transactions, *see* Maloney Memo. 19-20—hardly the kind of "evidence" that could justify launching a fishing expedition into President Trump's personal finances. *Mazars*, 140 S. Ct. at 2036. And, of course, the Committee already has Cohen's testimony (and believes it) and the financial statements that he produced. The Committee also admits that it does not know whether Mazars audited the relevant statements, Maloney Memo. 19, or whether Mazars has copies of the documents that underlie the statements, Maloney Memo. 22. And even assuming

Mazars is the right target, the Committee's subpoena is not tailored to documents concerning the Old Post Office, the GSA lease, the specific years in question, or the specific statements in question.

Plus, the Committee is perfectly capable of considering reforms to GSA's lease policies without detailed information about President Trump's finances. Congress can surely decide whether GSA should use different auditors or techniques, *see* Maloney Memo. 23, without auditing a decade of President Trump's confidential information. And if the Committee needs to know more about GSA's lease policies, then it can simply ask GSA. In fact, the Committee did just that, Maloney Memo. 20 n.85, and GSA responded by giving the Committee over 15,000 pages of documents, Ltr. from Post to Cummings (Aug. 22, 2019), bit.ly/35UGT3S; *see also* GSA, *Electronic Reading Room*, bit.ly/2FPwf3Z. To the extent the Committee is dissatisfied that GSA did not turn over every last document the Committee asked for, Maloney Memo. 22, that is how accommodation works, *see United States v. AT&T Co.* (*AT&T II*), 567 F.2d 121, 127 (D.C. Cir. 1977). The question is whether "other sources *could* reasonably provide Congress the information it needs"—not whether they definitely will. *Mazars*, 140 S. Ct. at 2035-36 (emphasis added). And Congress cannot justify a subpoena for specific documents by arguing, quite circularly, that it is considering legislation that would require "GSA to provide … documents … to Congress upon request." Maloney Memo. 23.

### iii.    Financial Disclosures

Finally, the Maloney memo claims that the Mazars subpoena will help the Committee study existing financial-disclosure laws and how they apply to the Trump presidency. Maloney Memo. 5-14. In terms of remedial legislation, the Committee says it's considering amendments that would require Presidents to disclose information over a longer period of time, to provide "exact numbers" instead of "ranges" or to give larger ranges, and to include additional information such as debts. Maloney Memo. 12. The Committee's disclosure rationale fails the Supreme Court's new, heightened standard.

**First**, the Committee fails to identify, with any specificity, what kind of disclosure laws it is considering. *Cf. Mazars*, 140 S. Ct. at 2036. While the Maloney memo mentions a smattering of proposals, the Committee never explains which proposals are actually under consideration, what those proposals would require, how those proposals would be enforced, or why those proposals (most of which have been drafted already) require an examination of the President's papers. The answers to these questions are critically important. For example, of the laws explicitly mentioned in the Maloney Memo, some are plainly unconstitutional (*e.g.*, H.R. 706, 1481, 2027, 4775 & 7526), some have nothing to do with the Mazars subpoena (*e.g.*, H.R. 210, 273, 950, 1524, 1736, 3688, 4454, 5131, 5433 & 745), some have already passed the House (*e.g.*, H.R. 1, twice), and some are not laws at all (*e.g.*, H. Con. Res. 51). *See* Maloney Memo. 56-58.

**Second**, as explained, *supra* I.B.i, the Committee's interest in disclosure laws cannot justify the "significant step" of subpoenaing President Trump's papers. *Mazars*, 140 S. Ct. at 2035. There is no reason why Congress would need a detailed accounting of the President's specific finances to enact legislation requiring financial disclosures. Any new disclosure law would apply to all Presidents (not just President Trump) and would require the disclosure of all specified information (no matter the content). The key questions for legislative study, then, are "predictive policy judgments"—balancing the benefits of greater disclosure against the risks of inundating the public with too much information or discouraging certain people from seeking public office. *Id.* at 2036. Nothing turns on the *details* of any *particular* official's finances.

While unique cases might expose holes in a statute, those problems often reveal themselves without requiring a full-blown audit of the person in question. Here, for example, the Committee has relied on the wealth of information it already has about President Trump to pinpoint specific amendments to the Ethics in Government Act that it wants to study. It nowhere explains why it needs

still more information to weigh the pros and cons of those reforms. *See Senate Select*, 498 F.2d at 732 ("Congress frequently legislates on the basis of conflicting information").

