## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

        *Plaintiffs*,

        v.

MAZARS USA LLP,

        *Defendant*,

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

        *Intervenor-Defendant.*

Case No. 1:19-cv-01136-APM

## INTERVENOR-DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7, Intervenor-Defendant Committee on Oversight and Reform of the United States House of Representatives opposes Plaintiffs' Motion for Summary Judgment and hereby moves for summary judgment on all claims in Plaintiffs' Complaint. The grounds supporting this motion are set forth in the accompanying memorandum. In accordance with the Local Civil Rules, a proposed order is attached.

Dated:  May 5, 2021

/s/ *Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
*General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
Megan Barbero (MA Bar No. 668854)
William E. Havemann (VA Bar No. 86961)
Eric R. Columbus (D.C. Bar No. 487736)

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

Alan D. Strasser (D.C. Bar No. 967885)
Jennifer S. Windom (D.C. Bar No. 502481)
D. Hunter Smith (D.C. Bar No. 1035055)
Brandon L. Arnold (D.C. Bar No. 1034238)

ROBBINS, RUSSELL, ENGLERT, ORSECK
& UNTEREINER LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
(202) 775-4500
astrasser@robbinsrussell.com

*Counsel for Intervenor-Defendant Committee on
Oversight and Reform of the U.S. House of
Representatives*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

        *Plaintiffs*,

        v.

MAZARS USA LLP,

        *Defendant*,

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

        *Intervenor-Defendant*.

Case No. 1:19-cv-01136-APM

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## INTERVENOR-DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
## AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.    The Committee on Oversight and Reform.............................................................3

    B.    President Trump's Conflicts of Interest................................................................3

    C.    The Committee's Investigation ............................................................................5

    D.    The Committee's Subpoena to Mazars ................................................................9

    E.    The Supreme Court's *Mazars* Decision ...........................................................11

    F.    The Maloney Memorandum ...............................................................................12

    G.    The Reissued Subpoena.....................................................................................14

LEGAL STANDARD ...........................................................................................................15

ARGUMENT........................................................................................................................15

    I.    THE COMMITTEE IS ENTITLED TO FORMER PRESIDENT TRUMP'S INFORMATION ...................................................................................15

        A.    The *Mazars* Test Does Not Apply Because The Separation-Of-Powers Concerns Identified By The Supreme Court Are Significantly Reduced As To Former Presidents ..............................................................................................16

        B.    Under The Applicable Balancing Test, The Committee's Need For The Subpoenaed Information Outweighs The Limited Separation-of-Powers Concerns For A Former President........................................................................21

            1.    The Committee Has A Significant Need For The Mazars Documents To Advance Its Legislative Purposes....................................................21

            2.    The Separation-Of-Powers Interests Invoked By Plaintiffs Are Weak............26

    II.    THE COMMITTEE'S SUBPOENA SATISFIES THE *MAZARS* TEST ..............28

        A.    This Court Should Consider Chairwoman Maloney's Memorandum In Evaluating The Committee's Subpoena.............................................................28

        B.    The Committee's Subpoena Satisfies Each Of The *Mazars* Factors ............31

            1.    Involvement Of The Former President And His Papers Is Warranted ...........31

  2. The Subpoena Is "No Broader Than Reasonably Necessary" ..........................35

  3. There Is "Detailed And Substantial" Evidence Of The Committee's Legislative Purposes ...................................................................................38

  4. The Subpoena Does Not Impose Burdens That Cross Constitutional Lines..........................................................................................................40

III. PLAINTIFFS' RECYCLED ARGUMENTS ARE UNPERSUASIVE ....................41

 A. The Mazars Subpoena Does Not Serve An Impermissible Purpose ...........................41

 B. The Subpoena Could Yield Valid Legislation .............................................................42

CONCLUSION....................................................................................................................................44

# TABLE OF AUTHORITIES†

**Cases**                                                                 **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................................................15

*Bradley v. Sch. Bd. of Richmond,*
    416 U.S. 696 (1974).................................................................................................20

*Clinton v. Jones,*
    520 U.S. 681 (1997).................................................................................................26

*Doe v. Rumsfeld,*
    341 F. Supp. 2d 1 (D.D.C. 2004) ...........................................................................15

*Gojack v. United States,*
    384 U.S. 702 (1966)...........................................................................................29, 30

*Hutcheson v. United States,*
    369 U.S. 599 (1962).................................................................................................42

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.,*
    56 F.3d 279 (D.C. Cir. 1995) ..................................................................................28

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs,*
    104 F.3d 1349 (D.C. Cir. 1997)...............................................................................30

*Maloney v. Murphy,*
    984 F.3d 50 (D.C. Cir. 2020) ....................................................................................9

*McGrain v. Daugherty,*
    273 U.S. 135 (1927).................................................................................................42

*\*Nixon v. Adm'r of Gen. Servs. (Nixon v. GSA),*
    433 U.S. 425 (1977) ..........................................................................................*passim*

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982).................................................................................................26

*Public Citizen, Inc. v. DOJ,*
    111 F.3d 168 (D.C. Cir. 1997) ................................................................................27

*\*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) (en banc)...........................................................29, 33

---

† Authorities upon which we chiefly rely are marked with asterisks.

*Shelton v. United States,*
    327 F.2d 601 (D.C. Cir. 1963) .................................................................................. 29, 30, 31

*Sinclair v. United States,*
    279 U.S. 263 (1929) .......................................................................................................... 42, 43

*Tory v. Cochran,*
    544 U.S. 734 (2005) ............................................................................................................... 20

*\*Trump v. Comm. on Oversight & Reform of U.S. House of Representatives (Mazars I),*
    380 F. Supp. 3d 76 (D.D.C. 2019) ......................................................................... 3, 10, 42, 43

*Trump v. Deutsche Bank AG,*
    943 F.3d 627 (2d Cir. 2019) ................................................................................................... 31

*Trump v. Mazars USA, LLP,*
    832 F. App'x 6 (D.C. Cir. 2020) ........................................................................................... 14

*\*Trump v. Mazars USA, LLP (Mazars II),*
    940 F.3d 710 (D.C. Cir. 2019) ......................................................................................*passim*

*\*Trump v. Mazars USA, LLP (Mazars III),*
    140 S. Ct. 2019 (2020) ...................................................................................................*passim*

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) ............................................................................................................... 43

*United States v. Rumely,*
    345 U.S. 41 (1953) ................................................................................................................. 29

*Watkins v. United States,*
    354 U.S. 178 (1957) ......................................................................................................... 29, 30

*Williams v. Fanning,*
    63 F. Supp. 3d 88 (D.D.C. 2014) .......................................................................................... 15

**Constitutional Provisions, Statutes, Regulation, and Rules**

U.S. Const. art. I, § 6, cl. 2 ................................................................................................... 18

U.S. Const. art. I, § 9, cl. 8 ..................................................................................................... 8

U.S. Const. art. II, § 1, cl. 5 ................................................................................................... 43

U.S. Const. art. II, § 1, cl. 7 ..................................................................................................... 8

3 U.S.C. § 102 note ................................................................................................................ 18

5 U.S.C. § 2954 ..................................................................................................................9

Ethics in Government Act of 1978, 5 U.S.C. app. 4 ........................................................4

    5 U.S.C. app. 4 § 102(a)(1) ......................................................................................5

    5 U.S.C. app. 4 § 102(b)(1) ......................................................................................5

    5 U.S.C. app. 4 § 102(d)(1) ......................................................................................5

Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 ....................................................25

18 U.S.C. § 202(c) ..............................................................................................................5

5 C.F.R. § 2635.102(h) ......................................................................................................5

House Rule II.8(c) ............................................................................................................20

House Rule X.1(n)(1) ........................................................................................................3

House Rule X.1(n)(4) ........................................................................................................3

House Rule X.1(n)(6) ........................................................................................................3

House Rule X.2(a) ..............................................................................................................3

House Rule X.2(b)(1) ........................................................................................................3

House Rule X.3(i) ..............................................................................................................3

House Rule X.4(c)(2) ........................................................................................................3

House Rule XI.2(m)(1) ......................................................................................................3

House Rule XI.2(m)(1)(B) ................................................................................................3

House Rule XI.2(m)(3)(A)(i) ......................................................................................3, 31

**Miscellaneous**

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222
    (2000) ..............................................................................................................................19

Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20,
    2016)................................................................................................................................23

*The Documentary History of the Ratification of the Constitution Digital Edition* (John P.
    Kaminski et al. eds., 2009) ..........................................................................................17

*Donald Trump's New York Times Interview*, N.Y. Times (Nov. 23, 2016),
    https://perma.cc/8DQQ-C3SF ....................................................................................4

The Federalist No. 71 ................................................................................................ 15

*H.R. 1: Strengthening Ethics: Hearing Before the H. Comm. on Oversight & Reform*, 116th
    Cong. (2019), https://perma.cc/X5LU-VLR5 .......................................................... 4

H.R. 1, 116th Cong. (2019) ........................................................................... *passim*

H.R. 244, 117th Cong. (2021) ................................................................................ 33

H.R. 347, 117th Cong. (2021) ................................................................................ 33

H. Rep. No. 29-684 (1846) ..................................................................................... 17

H. Rep. No. 29-686 (1846) ..................................................................................... 17

Memorandum from Chairwoman Carolyn B. Maloney to Members of the Committee
    on Oversight and Reform (Aug. 26, 2020) ..................................................... *passim*

Office of Gov't Ethics, Financial Disclosure Report for President Donald J. Trump,
    OGE Form 278e (July 15, 2015), https://perma.cc/Z9RZMMKT ................................ 23

Office of Gov't Ethics, *Public Financial Disclosure Guide: FAQs-Liabilities*,
    https://perma.cc/6PMC-XRFW ............................................................................ 5

Remarks of Walter M. Shaub, Jr., Director, U.S. Office of Government Ethics, at the
    Brookings Institution (Jan. 11, 2017), https://perma.cc/HE3C-456B ........................... 34

Ronald D. Rotunda, *Presidents and Ex-Presidents As Witnesses* U. Ill. L.F. 1 (1975) ........................... 1, 18

## INTRODUCTION

Since the beginning of the 116th Congress, the Committee on Oversight and Reform (Committee) has been investigating "glaring weaknesses in current ethics legislation that threaten the accountability and transparency of our government."  SOMF ¶ 31.  As part of this investigation, the Committee issued a subpoena to Mazars USA LLP for documents concerning President Trump's personal financial information.  Through more than two years of litigation—and the end of one Congress and the beginning of another—the Committee has been stymied in its efforts to obtain the subpoenaed information despite its ongoing and pressing legislative need.

While the Committee's need for the subpoenaed information has not changed, one key fact has:  Plaintiff Donald J. Trump is no longer the President.  Because he is no longer the incumbent, the constitutional separation-of-powers principles that were the foundation of the Supreme Court's recent decision are significantly diminished.  Former President Trump no longer "alone composes a branch of government."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020).  He and Congress no longer have an "ongoing institutional relationship as the 'opposite and rival' political branches," and the Committee's subpoena does not "unavoidably pit the political branches against one another."  *Id.* at 2033-34.  Presidents are not kings, and they do not serve for life.  Thus, as former President Theodore Roosevelt explained when he testified before a House committee: "*an ex-President is merely a citizen of the United States, like any other citizen,* and it is his plain duty to try to help this committee or respond to its invitation."  Ronald D. Rotunda, *Presidents and Ex-Presidents As Witnesses*, 1975 U. Ill. L.F. 1, 4 (1975) (emphasis added).

