**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD J. TRUMP; THE TRUMP ORGANIZATION, INC.; TRUMP ORGANIZATION LLC; THE TRUMP CORPORATION; DJT HOLDINGS LLC; THE DONALD J. TRUMP REVOCABLE TRUST; and TRUMP OLD POST OFFICE LLC, | Civil Action No. 1:19-cv-01136-APM |
| Plaintiffs, | **ORAL HEARING SCHEDULED JUNE 18, 2021** |
| v. | |
| MAZARS USA LLP, | |
| Defendant, | |
| and | |
| COMMITTEE ON OVERSIGHT AND REFORM OF THE U.S. HOUSE OF REPRESENTATIVES, | |
| Intervenor-Defendant. | |

**PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANT'S CROSS-
MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ii

Introduction .......................................................................................................................1

Argument ...........................................................................................................................2

    I.   The Court should not apply the Committee's balancing test. .......................................2

        A.  The subpoena must be evaluated as of the time it was issued. ............................3

        B.  Under any framework, the Committee's test is unpersuasive. ..........................6

    II.  The Mazars subpoena cannot survive any meaningful balancing test. ......................9

        A.  Committee's side of the balance .....................................................................10

        B.  Plaintiffs' side of the balance .........................................................................15

    III. The subpoena lacks a legitimate legislative purpose. ..........................................19

        A.  The subpoena pursues illegitimate purposes. ................................................20

        B.  The subpoena is not pertinent to valid legislation. ........................................21

        C.  The subpoena is overbroad. ...........................................................................23

Conclusion .......................................................................................................................24

Certificate of Service .......................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Bendix Autolite Corp. v. Midwesco Enters., Inc.,*
  486 U.S. 888 (1988) ................................................................................................................ 8

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ............................................................................................................... 24

*Christoffel v. United States,*
  338 U.S. 84 (1949) .................................................................................................................. 6

*Comm. on Judiciary of U.S. House of Reps. v. McGahn,*
  973 F.3d 121 (D.C. Cir. 2020) ............................................................................................... 5

*Consumer Energy Council of Am. v. FERC,*
  673 F.2d 425 (D.C. Cir. 1982) ............................................................................................. 22

*Gojack v. United States,*
  384 U.S. 702 (1966) ................................................................................................................ 6

*Griffin v. Padilla,*
  408 F. Supp. 3d 1169 (E.D. Cal. 2019) .............................................................................. 22

*Hunter v. Bryant,*
  502 U.S. 224 (1991) ................................................................................................................ 3

*June Med. Servs. LLC v. Russo,*
  140 S. Ct. 2103 (2020) ........................................................................................................... 8

*Nixon v. GSA,*
  433 U.S. 425 (1977) ..................................................................................................... 7, 9, 18

*Plaut v. Spendthrift Farm, Inc.,*
  514 U.S. 211 (1995) .............................................................................................................. 19

*Powell v. McCormack,*
  395 U.S. 486 (1969) .............................................................................................................. 22

*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
  498 F.2d 725 (D.C. Cir. 1974) .......................................................................... 6, 7, 11, 12, 14

*Shelton v. United States,*
  327 F.2d 601 (D.C. Cir. 1963) ......................................................................................... 4, 6

*Trump v. Mazars USA, LLP,* 140 S. Ct. 2019 (2020) ............................................. 1, 4, 5, 7, 9, 10, 11, 12,
                                                                                  15, 16, 17, 19, 21, 22, 24

*Chief authority

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) .................................................................................. 4

*United States v. Rumely*,
   345 U.S. 41 (1953) ..................................................................................... 3, 4

*United States v. Taylor*,
   636 F.3d 901 (7th Cir. 2011) ......................................................................... 3

*Watkins v. United States*,
   354 U.S. 178 (1957) ........................................................................ 3, 4, 5, 6, 23

*Zellweger v. Saul*,
   984 F.3d 1251 (7th Cir. 2021) ....................................................................... 3

## Other Authorities

2 *Elliott's Debates* (1828) .................................................................................... 7

H. Rep. No. 29-684 (1846) ........................................................................... 8, 16

*Hearings Before the H. Committee on Investigation of United States Steel Corporation*,
   62d Cong. (1911). ........................................................................................... 8

House Rule XI.2(3)(A)(i),
   116th Cong. ..................................................................................................... 6

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
   43 Op. O.L.C. ___, 2019 WL 6047057 (May 20, 2019) .................................. 8

## INTRODUCTION

To its credit, the Committee has abandoned its initial position in this litigation. The Committee now concedes that it cannot prevail if it proves "only that the subject matter" of the Mazars subpoena is "one on which legislation could be had." PI Opp. (Doc. 20) 15 (cleaned up). Instead, a higher standard applies because this subpoena seeks "a former President's personal papers." Cross-MSJ (Doc. 56) 2, 15-17, 20-21, 26. And a subpoena for a former President's personal papers, the Committee concedes, presents "separation-of-powers concerns." Cross-MSJ 1-2, 15-16, 18-19, 21, 26-28.

These concessions are fatal. The Mazars subpoena cannot withstand *any* meaningful form of balancing—unsurprisingly, since it was never drafted to do so. MSJ (Doc. 54) 1. The Committee's need for the subpoenaed documents is now miniscule: It wants detailed financial information about one former President, to confirm what it already claims to know about him, to craft broad disclosure laws that would govern all future Presidents, based on defects it has already identified, for reforms it has already drafted and passed (twice), without having to negotiate with Plaintiffs, and without having to ask the executive branch that is now headed by a member of the same party. Weighed against the Committee's negligible need, the Mazars subpoena imposes real burdens on Plaintiffs and the balance of interbranch power. It burdens individuals, to put it mildly, to have Congress obtain and publicly expose their entire financial history over the last decade. And if Congress can threaten anyone who serves as President with a public audit of himself, his businesses, and his family, then Congress will have an important new tool to "'exert an imperious controul' over the Executive Branch." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). It would be naïve to assume that this new power, if granted, will be used only by *this House* against "*this President[]*." Maloney Memo. (Doc. 56-2, Ex. F) 37.