Even if the Committee needed more, the separation of powers requires it to try "other sources" first. *Mazars*, 140 S. Ct. at 2036. President Trump is not the only federal official with complex finances, large business holdings, or private business debts. The Committee could have studied any number of officials to determine how best to adjust the timeframe, amounts, and types of disclosures its laws require. Or it could hear testimony from ethics, accounting, and financial experts. The "unique constitutional position" of a President means that a third-party subpoena for his private papers is the *last* place the committee should have turned—not the first. *Mazars*, 140 S. Ct. at 2036.

At the very least, the Committee should have to sequence its requests. For example, it could ask for the contracts first. If the contracts reveal that Mazars exercised no independent judgment, *see* 940 F.3d at 741-42, then the Committee doesn't need the financial statements. If the contracts reveal the opposite, then the Committee doesn't need the source documents. And it's hard to see why the Committee, if its goal is to study general financial-disclosure laws, would ever need sensitive communications between an accountant and its clients.

The President's unique position also means that a House committee cannot subpoena his private papers to persuade "the Senate" that its reforms are needed, to inform a "conference committee" that does not yet exist, or to rehabilitate Michael Cohen's credibility. Maloney Memo. 4, 11. The Senate (or a future conference committee) can subpoena its own documents if and when the time comes. *See Mazars*, 140 S. Ct. at 2035-36 ("the significant step" of subpoenaing the President's papers should be "'avoided whenever possible'" and done only when "reasonably necessary"); *Dodge v. Woolsey*, 59 U.S. 331, 355 (1855) ("The senate and house of representatives of the United States exercise their legislative powers independently of each other"). The House Rules give the Committee jurisdiction to "evaluat[e]" and "study" laws for itself, for another House "standing committee," or

for "the House." House Rule X, cls. 2, 4. Lobbying or persuading Senators are not mentioned. A court could not possibly determine, moreover, what is "reasonably necessary" to persuade Republican Senators or a nonexistent conference committee. *Mazars*, 140 S. Ct. at 2036. Nor could these back-end tasks ever justify the "significant step" of subpoenaing the President. *Id.* If they did, committees could declare "open season on the President's information," as any number of intrusive inquiries could aid the passage (or defeat) of legislation by embarrassing, distracting, coercing, or undermining the President. *Id.* at 2035.

**Third**, if the Committee is interested in reforming presidential-disclosure laws, then the Mazars subpoena is "broader than reasonably necessary to support [this] legislative objective." *Id.* at 2036. The Committee concedes as much, stressing that its subpoena was drafted to obtain "a full … understanding of the President's personal and business financial affairs." Maloney Memo. 45. The Committee forgets that congressional inquiries must be tailored "to a subject matter properly under inquiry, not … to the person under interrogation." *Rumely v. United States*, 197 F.2d 166, 177 (D.C. Cir. 1952). Given the subject matters that the Committee is purportedly considering—reforms that would require Presidents to disclose larger amounts, longer timeframes, and additional debts—the Mazars subpoena is grossly overbroad. It is not limited to debts. It does not ask for specific dollar amounts where ranges are reported instead. And it does not ask about any particular timeframe based on anything specific to President Trump. The subpoena's utter lack of "specificity" should doom it, based on the only legislative aims that the Committee reasonably identifies. *Mazars*, 140 S. Ct. at 2036.

The Committee's failure to make a confidential request for President Trump's papers also makes its subpoena "broader than reasonably necessary." *Id.* Nothing in the Mazars subpoena guarantees that his papers will remain confidential, requires them to viewed in a closed session, or anything of that sort. Indeed, throughout this litigation, the Committee has not only maintained the absolute "discretion" to "make the records public," 380 F. Supp. 3d at 105, but has boasted that one

of its purposes is to "inform the public" about what it finds in President Trump's papers. Doc. 20 at 2. The Committee's refusal to offer a simple promise of confidentiality in this litigation is telling. *Cf. Mazars*, 140 S. Ct. at 2030 (recounting an accommodation where "documents were made available, but only for one day with no photocopying, minimal notetaking, and no participation by non-Members of Congress").