Plaintiffs urge the Court to ignore this reality and evaluate the subpoena under the *Mazars* test as if nothing has changed.  But the Supreme Court developed the *Mazars* test to address the separation-of-powers concerns that arise when Congress subpoenas a sitting President's information.  That is no longer the relevant analysis.  Instead, under Supreme Court precedent

addressing the separation of powers as applied to former Presidents, *see Nixon v. Adm'r of Gen. Servs.* (*Nixon v. GSA*), 433 U.S. 425 (1977), the Court should apply a balancing test that weighs the Committee's need for the subpoenaed documents—which is significant—against the harm to the Presidency implicated by production of a former President's personal information—which is limited. The Committee's need for the subpoenaed documents to address Presidential conflicts of interest far outweighs any harm to the Office of the President or the functioning of the Executive Branch.

Even if Plaintiffs were right that the Supreme Court's test applies—notwithstanding the many indications that its analysis was specific to incumbents—this Court should still hold that the Committee's subpoena is enforceable. As the analysis in this Court's prior decision and that of the D.C. Circuit demonstrate, the Committee's subpoena is directed to informing legislative judgments of significant importance. Those legislative aims are specific to Presidential conflicts of interest and thus warrant the involvement of the former President's papers. The subpoena is no broader than reasonably necessary to obtain material for its investigation into Presidential financial disclosures, self-dealing in government contracts, and emoluments. And the Committee has documented its legislative need in exceptional detail. Against these weighty interests, any burden on the Presidency from production of a former President's personal papers is negligible.

The Committee is therefore entitled to summary judgment.

## BACKGROUND

President Trump's term in office raised significant conflicts-of-interest concerns relating to the Presidency. The Committee has been investigating the nature and extent of these problems since the beginning of the 116th Congress to inform legislation to address the vulnerabilities in existing law. This suit arises from a subpoena issued to Mazars in April 2019, and reissued in

February 2021, as part of the Committee's investigation.  This investigation has been detailed in the prior opinions in this case.[1]  We summarize the key facts here.

### A.  The Committee on Oversight and Reform

The Committee on Oversight and Reform is the House's principal oversight body.  The House has charged the Committee with "review[ing] and study[ing] on a continuing basis the operation of Government activities at all levels."  House Rule X.3(i).[2]  The Committee also has authority over matters related to "officers and employees of the United States," "[g]overnment management and accounting measures generally," and "government operations and activities."  House Rule X.1(n)(1), (4), (6).  In addition to "general oversight responsibilit[y]" for the statutes and agencies within its jurisdiction, the Committee is empowered to "conduct investigations of any matter without regard to" the jurisdictions of the House's other standing committees.  House Rule X.2(a), (b)(1), X.4(c)(2).  Accordingly, the Committee's investigative authority is coextensive with the jurisdiction of the House itself.

The House Rules empower Committees to issue subpoenas to further their investigations.  Thus, to "carry[] out" its "functions and duties," the Committee can "require, by subpoena or otherwise, … the production of such … documents as it considers necessary."  Rule XI.2(m)(1), (m)(1)(B), (m)(3)(A)(i).

### B.  President Trump's Conflicts of Interest

The Trump Presidency highlighted significant vulnerabilities in the existing regime governing Presidential conflicts of interest.

---

[1] *See Trump v. Comm. on Oversight & Reform of U.S. House of Representatives* (*Mazars I*), 380 F. Supp. 3d 76, 83-88 (D.D.C. 2019); *Trump v. Mazars USA, LLP* (*Mazars II*), 940 F.3d 710, 714-18 (D.C. Cir. 2019); *Trump v. Mazars USA, LLP* (*Mazars III*), 140 S. Ct. at 2027-28.

[2] Rules of the House of Representatives, 117th Cong. (2021), https://perma.cc/QM5L-E9GL; *see also* Rules of the House of Representatives, 116th Cong. (2019), https://perma.cc/X5ZQ-ZZWD.

When he was sworn into office, President Trump brought with him a vast array of financial holdings, which comprised hundreds of interconnected businesses and were more complex than the finances of any other President in modern American history.  *See* SOMF ¶ 31.  Rather than divest from these holdings or place them in a "blind trust" over which he exercised no control, however, he set up a revocable trust that was overseen by his son and from which he was authorized to withdraw income at any time.  *See* SOMF ¶¶ 29, 31.  This arrangement represented a stark departure from "decades of precedent set by previous Presidents," who divested their financial holdings or used blind trusts to avoid even the appearance of conflicts of interest in their decision-making. SOMF ¶ 14.  President Trump declared that this arrangement was appropriate because "the president can't have a conflict of interest."[3]

President Trump went further than refusing to divest from his financial holdings:  He also declined to disclose any financial information from his tax returns.  Again, this decision broke with precedent set by every President dating back to President Carter, all of whom "exceeded statutory disclosure requirements by releasing their personal federal income tax returns to the public."  *Mazars II*, 940 F.3d at 735.  President Trump's refusal to disclose his financial information voluntarily, even as he continued to benefit from his holdings, caused "an ethics crisis" that left "no way of knowing how personal interests are affecting public policy."[4]

President Trump's decisions created "both perceived and actual conflicts of interest" and exposed shortcomings in the existing regime governing Presidential conflicts of interest.  SOMF ¶ 14.  The centerpiece of that regime is the Ethics in Government Act of 1978, 5 U.S.C. app. 4.

---

[3] *Donald Trump's New York Times Interview*, N.Y. Times (Nov. 23, 2016), https://perma.cc/8DQQ-C3SF.

[4] *H.R. 1: Strengthening Ethics: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 125 (2019), https://perma.cc/X5LU-VLR5 (testimony of Walter M. Shaub, Jr., former director of the Office of Government Ethics).

"Enacted in the wake of the Watergate scandal," the Ethics in Government Act "requires many aspiring and current government officials, including presidential candidates and sitting Presidents, to file financial disclosure reports at various times during their candidacies and incumbencies." *Mazars II*, 940 F.3d at 714-15.  But the statute requires only limited disclosures.  Information is generally required only for the preceding calendar year; amounts are listed only in broad ranges instead of exact numbers; and the maximum amount of those ranges is relatively low.  *See* 5 U.S.C. app. 4 § 102(a)(1), (b)(1), (d)(1).  In addition, the statute does not require disclosure of certain private business information—including the liabilities of the President's closely held companies.[5]  While other laws regulate conflicts of interest of federal employees, these laws exempt the President.  *See, e.g.*, 18 U.S.C. § 202(c); 5 C.F.R. § 2635.102(h).

## C.  The Committee's Investigation

From the outset of the 116th Congress, the Committee has been investigating President Trump's conflicts of interest to evaluate how to reform existing law.  In April 2019, as required by House Rules, the Committee published its oversight plan describing its intent to investigate President Trump's business interests, conflicts of interests, and emoluments.  SOMF ¶ 14.  The oversight plan noted that President Trump had failed to separate himself from his business interests and that he had also eschewed the modern norm of tax-return disclosure.  SOMF ¶ 14.  The plan therefore explained that the Committee was conducting "robust and independent oversight of the President and his family's multiple business interests in order to guard against financial conflicts and unconstitutional emoluments."  SOMF ¶ 14.

The Committee began its investigation in early 2019.  *See* SOMF ¶¶ 5-15.  A year earlier, the Office of Government Ethics (an Executive Branch entity) announced that President Trump had

---

[5] *See* Office of Gov't Ethics, *Public Financial Disclosure Guide: FAQs-Liabilities*, https://perma.cc/6PMC-XRFW.

omitted a liability that should have been reported on his 2017 financial disclosure required by the Ethics in Government Act—a payment from his former personal attorney, Michael Cohen, to "a third party." SOMF ¶ 6. In January 2019, the Committee responded by requesting documents from the White House and the Trump Organization concerning President Trump's financial disclosures and reporting of debts. SOMF ¶ 5. In a letter to the White House, then-Committee Chairman Elijah Cummings explained that these documents would "help the Committee determine why the President failed to report … payments and whether reforms are necessary to address deficiencies with current laws, rules, and regulations." SOMF ¶ 8. The White House and the Trump Organization refused to produce the material. SOMF ¶¶ 7, 9.

To better understand the limitations of existing laws, it became clear that the Committee needed information regarding President Trump's financial statements and disclosures, including how those documents were compiled. The Committee needed this information to inform three tracks of its investigation into President Trump's conflicts of interest:

*First*, the Committee needed to evaluate whether and how to modify existing financial disclosure laws governing the Presidency. Like every President since 1978, President Trump was required under the Ethics in Government Act to file an annual financial disclosure form that reports certain debts and liabilities. In February 2019—after the Committee began its investigation—Cohen testified before the Committee that President Trump "inflated his total assets when it served his purposes," but, at other times, "deflated his assets." SOMF ¶ 10. To corroborate his testimony, Cohen produced accounting documents from 2011, 2012, and 2013, at least two of which were prepared by Mazars. SOMF ¶ 11. These documents showed large fluctuations in Trump's reported assets and liabilities from year to year, and they also revealed discrepancies between what he listed as his assets and liabilities to Mazars and what he later self-reported in the financial disclosures mandated by the Ethics in Government Act. These documents thus raised questions about whether

6

existing law had effectively identified his conflicts of interest, and caused the Committee to

"reasonably wonder whether the Ethics in Government Act need[ed] an update." *Mazars II*, 940

F.3d at 741.  But these documents did not provide sufficient detail to understand President Trump's

unreported conflicts of interest or the extent to which current law was falling short.

*Second*, the Committee's investigation delved into concerns relating to the procurement and

management of the lease between President Trump's business and the General Services

Administration (GSA) for the Old Post Office Building in Washington, D.C.  The documents

provided by Cohen suggested that President Trump inflated his assets to procure the lease with

GSA—which was signed in 2013, one of the years in which discrepancies were found in President

Trump's financial statements.  These documents thus raised questions about whether President

Trump's business had made comprehensive and accurate disclosures to GSA in its bid to lease

federal property and in its subsequent submissions to GSA throughout the course of the lease, and

whether reforms are needed to improve the rigor of the GSA leasing process.  But without

information about what was submitted for GSA review, it was impossible to assess adequately the

failures in GSA's process.

In addition, the GSA lease prohibits any "elected official of the Government of the United

States" from benefiting from the lease.  SOMF ¶ 17.  Yet, shortly after President Trump's

inauguration, GSA concluded that the lease remained "valid," even though President Trump had

become an elected official.  SOMF ¶ 18.  In January 2019, GSA's Office of Inspector General issued

a report finding "serious shortcomings" in GSA's decision to uphold the validity of the lease.