Though the Mazars subpoena fails the Committee's own balancing test, the Committee's test is not the right way to decide this case. When subpoenas for private papers implicate the separation of powers, the only recognized test is the one announced in this case: the *Mazars* test. The Committee's

balancing test is creative, but invented. And under any test, the Mazars subpoena pursues invalid purposes and is pertinent to no valid legislation—claims that this Court should reconsider now that vacatur has wiped the slate clean. Because the Mazars subpoena is unenforceable, this Court should grant Plaintiffs' motion and deny the Committee's cross-motion for summary judgment.

## ARGUMENT

The parties dispute what test applies, whether that test is satisfied, and whether the subpoena has independent flaws. Plaintiffs have the better of each argument. This Court should apply the *Mazars* test, not a balancing test that the Committee concocted. But under any meaningful balancing test, the Mazars subpoena cannot pass muster. The Mazars subpoena also continues to violate the general rules that govern all congressional subpoenas.

## I.    The Court should not apply the Committee's balancing test.

Plaintiffs predicted that "the Committee might ask this Court to treat its reissued subpoena as an entirely new document." MSJ 28. The Committee does not do that. It never disputes that the subpoena's reissuance was "a technical matter," that the Committee invoked House Rule II.8(c) to pursue the interests of the "prior Congress," or that Plaintiffs never needed to amend their complaint because this case never became moot. MSJ 10-12; *see* Cross-MSJ 20; SMF Resps. (Doc. 56-1) ¶¶81-83, 88-89. Thus, legally speaking, there has only ever been one Mazars subpoena—the one that the Committee issued against President Trump in 2019. *Cf.* Cmte. Resp. to 28(j) Ltr. (CADC Doc. #1876578) (urging the D.C. Circuit to decide this case, even if it could not do so "before the end of this Congress," because the Committee would "reissue" the exact same subpoena).

Instead of distinguishing between the original subpoena and the reissued subpoena, the Committee claims that the original subpoena "now seeks a former President's information." Cross-MSJ 20. And a former President's information, the Committee says, is governed not by the *Mazars* test but by a more lenient "balancing test." Cross-MSJ 2, 21.

The Court should reject this approach. A subpoena must be valid ab initio; the relevant question is whether the Mazars subpoena was valid *in 2019*, when Plaintiffs objected to it. But even if an invalid subpoena could become valid based on changed facts, the Committee's balancing test is the wrong approach. It has no legal support, historical foundation, or internal logic. This Court should simply apply the *Mazars* test.

### A.     The subpoena must be evaluated as of the time it was issued.

The question before this Court is whether the Mazars subpoena was valid in 2019—the time when the subpoena was both issued and objected to. At that time, the subpoena was directed to the President and supported only by the Cummings memo; thus, the *Mazars* test applies, and this Court should set aside the retroactive rationalizations in the Maloney memo. *See* MSJ 11-15. The Committee disagrees: Because Plaintiffs aren't being criminally prosecuted and weren't subpoenaed directly, the Committee thinks it can justify the subpoena based on facts that arose long after it issued the subpoena. *See* Cross-MSJ 29-30. The Committee is not correct.

Even if a court "generally" considers the facts "in existence 'at the time it renders its decision,'"[1] Cross-MSJ 20, that general rule does not apply in this context. The law governing congressional subpoenas states a different rule: the legality of these requests must be assessed, at the very latest, "upon objection." *Watkins v. United States*, 354 U.S. 178, 214-15 (1957); *see id.* at 206 (requiring a "clear determination" by the body "initiating" the investigation); *United States v. Rumely*, 345 U.S. 41, 48 (1953) ("duty to answer must be judged as of the time of [the] refusal"); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) ("when the subpoena was issued"). Plaintiffs objected to this subpoena in 2019.

---

[1] The general rule is not terribly general. In many areas of law, courts evaluate only the facts that existed when the challenged action was taken. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (qualified immunity and probable cause); *Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021) (*Chenery* doctrine); *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011) (*Batson* challenges).

And *Plaintiffs'* objection is the one that matters—"it is, after all, [their] information." *Mazars*, 140 S. Ct. at 2035; *accord id.* at 2034 (subpoena is "directed at the President"). As the Supreme Court said about essentially the same document, the Mazars subpoena is "functionally a subpoena issued to the President," even though it is "directed to the President's accounting firm," because "the papers at issue belong to the President" and "Mazars is merely the custodian." *Trump v. Vance*, 140 S. Ct. 2412, 2425 n.5 (2020). The Committee must agree: A subpoena to a mere accountant would not be "a subpoena to a former President" that presents "separation-of-powers concerns." Cross-MSJ 17-18. In any event, Mazars, given its legal and ethical obligations to Plaintiffs, also objected to the Committee's requests in 2019. It correctly noted that it cannot disclose Plaintiffs' confidential documents without "a validly issued and enforceable subpoena." Tatelman Decl. (Doc. 56-2), Ex. G. Whether this subpoena is validly issued and enforceable is something the Committee has yet to prove.

The rule about when to evaluate the legality of congressional subpoenas makes sense. Congress has several ways to coerce compliance with its subpoenas, including criminal prosecution, civil litigation, and even congressional imprisonment. Because a recipient must "decide at his peril whether or not to answer" a subpoena, "[f]undamental fairness demands" that his "objection" be judged "at that time." *Watkins*, 354 U.S. at 214-15. Congressional subpoenas also threaten "the right of citizens to carry on their affairs free from unnecessary governmental interference." *Id.* at 205-06; *see Rumely*, 345 U.S. at 44 (highlighting the "wide concern, both in and out of Congress," over how "the congressional power of investigation" can be "exercise[d]"). To "protect the rights of individuals against illegal encroachment," committees must take a "measure of added care" when issuing compulsory process, "responsibly consider[ing] whether or not [the recipient] should be subpoenaed before the subpoena issue[s]." *Watkins*, 354 U.S. at 215; *Shelton*, 327 F.2d at 607.

Instead of refuting these principles, the Committee points out immaterial details in the cases that articulate them. (The upshot is that the Committee thinks it's free to use whatever "retroactive

rationalization[s]" it wants, even ones having nothing to do with the subpoena's original purposes. *See* Cross-MSJ 29-30.) That the prior cases involved criminal prosecutions for contempt of Congress is not surprising: Congress rarely uses its inherent-contempt power, and prior to 1978, neither house of Congress could bring a civil suit (the House's right to bring one remains contested). *See generally Comm. on Judiciary of U.S. House of Reps. v. McGahn*, 973 F.3d 121, 125 (D.C. Cir. 2020), *reh'g en banc granted, judgment vacated* (Oct. 15, 2020). But a person who objects to a congressional subpoena does not know how the subpoena will be enforced, only that he "acts at his peril." *Watkins*, 354 U.S. at 208. "Funda-mental fairness demands" that, in future proceedings, his decision be judged "at th[e] time" it was made. *Id.* at 214-15. This dilemma even confronts neutral third-party custodians like Mazars, who risk criminal and civil liability if they comply with a subpoena that is not "validly issued and enforceable." Tatelman Decl., Ex. G.