**Fourth**, the damage that both the Mazars subpoena and the disclosure rationale, if accepted, would do to the burden on the Presidency and the long-term balance of power between Congress and the President is troubling. *See id.* at 2036 (urging "careful[]" consideration of the branches' "ongoing relationship" and future "incentives"); *Rumely*, 197 F.2d at 177 (rejecting a "startlingly broad" theory of Congress's investigative powers that, "[i]f valid … would mean that all of the affairs of any [similar recipient] would be open to inquiry"); *Clinton v. Jones*, 520 U.S. 681, 690, 702 (1997) (stressing "the potential impact" of a decision and the actions that such a decision "might spawn"). If accepted, the Committee's disclosure rationale is a foolproof way to subpoena any private records from any President. By the Committee's logic, Congress can subpoena the private papers of a President so long as it claims to be considering legislation that would require Presidents to disclose those same papers. Automatically, then, every President would be subject to a thorough and public audit of his finances by whichever House of Congress is run by his political rivals. "[I]t is not at all difficult to conceive" how committees gifted with this principle would "significantly burden presidents with myriad inquiries into their business, person, and family affairs." *Deutsche Bank*, 943 F.3d at 684 (Livingston, J., concurring in part and dissenting in part).

Gone will be any real check on subpoenas that seek "exposure for the sake of exposure." Whatever reasons Congress wants to see "*this President's*" papers, Maloney Memo. 37, will be a reason the public should see them too. To get around the rule that Congress cannot subpoena a President's "medical records" to consider "health reform" or his "school transcripts" to consider "education

reform," *Mazars*, 140 S. Ct. at 2034, Congress would simply argue that it wants those documents to study laws requiring Presidents to *disclose* their medical records or *disclose* their school transcripts. "The Constitution does not tolerate such ready evasion." *Id.* at 2035. This Court shouldn't either.

### C.   Even treating the subpoena as an entirely new demand, it violates *Mazars*.

Instead of applying the *Mazars* test to the Mazars subpoena, the Committee might ask this Court to treat its reissued subpoena as an entirely new document. *But cf.* Status Conf. Tr. 6, 9 (Mar. 4, 2021) (House counsel acknowledging that, given the "residual separation-of-powers concerns," a version of the *Mazars* test may still apply). This "new" subpoena, the argument would go, should be judged on the present state of affairs—including the fact that President Trump is no longer office. This argument would be wrong under the law of congressional subpoenas and would contradict the Committee's position on mootness. But if the Committee makes it and the Court accepts this framing, the Committee should still lose.

Subpoenas to former Presidents are covered by the *Mazars* standard. That standard is grounded in the "separation of powers." *Mazars*, 140 S. Ct. at 2033, 2034, 2035, 2036. The Supreme Court has "reject[ed] the argument that only an incumbent President may assert" separation-of-powers claims defending the Office of the President; a "former President" can "also be heard to assert them." *Nixon*, 433 U.S. at 439. A "former President in this context can hardly be viewed as an ordinary private citizen." *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997). The protection that he—and, in turn, "'the Republic'"—needs from congressional subpoenas of his private papers "'cannot be measured by the few months or years between the submission of the [subpoena] and the end of the President's tenure.'" *Nixon*, 433 U.S. at 449. The separation-of-powers concern, after all, is that Congress will use these subpoenas to "harass the President," "render him complaisant to the humors of the Legislature," and gain an "institutional advantage" over him. *Mazars*, 140 S. Ct. at 2034, 2036 (cleaned up). If Congress can subpoena the President's personal papers while he's in office, and then

"declare open season" the minute he leaves, this dynamic will affect how the President acts toward Congress while in office (and who runs for office in the first place). *Id.* at 2035.