SOMF ¶ 19.  The deficiencies in GSA's process suggested that the President's dual roles as the

tenant of GSA and the head of the Executive Branch could have tainted GSA's decision to approve

his continued ownership of the lease.  Information regarding the submissions to GSA after

President Trump took office would further shed light on potential undue influence regarding the

lease—for example, by revealing that GSA opted to continue the lease even though President Trump's business failed to comply with the terms of the lease.

*Third*, the Committee's investigation revealed possible violations of the Constitution's Emoluments Clauses, two anticorruption provisions that prohibit the President from accepting domestic emoluments and require the President to obtain Congressional consent before accepting foreign emoluments. *See* U.S. Const. art. I, § 9, cl. 8; *id.* art. II, § 1, cl. 7. The documents that Cohen provided to the Committee revealed a pledge by President Trump of nearly $20 million to one of his business associates, which appears to be a foreign creditor, *see* SOMF ¶ 12, thus raising significant emoluments concerns, including with how the debt is structured. And, as the GSA Inspector General's report noted, President Trump's business interest in the Old Post Office Building "raised issues under the Constitution's Emoluments Clauses," but GSA officials "improperly ignored" those issues in approving the lease. SOMF ¶ 19. GSA's handling of the emoluments question—as well as reporting about foreign government spending at Trump properties—raised significant questions about whether existing law was adequately addressing Presidential emoluments.

To better understand the concerns raised by its investigation, the Committee sought additional information regarding President Trump's finances. Chairman Cummings wrote to Mazars, explaining that the documents provided by Cohen "raise questions about the President's representations of his financial affairs on these forms and on other disclosures." SOMF ¶ 12. The Chairman requested that Mazars produce accounting documents relating to President Trump and certain of his business entities, dating from 2009 to the present. SOMF ¶ 12. Mazars, however, declined to produce the requested documents voluntarily. SOMF ¶ 13.

Chairman Cummings also requested documents from GSA.  SOMF ¶ 20.[6]  He sought documents that President Trump's business used to obtain the lease and submitted throughout the course of the lease—including any financial statements prepared by Mazars—to inform the Committee's analysis of emoluments, Executive Branch self-dealing, and oversight of GSA.  GSA produced certain documents in response to this request, but the overwhelming majority of those were irrelevant to the Committee's investigation (most were already in the Committee's possession, and many concerned routine hotel administration such as fire alarm testing and art installations). SOMF ¶ 21.  GSA refused to provide relevant financial documents, including any financial statements prepared by Mazars.  SOMF ¶ 21.  Contrary to Plaintiffs' assertion (Pls. Mem. 5), the Committee Chair has continued to seek material related to the lease from GSA ever since.

### D.  The Committee's Subpoena to Mazars

In April 2019, the Committee issued a subpoena to Mazars for four categories of documents for President Trump and certain of his business entities: (1) "statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports," (2) "underlying, supporting, or source documents and records," (3) related "memoranda, notes, and communications;" and (4) all related "engagement agreements or contracts."  SOMF ¶ 25.  The subpoena sought a narrower category of material than the Committee had sought in its initial request to Mazars:  Rather than seeking material dating back to 2009, the subpoena sought (with limited exceptions) documents from 2011—the year GSA sought proposals for the Old Post Office Building and the first year for which Cohen produced Mazars accounting records—through 2018. *See* Pls. SOMF ¶ 40 (reproducing subpoena).

---

[6] Chairman Cummings's request to GSA followed an earlier request under 5 U.S.C. § 2954 made by Cummings and seven other Members of the Committee before they came into the majority, seeking documents related to the GSA lease.  That earlier request is the subject of ongoing litigation. *See Maloney v. Murphy*, 984 F.3d 50, 54 (D.C. Cir. 2020).

In a memorandum to the Committee, Chairman Cummings explained that the Committee needed the documents to advance important legislative interests, including to "determine whether [President Trump] has undisclosed conflicts of interest," to "assess whether he is complying with the Emoluments Clauses," and to "review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities."  SOMF ¶ 23.  Chairman Cummings added that documents in Mazars' possession would "inform[] [the Committee's] review of multiple laws and legislative proposals under [its] jurisdiction."  SOMF ¶ 23.

Before the subpoena's return date, President Trump and affiliated business entities filed suit to prevent Mazars from complying.  Following expedited briefing and a hearing, this Court entered summary judgment for the Committee.  *Mazars I*, 380 F. Supp. 3d at 90.  The Court recognized that Congress may not "trench upon Executive or judicial prerogatives," but concluded that the subpoena was well within the Committee's power given that the Committee "identified several pieces of actual legislation" that its investigation would inform, including H.R. 1, a reform bill that would address Presidential conflicts of interest in numerous respects.  *Id.* at 91, 96.  These bills "demonstrate[d] Congress's intent to legislate, at the very least, in the areas of ethics and accountability for Executive Branch officials, including the President."  *Id.* at 96.  The Court rejected President Trump's arguments that the subpoena had an impermissible law-enforcement purpose and could not result in valid legislation.  *Id.* at 99, 103.

The D.C. Circuit affirmed, concluding that the subpoena sought information that was "reasonably relevant to remedial legislation addressing … potential 'undisclosed conflicts of interest' and the President's [financial-disclosure] reports."  *Mazars II*, 940 F.3d at 740 (quotation marks omitted).  The D.C. Circuit emphasized "how much Congress has already revealed about its legislative objectives," and noted that "the House has even put its legislation where its mouth is" by passing H.R. 1 and by considering other bills "pertaining to the information sought in the

subpoenas." *Id.* at 729, 731. The D.C. Circuit recognized that the House had passed H.R. 1 without

the benefit of the Mazars documents, but noted that "[i]nformation revealed by the subpoena could

inform the Senate as it considers the bill, as well as any subsequent conference committee or the

House itself, should it reconsider the bill post-conference." *Id.* at 731-32. Like this Court, the D.C.

Circuit rejected Plaintiffs' arguments that the subpoena had an illegitimate law-enforcement purpose

and could not result in valid legislation. *Id.* at 728-37.

### E. The Supreme Court's *Mazars* Decision

The Supreme Court granted certiorari and consolidated the proceedings with *Trump v.*

*Deutsche Bank AG*, No. 19-760 (S. Ct. 2019), which addressed President Trump's challenges to

subpoenas issued by different House committees to different entities.

The Supreme Court recognized that the "congressional power to obtain information is

broad and indispensable" and that it "extend[s] to every affair of government." *Mazars III*, 140 S.

Ct. at 2031, 2033 (quotation marks omitted). The Supreme Court further affirmed that Congress

has the power in appropriate cases to issue "a subpoena directed at the President's personal

information." *Id.* at 2035. And the Court rejected the theory that Congress may only subpoena the

President's information when it shows a "demonstrated, specific need" for the material, reasoning

that such a "demanding" standard "would risk seriously impeding Congress in carrying out its

responsibilities." *Id.* at 2032-33.

The Supreme Court concluded, however, that because this case involved a subpoena for the

President's information, it presented "weighty concerns regarding the separation of powers" and

could not be governed by "precedents that do not involve the President's papers." *Id.* at 2033, 2035.

The Court noted that "congressional subpoenas for the President's information unavoidably pit the

political branches against one another." *Id.* at 2034-35. It instructed courts evaluating these

subpoenas to "perform a careful analysis that takes adequate account of the separation of powers

principles at stake, including both the significant legislative interests of Congress and the unique

position of the President." *Id.* at 2035 (quotation marks omitted).  And it announced four factors to

guide that separation-of-powers analysis.  *Id.* at 2035-36.

The Court did not apply its new test; instead, it remanded for the lower courts to apply it in

the first instance.  Nor did the Court address—much less accept—President Trump's arguments

that the subpoena had an impermissible law-enforcement purpose and could not result in valid

legislation, even though these were his principal arguments.  *See* Pet. Br. 35-52.

### F.  The Maloney Memorandum

The Committee's subpoena to Mazars satisfied the Supreme Court's new test.  The

Committee therefore did not narrow its subpoena in light of the Court's decision.  Instead, in

response to the Court's call for Congress to provide "detailed" and "substantial" evidence that

"explains why the President's information will advance its consideration of the possible legislation,"

*Mazars III*, 140 S. Ct. at 2036, Chairwoman Carolyn Maloney—Chairman Cummings's successor—

issued a memorandum elaborating in detail on the purposes that had always underpinned the

subpoena.

The Maloney memorandum explained that President Trump's conflicts of interest and his

failure to adequately separate from his complex financial holdings "exposed glaring weaknesses in

current ethics legislation that threaten the accountability and transparency of our government."

Memorandum from Chairwoman Carolyn B. Maloney to Members of the Committee on Oversight

and Reform, at 3 (Aug. 26, 2020) (Maloney Mem.), Ex. F to Declaration of Todd B. Tatelman.  The

memorandum confirmed that "[t]he House attaches immense importance to addressing these

vulnerabilities."  *Id.* at 4.  It specified that the Committee's investigation had followed three tracks,

all of which are "aimed at defining, understanding, and mitigating presidential conflicts of interest

and self-dealing." *Id.* at 4-5. And it described in detail each track of the investigation and the legislation that would be informed by the investigation.

The memorandum further explained why the material sought from Mazars was critical to the investigation. It described how Mazars emerged during the investigation "as a crucial custodian of documents relevant to all three investigative tracks." *Id.* Without a detailed understanding of President Trump's financial holdings as reflected in the Mazars documents, Congress cannot tailor "bills that seek to prevent presidential conflicts of interest and self-dealing" to "ensure the legislation's effectiveness and minimize the burden on the President and presidential candidates." *Id.* at 4. Hence, "Mazars is in possession of documents and information necessary to help the Committee define areas that require remedial measures and undertake the necessary legislative reforms." *Id.* at 5.

Chairwoman Maloney also pointed to "new information" that had emerged during the Committee's investigation "about President Trump's conflicts of interest and self-dealing" that made the Mazars documents all the more critical. *Id.* at 33. Since first issuing its subpoena, the Committee had uncovered additional evidence that President Trump used his official position for the benefit of his personal businesses—including nearly $1 million in taxpayer funds spent on "room rentals at Trump hotels and establishments." *Id.* These revelations underscore "the urgent need for reform legislation" and make it "more imperative that Congress determine the extent and scope of [President Trump's] conflicts of interest." *Id.*

Chairwoman Maloney emphasized the need to examine President Trump's financial records specifically. As she explained, "[n]o other president's information would suffice because other presidents took steps to avoid similar problematic arrangements, and none was ever a federal leaseholder during his presidency." *Id.* at 38. But she also made clear that "the Committee fully intends to continue this investigation and ethics reform legislation in the next Congress, regardless

13

of who holds the presidency, because the Committee's goal is to prevent problems raised by the circumstances of the current President from being repeated." *Id.* at 55.