Additionally, the "concerns" behind the rule requiring subpoenas to be valid when issued "are no less important when congressional subpoenas threaten the separation of powers than when they threaten due process." DOJ Supp. Amicus Br. (CADC Doc. #1860386) 17. The Committee concedes that this subpoena implicates the separation of powers. So a "measure of added care" on its part is a "small price to pay" to "uphold the principles of limited, constitutional government." *Watkins*, 354 U.S. at 215-16. This separation-of-powers concern explains why, in *this* case, the Supreme Court relied on *Watkins* and other criminal cases in articulating the Committee's evidentiary burden. *See* 140 S. Ct. at 2036 (citing *Watkins*, 354 U.S. at 205-06, 214-15). "When the Supreme Court referred to 'the evidence offered by Congress' of legislative purposes, it cannot have meant that the Committee was free to supply rationales after the fact, once the Court had rejected the existing rationales." DOJ Supp. Amicus Br. 17 (cleaned up).

The Committee's discussion of *Shelton* is equally unpersuasive. True, *Shelton* involved a rule that said, "The committee, or any duly authorized subcommittee thereof, is authorized to require by

subpenas or otherwise the attendance of such witnesses as it deems advisable. Subpenas shall be issued by the chairman of the committee." 327 F.2d at 606 (cleaned up). But the key point was that, when the subcommittee tried to "ratif[y]" a subpoena that was invalid "when [it] was issued," the D.C. Circuit rejected the attempt. *Id.* at 607 (citing *Christoffel v. United States*, 338 U.S. 84 (1949)); *accord Gojack v. United States*, 384 U.S. 702, 715 n.12 (1966) (rejecting another attempted "retroactive authorization"). The reason that the subcommittee's rule required subpoenas to be authorized, the D.C. Circuit explained, is so that the subcommittee would "responsibly consider whether or not [the recipient] should be subpoenaed *before* the subpoena issued." 327 F.2d at 607 (emphasis added). The same rule, and thus the same principle, is in effect here. *See* House Rule XI.2(3)(A)(i), 116th Cong. ("a subpoena may be authorized and issued … only when authorized by the committee or subcommittee" or the "delegated … chair"). Still today, the whole point of a rule requiring the committee chairman to authorize subpoenas is to "prevent the separation of power from responsibility" and to ensure that the chairman takes "added care" *before* exercising this grave power. *Watkins*, 354 U.S. at 215. The chairman cannot subpoena now, get authority later.[2]

**B.    Under any framework, the Committee's test is unpersuasive.**

If the Court nevertheless treats this subpoena as "a subpoena to a former President," Cross-MSJ 17, it should not apply the Committee's balancing test. Seemingly cut from whole cloth, the Committee's test has no grounding in law, history, or logic. The sounder approach would be to apply the *Mazars* test to former Presidents.

---

[2] *Senate Select* does not hold otherwise. That "peculiar" case involved an assertion of executive privilege and the "first" time "in our history" that a court was asked "to exercise the equity power" against a sitting President. *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (en banc). In declining to force President Nixon to comply with the subpoena, the D.C. Circuit considered subsequent events that *removed* Congress's need for the subpoenaed materials. It did not uphold a subpoena based on subsequent events, or deprive a subpoena recipient of his right to have the legality of his objection judged at the time it was made.

The Committee's balancing test has no basis in law. Balancing is needed, according to the Committee, because subpoenas for a former President's personal papers present "separation-of-powers concerns." Cross-MSJ 15-16, 28. But *Mazars* already articulates a test for subpoenas that "seek personal papers" and present "separation of powers concerns." 140 S. Ct. at 2034. The Committee doesn't get to make up a new one. Though *Nixon v. GSA* is the only case the Committee cites, its new test finds no support there. That case analyzed whether a federal *statute* was "unconstitutional on its face." 433 U.S. 425, 443 (1977). And the statute in question, the Court stressed, did not pit Congress against the former President. *See id.* at 444 (explaining that "the Act 'does not make the presidential materials available to the Congress'" and that "it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than … Congress"). Perhaps the closest analogy to the Committee's test is the law governing executive privilege. When a congressional inquiry is resisted based on executive privilege, courts will weigh Congress's "strong showing of need" against "the public interest served by nondisclosure." *Senate Select*, 498 F.2d at 730-31. But the Committee specifically asked the Supreme Court *not* to adopt that standard. *See Mazars*, 140 S. Ct. at 2032. Having won that debate, the Committee cannot run from the test that *Mazars* did impose.

The Committee's balancing test has no basis in history either. The Committee agrees that subpoenas to former Presidents implicate the separation of powers, so its generic quotes equating former Presidents with private citizens are irrelevant. *See* Cross-MSJ 17-18. Besides, the quote from George Mason was a *criticism* of the Constitution—one that Virginians ultimately found unpersuasive. 2 *Elliott's Debates* 357-58 (1828). And former President Roosevelt made his statement while giving *voluntary* testimony at Congress's "invitation." *Hearings Before the H. Committee on Investigation of United States Steel Corporation*, 62d Cong., at 1392 (1911). While Congress did subpoena former Presidents Tyler and Adams to testify about the possible impeachment of Daniel Webster, the Committee cites no evidence that the Presidents' participation was involuntary. In fact, the House and the former

Presidents agreed ahead of time that their testimony would be taken confidentially and kept under seal, to be disclosed only if "necessary" and "only in the event of [Webster's] impeachment." H. Rep. No. 29-684 at 4. Further undermining the Committee's position, former President Truman *refused* to comply with a House subpoena for his testimony. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. ___, 2019 WL 6047057, at *5 (May 20, 2019). More broadly, none of these episodes involved a lingering request for the President's personal papers or claimed to be exercises of Congress's legislative powers. And no one during these episodes endorsed, proposed, or even hinted at the Committee's balancing test.