Against these continuing separation-of-powers concerns, the Committee has nothing. Now that President Trump is out of office, its asserted legislative needs make even less sense. Any "emoluments" have ended. *See Trump v. CREW*, No. 20-330, 2021 WL 231541 (U.S. Jan. 25, 2021); *Trump v. D.C.*, No. 20-331, 2021 WL 231542 (U.S. Jan. 25, 2021). Any breach of the GSA lease has ended. Any "conflicts of interest" have ended. The Committee does not claim to be studying legislation that governs *former* Presidents. If the Committee is studying disclosure laws that govern sitting Presidents, then it's concededly using President Trump "as a 'case study.'" *Mazars*, 140 S. Ct. at 2036 (quoting *Deutsche Bank*, 943 F.3d at 662-63 n.67). Here, too, the case-study rationale is too dubious and insubstantial to justify a legislative subpoena—especially when only one President is singled out. *Cf.* 940 F.3d at 729 (deeming it "not at all suspicious that the Committee would focus an investigation into presidential financial disclosures on the accuracy and sufficiency of the *sitting* President's filings" (emphasis added)). And the Committee's failure to turn to "other sources" for this information is particularly inexplicable, now that President Trump is no longer the head of the executive branch. *Mazars*, 140 S. Ct. at 2035; *cf.* Maloney Memo. 23.

In short, the Committee cannot try to have it both ways. The Committee justified its subpoena entirely on President-specific grounds. If this subpoena is no longer to the President, then it no longer has any justification. Whatever justification remains would be far outweighed by the separation-of-powers implications of allowing Congress to subpoena a President's private papers in office and then continue harassing him after he leaves.

## II.     The subpoena lacks a legitimate legislative purpose.

Even if the Mazars subpoena were directed at a purely private citizen, it would still exceed the

House's authority. All congressional subpoenas, the Supreme Court reiterated in *Mazars*, are subject

to "several" constitutional limitations. 140 S. Ct. at 2031.

1.  Subpoenas must have a "'legislative'" purpose. *Id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Congress cannot "issue a subpoena for the purpose of 'law enforcement'" or for mere "'exposure'" or "'disclosure[].'" *Id.* at 2031-32 (quoting *Quinn*, 349 U.S. at 161; *Watkins*, 354 U.S. at 200; and *McGrain v. Daugherty*, 273 U.S. 135, 173 (1927)).

2.  The subpoena's legislative purpose must be "valid"; it "must concern a subject on which legislation could be had." *Id.* at 2031-32 (cleaned up; quoting *Quinn*, 349 U.S. at 161; and *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975)). Valid legislation "could not 'be had' if it would be unconstitutional." 940 F.3d at 732 (quoting Plaintiffs' brief).

3.  The subpoena must be "'related to, and in furtherance of,'" the committee's valid legislative purpose. *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187). In other words, the subpoena's requests must be "'pertinen[t]'"—or "'reasonably relevant'"—to the legislation being considered. 940 F.3d at 739-40.

As Plaintiffs argued before, the Mazars subpoena fails each of these limitations. *See* Doc. 11-1 at 9-1;

Doc. 24 at 9-16.

While this Court rejected these arguments in its earlier opinion, it should reconsider them now.

For starters, this Court's prior opinion was vacated (as was the D.C. Circuit's). The whole point of

vacatur is to "eliminate a judgment" and "clear the path for future relitigation of the issues." *Mundo*

*Verde Pub. Charter Sch. v. Sokolov*, 315 F. Supp. 3d 374, 385 (D.D.C. 2018) (cleaned up). "Of necessity,"

vacatur "deprives" every "opinion of precedential effect" except the Supreme Court's. *O'Connor v.*

*Donaldson*, 422 U.S. 563, 577 n.12 (1975); *see Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th

Cir. 1991) ("A decision may be *reversed* on other grounds, but a decision that has been *vacated* has no

precedential authority whatsoever."). And the Supreme Court's opinion was not neutral on these

questions; it made conclusions that support each of Plaintiffs' arguments. Important facts have also

come to light since this Court's decision. The Court should take these subsequent legal and factual developments into account and rule for Plaintiffs.

### A.     Legislation is not the subpoena's primary purpose.

The Mazars subpoena is invalid if, instead of legislation, its "purpose" is something else, like law enforcement or exposure. *Mazars*, 140 S. Ct. at 2032. The "mere assertion of a need to consider 'remedial legislation'" is not enough. *Shelton*, 404 F.2d at 1297. Courts must determine the subpoena's "real object," its "primary purpose[]," its "*gravamen*." *McGrain*, 273 U.S. at 178; *Barenblatt v. United States*, 360 U.S. 109, 133 (1959); *Kilbourn v. Thompson*, 103 U.S. 168, 195 (1880). While courts cannot consider hidden motives, they must identify the Committee's actual purpose by consulting all "available evidence—that is, what the Committee is doing and what it has stated publicly." 940 F.3d at 726 (cleaned up; quoting Plaintiffs' brief); *accord* 380 F. Supp. 3d at 92 (citing *Shelton*, 404 F.2d at 1297).