In the D.C. Circuit, the Committee maintained that it should prevail under the *Mazars* test while President Trump remained in office and urged the Court to resolve this case before the end of the 116th Congress.  *See* Comm. Supp. Br. 36-37; Oral Arg. at 41:41-42:30.  Before the D.C. Circuit took any action, however, President Trump lost the 2020 election.  The Committee subsequently notified the Court that Chairwoman Maloney would reissue the subpoena in the 117th Congress if the case was not resolved before then.  *See* SOMF ¶ 44.  Given these developments, the D.C. Circuit remanded.  *Trump v. Mazars USA, LLP*, 832 F. App'x 6 (D.C. Cir. 2020) (per curiam).

**G.  The Reissued Subpoena**

The 117th Congress began on January 3, 2021.  SOMF ¶ 45.  President Trump left office on January 20, 2021.  SOMF ¶ 46.

In February 2021, Chairwoman Maloney issued a memorandum confirming her intent to reissue the Mazars subpoena.  SOMF ¶ 47.  She explained that the Committee "is continuing its investigation of presidential conflicts of interest, presidential contracting and self-dealing, and presidential emoluments in order to inform consideration of landmark ethics reform and other remedial legislation."  SOMF ¶ 48.  She noted that the documents sought in the Mazars subpoena are necessary to "allow the Committee and Congress to more fully identify the areas that need reform and craft appropriate legislation in response."  SOMF ¶ 49.

Chairwoman Maloney emphasized that the Committee's investigation remains just as critical as it was "before President Trump vacated the White House."  SOMF ¶ 47.  That is because the Committee's goal is to prevent the unresolved ethics crisis from tarnishing the Presidency and further reducing public confidence in government.  SOMF ¶ 49.  Indeed, in a sign of the "immense importance" that the 117th Congress attached to this goal, Chairwoman Maloney noted the House's

consideration of numerous bills that would be informed by the Committee's investigation—including H.R. 1, which was reintroduced in the first days of the 117th Congress.  SOMF ¶ 49.  She explained that the House was forced to pass the bill "without the benefit of the former President's information," which resulted in legislation "that will need to be amended once Congress obtains the specific information sought in this case."  SOMF ¶ 49.  She then reissued the subpoena to Mazars on February 25, 2021.  SOMF ¶ 50.

## LEGAL STANDARD

On cross motions, summary judgment is appropriate "if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not in dispute."  *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 8 (D.D.C. 2004).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Williams v. Fanning*, 63 F. Supp. 3d 88, 92 (D.D.C. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  Where, as here, there are "no genuine material facts that preclude judgment," the Court should evaluate the legal arguments and grant summary judgment to the appropriate party.  *Doe*, 341 F. Supp. 2d at 8.

## ARGUMENT

## I.      THE COMMITTEE IS ENTITLED TO FORMER PRESIDENT TRUMP'S INFORMATION

To ensure Congress would not exert "'an imperious controul' over the Executive Branch," the Supreme Court identified four "special considerations" to guide courts in evaluating a subpoena for the President's personal information.  *Mazars III*, 140 S. Ct. at 2034-35 (quoting The Federalist No. 71).  But Donald Trump is no longer the President.  Accordingly, the Supreme Court's separation-of-powers test for subpoenas seeking the President's personal information no longer applies.  Instead, this Court should balance the Committee's significant legislative need for the Mazars documents against the limited separation-of-powers concerns implicated by a subpoena for

the personal information of a former President.  This balance tips decisively in the Committee's favor.

A.    The *Mazars* Test Does Not Apply Because The Separation-Of-Powers Concerns Identified By The Supreme Court Are Significantly Reduced As To Former Presidents

The test announced by the Supreme Court was predicated on the separation-of-powers concerns involved in seeking the personal information of the incumbent President.  "[T]he two political branches established by the Constitution," the Court explained, "have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity."  *Id.* at 2026.  That ongoing relationship "necessarily inform[ed]" the Court's analysis and was the reason why "[t]his case is different" from others involving Congressional subpoenas.  *Id.*

But because former President Trump no longer "alone composes a branch of government," *id.* at 2034-35, the separation-of-powers principles at stake are significantly reduced.  This case is no longer "a clash between rival branches of government," *id.* at 2034, nor does it concern "the allocation of power between [the] two elected branches of Government," *id.* at 2031 (alteration in original).  The subpoena cannot "intru[de] into the operation of the Office of the President," nor will it burden "the President's time and attention."  *Id.* at 2036.  Subpoenas for a former President's information plainly pose a far lower risk to the President's discharge of his duties than subpoenas for the information of an incumbent.

Not only are the risks to the Executive Branch diminished where Congress seeks information from a former President, but a former President's incentives to accommodate Congress are diminished as well.  A former President has no need for Congress's help funding the government or advancing his legislative priorities.  *See id.* at 2029.  Nor is he subject to impeachment or electoral consequences for defying a Congressional inquiry.  Thus, the background "tradition of negotiation

and compromise" against which the Supreme Court crafted its test, *id.* at 2031, no longer applies to Plaintiff Trump as a private citizen.

The *Mazars* test was entirely directed to addressing the separation-of-powers concerns implicated by subpoenas to an incumbent.  The Supreme Court, for example, instructed lower courts to assess whether Congress's legislative purpose "warrants the significant step of involving the President and his papers."  *Id.* at 2035.  But seeking information from a former President is undeniably less fraught than seeking information from the incumbent, and therefore can be justified by a lower showing of need.  Likewise, the Supreme Court instructed lower courts to ensure that a subpoena seeking the President's information is "no broader than reasonably necessary" given the separation-of-powers principles at stake.  *Id.* at 2036.  But a subpoena for a former President's information does not intrude on the Office of the President, and therefore need not be as narrowly tailored.  And the Supreme Court instructed lower courts to ensure that a subpoena would not impose an impermissible "burden[]" on the President.  *Id.*  But a subpoena to a former President imposes no burden on the current President at all.

It should come as no surprise that a test designed to preserve the separation of powers between Congress and the President applies differently to former Presidents.  The Framers contemplated that when a President leaves office, he "return[s] to the general mass of the people, from whence he was taken; where he must participate [in] their burdens."  *The Documentary History of the Ratification of the Constitution Digital Edition* (John P. Kaminski et al. eds., 2009) (statement of George Mason).  Congress has accordingly subpoenaed former Presidents on occasions dating back nearly two centuries.  In 1846, former President John Tyler testified pursuant to a Congressional subpoena in an investigation into suspected misconduct in his administration.  Former President John Quincy Adams filed a deposition pursuant to subpoena in the same investigation.  *See* H. Rep. No. 29-686, at 9, 22-25, 27-29 (1846); H. Rep. No. 29-684, at 8-11 (1846).  Still other Presidents

have testified before Congress voluntarily after leaving office.  *See, e.g.*, Rotunda, *supra*, at 4 (quoting former President Theodore Roosevelt's testimony that "an ex-President is merely a citizen of the United States, like any other citizen").

Former Presidents receive limited special recognition because they previously served in office, including receipt of certain statutory benefits—for example, they receive a pension and are eligible for security protection.  *See* 3 U.S.C. § 102 note.  But they do not retain Executive authority or an official role that would cause a subpoena for their information to distract from Executive duties or interfere with Executive Branch functioning.  Indeed, while the Constitution provides that no Executive Branch officer may serve in Congress, U.S. Const. art. I, § 6, cl. 2, former Presidents have served in the House (John Quincy Adams) and the Senate (Andrew Johnson)—underscoring the distinction between a former President and the incumbent.

The Supreme Court has accordingly recognized that separation-of-powers concerns—and the related Presidential privilege concerns—are reduced in cases involving a former President, because the analysis focuses on whether regulation of a former President burdens the incumbent President and the functioning of the Executive Branch.  In *Nixon v. GSA*, 433 U.S. at 430, the Supreme Court addressed the constitutionality of the Presidential Recordings and Materials Preservation Act, which required GSA to take custody of "some 42 million pages of documents and some 880 tape recordings of conversations" constituting former President Nixon's Presidential records, to ensure that he would not destroy records pertaining to Watergate.  After balancing the legislative interests supporting the statute against the diminished interests of the former President, the Court upheld the statute against a facial challenge.  *Id.* at 439-46, 484.  The Court concluded that the seizure of a former President's materials for eventual public release would not "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions," particularly given "the important interests that the Act seeks to attain."  *Id.* at 443, 446.

18

Even the Executive Branch has recognized that separation-of-powers concerns are significantly reduced as to former Presidents. For decades, the Department of Justice's Office of Legal Counsel (OLC) has maintained that incumbent Presidents may not be indicted or prosecuted given the separation-of-powers concerns implicated by prosecuting the President. But OLC made clear that "[r]ecognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over." *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 255 (2000). OLC thus saw no separation-of-powers obstacle to criminally prosecuting a former President even though it believed such a prosecution would be impermissible as to an incumbent.

Despite these differences between former Presidents and incumbents, Plaintiffs ask this Court to decide this case as if Donald Trump were still the President. They argue (Pls. Mem. 1) that this case remains a dispute about a "demand for the President's information," and that this Court should apply the *Mazars* test unchanged. But these arguments are unpersuasive.

*First*, Plaintiffs cannot be right (Pls. Mem. 28) that all "[s]ubpoenas to former Presidents are covered by the *Mazars* standard." Under their theory, a subpoena for the personal information of a President who left office decades ago would be governed by the same separation-of-powers test that applies to the incumbent. To be sure, *Nixon v. GSA* makes clear that former Presidents may assert separation-of-powers claims. But that case holds that former Presidents have a weaker basis to assert such claims than incumbents. *Nixon v. GSA*, 433 U.S. at 441 (rejecting former President Nixon's separation-of-powers claim in part because President Ford signed the challenged statute into law and President Carter supported its constitutionality); *id.* at 448 ("a former President is in less need of [Presidential privilege] than an incumbent").

*Second*, Plaintiffs appear to make a narrower argument (Pls. Mem. 12) that, because the Committee first issued the subpoena when President Trump was in office, it must continue to

defend the subpoena under the *Mazars* test as if he remained the incumbent. This argument is wrong. A court generally applies the facts and law in existence "at the time it renders its decision." *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974); *see also Tory v. Cochran*, 544 U.S. 734, 737-38 (2005). It is altogether commonplace for changed factual circumstances to affect the outcome of litigation. This Court should evaluate the Committee's subpoena without blinding itself to the present circumstances.

*Third*, Plaintiffs contend (Pls. Mem. 12) that the *Mazars* test nevertheless applies because the Committee chose "to revive a subpoena to the President" upon the expiration of the prior subpoena rather than issuing an altogether new subpoena with a different scope. This argument is difficult to understand. The Committee reissued the *Mazars* subpoena without change at the start of the 117th Congress because it continues to need the subpoenaed materials and it is entitled to these materials. The Committee agrees that the reissuance of the subpoena prevented Plaintiffs' case from becoming moot. But Plaintiffs' suggestion (Pls. Mem. 11-13) that the reissuance of the subpoena means that the subpoena remains a request for information of an incumbent President is mistaken—there is only one incumbent President, and the Committee has not requested his information. The House Rule allowing "a committee … to act as the successor in interest" to a committee of the prior Congress, *see* House Rule II.8(c), likewise does not change the fact that the subpoena now seeks a former President's information.