Aside from being unsupported, the Committee's balancing test makes little sense. The Committee's "scale analogy is not really appropriate, since the interests on both sides are incommensurate." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment). On the one side, courts are supposed to quantify Congress's *specific* "need" for these "subpoenaed materials" to fulfill its current "legislative purposes." Cross-MSJ 21. Then, against this particularized need, courts are supposed to weigh the *abstract* "burden on the Presidency from production of a former President's personal papers." Cross-MSJ 2. This test is like "judging whether a particular line is longer than a particular rock is heavy." *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2136 (2020) (Roberts, C.J., concurring in the judgment) (quoting *Bendix*, 486 U.S. at 897 (Scalia, J., concurring in the judgment)).

Worse, the Committee gives the presidential side of the balance a fixed weight of zero. The only burdens that count are burdens on "the incumbent President," the Committee says, and a subpoena "to a former President imposes no burden on the current President at all." Cross-MSJ 17-18. So unless a committee cannot articulate *any* legislative need for the subpoenaed materials—a case that would fail even the basic standard for subpoenas to purely private parties—its stated needs will always outweigh the former President's nonexistent burdens. But a balancing test that Congress always wins

is not much of a test. It would "leav[e] essentially no limits on the congressional [subpoena] power," *Mazars*, 140 S. Ct. at 2034, in a context that the Committee agrees presents separation-of-powers concerns.

The Committee's fait accompli is not the way to evaluate subpoenas to former Presidents, should the Court decide to view the case that way. As explained, the *Mazars* test governs subpoenas for personal papers that implicate the separation of powers. A "former President" who was subpoenaed while in office "may also be heard to assert" the separation-of-powers protections in that case. *Nixon v. GSA*, 433 U.S. at 439. After all, the Mazars subpoena did not suddenly become "a run-of-the-mill legislative effort" once President Trump left office. *Mazars*, 140 S. Ct. at 2034. The *Mazars* test should apply as is, though the application of the fourth factor will differ for a former President. Specifically, a subpoena to a former President will rarely impose direct "burdens on the President's time and attention." *Id.* at 2036. But that observation shouldn't change the answer here, since physical burdens on President Trump's time and attention were never a central part of this case. *See* MSJ 19.[3]

## II.   The Mazars subpoena cannot survive any meaningful balancing test.

The Committee's concession that its subpoena implicates separation-of-powers concerns effectively dooms its subpoena. The subpoena was not drafted to withstand *any* kind of balancing test; it was issued under an "approach" that failed to "account[] for separation of powers concerns" and that recognized "essentially no limits" on the House's subpoena power. *Mazars*, 140 S. Ct. at 2034. And the D.C. Circuit's decision upholding it "[l]argely follow[ed] the House's lead," "applying precedents that do not involve the President's papers" and that use something akin to rational-basis review. *Id.* at 2033, 2036.

---

[3] The Committee cites the absence of these burdens as a reason to apply a *different test*. But the Committee confuses the answer for the question. The *Mazars* test already instructs courts to consider burdens on the President's time and attention. If these burdens are absent, then courts should simply weigh that in their application of the *Mazars* test.

Unsurprisingly then, the Committee's balancing test cannot justify the Mazars subpoena—at least once the Committee's dice-loading features are removed. Under its balancing test, the Committee's legislative needs have dwindled from little to almost nothing. And contrary to the Committee's assertion, its sweeping subpoena for reams of sensitive financial information imposes real burdens on Plaintiffs and serious threats to the separation of powers. In short, the Committee fails its own test (and thus necessarily fails the more stringent *Mazars* test).

### A.      Committee's side of the balance

At the outset, the Committee's claimed urgency is gone. Before the election, the Committee claimed that its laser focus on President Trump was justified by an "urgent need," Maloney Memo. 33, to

- address "ethical issues" that President Trump was allegedly facing "while in office," Maloney Memo. 37;

- understand how President Trump's "'personal interests *are* affecting public policy,'" Maloney Memo. 38 (emphasis added);

- understand the alleged "undue influence that may be impairing GSA's management of [the] lease," Maloney Memo. 38;

- understand and reign in an "unprecedented" President, Maloney Memo. 37;

- assess the "ongoing … risk that [President Trump's] decision-making as President may be influenced by private financial considerations," Cmte. Supp. Reply Br. (CADC Doc. #1862693) 7;

- consider "legislation to *immediately* address" these concerns, Maloney Memo. 38 (emphasis added); and

- "tailor[]" legislative remedies to President Trump's "financial interests and conflicts of interest," Cmte. Supp. Reply Br. 2; *see also* Cmte. Supp. Reply Br. 20 ("[T]he Oversight Committee is not using President Trump as a case study; it is considering what legislative reforms are needed to address any *specific conflicts of interest* that *President Trump* may have brought into the Presidency." (emphasis added)).

If these time-sensitive needs ever justified the Mazars subpoena, they plainly don't now.

The Committee's only possible need, then, is for legislation that will govern "*future* Presidents." Cross-MSJ 21. That legislation is not pressing until 2024 at the earliest, and even then only if someone

runs who presents "the unique circumstances" of President Trump—someone the Committee describes as a "'class of one.'" Cross-MSJ 34. The only President-specific legislation that the Committee can rely on, moreover, are laws requiring Presidents to disclose financial information. The D.C. Circuit was correct that the Mazars subpoena is not even pertinent to legislation governing agencies or ordinary executive-branch officials. *See* 940 F.3d at 733. And the D.C. Circuit was correct to suggest that presidential conflict-of-interest laws are unconstitutional. *See id.* Plaintiffs raised these points in their initial brief, *see* MSJ 6-7, 33, and the Committee offered no response. This Court should thus limit its analysis, as the D.C. Circuit did, to presidential financial-disclosure laws.

The Committee does not need to dig through Plaintiffs' detailed financial information to consider disclosure laws for "*future* Presidents." Cross-MSJ 21. Congress can legislate without "every scrap of potentially relevant evidence." *Mazars*, 140 S. Ct. at 2036. That's especially true for disclosure laws. The whole point of these laws is that the information to be disclosed is *not known* in advance; the disclosure law requires that information to be shared with the public, *whatever its contents*. The relevant questions are thus all "predictive policy judgments": what kind of information should be disclosed, how much should be disclosed, and what are "the predicted consequences" of requiring those disclosures. *Id.*; *Senate Select*, 498 F.2d at 732. Congress does not need a "precise reconstruction of past events" to make these judgments, and it is more than capable of "legislat[ing] on the basis of conflicting information." *Senate Select*, 498 F.2d at 732. In fact, Congress has legislated on presidential disclosures in the past, never once subpoenaing a former President for his personal financial information. The Committee offers no rebuttal to these basic truths about how the legislative process works. Its reasons for why it nevertheless needs a full accounting of *Plaintiffs'* finances make little sense.