Legislation is not the Mazars subpoena's primary purpose. As the Supreme Court stressed, this subpoena is "of such great consequence" to the parties "precisely because" it targets President Trump's "personal papers"—a request with a "less evident connection to a legislative task" that poses "a heightened risk" that the Committee is pursuing "impermissible purposes." *Mazars*, 140 S. Ct. at 2035. This "risk" fully materialized here, as the Supreme Court observed. A court "would have to be 'blind' not to see" that this subpoena does "not represent a run-of-the-mill legislative effort but rather a clash between rival branches of government over records of intense political interest." *Id.* at 2034. Indeed, the Mazars subpoena is part of a broader struggle between elected Democrats and President Trump over his private financial information. SMF ¶¶42-63. As OLC documented, the record plainly refutes the notion that legislation is what drove Congressional Democrats' requests for the President's information. SMF ¶¶46-47.

From the very beginning, it's been clear that "the gravamen of the Oversight Committee's investigation in this case is the President's wrongdoing." 940 F.3d at 774 (Rao, J., dissenting).

Chairman Cummings said so at the Cohen hearing, as did other Committee members. SMF ¶¶9-15. Cohen's testimony focused on crimes that President Trump supposedly committed as a private citizen, and Chairman Cummings told Mazars that he wanted the documents to confirm Cohen's allegations. SMF ¶¶2, 8, 16-17, 19-20, 24. The memo accompanying his document request made no mention of legislation. SMF ¶25. And the memo accompanying the Mazars subpoena mentioned legislation only as a vague, conclusory afterthought. SMF ¶31. It flatly admitted that the Committee was investigating whether President Trump "engaged in illegal conduct before and during his tenure in office." SMF ¶30. That the Cummings memo led with this rationale before litigation, but the Maloney memo abandoned it after litigation, is telling. So is the way the Committee seamlessly argued that the subpoena could be upheld as part of an *impeachment* investigation. SMF ¶68.

The Committee's post-litigation focus on H.R. 1 is also revealing. Though H.R. 1 is the key legislation that the subpoena supposedly supports, the House passed it *twice* without anyone receiving (or seeming to care about) the President's information. SMF ¶¶33, 71. H.R. 1 is a retroactive rationalization for a subpoena that was issued on other grounds. SMF ¶¶33, 73. 2011 is when Cohen accused the President of private wrongdoing, not the starting date for some expanded disclosure requirement in H.R. 1 or anywhere else. Disclosure reforms will apply to all Presidents, after all, and the problem of complex finances is not unique to President Trump. Yet President Trump is the only one whose private financial documents were targeted by a congressional subpoena.

The subpoena itself reveals the Committee's law-enforcement aims. Unlike legislative inquiries that "depend more on the predicted consequences of proposed legislative actions," the Mazars subpoena seeks a "precise reconstruction of past events." *Senate Select*, 498 F.2d at 732. And unlike legislative inquiries that have no "need" for "the most precise evidence," the subpoena focuses on "certain named individuals" and whether they "did or did not commit specific [acts]." *Id.* The subpoena's "dragnet" nature—seeking reams of documents, from multiple businesses, spanning

nearly a decade to get "detailed understanding of this President's financial holdings," Maloney Memo. 4—likewise reveals its illegitimacy. *Wilkinson v. United States*, 365 U.S. 399, 412 (1961). If prosecutors wanted to investigate Cohen's allegations of financial crimes, this is the subpoena they would issue. *See Deutsche Bank*, 943 F.3d at 688 n.20 (Livingston, J., concurring in part and dissenting in part) ("[A]t oral argument, the Committees' lawyer appeared explicitly to equate these subpoenas to those issued in connection with federal criminal investigations."). In fact, a prosecutor in New York County *did* issue this subpoena because he found it perfectly tailored to investigating Cohen's allegations of local crimes. SMF ¶69. Courts cannot declare the Mazars subpoena to be a real attempt to study legislation without refusing "to see what all others can see and understand." *Mazars*, 140 S. Ct. at 2034 (quoting *Rumely*, 345 U.S. at 44; cleaned up).