*Finally*, Plaintiffs argue (Pls. Mem. 29) that "[t]he Committee justified its subpoena entirely on President-specific grounds," and that therefore "[i]f this subpoena is no longer to the President, then it no longer has any justification." But this conclusion does not follow. It is true that the Committee seeks former President Trump's information to inform its consideration of legislation governing Presidential conflicts of interest. But that does not mean that the Committee lost its need for the subpoenaed materials the moment President Trump left office. Information about the

conflicts of interest that a *former* President operated under while in office obviously can inform

legislation that would prevent similar conflicts of interest in *future* Presidents.  That is why the

Maloney memorandum made clear that the Committee intends to continue its investigation

"regardless of who holds the presidency," to ensure that the conflicts of interest that beset the

Trump Presidency are not repeated.  Maloney Mem. 55.  No one else's information would suffice

"because other presidents took steps to avoid similar problematic arrangements, and none was ever

a federal leaseholder during his presidency."  *Id.* at 38.

B.   **Under The Applicable Balancing Test, The Committee's Need For The
     Subpoenaed Information Outweighs The Limited Separation-of-Powers
     Concerns For A Former President**

This Court should not apply the *Mazars* test to the Committee's subpoena.  Instead, similar

to the Supreme Court's analysis in *Nixon v. GSA*, this Court should apply a balancing test that

weighs the Committee's need for the subpoenaed materials for its legislative purposes against the

limited intrusion on the Presidency when Congress seeks a former President's information.  The

balance tilts decisively in the Committee's favor.

1.   *The Committee Has A Significant Need For The Mazars Documents To Advance Its*
     *Legislative Purposes*

As the prior rulings by this Court and the D.C. Circuit demonstrate, the Mazars documents

will inform the Committee as it considers legislative priorities of the highest order—ensuring that

the President of the United States does not labor under financial conflicts of interest that

compromise his official decision-making.  As detailed in the Committee's oversight plan, Chairman

Cummings's materials, and Chairwoman Maloney's memoranda, the Committee has a clear,

consistent, and pressing need for this information for all three tracks of its investigation.

*First*, the Committee is investigating whether existing financial disclosure laws adequately

protect against the risk of Presidential self-dealing and conflicts of interest.  *See* Maloney Mem. 5-14.

President Trump not only had extraordinarily complex financial arrangements, but he also broke

with the disclosure and divestment norms of his predecessors.  *See id.* at 37.  Before President

Trump, every President to hold office since the Ethics in Government Act was enacted had

"exceeded statutory disclosure requirements by releasing their personal federal income tax returns to

the public."  *Mazars II*, 940 F.3d at 735.  By refusing to do so, President Trump exposed the limits of

the existing financial disclosure laws.

The Committee is therefore considering whether the Ethics in Government Act should be

amended to require disclosure of additional information about a President's finances.  The Act

currently requires disclosures concerning only a relatively short period; it requires that many crucial

disclosures be made "only in broad ranges instead of exact numbers" and capped at relatively low

amounts; and it requires only limited disclosures about closely held businesses—and does not

require, for example, disclosure of debt unless the President is personally liable.  *See* Maloney Mem.

12.

The existing public record is limited insofar as it can guide the Committee's consideration of

how to reform the law.  "Congress needs more information about" how existing law applied or

failed to apply to former President Trump, so that it can appropriately "define the need for and the

scope of any additional information to require as part of federal financial disclosures."  Maloney

Mem. 39.  If, for example, the Mazars documents reveal that President Trump's reporting

discrepancies "were simply a mistake, the Committee could mandate additional instructions or

reporting requirements to assist presidential filers in avoiding those same mistakes."  *Id.* at 45.

"Alternatively, if the Committee obtained evidence that [former President Trump's] self-reporting

on financial disclosures includes intentional inaccuracies," Congress could amend the "federal

financial disclosure laws by requiring the submission of supporting financial information from

presidents and presidential candidates," or "require outside certification or auditing of such financial

information."  *Id.*  And because former President Trump has "structured his privately held

businesses in a manner that blurs the distinction between personal and business finances," *id.* at 39, the Committee's analysis of his finances and disclosures requires both his and his businesses' financial information.[7]

The Mazars subpoena seeks documents that will advance this track of the investigation.  As the D.C. Circuit concluded, financial statements and source documents for the years 2014 through 2018 are "highly relevant" to the investigation into "whether Candidate and President Trump accurately reported his finances to … federal entities, and, by extension, whether reforms are necessary to address deficiencies with current laws, rules, and regulations."  *Mazars II*, 940 F.3d at 740 (alteration in original) (quotation marks and citation omitted).  Financial statements and source documents for 2011 to 2013 are likewise needed to verify the authenticity of the financial statements the Committee has reviewed and to "assess the informational benefit that would be gained by reaching farther back in time and requiring additional disclosure."  Maloney Mem. 43; *see also Mazars II*, 940 F.3d at 741 (noting that Congress might reasonably consider requiring "disclos[ure] [of] earlier years' information").

Similarly, the Committee needs the Mazars communications "related to the preparation, compilation, review, or auditing of" the financial statements, Pls. SOMF ¶ 40—particularly with respect to the key Mazars partner responsible for managing the Trump engagement.  *See* Maloney Mem. 51-52.  These materials will help the Committee determine the reasons for discrepancies between President Trump's financial statements and his statutory disclosures.  *Id.*  And the Committee needs the Mazars engagement contracts related to the subpoenaed financial statements,

---

[7] Former President Trump appears to recognize as much: His own disclosures under the Ethics in Government Act reported some (though not all) of the assets and liabilities of his affiliated business entities.  *See* Office of Gov't Ethics, Financial Disclosure Report for President Donald J. Trump, OGE Form 278e, at 23, 47 (July 15, 2015), https://perma.cc/Z9RZMMKT; *cf.* Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016), https://perma.cc/6PWP-UVTY.

which will help the Committee "understand the underlying products that it receives in the other subpoena requests." *Id.* at 50.  The Committee's evaluation of the financial statements may differ if, for example, Mazars "merely was compiling numbers and estimates [that were] self-reported by the President or the Trump Organization" rather than performing a Generally Accepted Accounting Principles (GAAP) qualified review.  *Id.*

*Second*, the Committee is conducting oversight of conflicts of interest in GSA's lease with former President Trump's business for the Old Post Office building in Washington, D.C.  The Committee is considering possible legislation to remediate the "conflicts of interest that arise when the President or his businesses enter into a private contract with the United States or any of its agencies."  Maloney Mem. 23; *see id.* at 14-23.

The Committee has become concerned that President Trump's business may have "provided misleading or incomplete information to GSA" in the bidding process and in its subsequent financial certifications.  *Id.* at 23.  The Committee seeks the financial information that his business was required to submit under the contract solicitation and the lease itself—information GSA collected to minimize risk of tenant default and to determine payments owed to the U.S. Government.  These documents will inform the Committee's investigation into GSA's initial decision to award the lease to the Trump business and its subsequent management of the lease.  For example, to obtain the lease, the Trump business was required in 2011 to submit audited or certified financial statements, but the financial statements provided by Cohen from around that time appear to have been neither audited nor certified.  *Id.* at 43.  Mazars documents thus could "support alternative measures, such as independent auditing of contracts that involve the President or requiring GSA to change the reporting relationship of contracting officers to increase their independence and impartiality." *Id.* at 23.  In addition, "if the Committee uncovered evidence that [President Trump's business] provided

24

misleading or incomplete information to GSA as part of its annual financial statement submissions, then it would better understand how to help GSA identify similar issues in the future." *Id.*

The Committee is also investigating potential undue influence at GSA after President Trump took office. The GSA lease provides that no "elected official of the Government of the United States" shall be entitled to "any benefit" under the lease. *Id.* at 16. But after President Trump took office, GSA reversed its earlier position and determined that his business was "in full compliance" with the lease. *Id.* at 16-18. The GSA Inspector General has since identified "serious shortcomings" with that decision. *Id.* at 18. Given this evidence of undue influence at GSA after President Trump took office, the Committee is also investigating whether GSA may have succumbed to undue influence by permitting violations of other lease provisions. The Committee needs the Mazars documents submitted under the lease to determine whether such other violations occurred and how GSA responded to them. This information will aid the Committee's consideration of potential legislation to ensure responsible handling of future Presidential leases. *See id.* at 23.

*Third*, the Committee is investigating the concerns about compliance with the Constitution's Foreign and Domestic Emoluments Clauses generated by President Trump's sprawling business interests. A "full accounting" of foreign and domestic governmental payments to President Trump is needed for the Committee to determine whether additional disclosures are necessary to preserve Congress's constitutional role in determining whether to authorize acceptance of foreign emoluments, to require disgorgement of improper emoluments, and to undo policies tainted by improper influence. *See* Maloney Mem. 30-31; *cf., e.g.*, Foreign Gifts and Decorations Act, 5 U.S.C. § 7342(a)(1)(E), (b)-(c) (regulating receipt of gifts and decorations by "the President").

The Mazars documents are likely to show benefits that President Trump received from government institutions, *e.g.*, Maloney Mem. 45-46, and how his "businesses have recorded, or failed

to record, payments from these sources," *id.* at 49.  The documents will inform "legislation regarding the type of expenses that must be reported as foreign emoluments," proposals to "clarify and define incidental or *de minimis* payments that Congress could exempt categorically" from requiring consent, and help Congress "decide how to define the entities or organizations that fall into the definition of 'King, Prince, or foreign State' in the Foreign Emoluments Clause"—for example, whether state-owned enterprises or actors with close ties to foreign governments qualify.  *Id.* at 31, 50.  Such information will also help the Committee determine whether "any unlawful benefits or payments to [President Trump] have distorted policy in order to effectively remediate and address those negative effects through legislation."  *Id.* at 24.

2. *The Separation-Of-Powers Interests Invoked By Plaintiffs Are Weak*

On the other side of the balancing test, production of former President Trump's personal information raises only limited separation-of-powers concerns.  The subpoena presents no risk of distracting the incumbent and poses no unconstitutional burden on the Office of the President.

A former President may assert separation-of-powers claims, but only as needed to protect the incumbent President's "conduct of office."  *Nixon v. GSA*, 433 U.S. at 448.  For example, a former President is immune from civil liability for official actions because immunity is needed to protect the sitting President, whose concern about future liability could "distract" from the "fearless[] and impartial[]" discharge of his "public duties."  *Nixon v. Fitzgerald*, 457 U.S. 731, 752-53 (1982).  But even a sitting President has no "immunity for *unofficial* conduct," *Clinton v. Jones*, 520 U.S. 681, 694 (1997), and the mere "burdens on the President's time and attention stemming from judicial process and litigation, without more, generally do not cross constitutional lines."  *Mazars III*, 140 S. Ct. at 2036.

Similarly, a former President may assert Presidential privilege, but only because an incumbent must be able to "give his advisers some assurance of confidentiality" beyond his tenure

26

to ensure that he can "receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. GSA*, 433 U.S. at 449.  A former President's ability to assert privilege is thus designed to protect an incumbent's access to candid advice.  The D.C. Circuit has accordingly noted that a former President retains "authority to assert the executive privilege regarding Presidential communications," and that a "former President *in this context* can hardly be viewed as an ordinary private citizen." *Public Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997) (emphasis added).