The Committee does not need Plaintiffs' information to determine whether purported "discrepancies" on President Trump's disclosure reforms were "'intentional'" or "'simply a mistake.'" Cross-MSJ 22. The cold documents cannot possibly explain what was in anyone's head. That would

require an interview, deposition, or interrogatory. Combing through reams of financial documents might reveal the existence of mistakes, but not *why* they were made. And the desire to peruse the documents in the hopes of finding mistakes is the kind of "vague" goal that cannot justify the "significant step" of a subpoena. *Mazars*, 140 S. Ct. at 2035-36; *see Senate Select*, 498 F.2d at 733 ("The Committee has … shown no more than that the materials … may possibly have some arguable relevance … to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to [the subpoenaed materials].").

The Committee also cannot argue, in circular fashion, that it needs to see the details of former President Trump's finances "to address the specific problems exposed by the details of former President Trump's finances." Cross-MSJ 32. Again, as the Committee admits in the next sentence, it is not considering a specific bill on what *President Trump* must disclose; it is considering a general bill on what "future Presidencies" must disclose. Cross-MSJ 32. President Trump's particular information is barely relevant, let alone needed. It is unrepresentative, since President Trump's situation was "unprecedented" and "unique." Maloney Memo. 37. And it is wildly underinclusive, since President Trump is just one person in the endless sea of people who could be subject to federal disclosure requirements. No rational Congress would set the number of years that all officials must disclose, for example, based on the records of a single former official. It would at least demand a much larger sample. Better yet, it would consult the Office of Government Ethics, experts on disclosure and government ethics, accountants and other financial experts, lawyers with experience helping clients fill out disclosure forms, and former officials. All of these resources remain available to the Committee.

The Committee's discussion of the "unique need" for Presidents to disclose more information than other officials is a non sequitur. Cross-MSJ 33-34. President Trump is one of 46 people to serve as President, but the number of people who could serve as "*future* Presidents" is endless. Cross-MSJ 21. President Trump's information is no more relevant to the rules that will govern future presidential

disclosures than the information of other federal officials or other individuals with complex business holdings. If the Committee wants to "'tailor[]'" disclosure laws "'to respect the burdens on the Office of the President,'" Cross-MSJ 34, why is it rifling through one former President's finances? It should be *speaking* to former Presidents, as well as experts in the field and former White House staff, about the burdens of the Office and the pros and cons of various disclosure requirements.

These holes in the Committee's logic are not theoretical. Despite not having the subpoenaed materials, the Committee has already identified the defects that it wants to fix in the current financial-disclosure laws. To wit, it knows that the existing Ethics in Government Act requires disclosure "only for the preceding calendar year," that amounts are listed "only in broad ranges instead of exact numbers," that "the maximum amount of those ranges is relatively low," and that information about "closely held companies" can be omitted. Cross-MSJ 5. Tax returns and emoluments, too, are not required to be disclosed. The Committee has not only identified these problems, but the Maloney memo calls them "glaring" and "obvious." Cross-MSJ 1, 12; Maloney Memo. 3, 23. The Maloney memo "actually undermines the Committee's claims of need," the Justice Department has observed, because "[i]t demonstrates at great length that the Committee has already obtained an enormous amount of detailed information about the President's finances" and has already identified the "perceived deficiencies in existing legislation." DOJ Supp. Amicus Br. 3.

The House is so confident about what needs to be done that it already drafted the relevant reforms, put them in H.R. 1, and passed them twice. *See* SMF Resps. ¶¶3, 6, 16, 33, 70-71. The point is not that the mere "drafting" of legislation makes a subpoena "not necessary." Cross-MSJ 40. The point is that the Committee cannot claim to "need" subpoenaed documents for legislation that it has twice *enacted* and that, in the course of enacting it, voiced no concerns about the absence of Plaintiffs' documents. *See* SMF Resps. ¶¶6, 16, 71. The Chairwoman's statement that H.R. 1 could be "'amended

once Congress obtains [Plaintiffs'] specific information'" only begs the original question. Cross-MSJ 33.

Nor can this Court credit the Committee's supposed need to "'inform the Senate'" or to "generate momentum" and "build support" for H.R. 1. Cross-MSJ 33. Courts obviously cannot be in the business of political prognostication, figuring out what information would convince wary legislators to support which bills. And the Committee does not explain how informing the Senate is within the authority of a House committee, or why the Senate (or a future conference) would need a House committee to do its bidding. *See* MSJ 25-26. That the Senate has not subpoenaed Plaintiffs should be conclusive proof that it does not need this information. SMF Resps. ¶¶72-74. *Senate Select* provides no support for the Committee's attempt to conflate the House and Senate. Holding that the Senate doesn't need a subpoena for information it would soon get from the House, *see* 498 F.2d at 733, is a far cry from holding that the House needs a subpoena to give the Senate information it doesn't want.

Finally, if the Committee (or the Senate) needed any more information, the executive branch is now headed by a member of the same political party. Under the new House and new executive branch, disputes even older than this one are being accommodated and settled. *See, e.g.*, Agreement Concerning Accommodation (Doc. #1898440), *Comm. on the Judiciary, U.S. House of Reps. v. McGahn*, No. 19-5331 (D.C. Cir. May 12, 2021). Although the Committee did not bring it to this Court's attention, Plaintiffs recently discovered that GSA gave a House committee many of the same documents that the Committee complains were withheld here. *See* 4th Supp. Consovoy Decl., Ex. C. Specifically, on May 5, 2021, GSA gave the House Committee on Transportation and Infrastructure "additional responsive material" concerning its lease with the Trump International Hotel, including "monthly financial statements," "annual financial statements," "audits," "formal notices," and "lease amendments." *Id.* It would be surprising if the Committee doesn't have this information already. And if it doesn't, the only reason is its failure to ask GSA.

In short, the Committee has no quantifiable need for Plaintiffs' financial information. These detailed records are disconnected from the Committee's asserted "broad legislative objectives." *Mazars*, 140 S. Ct. at 2026. The Committee has already met those objectives using the wealth of information it already has. And the Committee has various other avenues for obtaining any other information it needs.