### B.     Any legislation pertinent to the subpoena would be invalid.

Even if the Mazars subpoena did pursue legislation, it remains unenforceable if no valid legislation "'could be had.'" *Id.* at 2031. Although this inquiry can be "abstract," the "only way to determine whether the Committee's investigation informs 'a subject on which legislation may be had' is to ask … whether 'legislation *may* be had' on that 'subject.'" 940 F.3d at 732. In other words, this Court must "define the universe of possible legislation that the subpoena provides 'information about'" and then "consider whether Congress could constitutionally enact any of those potential statutes." *Id.* The only arguably constitutional statutes that are arguably pertinent here are ones that "would require the President to do nothing more than *disclose*" additional "financial information." *Id.* at 733.

But laws that operate directly on the President and require him to disclose information are unconstitutional. While the D.C. Circuit did not consider this constitutional question "serious," *id.* at 745, the Supreme Court took a different view. "[L]egislation concerning the Presidency," the Court said without qualification, "raises sensitive constitutional issues." *Mazars*, 140 S. Ct. at 2036. Unlike

other executive agencies and offices created by Congress, the Presidency is "created by the Constitution." *Gordon v. United States*, 117 U.S. 697, 699 (1864). The President stands alone as "the only person who alone composes a branch of government." *Mazars*, 140 S. Ct. at 2034.

Because the President is "one of the three great divisions of power in the Government of the United States," and "independent" of the other two, *Gordon*, 117 U.S. at 699, Congress cannot coerce him to make public disclosures against his will. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838). The President is like the Supreme Court in this way, *id.*, and Congress's power to impose financial-disclosure requirements on the Justices has been flagged as a serious constitutional question. *See 2011 Year-End Report on the Federal Judiciary* 3-4, 6, bit.ly/2Ku5ZvM. Plaintiffs' formal view of the separation of powers is not "'archaic.'" 940 F.3d at 736. It is the law. *Compare id.* at 733-34 (calling for a "'pragmatic, flexible approach" to the separation of powers), *with Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2207 (2020) (rejecting calls for a "pragmatic, flexible approach" because our system of separated powers was "not chosen" for its "flexibility").

Beyond the separation of powers, presidential-disclosure laws violate the Qualifications Clause, U.S. Const., Art. II, §1, cl. 5. Congress cannot amend or add to the constitutional qualifications for President. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 827 (1995); *id.* at 861-62 (Thomas, J., dissenting). But presidential-disclosure laws with enforcement mechanisms would do just that. Although anyone who makes the required disclosure can still be President, 940 F.3d at 736, the Qualifications Clause does not turn on whether a requirement imposes a prior restraint. Constitutional rules "would be of little value if they could be indirectly denied." *Term Limits*, 514 U.S. at 829 (cleaned up). That's why the Constitution outlaws not only absolute bars on certain individuals serving in office, but also those requirements with "the likely effect of handicapping a class of candidates" in running for office. *Id.* at 836; *see Griffin v. Padilla*, 408 F. Supp. 3d 1169, 1179 (E.D. Cal. 2019), *vacated*, 2020 WL

1442091 (E.D. Cal. Jan. 13, 2020); *Campbell v. Davidson*, 233 F.3d 1229, 1236 (10th Cir. 2000); *Schaefer v. Townsend*, 215 F.3d 1031, 1039 (9th Cir. 2000). So too here.

### C.     The subpoena is overbroad.

Finally, even assuming presidential-disclosure laws are constitutional, the Mazars subpoena is not "'related to, and in furtherance of'" that legislation. *Mazars*, 140 S. Ct. at 2035. Subpoenas must be pertinent to their valid legislative purposes, "'a jurisdictional concept … drawn from the nature of a congressional committee's source of authority.'" 940 F.3d at 739 (quoting *Watkins*, 354 U.S. at 206). If a committee could "subpoena information irrelevant to its legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations." *Id.* Some courts have effectively narrowed congressional subpoenas when they seek impertinent information. *E.g.*, *Bergman*, 389 F. Supp. at 1130-31; *Deutsche Bank*, 943 F.3d at 667. But if courts lack this power, then an overbroad subpoena must be invalidated "in its entirety," sending Congress back to the drawing board. *Patterson*, 206 F.2d at 434. Otherwise, Congress could "read[il]y eva[de]" any constitutional limits by simply bundling a legitimate demand with an illegitimate one. *Mazars*, 140 S. Ct. at 2035.