But this case presents no concern about protecting official communications.  Former President Trump does not allege that the Mazars documents are privileged, and as the Supreme Court in *Mazars* recognized, cases like this one "involving nonprivileged, private information … by definition do[] not implicate sensitive Executive Branch deliberations."  140 S. Ct. at 2033. Disclosure of former President Trump's personal financial information thus creates no risk that future Presidents will be inhibited in their official conduct by fear that details of their decision-making may be revealed after they leave office.

Plaintiffs speculate (Pls. Mem. 29) that, if Congress can subpoena the personal information of former Presidents, it could "'declare open season' the minute [the incumbent] leaves" office, which would "affect how the President acts toward Congress while in office (and who runs for office in the first place)."  But the theory that Congress could use the threat of a subpoena for the personal information of a prior President as a political tool against an incumbent is extremely attenuated.  The incumbent would have to so fear retaliation in the form of a Congressional subpoena after he returns to private life—which is often long after Members of Congress would have to face their own voters—that it would affect his conduct while in office.  The remote possibility of such consequences does not outweigh the Committee's concrete and immediate need for the subpoenaed information.

27

This conclusion is underscored by the fact that the Justice Department participated as an amicus in opposition when the subpoena sought the *incumbent* President's records, but it has provided no such support for the *former* President's claims in this proceeding. As the Supreme Court explained in *Nixon v. GSA*, the fact that the incumbent President does not support a former President's claim "detracts from the weight of his contention that the Act impermissibly intrudes into the executive function and the needs of the Executive Branch." 433 U.S. at 449.

## II. THE COMMITTEE'S SUBPOENA SATISFIES THE *MAZARS* TEST

Even if this Court were to apply the *Mazars* factors as set forth by the Supreme Court for an incumbent President, the Committee's subpoena should be upheld. Plaintiffs attempt to avoid this conclusion by arguing that the Court should disregard Chairwoman Maloney's detailed explanation of the subpoena's legislative purpose and by picking apart each track of the Committee's investigation under each prong of the *Mazars* test. But those arguments fail.

This Court should hold that the *Mazars* test does not apply and that the Committee's need for the materials outweighs former President Trump's residual separation-of-powers concerns. But given Plaintiffs' argument that the *Mazars* test continues to apply, this Court should consider holding in the alternative that the subpoena satisfies the *Mazars* test, which would provide an additional ground for affirmance in any appeal. *See, e.g., Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 281, 287 (D.C. Cir. 1995) (disagreeing with the district court's primary holding but affirming based on its alternative holding).

### A. This Court Should Consider Chairwoman Maloney's Memorandum In Evaluating The Committee's Subpoena

Even before Chairwoman Maloney issued her memorandum, the Committee provided substantial evidence to support the subpoena. The record as it existed before the subpoena first issued, including the Committee's oversight plan, hearings on legislation, and the Cummings memorandum, provided ample evidence of the subpoena's purposes. But Plaintiffs' argument (Pls.

Mem. 13) that this Court "must" blind itself to the Maloney memorandum is wrong.  Chairwoman
Maloney released the memorandum after the Supreme Court announced a new test providing that
"[t]he more detailed and substantial the evidence of Congress's legislative purpose, the better."
*Mazars III*, 140 S. Ct. at 2036.  It was perfectly appropriate for her to respond to that ruling by
describing the legislative purposes underlying the subpoena in more detail.

D.C. Circuit precedent confirms as much.  In *Senate Select Committee on Presidential Campaign
Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), a Senate committee sought enforcement
of its subpoena to President Nixon for Watergate tapes, but, after the subpoena issued, the House
Judiciary Committee obtained copies of the tapes.  *Id.* at 732.  The D.C. Circuit therefore asked the
Senate committee to "file a supplemental memorandum stating whether the Committee has a
present sense of need for the materials."  *Id.* (quotation marks omitted).  Then, considering that
memorandum and other post-subpoena developments, the en banc court concluded that, "in the
peculiar circumstances of this case, *including the subsequent and on-going investigation* of the House
Judiciary Committee," the Senate committee did not need the materials.  *Id.* at 733 (emphasis added).
This Court can similarly consider information provided by the Committee after the subpoena first
issued in evaluating its need for the materials.

Plaintiffs ignore this discussion in *Senate Select Committee* and instead rely (Pls. Mem. 13-14) on
a line of cases involving the prosecution of witnesses for criminal contempt.  *See United States v.
Rumely*, 345 U.S. 41 (1953); *Watkins v. United States*, 354 U.S. 178 (1957); *Gojack v. United States*, 384
U.S. 702 (1966); *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963).  These cases are irrelevant.

*First*, each of them involved a criminal prosecution.  They stand only for the "obvious"
proposition that criminal liability may not be imposed based on "retroactive rationalization[s],"
*Watkins*, 354 U.S. at 204, 208-09, or post-hoc "enlarge[ments]" of a Congressional committee's
authority, *Rumely*, 345 U.S. at 48.  As the Supreme Court explained, as in "all other criminal cases,"

the defendant has the "right to have available … information revealing the standard of criminality before the commission of the alleged offense," *Watkins*, 354 U.S. at 208, and Congress cannot make criminal, after the fact, an act that was legal when committed. *See Gojack*, 384 U.S. at 708 (a "specific, properly authorized subject of inquiry is an essential element of the [criminal] offense").

Here, there is no concern about the retrospective imposition of criminal liability on Mazars (much less on former President Trump or the other Plaintiffs, who are not the subpoena respondents). Instead, the "relief by injunction" that Plaintiffs seek "operates *in futuro*," *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1352 (D.C. Cir. 1997), just as it did in *Senate Select Committee*. The Court may consider all present circumstances without fear of imposing retroactive liability. And, contrary to Plaintiffs' assertion (Pls. Mem. 13), nothing about the *Mazars* opinion's citation to *Watkins* suggests that the Court in *Mazars* intended to adopt wholesale the timing rules that apply in cases involving criminal contempt.

*Second*, Plaintiffs' cases show that, even in the criminal context, a witness's "duty to answer must be judged *as of the time of his refusal*," *Gojack*, 384 U.S. at 715 n.12 (emphasis added)—not as of the time a subpoena is first issued. This rule reflects the common-sense principle that the purposes of the subpoena should be evaluated as of the time the witness is subjected to potential sanctions for refusing to comply with it.

Here, compliance with the subpoena has not yet been demanded. Plaintiffs filed suit before the initial subpoena's return date, and the Committee has since repeatedly agreed to defer the date by which Mazars must comply. No one has been put to the choice whether to comply—or refuse to comply—based on incomplete information.

*Third*, Plaintiffs are wrong (Pls. Mem. 13) to rely on the D.C. Circuit's decision in *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963). *Shelton* involved the criminal prosecution of a witness who had been subpoenaed in violation of the subcommittee's charter: The witness was

subpoenaed by subcommittee counsel even though the charter entrusted the full subcommittee with "the power and the responsibility of deciding who shall be called." *Id.* at 606 (footnote omitted). Thus, the D.C. Circuit held that the witness "had a right *under the Subcommittee charter* to have *the Subcommittee* responsibly consider whether or not he should be subpoenaed before the subpoena issued." *Id.* at 607 (emphases added). The italicized language—which Plaintiffs omit from their quotation of *Shelton*—makes clear that the decision turned on the provisions of the charter.

Here, Plaintiffs do not invoke any rights under any charter, and they no longer attempt to argue that the subpoena was defective under the House Rules. *See* House Rule XI.2(m)(3)(A)(i) (the power to issue subpoenas "may be delegated to the chair of the committee"). *Shelton* therefore does not apply. And in any event, the statement in *Shelton* was a dictum, as the Second Circuit correctly concluded. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 655 (2d Cir. 2019), *vacated on other grounds* 140 S. Ct. at 2036.

### B. The Committee's Subpoena Satisfies Each Of The *Mazars* Factors

#### 1. *Involvement Of The Former President And His Papers Is Warranted*

The Committee's investigation warrants—indeed, requires—the involvement of the former President's papers because it concerns conflicts of interest in the Presidency. "The Committee is investigating *this President's* ethical challenges and conflicts of interest and how best to mitigate them, *this President's* financial holdings to illuminate the need for legislative reforms in presidential financial disclosures, and *this President's* acceptance of Emoluments and whether any congressional fixes are needed." Maloney Mem. 37. Thus, only former President Trump's financial records can "reasonably provide Congress the information it needs." *Mazars III*, 140 S. Ct. at 2035-36.

Plaintiffs' argument that the Committee does not need the Mazars material derives from the premise (Pls. Mem. 24) that "[n]othing turns on the *details* of any *particular* official's finances." But that premise misunderstands both the Committee's investigation specifically and the legislative

process generally.  While Congress can sometimes legislate based on "predictive policy judgments," *Mazars III*, 140 S. Ct. at 2036, here the Committee is considering legislation that would be designed to address the specific problems exposed by the details of former President Trump's finances. Understanding these details is necessary to inform legislation to prevent the Trump Presidency's conflicts of interest from being repeated in future Presidencies.

As to financial disclosure legislation, the Committee must understand "how the current laws appl[ied] or fail[ed] to apply to this President's complex and opaque financial holdings" to appropriately "define the need for and the scope of any additional information to require as part of federal financial disclosures."  Maloney Mem. 39.  That the Committee already has evidence that former President Trump disclosed his finances inaccurately (Pls. Mem. 22, 24) does not mean that the Committee should be unable to inform itself about other specific inaccuracies to guard against their recurrence.  As to GSA, while Congress may be "perfectly capable of considering" some reforms to GSA's lease policies without the subpoenaed material (Pls. Mem. 23), it needs more information to determine whether those reforms would remedy the failures that occurred in its management of the Old Post Office lease.[8]  As to emoluments, the fact that former President Trump accepted *some* emoluments in open and notorious fashion (Pls. Mem. 17-18) does not satisfy the Committee's needs—it only increases the likelihood of emoluments that were *not* received openly, which are a primary object of the Committee's concern.

Plaintiffs emphasize (Pls. Mem. 4, 5, 22, 24) that the House has already passed H.R. 1, one of the bills that the Committee's investigation will inform.  But while *the House* has passed H.R. 1,

---

[8] Whether GSA succumbed to undue influence in reversing its previous decision is not a "purely legal dispute."  Pls. Mem. 21.  The question whether GSA's interpretation of the lease is correct is a legal one; the question *why* it came to that determination is not.  Nor is it "baseless speculation," *id.* at 22, that then-President Trump may have furnished inaccurate information to GSA, when his own attorney testified that he falsified some of the very kinds of documents he submitted to GSA.  *See* Maloney Mem. 10.