### B.      Plaintiffs' side of the balance

While the Committee's need is nonexistent, there are real burdens on Plaintiffs' side of the balance. To quote the Justice Department, the Mazars subpoena "is a significant intrusion under any measure," given its "astonishing breadth." DOJ Supp. Amicus Br. 6, 15. It "demands eight years' worth of [President Trump's] accounting records, all documentation supporting those records, and all of his communications related to preparing those records, as well as his contracts with his accounting firm without regard to any time period." DOJ Supp. Amicus Br. 6-7. The Mazars subpoena "bears no resemblance to prior congressional subpoenas," which requested the disclosure of "'particular documents' related to discrete events, often under substantial protective restrictions." DOJ Supp. Amicus Br. 15 (quoting *Mazars*, 140 S. Ct. at 2030-31). And "the Committee has demanded wide-ranging and sensitive personal financial information without providing specific assurances or protections against further dissemination of this information beyond members of Congress." DOJ Supp. Amicus Br. 15.

The Committee could have reduced these burdens, but instead it chose to exacerbate them. The Committee does not deny that it could have requested Plaintiffs' information under an agreement to review it confidentially. *See* MSJ 26-27. While a confidential request would impose much less burden on Plaintiffs, it wouldn't hinder a legitimate *legislative* inquiry at all. A Committee that wanted to review a former President's financial information to help it craft legislation for future Presidents would not need to release the information to the public; only a Committee that wanted to expose the information of a recent rival would care about that. The Committee's only response to this alternative is that "[t]he

Supreme Court did not suggest [it]." Cross-MSJ 38. But the Supreme Court *did* suggest it, citing a "compromise" during the Reagan administration where "[a]ll documents were made available, but only for one day with no photocopying, minimal notetaking, and no participation by non-Members of Congress." 140 S. Ct. at 2030. And as noted, there are only two historical examples of congressional subpoenas to former Presidents; both times, Congress gave the former Presidents confidentiality protections. *See* H. Rep. No. 29-684 at 4.

The Committee also should have tried accommodation. The Committee does not deny that, by going around Plaintiffs and subpoenaing their accountant, it "*increased* the burden by requiring this extensive, emergency-posture litigation." MSJ 19. Accommodation encourages compromise and the narrows of disputes when neither party can "simply walk away from the bargaining table and compel compliance in court." *Mazars*, 140 S. Ct. at 2034. But Congress needn't even approach the table when it subpoenas a neutral third-party custodian. For similar reasons, the Committee's generic argument about former Presidents no longer needing to accommodate Congress, *see* Cross-MSJ 16, makes no sense here. If the Committee had subpoenaed Plaintiffs directly, Plaintiffs would have more incentive to accommodate Congress than before, since noncompliance would be backed by a realistic threat of sanctions. That threat is far more motivating than a sitting President's distant concerns with getting "Congress's help funding the government or advancing his legislative priorities." Cross-MSJ 16.

The Committee's suggestion that accommodation with Plaintiffs was "attempt[ed]" but "failed" is demonstrably false. Cross-MSJ 35. The Committee did make "requests for documents *related to payments of hush money*," Maloney Memo 9 (emphasis added), but that was a separate investigation involving documents that are not sought by, and have no relevant connection to, the Mazars subpoena. As the Committee now concedes, it *never* asked Plaintiffs for the documents in the Mazars subpoena. SMF Resps. ¶75. Its failure is inexcusable. Even in early 2019, the Trump administration had already accommodated the House hundreds of times on multiple topics. *See* 4th Supp. Consovoy Decl. Exs.

A, F. The Committee cannot argue that accommodation would have been unsuccessful here, having never tried it.

The Committee knows the opposite is true. Good-faith accommodation and negotiation are currently taking place between Plaintiffs and two other House committees in the parallel *Deutsche Bank* litigation—the case that was consolidated with this one at the Supreme Court. In *Deutsche Bank*, the parties (represented by the same counsel) recently submitted a joint status report, explaining that "Plaintiffs and [the Committees] are continuing to engage in negotiations intended to narrow or resolve their disputes *and believe they are close to an agreement.* Those negotiations encompass both the scope of the subpoenas and a process for resolving any concerns about privacy and responsiveness." *Trump v. Deutsche Bank AG*, Doc. 83, No. 1:19-cv-3826 (S.D.N.Y. May 17, 2021) (emphasis added). Separate from those discussions, the committees in those cases also decided to withdraw one subpoena and narrow two more in the wake of *Mazars*. Nothing prevents similar compromises here.

The unnecessary burdens that the Committee is imposing on Plaintiffs matter because the acknowledged "separation-of-powers concerns" here are serious. Cross-MSJ 15. If the Committee can enforce this subpoena, then an important precedent will be set. The cost of serving as President will be a full-blown audit of an individual's personal finances, business affairs, and even family members— information that will inevitably be leaked to the world. It will be "open season" on a former President's "information held by schools, archives, internet service providers, e-mail clients, and financial institutions." *Mazars*, 140 S. Ct. at 2035. All a committee will need to say is that it wants to use the former President to study legislation requiring future Presidents to disclose that information. This newfound power will be too tempting to avoid in times of divided government, particularly in this hyper-partisan era. The resulting dynamic will give Congress an "institutional advantage" over the executive, *id.* at 2036, as it will affect who runs for President and how the sitting President treats Congress while in office. The Committee calls the possibility of Congress subpoenaing a sitting President's personal

papers and then pursuing the information after he leaves office a "remote possibility." Cross-MSJ 27. But that possibility is what is happening in this very case.

These separation-of-powers concerns are not reduced because the Justice Department has not filed a brief in this Court. *Cf.* Cross-MSJ 28. As the Committee knows, the Justice Department did not file a brief in this Court last time either, when President Trump was President. Nor did it file one in the D.C. Circuit, until that court invited it to do so "on [its] own motion." CADC Doc. #1797054. While the Committee tries to compare this case to *Nixon v. GSA*, that case did not draw any inferences based on the executive branch's *silence*. Instead, it noted that President Ford had approved the challenged statute's constitutionality by "sign[ing it] into law," and that the Carter administration had "vigorously support[ed] … its constitutionality" by defending it in court. 433 U.S. at 441.