The Mazars subpoena has serious overbreadth problems. As explained, if the Court sustains the emoluments or GSA-lease rationales, this subpoena is not remotely tailored to those goals. *Supra* I.B.i-ii. If the Court sustains the presidential-disclosures rationale, it must keep three principles in mind: The Constitution places limits on Congress's subpoena powers; the Constitution bars exposure for the sake of exposure; and the Constitution "does not tolerate … ready evasion." *Mazars*, 140 S. Ct. at 2031-32, 2035. This Court thus cannot allow the Committee to argue that it needs to see certain private information because, depending on what it finds, it could pass a law requiring the disclosure of that information. Yet that is mostly what the Committee argues. *See* Maloney Memo. 13-14. This is the very definition of "the mere assertion of a need to consider 'remedial legislation'" that cannot

sustain a subpoena for private records. *Shelton*, 404 F.2d at 1297. The Committee must instead provide "references to specific problems" that it might remedy through disclosure laws. *Id.*

While the Maloney memo does specifically identify some legislative proposals, the Mazars subpoena is largely irrelevant to those proposals. The Maloney memo points to sections of H.R. 1 that would require Presidents to disclose business relationships, large debts, and large assets, H.R. 1, §8012; and to submit another financial disclosure after they enter office, H.R. 1, §8013. *See* Maloney Memo. 12-13 & nn.47-48. But the Mazars subpoena is not limited to documents reflecting business relationships, large debts, large assets, or documents from the year President Trump took office. Further, the Mazars subpoena covers 2011-13, years before the President was even a candidate for public office. The only specific proposal that could arguably justify this time span is the part of H.R. 1 that requires Presidents to disclose ten years' worth of tax returns. Maloney Memo. 13 & n.49 (citing H.R. 1, §10001); *see* 940 F.3d at 741. But the Mazars subpoena doesn't even seek tax returns, *see* SMF ¶¶41, 45, 69, let alone limit itself to tax returns.

These overbreadth problems are fatal. Until the Committee's subpoena reflects the financial-disclosure reforms it claims to be studying—rather than a blunderbuss shot at gaining "a full … understanding of the President's personal and business financial affairs," Maloney Memo. 45—this Court should not enforce it.

## CONCLUSION

The Mazars subpoena is unconstitutional and unenforceable, and the key facts proving that point are likely undisputed. This Court should enter summary judgment for Plaintiffs.

Respectfully submitted,

Dated: April 5, 2021                        *s/ William S. Consovoy*

Stefan C. Passantino (D.C. Bar #480037)     William S. Consovoy (D.C. Bar #493423)
MICHAEL BEST & FRIEDRICH LLP                Cameron T. Norris
1000 Maine Ave. SW, Ste. 400                Alexa R. Baltes
Washington, D.C. 20024                      CONSOVOY MCCARTHY PLLC
(202) 747-9582                              1600 Wilson Blvd., Ste. 700
spassantino@michaelbest.com                 Arlington, VA 22209
                                            (703) 243-9423
                                            will@consovoymccarthy.com
                                            cam@consovoymccarthy.com
                                            lexi@consovoymccarthy.com

                                            Patrick Strawbridge
                                            CONSOVOY MCCARTHY PLLC
                                            Ten Post Office Square
                                            8th Floor South PMB #706
*Counsel for The Trump Organization, Inc., Trump*   Boston, MA 02109
*Organization LLC, The Trump Corporation, DJT*      patrick@consovoymccarthy.com
*Holdings LLC, The Donald J. Trump Revocable*
*Trust, and Trump Old Post Office LLC*              *Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I filed this document and its attachments with the Court via ECF, which will electronically

notify all counsel of record.

Dated: April 5, 2021                        *s/ William S. Consovoy*