*Congress* has not.  As the D.C. Circuit observed, the subpoenaed material "could inform the Senate as it considers the bill," *Mazars II*, 940 F.3d at 731-32, could generate momentum regarding the need for reform, and could help build support to pass pieces of H.R. 1 as standalone bills, *see* Maloney Mem. 4; *see, e.g.*, H.R. 347, 117th Cong. (2021) (requiring Presidential and Vice-Presidential disclosures of tax returns); H.R. 244, 117th Cong. (2021) (strengthening and enhancing certain ethics requirements).  Even if the Senate were to pass H.R. 1, information revealed by the subpoena could inform "any subsequent conference committee or the House itself, should it reconsider the bill post-conference."  *Mazars II*, 940 F.3d at 731-32.

Plaintiffs' only response is to dispute (Pls. Mem. 25-26) that the Committee can justify the subpoena by relying on the need to inform the Senate or a conference committee.  But Plaintiffs support this argument (Pls. Mem. 25) only with the truism that the Senate and the House "exercise their legislative powers independently of each other."  Plaintiffs ignore that the D.C. Circuit in *Senate Select Committee* specifically considered developments in the House when evaluating the Senate's legislative needs.  *See* 498 F.2d at 733.  And Plaintiffs ignore that Chairwoman Maloney herself noted that because the House passed H.R. 1 "without the benefit of the former President's information," the bill "will need to be amended once Congress obtains the specific information sought in this case."  SOMF ¶ 49.

Plaintiffs are wrong to insist (Pls. Mem. 25) that studying other "federal official[s] with complex finances" would be an adequate substitute for former President Trump's information.  The "unique constitutional position" of the President, *Mazars III*, 140 S. Ct. at 2036, creates unique risks of conflicted interests and a corresponding unique need for disclosure.  While other federal officials might have complex financial holdings, the breadth of policymaking controlled by the President (and thus the areas vulnerable to improper influence) is greater by orders of magnitude.  Moreover, the Committee needs to study a President, not an inferior officer, if it is to "craft a

disclosure regime for presidents and presidential candidates that is tailored to respect the burdens on the Office of the President, yet still meets the legislative and Constitutional goals of identifying and deterring possible conflicts of interests."  Maloney Mem. 41.[9]

For similar reasons, the Committee's inquiry is not, as Plaintiffs suggest (Pls. Mem. 29), an impermissible "'case study' for general legislation."  *Mazars III*, 140 S. Ct. at 2036.  The legislation contemplated by the Committee applies specifically to Presidents, and it addresses weaknesses in the existing ethics regime that were revealed by the Trump Presidency.  Former President Trump is not being improperly "singled out" (Pls. Mem. 29)—to the contrary, given the unique circumstances of his Presidency, he is simply the only subject of study adequate to inform the Committee's investigation.  *See Nixon v. GSA*, 433 U.S. at 472 (noting that former President Nixon "constituted a legitimate class of one," which justified Congress's decision to subject him to different treatment than other former Presidents).

Plaintiffs err in asserting (Pls. Mem. 23) that the Committee does not need former President Trump's information because "it can simply ask GSA."  The Committee requires former President Trump's information for its GSA investigation, and nothing about the Supreme Court's decision prescribes an order by which Congress must seek to obtain the President's information from different custodians.  In any event, as already noted, GSA has refused to disclose the information the Committee seeks.  SOMF ¶ 21.  While Chairwoman Maloney is continuing to seek material from GSA, that material is at most a subset of the material relevant to the GSA lease that the Committee seeks from Mazars.  Even the documents in GSA's possession are "likely not an exact duplicate of the set in Mazars' possession."  Maloney Mem. 22.

---

[9] As a former director of the Office of Government Ethics explained, "[t]he signals a President sends set the tone for ethics across the executive branch.  Tone from the top matters."  Remarks of Walter M. Shaub, Jr., Director, U.S. Office of Government Ethics, at the Brookings Institution, at 2 (Jan. 11, 2017), https://perma.cc/HE3C-456B.

Finally, Plaintiffs fault the Committee (Pls. Mem. 18, 23, 26) for purportedly failing to engage in the "hurly-burly" of the traditional inter-branch accommodation process. But all such attempts at accommodation failed while President Trump was in office. *See, e.g.*, Maloney Mem. 7-9, 27-29 (describing how, before issuing the subpoena, the Committee sought information from the White House Counsel). And now that former President Trump has left office, he no longer has the same incentive to engage in accommodations as he did before.

      2.    *The Subpoena Is "No Broader Than Reasonably Necessary"*

The subpoena requires Mazars to produce four categories of documents for the years 2011 through 2018: (1) financial statements; (2) underlying source documents; (3) related memoranda, notes, and communications; and (4) related engagement contracts, without regard to time. *See* SOMF ¶¶ 24-25; *see also* Maloney Mem. 32-33, 44-52 (explaining categories of requests and reasons that each is needed). Each of these requests is "no broader than reasonably necessary," *Mazars III*, 140 S. Ct. at 2036, to support the Committee's investigation.

Plaintiffs argue to the contrary by focusing on each track of the investigation separately and then insisting that each track by itself does not justify the entire subpoena. This argument misses the point. Some subpoenaed material is of course more relevant to some tracks of the Committee's investigation than to others. But the subpoena is valid if the requested material is reasonably necessary to one or more of the Committee's legislative purposes. And the documents need only be "reasonably necessary"—not "demonstrably critical." *See Mazars III*, 140 S. Ct. at 2032-33 (rejecting the "demonstrably critical" standard because it "would risk seriously impeding Congress in carrying out its responsibilities"). Here, the material sought from Mazars is reasonably necessary to the Committee's investigation. *See supra* Part I.B.1.

Plaintiffs devote most of their brief to attacking the emoluments and GSA tracks of the Committee's investigation, and when they finally address the financial disclosure track (Pls. Mem.

35

23), their argument is conspicuously thin.  This is unsurprising.  The Committee's review of former

President Trump's 2011 and 2012 Mazars financial statements demonstrated "that the current

disclosure laws [are] not operating effectively to identify and disclose the President's conflicts of

interests," including "by not requiring the reporting of assets, liabilities, and ownership structure of

privately-held businesses."  Maloney Mem. 45.  The subpoenaed material is needed to address that

concern.  The first two categories of material sought—financial statements and source documents—

will inform the decision whether to require additional instructions for financial disclosures,

submission of supporting financial information or outside certifications, and whether to "reach[]

farther back in time and require[] additional disclosure."  *Id.* at 43.  The third category—Mazars's

communications—will aid the Committee in crafting legislation that may differ depending on

whether the discrepancies in former President Trump's financial statements were based on

confusion, calculation error, or intentional misrepresentation.  *Id.* at 51-52.  The fourth category—

engagement contracts related to the financial statements—is necessary to "understand the

underlying products that [the Committee] receives in the other subpoena requests."  *Id.* at 50.[10]  The

Committee's evaluation of the financial statements may depend, for example, on whether Mazars

"merely was compiling numbers and estimates [that were] self-reported by the President or the

Trump Organization" or whether it was performing a more robust GAAP-qualified review.  *Id.*

Plaintiffs' efforts to nitpick the subpoena are unpersuasive.  They assert, for example, (Pls.

Mem. 25) that if the engagement contracts "reveal that Mazars exercised no independent judgment,"

then "the Committee doesn't need the financial statements" and that if Mazars did exercise such

judgment, then the Committee "doesn't need the source documents."  But the Committee needs the

---

[10] "Given President Trump's reportedly longstanding relationship with key partners at Mazars, it is possible that an engagement agreement signed years earlier was still in use for the 2011 financial statement and accounting products, which is why this particular demand contains no time limitation."  Maloney Mem. 51.

engagement contracts to understand *how* Mazars prepared the financial statements (including whether the statements were GAAP-compliant, as required by the GSA lease). And it needs the underlying source documents to make sense of the financial statements, particularly with respect to omissions, errors, and discrepancies in the financial statements. And regardless of whether Mazars exercised independent judgment, the source documents are needed to understand whether discrepancies in former President Trump's mandatory reporting were deliberate or a mistake (and, if the latter, how the mistake came about). *See* Maloney Mem. 45.

Plaintiffs argue (Pls. Mem. 18-19) that the Committee does not need documents dating back to 2011 to legislate on emoluments. This ignores the other two tracks of the investigation. But even as to emoluments it is wrong. A mere snapshot of the President's finances in time will not accurately reveal his emoluments. Without an understanding of President Trump's financial relationships as they existed *before* he took office, the Committee cannot know whether changes in those relationships *after* he took office may reflect impermissible emoluments. Nor does the Committee "agree[]" (Pls. Mem. 19) that the only Mazars documents relevant to emoluments are hotel ledgers and financial statements. The Committee seeks "a full accounting of the President's receipt of foreign or U.S. government funds at his properties." Maloney Mem. 30. The work papers for financial statements for 2017 and 2018 are likely to reveal information about payments from foreign sources.

Plaintiffs insist (Pls. Mem. 26) that the subpoena is "grossly overbroad," suggesting that the requests must be tied directly to specific legislative reforms under consideration. In Plaintiffs' constricted view, if the Committee is considering requiring the reporting of "additional debts," it could issue a subpoena "limited to debts," but any other demand would be overbroad. Nothing about the Supreme Court's opinion hamstrings the Committee's information-gathering function by

37

requiring this level of granularity in connecting a document request to specific language in a current legislative proposal.

There is likewise no support for Plaintiffs' arguments (Pls. Mem. 25-26) that the Committee should "sequence its requests" or make a "confidential request" for the material. The Supreme Court did not suggest these requirements, which would improperly transform Congressional investigations into secret, multi-tiered (and multi-year) judicially managed affairs.

3. *There Is "Detailed And Substantial" Evidence Of The Committee's Legislative Purposes*

The Committee's subpoena is scrupulously documented. The Committee's official memoranda, hearings, and other statements are a far cry from the "vague" and "loosely worded" evidence that concerned the Supreme Court. *Mazars III*, 140 S. Ct. at 2036.

At the outset of the 116th Congress, the Committee published its official oversight plan describing its intent to investigate President Trump's business interests, conflicts of interests, and emoluments. *See* SOMF ¶ 14. The report noted that President Trump had failed to separate himself from his business interests and that he had also eschewed the modern norm of tax-return disclosure. *See* SOMF ¶ 14. The report therefore explained that the Committee was conducting "robust and independent oversight of the President and his family's multiple business interests in order to guard against financial conflicts and unconstitutional emoluments." SOMF ¶ 14.

The Committee held several hearings that made plain its legislative objectives, including at least one featuring testimony from subject-matter experts in the field of Presidential ethics. Maloney Mem. 53. That hearing focused on H.R. 1, including a legislative proposal that "would require this President and future presidents (and vice presidents) to either divest from their business interests that pose a conflict of interest or disclose significant information on their business interests, including ownership structure and assets and liabilities exceeding $10,000." *Id.* This proposal implicated all three tracks of the Committee's investigation—by enhancing disclosure requirements,

banning Presidential contracts with the Federal Government, and creating greater visibility into the receipt of unconstitutional emoluments. *See id.* at 56 (discussing H.R. 1). To the extent the Committee's other hearings, such as the hearing with Cohen, were focused on fact gathering rather than specific legislative proposals, that in no way casts doubt on the importance of the information gathered to the Committee's legislative efforts. Congress "has power to secure needed information in order to legislate." *Mazars III*, 140 S. Ct. at 2031 (quotation marks omitted).