The Justice Department *has* recently weighed in, moreover, after the Supreme Court remanded this case to the D.C. Circuit. In its post-*Mazars* brief, the Department took a dim view of many of the same arguments the Committee makes now. It said, for example:

- "The post hoc rationalizations in the Maloney memorandum cannot cure the defects in the Cummings memorandum"; the "new memorandum" would not need "to devote *nearly sixty pages* of added explanations if it was simply clarifying rather than manufacturing the rationale for the subpoena." DOJ Supp. Amicus Br. 3, 16.

- "[T]here is no reason why Congress would need the sheer level of detail about the President's finances that the subpoena demands just to enact legislation requiring financial disclosures." DOJ Supp. Amicus Br. 12.

- The Maloney memo "devotes more than thirty single-spaced pages to a detailed recitation of the President's financial information that the Committee *already has*," from "the President's prior financial statements, to the number of trademarks he and his companies have obtained, to which of his businesses' hotels he slept in on particular days." The Committee does not need a "mere incremental benefit of more information" just "to legislate." DOJ Supp. Amicus Br. 20.

- "The overarching theme of [Chairman Cummings'] contemporaneous statements was that the Committee was improperly searching for evidence of wrongdoing by this President in particular, regardless of whether the conduct occurred before or after he assumed his office." DOJ Supp. Amicus Br. 9.

- The Committee has not explained how its "contemplated legislation directed at the office of the President would even be within the bounds of Congress's

authority," and "some of [its] proposed legislation … is constitutionally dubious on its face." DOJ Supp. Amicus Br. 9, 22.

- "[T]he subpoena's dragnet for nearly a decade of financial records—most of which relate solely to the President's actions as a private citizen—is vastly overbroad." DOJ Supp. Amicus Br. 2.

These statements remain the Justice Department's last word on the issues in this case. And this Court should not lightly assume, based on its mere silence, that the executive branch would embrace the Committee's position. President Biden might very well resist the idea that, once he leaves office, a Republican House or Senate is free to subpoena any financial documents it wants from him, his business ventures, or his family.

## III.   The subpoena lacks a legitimate legislative purpose.

No matter what test applies, the Mazars subpoena is invalid because it violates several of the basic limits that govern all congressional subpoenas. It pursues the impermissible purposes of law enforcement and exposure. It does not pursue constitutional legislation. And it is fatally overbroad. This Court rejected these claims last time, but Plaintiffs respectfully ask it to reconsider.

Despite the Committee's urging, this Court cannot ignore these claims simply because the Supreme Court did not "address" or "accept" them. Cross-MSJ 42. The Supreme Court did not accept the Committee's *defenses* to these claims either. And the "silences" in judicial opinions "lack precedential weight." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 232 n.6 (1995).

What the Supreme Court did say about these claims, moreover, proves that it expected them to be important focal points of litigation on remand. For starters, the Court spoke on these issues by vacating the D.C. Circuit's entire decision. It could have affirmed the D.C. Circuit in part, but it deliberately chose a vacatur, which "'clear[ed] the path for future relitigation.'" MSJ 30. The D.C. Circuit, too, decided to vacate this Court's decision in full rather than leaving certain parts undisturbed. The Supreme Court's opinion, moreover, made a point to restate and reaffirm the basic limits on congressional subpoenas. *See Mazars*, 140 S. Ct. at 2031-32. And throughout its analysis, the Supreme Court

drew conclusions that directly support Plaintiffs' claims. *See* MSJ 31, 33. This Court should reassess Plaintiffs' claims in light of these important clarifications.

### A.    The subpoena pursues illegitimate purposes.

The Court should revisit whether the Mazars subpoena pursues law enforcement or exposure for the sake of exposure. Though it could have done so in its brief, the Committee never disputes the governing test: even if legislation is *a* purpose, the Mazars subpoena is invalid if law enforcement or exposure are its "'gravamen'" or "'primary purpose.'" MSJ 31. Nor does the Committee dispute what evidence the Court should consult to make this determination. As the D.C. Circuit agreed, "purpose and motive are different," and courts discern the former by consulting "what the Committee is doing and what it has stated publicly," including through "statements of the members." 940 F.3d at 726 (cleaned up).

Plaintiffs have submitted that evidence to this Court, and the Committee disputes none of it. *See, e.g.*, SMF Resps. ¶¶9-15, 28-30, 38, 47, 49-63. The Court did not consider most of this evidence last time. When this case was being litigated on an emergency basis, many of the relevant statements were not yet in the record.[4] The New York District Attorney had not yet photocopied the Mazars subpoena as part of an admitted *criminal* investigation. *See* MSJ 5, 33. The executive branch had not yet concluded that the House's pursuit of President Trump's financial information—a pursuit that the Committee aligns itself with here, *see* SMF Resps. ¶41—was a pretextual attempt to expose his information to the public. *See* MSJ 2-3, 31; SMF Resps. ¶¶45-47. And the House had not yet passed H.R. 1 a *second time*, without a hint of concern about Plaintiffs' documents. *See* SMF Resps. ¶¶3, 5-6, 16, 33,

---

[4] The Committee accuses Plaintiffs of "selectively" quoting Chairman Cummings. Cross-MSJ 42. But the vast majority of what the Chairman and other Committee members have said is about law enforcement and exposure. *See* SMF Resps. ¶¶9-15, 24, 28-30, 38, 47, 49-63. What would be "selective" is highlighting the rare, boilerplate references to "legislation" that are buried in the mountain of statements about the Committee's desire to expose alleged wrongdoing by President Trump.

70-71. This evidence all confirms what Chairman Cummings said when he first issued the Mazars subpoena: the subpoena's leading purpose is to "investigate whether the President may have engaged in illegal conduct before and during his tenure in office." *Mazars*, 140 S. Ct. at 2028 (cleaned up).