After the Committee's requests for information went unheeded, Chairman Cummings circulated a memorandum to the Committee describing his intent to issue this subpoena and explaining that the materials sought would inform the Committee's "review of multiple laws and legislative proposals under [its] jurisdiction." SOMF ¶ 23.

The Committee took these steps to identify its aims before issuing its subpoena to Mazars. Accordingly, the D.C. Circuit emphasized "how much Congress has already revealed about its legislative objectives," such as determining "whether changes are necessary to laws relating to financial disclosures required of the President." *Mazars II*, 940 F.3d at 731 (quotation and alteration marks omitted). In releasing a detailed supplemental memorandum describing its investigations after the Supreme Court's decision, *see* Maloney Mem. 5-37, the Committee provided an even more detailed explanation of "why [former President Trump's] information will advance its consideration of the possible legislation." *Mazars III*, 140 S. Ct. at 2036. And, following the change in administration, Chairwoman Maloney issued another memorandum explaining that the Committee's need for the Mazars information "remains just as compelling now as it was when the Committee first issued its subpoena." SOMF ¶ 47.

Plaintiffs nonetheless argue (Pls. Mem. 16, 20, 21) that the Committee has described its purposes in "the vaguest possible terms." It is difficult to take this contention seriously. If the evidence the Committee has provided about its legislative purposes does not suffice, it is hard to see

what might, short of the text of a proposed bill (the drafting of which Plaintiffs would surely cite as

evidence that the subpoenaed information was not necessary at all). Similarly, Plaintiffs' demand

(Pls. Mem. 16) that the Committee identify which policies were unduly influenced by foreign

payments *before* it subpoenas those documents makes no sense. The very purpose of the subpoena is

to identify which policy determinations made by President Trump were tainted. Again, if the

Committee were able to identify all tainted policies before issuing a subpoena, Plaintiffs would assert

that the information sought by the subpoena is unnecessary.

4.     *The Subpoena Does Not Impose Burdens That Cross Constitutional Lines*

The Committee's subpoena does not burden the President. The Committee "has taken

numerous reasonable steps to minimize the burden on the President during its investigations,

including by … issuing the subpoena to Mazars, a third-party custodian for non-privileged

information." Maloney Mem. 54. Moreover, because "there is no legally recognized privilege for

the President to assert regarding these records, the distractions on [former President Trump's] time

should remain minimal." *Id*. at 55.

Plaintiffs have never argued that "*th[is]* subpoena" imposes an unconstitutional burden.

*Mazars II*, 940 F.3d at 747. "Nor could they." *Id.* Instead, they argue (Pls. Mem. 27) that the

subpoena's "rationale" will permit *other*, future subpoenas to place a "burden on the Presidency and

the long-term balance of power between Congress and the President," because, they say, the

Committee's "disclosure rationale [would become] a foolproof way to subpoena any private records

from any President." But their attempts to gin up an unconstitutional burden fail.

If (as Plaintiffs predict, *see* Pls. Mem. at 27) future Congresses will subject their "political

rivals" to a "public audit of [their] finances" to expose "for the sake of exposure," the courts have

tools to address that problem. *Cf. Mazars III*, 140 S. Ct. at 2036 (instructing courts to be "attentive

to" the evidence of legislative purpose). But this Committee's interest in the adequacy of conflicts-

of-interest laws as applied to former President Trump is not a subterfuge.  Unlike the Presidential medical records and elementary school report cards that Plaintiffs hypothesize a future Congress might investigate (*see* Pls. Mem. 27-28), Presidential conflicts of interest have traditionally been regulated by Congress, the evidentiary record giving rise to the Committee's concerns is substantial, and the subpoena records cover a relatively limited and recent period.  The Committee is not using its investigatory power to circumvent limits on Congress's legislative authority, nor is it acting on a contrived or flimsy record to peer far back in former President Trump's history.  There is simply no support for Plaintiffs' slippery slope argument.

Even if Plaintiffs were right (Pls. Mem. 27-28) that Congress might attempt to compel disclosure of the President's information using the circular logic they hypothesize, that would say nothing about the Committee's need to investigate GSA.  The rationale of the investigation into GSA—to ensure that GSA is properly managing leases of federal property and does not succumb to undue influence when the President is a leaseholder—cannot possibly lead to the circular consequences that Plaintiffs posit.

Plaintiffs' argument proves too much in any event.  Plaintiffs ask the Court to rule that Congress can *never* subpoena the President's personal information in service of an investigation of Presidential conflicts of interest for fear that a hypothetical future committee might do so abusively. But the Supreme Court confirmed that "[l]egislative inquiries might involve the President in appropriate cases" and that "Congress's responsibilities extend to every affair of government." *Mazars III*, 140 S. Ct. at 2033 (quotation marks omitted).

## III.   PLAINTIFFS' RECYCLED ARGUMENTS ARE UNPERSUASIVE

### A.  The Mazars Subpoena Does Not Serve An Impermissible Purpose

Plaintiffs' principal argument during the first proceedings in this Court was that the Mazars subpoena serves an impermissible law-enforcement purpose.  This Court rejected that argument.

Plaintiffs again emphasized that argument on appeal, but the D.C. Circuit, like this Court, rejected it. In the Supreme Court, Plaintiffs again argued that the subpoena served an impermissible law-enforcement purpose, but the Supreme Court did not even address that argument, let alone accept it, and instead developed the four-part *Mazars* test. Nothing about the Supreme Court's reasoning called into question this Court's conclusion on Plaintiffs' law-enforcement argument. Nonetheless, Plaintiffs now urge (Pls. Mem. 30) this Court to reject its prior reasoning, which the D.C. Circuit accepted and the Supreme Court left undisturbed.

Plaintiffs are wrong now for the same reasons they were wrong before. It is true that the Committee's investigation implicates possible violations of the law. But, as this Court explained, "the mere prospect that a congressional inquiry will expose law violations does not transform a permissible legislative investigation into a forbidden executive or judicial function." *Mazars I*, 380 F. Supp. 3d at 97. After canvassing the relevant Supreme Court precedent, the D.C. Circuit agreed, concluding that an "interest in past illegality can be wholly consistent with an intent to enact remedial legislation." *Mazars II*, 940 F.3d at 728.; *see also Hutcheson v. United States*, 369 U.S. 599, 616-17 (1962) (plurality opinion); *Sinclair v. United States*, 279 U.S. 263, 289-90, 295 (1929); *McGrain v. Daugherty*, 273 U.S. 135, 176-77, 180 (1927).

Plaintiffs again selectively quote Chairman Cummings and ignore the ample evidence of legislative purpose. This Court already rejected those arguments: "[h]istory has shown that congressionally-exposed criminal conduct by the President or a high-ranking Executive Branch official can lead to legislation." *Mazars I*, 380 F. Supp. 3d at 98. Plaintiffs offer no reason to revisit that conclusion.

### B.  The Subpoena Could Yield Valid Legislation

Plaintiffs also recycle their argument that the Committee's investigation could not result in valid legislation. They assert (Pls. Mem. 33) that laws that "require [the President] to disclose

information are unconstitutional."  But as this Court previously explained, this "contention flies in the face of decades of legislation covering the President."  *Mazars I*, 380 F. Supp. 3d at 102.  All three tracks of the Committee's investigation could yield valid legislation.

Financial disclosure statutes directed at the President are constitutionally permissible.  Such statutes "require the President to do nothing more than *disclose* financial information," and thus do not "prevent the President from accomplishing his constitutionally assigned functions."  *Mazars II*, 940 F.3d at 733-34 (alteration marks omitted).  "Every President to have served since the Ethics in Government Act became law … has complied with [its] disclosure requirements," *id.* at 735, without any apparent impairment of his ability to perform his constitutional duties.  And while Plaintiffs assert (Pls. Mem. 34) that Presidential disclosure laws violate the Qualifications Clause, U.S. Const. art. II, § 1, cl. 5, the case they cite for that proposition holds only that a law is unconstitutional if "it has the likely effect of handicapping a class of candidates *and has the sole purpose of creating additional qualifications indirectly.*"  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 836 (1995) (emphasis added).  There is no reason to presume a statute informed by the Committee's investigation would involve that sort of improper purpose.

Valid legislation could also arise from the investigation into the GSA lease—indeed, Plaintiffs do not attempt to argue otherwise.  As the Committee has explained, information revealed by the subpoena might support "independent auditing of [GSA] contracts that involve the President" or statutes "requiring GSA to change the reporting relationship of contracting officers to increase their independence and impartiality."  Maloney Mem. 23.  Such legislation would regulate an agency that Congress itself created and could not plausibly be said to impair the President's performance of his constitutional functions.  And Congress is entitled to know whether a tenant of the Federal Government was in breach of its lease for four years.  *See Sinclair*, 279 U.S. at 294

("Congress has plenary power to dispose of and to make all needful rules and regulations respecting … property of the United States.").

As to the emoluments investigation, the Committee has explained that former President Trump's financial information "may show the tangible and intangible benefits President Trump has received" from foreign entities as a result of his financial ties, which "would aid consideration of legislation regarding the type of expenses that must be reported as foreign emoluments." Maloney Mem. 31. Given that the Constitution prohibits the President from accepting domestic emoluments and requires him to "seek Congress's permission before accepting any foreign emoluments, then surely a statute facilitating the disclosure of such payments lies within constitutional limits." *Mazars II*, 940 F.3d at 734. Plaintiffs never explain how the same Constitution that requires the President to obtain Congress's consent to receive foreign emoluments could forbid Congress from legislating in this area.[11]

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and enter summary judgment for the Committee.

---

[11] Plaintiffs end their brief (Pls. Mem. 35-36) by rearguing that the subpoena is too broad. This argument is incorrect for the reasons already explained. *Supra* Part I.B.1, II.B.2.

Dated:  May 5, 2021

/s/ *Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
*General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
Megan Barbero (MA Bar No. 668854)
William E. Havemann (VA Bar No. 86961)
Eric R. Columbus (D.C. Bar No. 487736)

OFFICE OF GENERAL COUNSEL[12]
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

Alan D. Strasser (D.C. Bar No. 967885)
Jennifer S. Windom (D.C. Bar No. 502481)
D. Hunter Smith (D.C. Bar No. 1035055)
Brandon L. Arnold (D.C. Bar No. 1034238)

ROBBINS, RUSSELL, ENGLERT, ORSECK
& UNTEREINER LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
(202) 775-4500
astrasser@robbinsrussell.com

*Counsel for Intervenor-Defendant Committee on
Oversight and Reform of the U.S. House of
Representatives*

---

[12] The Office of General Counsel wishes to acknowledge the assistance of law clerks Lily Hsu, a student at The George Washington University Law School, and Jennifer Kaplan, a student at The Catholic University of America, Columbus School of Law, in preparing this brief.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2021, I filed this document and its attachments with the

Court via ECF, which will electronically notify all counsel of record.

*/s/ Douglas N. Letter*
Douglas N. Letter