Ignoring the Supreme Court's decision in this case, the Committee's only response is to repeat the D.C. Circuit's observation that an "'interest in past illegality can be wholly consistent with an intent to enact remedial legislation.'" Cross-MSJ 42 (quoting 940 F.3d at 728). That principle is true as a general matter, but the D.C. Circuit applied it under the assumption that this case could be equated to past precedents that did not involve Presidents or their personal papers. *See* 940 F.3d at 724-42. The Supreme Court disagreed. It stressed that "[t]his dispute … represents a significant departure from historical practice" and was "the first of its kind to reach this Court." *Mazars*, 140 S. Ct. at 2031. The Court would not ignore that the Mazars subpoena "do[es] not represent a run-of-the-mill legislative effort," but rather "a clash" between rivals "over records of intense political interest." *Id.* at 2034. So while the D.C. Circuit was right that an "interest in past illegality *can*" be consistent with legitimate legislative purposes, 940 F.3d at 728 (emphasis added), this subpoena "pose[s] a heightened risk of such impermissible purposes, precisely because of the documents' personal nature and their less evident connection to a legislative task." *Mazars*, 140 S. Ct. at 2035. That heightened risk has come to fruition here, as the record plainly shows.

**B.     The subpoena is not pertinent to valid legislation.**

Even if the subpoena were animated by a desire to pass legislation, it does not pursue legislation that "'could be had.'" *Id.* at 2031; *see* MSJ 33-35. The only potentially valid laws that "could be had" here, the D.C. Circuit correctly observed, are laws requiring the disclosure of financial information. 940 F.3d at 732-33. The parties disagree about the constitutionality of those laws as applied to Presidents (and Supreme Court Justices). *Compare* MSJ 33-35, *with* Cross-MSJ 43. But here, too, the Supreme Court offered important guidance. "[L]egislation concerning the Presidency," it noted

21

without reservation, "raises sensitive constitutional issues." *Mazars*, 140 S. Ct. at 2036. If the Committee's breezy defense of presidential disclosure laws were accurate, then this statement from the Supreme Court would have made little sense.

A few points on presidential-disclosure laws are worth reiterating. Requiring the President to make disclosures is different because he "is the only person who alone composes a branch of government." *Id.* at 2034. That Presidents (and Justices) have voluntarily complied with disclosure laws in the past is inconclusive at best, since "'compliance is not the measure of constitutionality.'" 940 F.3d at 735. The Constitution also sets the qualifications for President, and Congress cannot add to them. *Powell v. McCormack*, 395 U.S. 486, 550 (1969). The Committee does not explain how a law requiring presidential candidates to disclose their tax returns is an impermissible qualification, *see Griffin v. Padilla*, 408 F. Supp. 3d 1169, 1179-81 (E.D. Cal. 2019), but the reforms it claims to be contemplating are not.

A law requiring the disclosure of emoluments would have even more problems. The Domestic Emoluments Clause does not contemplate *any* role for Congress—legislative or otherwise. *See* Pet. for Writ of Cert. 5, *Blumenthal v. Trump*, No. 20-5 (U.S. July 6, 2020), bit.ly/2RM56kW (Democratic legislators agreeing that the "Domestic Emoluments Clause" "give[s] members of Congress no special role"). And while the Foreign Emoluments Clause allows Congress to "consent" to foreign emoluments, that power says nothing about the power to compel disclosures. The power to mandate disclosure would have to be necessary and proper to the power to consent, but whether disclosure legislation is necessary and proper would simply reraise the difficult questions surrounding presidential disclosures more broadly. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 455 n.127 (D.C. Cir. 1982) ("[T]he Necessary and Proper Clause … is properly read as 'a means of making the exercise of powers by the various branches effective, not as a means of shifting powers between the branches of government.'").

22

### C.      The subpoena is overbroad.

As the Justice Department observed, the Mazars subpoena "is plainly overbroad for the Committee's asserted needs in each of [the asserted] legislative areas." DOJ Supp. Amicus Br. 23. Contrary to the Committee's criticism, Plaintiffs do not "focus[] on each track of the investigation separately and then insist[] that each track by itself does not justify the entire subpoena." Cross-MSJ 35. Every request in the subpoena must be supported by at least *one* of the Committee's tracks, so Plaintiffs simply explained what would happen if the Court approved some tracks but not others. *See* MSJ 15-28. The Committee, though, flatly ignores the parts of the D.C. Circuit's opinion that it doesn't like. Most notably, the D.C. Circuit was correct that the Mazars subpoena is pertinent to no legislation other than presidential financial-disclosure laws. *See* 940 F.3d at 733. So those laws are the "litmus test" for overbreadth—not laws governing GSA, presidential conflicts of interest, and the like. *Id.*

While some parts of the subpoena are arguably pertinent to some of H.R. 1's disclosure requirements, the Committee's arguments get noticeably abstract when it has to justify the entire Mazars subpoena. When it needs to, the Committee falls back on two arguments: that it needs more documents because it's considering legislation requiring the disclosure of more documents, *see* Cross-MSJ 21-23, 25-26, or that it needs more documents because it doesn't know what's in the documents it has "*not* received," Cross-MSJ 32. The Committee never addresses the glaring problems with these unfalsifiable arguments. *See* MSJ 20, 27. If the subpoena power is to remain "not unlimited," *Watkins*, 354 U.S. at 187, this Court cannot allow Congress to argue that it needs a recipient to disclose information so Congress can see that information—or so Congress can see if it wants to pass legislation to require the disclosure of that information. The potential for abuse is obvious: Such a subpoena would "provide [committees] 'all the disclosure to which they would be entitled in the event' they had already successfully enacted [the contemplated disclosure] legislation, 'and much more besides.'" DOJ Supp.

Amicus Br. 25 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 388 (2004)). The Constitution "does not tolerate such ready evasion." *Mazars*, 140 S. Ct. at 2035.

## CONCLUSION

The Mazars subpoena is unconstitutional and unenforceable. This Court should enter summary judgment for Plaintiffs and deny summary judgment to the Committee.

Respectfully submitted,

Dated: May 25, 2021

   *s/ William S. Consovoy*

Stefan C. Passantino (D.C. Bar #480037)
MICHAEL BEST & FRIEDRICH LLP
1000 Maine Ave. SW, Ste. 400
Washington, D.C. 20024
(202) 747-9582
spassantino@michaelbest.com

William S. Consovoy (D.C. Bar #493423)
Cameron T. Norris
Alexa R. Baltes
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com
lexi@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

*Counsel for The Trump Organization, Inc., Trump Organization LLC, The Trump Corporation, DJT Holdings LLC, The Donald J. Trump Revocable Trust, and Trump Old Post Office LLC*

*Counsel for President Donald J. Trump*

**CERTIFICATE OF SERVICE**

I filed this consolidated opposition and reply with the Court via ECF, which will electronically notify all counsel of record.

Dated: May 25, 2021                                     */s/ William S. Consovoy*