**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP; THE TRUMP
ORGANIZATION, INC.; TRUMP
ORGANIZATION LLC; THE TRUMP
CORPORATION; DJT HOLDINGS LLC;
THE DONALD J. TRUMP REVOCABLE
TRUST; and TRUMP OLD POST OFFICE
LLC,

        *Plaintiffs*,

        v.

MAZARS USA LLP,

        *Defendant,*

COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF
REPRESENTATIVES,

        *Intervenor-Defendant.*

Case No. 1:19-cv-01136-APM

**REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT OF
INTERVENOR-DEFENDANT COMMITTEE ON OVERSIGHT AND REFORM OF
THE U.S. HOUSE OF REPRESENTATIVES**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    This Court Should Apply A Separation-Of-Powers Balancing Test For A Former President .......................................................................................................................2

    A.   The *Mazars* Test Does Not Apply .......................................................................2

    B.   Plaintiffs' Arguments Against A Separation-Of-Powers Balancing Test Fail .............9

II.    The Separation-Of-Powers Balancing Test For A Former President Weighs Strongly In The Committee's Favor .......................................................................14

    A.   Plaintiffs' Arguments Against The Committee's Need Fail........................................14

    B.   Plaintiffs Have Not Demonstrated A Risk To The Separation Of Powers .............19

III.    Plaintiffs' Rehashed Arguments Remain Unconvincing.......................................21

    A.   The Subpoena Is Not Invalid As Prohibited Legislative Law Enforcement Or Exposure For The Sake Of Exposure .................................................................22

    B.   The Subpoena Is Relevant To Legislation That May Be Had ....................................23

    C.   The Subpoena Is Not Overbroad ..........................................................................25

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES†

**Cases**                                                               **Page(s)**

*Agostini v. Felton,*
  521 U.S. 203 (1997)............................................................................5

*Am. Steel Foundries v. Tri-City Cent. Trades Council,*
  257 U.S. 184 (1921)..........................................................................4, 6

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011)..........................................................................20

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)............................................................................5

*Barenblatt v. United States,*
  360 U.S. 109 (1959)..........................................................................25

*Bendix Autolite Corp. v. Midwesco Enters., Inc.,*
  486 U.S. 888 (1988)..........................................................................13

*Broudy v. Mather,*
  460 F.3d 106 (D.C. Cir. 2006)...........................................................22

*\*Clinton v. Jones,*
  520 U.S. 681 (1997)..........................................................................10

*Comm. on Judiciary v. McGahn,*
  968 F.3d 755 (D.C. Cir. 2020) (en banc)...........................................19

*Duplex Printing Press Co. v. Deering,*
  254 U.S. 443 (1921)............................................................................4

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975)..........................................................................25

*Gibbons v. Ogden,*
  22 U.S. (9 Wheat.) 1 (1824)..............................................................11

*Gojack v. United States,*
  384 U.S. 702 (1966)........................................................................7, 8

*Griffin v. Padilla,*
  408 F. Supp. 3d 1169 (E.D. Cal. 2019) ............................................24

---

† Authorities upon which we chiefly rely are marked with asterisks.

*June Med. Servs. LLC v. Russo,*
    140 S. Ct. 2103 (2020) ......................................................................................13

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994)............................................................................................4

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ........................................................................24

*McGrain v. Daugherty,*
    273 U.S. 135 (1927)..........................................................................................15

*NFIB v. Sebelius,*
    567 U.S. 519 (2012)..........................................................................................25

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)..........................................................................................10

*\*Nixon v. GSA,*
    433 U.S. 425 (1977) .....................................................................................*passim*

*Paulsen v. Remington Lodging & Hosp., LLC,*
    773 F.3d 462 (2d Cir. 2014)..............................................................................5

*Rostker v. Goldberg,*
    453 U.S. 57 (1981)............................................................................................16

*\*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) ................................................................4, 8, 13

*Shelton v. United States,*
    327 F.2d 601 (D.C. Cir. 1963) ..........................................................................8

*Tenney v. Brandhove,*
    341 U.S. 367 (1951).....................................................................................23, 25

*Tory v. Cochran,*
    544 U.S. 734 (2005)............................................................................................5

*\*Trump v. Comm. on Oversight & Reform of U.S. House of Representatives (Mazars I),*
    380 F. Supp. 3d 76 (D.D.C. 2019) ...............................................................22, 23

*\*Trump v. Mazars USA, LLP (Mazars II),*
    940 F.3d 710 (2019) ....................................................................................*passim*

*\*Trump v. Mazars USA, LLP (Mazars III),*
    140 S. Ct. 2019 (2020) ...............................................................................*passim*

*U.S. Term Limits v. Thornton*,
  514 U.S. 779 (1995) .................................................................................................24

*United States v. Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945) .......................................................................................5

*United States v. Nixon*,
  418 U.S. 683 (1974) .................................................................................................10

*United States v. Rumely*,
  345 U.S. 41 (1953) .....................................................................................................8

*\*Watkins v. United States*,
  354 U.S. 178 (1957) .........................................................................................6, 7, 22

*Wilkinson v. United States*,
  365 U.S. 399 (1961) .................................................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................................................10

**Constitutional Provisions and Rule**

U.S. Const. art I, § 8, cl. 18 .........................................................................................25

U.S. Const. art. I, § 9, cl. 8 ..........................................................................................25

Fed. R. Civ. P. 60(b)(5) ................................................................................................5

**Miscellaneous**

Stuart Minor Benjamin, *Stepping into the Same River Twice: Rapidly Changing Facts and the
  Appellate Process*, 78 Tex. L. Rev. 269 (1999) .....................................................5, 6

Committee on Oversight and Reform, *Hearing on H.R. 1: Strengthening Ethics Rules for
  the Executive Branch* (Feb. 6, 2019) .......................................................................17

1 *The Diary of James K. Polk During His Presidency* (M. Quaife ed., 1910) ...............11

3 Elliot's Debates (2d ed. 1836) ...........................................................................11, 14

11 Fed. Prac. & Proc. § 2863 (3d ed.) .........................................................................5

The Federalist No. 22 (Hamilton) (Carey & McClellan eds., 2001) ............................14

The Federalist No. 47 (Madison) .................................................................................11

H. Rep. No. 29-684 (1846) ..........................................................................................12

H. Rep. No. 29-686 (1846) ..........................................................................................11

*Hearings Before the H. Comm. on Investigation of United States Steel Corporation*, 62d Cong. (1911) ............................................................................................................................11

*Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) ................................................................................3

Hon. Andrew S. Oldham, *The Anti-Federalists: Past As Prologue*, 12 N.Y.U. J.L. & Liberty 451 (2019) ...........................................................................................................11

1 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)....................................14

Ronald D. Rotunda, *Presidents and Ex-Presidents As Witnesses*, 1975 U. Ill. L.F. 1 (1975) ....................12

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) ................................................................................................... 1, 3, 11

1 J. Story, *Commentaries on the Constitution* § 525 (M. Bigelow, 5th ed. 1905) .........................................11

# INTRODUCTION

Plaintiffs acknowledge on the first page of their brief (Pls. Opp. 1) that the Committee's subpoena "seeks a former President's personal papers." They nonetheless spend much of their brief urging this Court to decide this case as if the subpoena were directed to the incumbent President. Their reason for pressing this argument is no mystery. Now that the separation-of-powers concerns implicated by requests for the incumbent President's information no longer apply, Plaintiffs have run out of options for obstructing the Committee's subpoena. Plaintiffs' strategy is therefore to insist that this case be decided as if former President Trump were still in office.

This Court should decline Plaintiffs' invitation to ignore reality. The Court should instead do what the Supreme Court has done when confronted with a separation-of-powers claim brought by a former President—it should balance the legislative interests at stake against any intrusion into the functioning of the Executive Branch. *See Nixon v. GSA*, 433 U.S. 425, 443 (1977). Plaintiffs' arguments against this approach are confounding. They ignore that Supreme Court decisions governing the separation of powers "embrace … constitutional balancing" by weighing "the constitutional interests underlying a claim of presidential immunity against the governmental interests in rejecting that immunity." *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 244 (2000). And they ignore that the Supreme Court's *Mazars* test itself called for a form of constitutional balancing, albeit one directed to subpoenas for an incumbent President's information.

Regardless of which form of balancing this Court applies, it should enforce the Committee's subpoena. The balance in this case overwhelmingly favors the Committee. The subpoena is designed to advance legislative interests of continuing importance to the Nation—seeking key information about potential legislation to ensure that Presidents do not operate under conflicts of interest that allow them to engage in public policy for private gain. The Committee's need for the

material survived the end of the Trump Presidency.  And any interference with Executive Branch functioning from this subpoena for a former President's information is now plainly negligible.  The subpoena does not intrude on the incumbent President's official duties, and former President Trump has no executive functions.  The Committee is entitled to summary judgment.

**ARGUMENT**

I.    **This Court Should Apply A Separation-Of-Powers Balancing Test For A Former President**

A.    **The *Mazars* Test Does Not Apply**

As explained in our principal brief (Cross-MSJ 15-19), the Supreme Court's *Mazars* test was tailored to the separation-of-powers concerns implicated by Congressional subpoenas for the personal information of an incumbent President.  Now that former President Trump has left office, that rationale no longer applies.  He no longer oversees the Executive Branch, and a Congressional subpoena for his information does not "pit the political branches against one another." *Trump v. Mazars USA, LLP* (*Mazars III*), 140 S. Ct. 2019, 2034 (2020).  And Congress cannot use a subpoena against former President Trump to "'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense." *Id.*  The reasons for applying the Supreme Court's heightened *Mazars* test ended with the end of the Trump Presidency.

Plaintiffs make little effort to dispute this conclusion.  They do not dispute that this case no longer presents "a clash between rival branches of government." *Id.*  They do not dispute that former President Trump is no longer "the only person who alone composes a branch of government," *id.,* or that the "tradition of negotiation and compromise" between the political branches that provided the backdrop for the *Mazars* decision no longer applies, *id.* at 2031.  And they do not meaningfully dispute that the four factors the Supreme Court identified in *Mazars* stemmed from separation-of-powers concerns specific to incumbents.  That is, they do not dispute that seeking the personal information of an ex-President is a less "significant step" than seeking

information from the incumbent under the first *Mazars* factor. *Id.* at 2035. And they concede (Pls. Opp. 9) that "a subpoena to a former President will rarely impose direct 'burdens on the President's time and attention'" under the fourth *Mazars* factor.

Nor do Plaintiffs dispute that ex-Presidents have a vastly weaker claim to separation-of-powers protections than incumbents. The Supreme Court recognized as much in *Nixon v. GSA*, 433 U.S. at 430, where the Court upheld a statute providing for the seizure and eventual public disclosure of former President Nixon's Presidential records. Courts confronting separation-of-powers claims ask whether the challenged act "prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443. Congressional acts involving former Presidents, who no longer control the Executive Branch and have returned to private life, obviously pose far less risk of interfering with Executive functions than acts directed to incumbent Presidents.

Finally, Plaintiffs do not even address the Executive Branch's own analysis, which underscores that former Presidents have a weaker claim than incumbents to separation-of-powers protections. In concluding that ex-Presidents can be indicted and criminally prosecuted, the Office of Legal Counsel (OLC) of the Department of Justice (DOJ) has conceded that some actions that would, in its view, violate the separation of powers as to an incumbent President are permissible as to an ex-President. *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 255 (2000) (incumbent Presidents are immune from prosecution, but this immunity "would not preclude such prosecution once the President's term is over"); *Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) (similar).

Plaintiffs nonetheless maintain that the *Mazars* test should continue to govern this case even though it was designed for incumbent Presidents. Their attempts to fit a square peg into a round hole can be readily rejected.

3

*First*, Plaintiffs argue (Pls. Opp. 1) that the *Mazars* test applies because it is "the only recognized test" addressing the separation-of-powers concerns implicated by the Committee's subpoena. But that contention is incorrect. The Court in *Mazars* did not address how the separation-of-powers analysis would apply to a former President. When the Supreme Court considered a separation-of-powers claim brought by a former President in *Nixon v. GSA*, it resolved that claim by balancing the interests at stake and concluding that Congress's interests outweighed any intrusion into Executive Branch functioning. *See* 433 U.S. at 443. This Court should do the same. Plaintiffs' contrary argument would yield the startling result that the same separation-of-powers test that governs Congressional subpoenas for an incumbent President's information would also govern such subpoenas for *any* former President's information—even if the ex-President passed away long ago or left office decades earlier.

*Second*, Plaintiffs assert (Pls. Opp. 3) that the "question before this Court is whether the Mazars subpoena was valid in 2019—the time when the subpoena was both issued and objected to." This argument misrepresents the nature of Plaintiffs' own suit and the governing legal principles.

This is a suit for prospective rather than retrospective relief. The "purpose of prospective relief is to affect the future rather than remedy the past." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 293 (1994) (Scalia, J., concurring). Accordingly, in evaluating requests for prospective relief, courts consider all developments up to "the very moment at which [relief] is ordered" without fear of "retroactivity." *Id.*; *see also Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201 (1921). "Obviously, [injunctive] relief operates only in futuro, and the right to it must be determined as of the time of the hearing." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464 (1921).

This principle explains why the en banc D.C. Circuit considered the then-current factual situation in a suit like this one involving enforcement of a Congressional subpoena. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974). Plaintiffs

relegate (Pls. Opp. 6 n.2) their discussion of *Senate Select Committee* to a footnote and call it a

"peculiar" case, even though they rely on it heavily (Pls. Opp. 11-12) when it suits them.  They seem

to suggest that courts should consider current facts that *weaken* Congress's claim to subpoenaed

material, but not current facts that *strengthen* that claim.  Apart from being illogical, this argument

contradicts Plaintiffs' principal theory (Pls. Opp. 3) that courts must consider whether a subpoena

was valid "when the subpoena was both issued and objected to."  Had the D.C. Circuit in *Senate*

*Select Committee* followed Plaintiffs' approach, the Court could not have resolved the case as it did by

considering factual developments that occurred after the subpoena was challenged in court.

     *Senate Select Committee* is not an anomaly.  Courts in equity routinely take the common-sense

step of considering current relevant facts in deciding whether to award prospective relief.[1]  Indeed,

even after entry of final judgment, a court can modify an injunction if a change "in factual

conditions" warrants the modification.  *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *see also* Fed. R.

Civ. P. 60(b)(5) (courts may modify a judgment on the ground that applying the judgment

"prospectively is no longer equitable").  This rule "is based on the historic power of a court of equity

to modify its decree in the light of changed circumstances," to ensure that prospective relief remains

appropriate.  11 Fed. Prac. & Proc. § 2863 (3d ed.).

---

[1] *See, e.g.*, *Tory v. Cochran*, 544 U.S. 734, 737-38 (2005) (taking account of current facts in suit involving prospective relief); *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 470-71 (2d Cir. 2014) (explaining in labor-dispute case that "the facts that would otherwise counsel in favor of an injunction had changed"); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 445 (2d Cir. 1945) (L. Hand, J.) (noting in a suit involving prospective relief that "the judgment in this action should speak from the time of its entry"); *see also* Stuart Minor Benjamin, *Stepping into the Same River Twice: Rapidly Changing Facts and the Appellate Process*, 78 Tex. L. Rev. 269, 276, 325 (1999) (noting that whether courts should consider current facts generally turns on the "distinction between retrospective and prospective relief" and that an "opinion with prospective effect based solely on outdated facts seems to confound our notion of what judicial opinions are").  For this reason, appellate courts frequently remand for consideration of whether injunctive relief is appropriate where there is "some discrepancy between the facts as found and the facts at the time the appellate court takes up the question."  *Ashcroft v. ACLU*, 542 U.S. 656, 672 (2004).

Plaintiffs in this case seek prospective relief. *See* Compl. at 13-14 (seeking a declaratory judgment, a preliminary injunction, and a permanent injunction). If they prevail, a judgment in their favor would operate entirely "in futuro," *Am. Steel*, 257 U.S. at 201, by barring Mazars from future compliance with the subpoena. Likewise, if their suit fails, a judgment denying relief would operate prospectively by requiring Mazars to comply with the subpoena in the future. Either way, Mazars will face no consequences for declining to comply with a subpoena whose return date has been stayed. And this is true—contrary to Plaintiffs' suggestion (Pls. Opp. 2)—regardless of which procedural House Rule the Committee used to reissue the subpoena. Plaintiffs provide no reason why this Court, in exercising its equitable authority to award prospective relief, should ignore that the Trump Presidency has ended by applying a test designed for circumstances that no longer exist.

*Third*, rather than grappling with this basic prospective-relief rule, Plaintiffs posit (Pls. Opp. 3) that "[t]he law governing congressional subpoenas states a different rule." They then discuss (Pls. Opp. 3-6) cases involving criminal prosecutions of witnesses for obstructing Congressional inquiries.

For the reasons explained in our principal brief (Cross-MSJ 29-31), these cases have no bearing here. Unlike civil cases involving prospective relief, criminal prosecutions seek to impose punishment for past acts. In such cases, defendants have a due process right to be informed of "the standard of criminality before the commission of the alleged offense." *Watkins v. United States*, 354 U.S. 178, 208 (1957). The defendant must be informed of what is prohibited before deciding "at his peril" whether to refuse to cooperate with Congress. *Id.* Thus, whether criminal punishment should be imposed turns on the facts that existed at the time of the witness's refusal. *See* Benjamin, *supra*, at 276 (changed facts are not relevant in "backward looking" cases that "focus on a set of historical events and ask whether, at the time they occurred, the parties took reasonable actions").

Unlike in criminal cases, no one in this case faces liability for a past act or has been forced to decide at their "peril" whether to comply with the subpoena. Plaintiffs try to obscure this point (Pls.

Opp. 4) by conflating prospective and retrospective relief—noting that "Congress has several ways to coerce compliance with its subpoenas, including [1] criminal prosecution, [2] civil litigation, and [3] even congressional imprisonment."  But while the first and third mechanisms on that list involve the imposition of consequences for past acts, the second—civil litigation seeking equitable relief to compel (or enjoin) compliance with a subpoena—does not.  That is the mechanism at issue here.

Plaintiffs dismiss (Pls. Opp. 4) the distinctions between criminal cases and civil enforcement litigation as "immaterial details."  The Supreme Court disagrees.  In *Watkins*, the Court justified its holding by explicit reference to the obligation to give witnesses "every right which is *guaranteed to defendants in all other criminal cases*."  354 U.S. at 208 (emphasis added).  That was not an isolated statement.  *See id.* at 209 (information "must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of *any element of a criminal offense*") (emphasis added); *id.* (the "'vice of vagueness' must be avoided here *as in all other crimes*") (emphasis added); *Gojack v. United States*, 384 U.S. 702, 707 (1966) ("[i]t is clear as a matter of law that *the usual standards of the criminal law must be observed*") (emphasis added).  Nothing about these criminal cases suggests that this Court is forbidden from recognizing changed factual circumstances in the context of a civil suit for prospective relief.

*Fourth*, just as Plaintiffs are wrong that this Court must disregard the current facts in deciding which legal test to apply, they are also wrong that this Court must disregard the Maloney Memorandum in deciding whether the applicable legal test has been satisfied.  Both errors stem from the same basic failure to grapple with the nature of prospective relief.

Plaintiffs again rely on criminal cases (Pls. Opp. 3-5) in urging this Court not to consider the Maloney Memorandum, but those cases are irrelevant for the reasons already explained.  In prosecuting a witness for a past act, it is "obvious" that criminal liability may not be imposed based on a "retroactive rationalization."  *Watkins*, 354 U.S. at 204, 208.  What matters is what the witness

knew "as of the time of his refusal." *Gojack*, 384 U.S. at 715 n.12; *see United States v. Rumely*, 345 U.S. 41, 48 (1953) (same). By contrast, where the question is prospective enforcement of a subpoena, it makes no sense to refuse to consider new descriptions of legislative need. That is why the D.C. Circuit in *Senate Select Committee* considered the committee's "supplemental memorandum" explaining its "present sense of need for the materials subpoenaed" in deciding whether to enforce the subpoena. 498 F.2d at 732. Just as the D.C. Circuit considered the committee's memorandum in *Senate Select Committee*, this Court can—indeed must—consider the Maloney Memorandum here.

Nor are Plaintiffs correct (Pls. Opp. 6) that *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963), prohibits Congress from "ratify[ing] a subpoena that was invalid when it was issued." *Shelton* is another criminal case. It involved a subpoena issued in violation of a subcommittee charter, which required the full subcommittee (rather than its counsel) to issue subpoenas. The Court held that subcommittee members did not ratify the subpoena when they later showed up at the hearing to ask the witness questions, noting that the witness "*had a right under the Subcommittee charter*" to have the subcommittee decide to subpoena him before it issued the subpoena. *Id.* at 607 (emphasis added). *Shelton* thus held that the witness could not be prosecuted for refusing to answer questions at a hearing to which he had been improperly summoned in the first place. This holding turned on principles of criminal law and provisions of the subcommittee's charter that do not govern here.

Even assuming this Court were limited to considering the Committee's rationale at the time the subpoena was issued, this Court could still consider the Maloney Memorandum. The Memorandum does not, as Plaintiffs claim (Pls. Opp. 3), provide a "retroactive rationalization" for the subpoena. Instead, it responds to the Supreme Court's admonition that "[t]he more detailed and substantial the evidence of Congress's legislative purpose, the better." *Mazars III*, 140 S. Ct. at 2036. The Maloney Memorandum reasonably provided the type of additional detail that the Supreme Court requested, to describe the rationale that had supported the subpoena from the outset.

Moreover, Committee Chairwoman Carolyn Maloney issued the Memorandum several months *before* she reissued the subpoena at the start of the 117th Congress. *See* SOMF ¶ 50. Plaintiffs do not address this fact, presumably because it underscores the rigid formalism of their proposed rule. After all, the Committee could rescind the subpoena tomorrow, then invoke the Maloney Memorandum in issuing an identical new subpoena to Mazars. If Plaintiffs again sued to prevent compliance with this subpoena, there is no question that this Court would consider the Memorandum in deciding whether to grant Plaintiffs' request for the same prospective relief they seek here. Plaintiffs provide no reason why this Court should have to engage in the inefficient process of adjudicating an entirely new suit in order to take into account the Maloney Memorandum.

In any event, the record even as it existed in 2019 would justify the subpoena. While Plaintiffs argue (Pls. Opp. 3) that the subpoena was "supported only by the Cummings memo" in 2019, that ignores the ample other evidence of the Committee's legislative purposes, such as its oversight plan, its hearings on legislation, and then-Chairman Elijah Cummings's correspondence with Mazars and GSA, all of which identify the subpoena's purposes. *See* Cross-MSJ 5-9.

### B. Plaintiffs' Arguments Against A Separation-Of-Powers Balancing Test Fail

Plaintiffs insist (Pls. Opp. 6) that there is "no grounding in law, history, or logic" for this Court to apply a balancing test that accounts for the separation-of-powers concerns of an ex-President. But, as already explained, the Supreme Court long ago established that constitutional balancing is the proper approach when a case implicates competing Congressional and Executive Branch interests. *See Nixon v. GSA*, 433 U.S. at 443. Far from being "cut from whole cloth" (Pls. Opp. 6), the Committee's test is taken directly from applicable Supreme Court precedent.

Plaintiffs fault the Committee for relying too heavily on *Nixon v. GSA*, which they try to brush aside (Pls. Opp. 7) on the ground that it involved a "federal *statute*" that "did not pit Congress against the former President" and instead provided for custody of the ex-President's records in the

9

Executive Branch.  But *Nixon v. GSA* rejected the distinctions Plaintiffs now attempt to draw: Neither the fact that former President Nixon challenged a statute nor the fact that the statute vested "control over the materials … in the Executive Branch" was dispositive of the former President's separation-of-powers claim.  433 U.S. at 441.  To the contrary, the Supreme Court reaffirmed a "pragmatic, flexible approach" to the separation of powers that stressed that "the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."  *Id.* at 442-43 (citing *United States v. Nixon*, 418 U.S. 683, 711-12 (1974)).  Because the challenged statute did not "unduly disrupt[]" Executive Branch functions, the Court rejected former President Nixon's separation-of-powers challenge.  *Id.* at 445.  Put bluntly, Supreme Court precedent is Supreme Court precedent, and Plaintiffs cite no decision overriding the Court's approach in *Nixon v. GSA* to resolve a separation-of-powers claim by an ex-President.

In other cases, too, the Supreme Court endorsed constitutional balancing in separation-of-powers disputes.  In *United States v. Nixon*, for example, the Supreme Court emphasized that courts in separation-of-powers cases should seek a "constitutional balance of 'a workable government.'" 418 U.S. at 707 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)); *see also Clinton v. Jones*, 520 U.S. 681, 702-03 (1997) (balancing Judicial and Executive Branch interests and explaining that "[t]he fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution").  As the Supreme Court instructed almost four decades ago, it is "established" in separation-of-powers cases that courts "must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch."  *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982).  Indeed, the *Mazars* test itself is a balancing test, albeit one directed to the specific circumstances of incumbent Presidents.  And OLC has affirmed that the "balancing analysis" for separation-of-

powers claims has "been adopted as the appropriate mode of analysis by the Court." *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 244. That is precisely the analysis this Court should apply here.

Plaintiffs incorrectly contend (Pls. Op. 7) that "[t]he Committee's balancing test has no basis in history." To the contrary, the Supreme Court traced its balancing test in *Nixon v. GSA* to the "approach of Madison in the Federalist[] Papers and later of Mr. Justice Story." 433 U.S. at 442 (citing The Federalist No. 47 (Madison) and 1 J. Story, *Commentaries on the Constitution* § 525 (M. Bigelow, 5th ed. 1905)). And Plaintiffs further err in urging this Court to ignore Framer George Mason's view that an ex-President returns "to the general mass of the people … where he must participate [in] their burdens," 3 Elliot's Debates 485 (2d ed. 1836), on the theory that Mason's statement was "a criticism of the Constitution." Pls. Opp. 7 (emphasis omitted). Mason was criticizing the Constitution's failure to provide *term limits*, and that debate did not raise any doubt that a President voted out of office is "reduced to a private station." 3 Elliot's Debates 485.[2]

Plaintiffs emphasize (Pls. Opp. 7) that President Theodore Roosevelt was testifying voluntarily when he recognized that "an ex-President is merely a citizen of the United States." *Hearings Before the H. Comm. on Investigation of United States Steel Corporation*, 62d Cong. 1392 (1911). But the salient point is that he had a good reason for cooperating with the investigation—that is, former Presidents have a "plain duty to try to help this committee or respond to its invitation." *Id.*

Plaintiffs do not dispute that House committees issued subpoenas to former Presidents John Tyler and John Quincy Adams. *See* H. Rep. No. 29-686, at 22-23 (1846); *see also* 1 *The Diary of James*

---

[2] The Supreme Court has relied on similar statements by Mason and other anti-federalists in interpreting the Constitution. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 108 (1824) (relying on Mason's criticisms of the Constitution as evidence of its meaning); *see also* Hon. Andrew S. Oldham, *The Anti-Federalists: Past As Prologue*, 12 N.Y.U. J.L. & Liberty 451, 457 (2019) ("the Anti-Federalists framed the debate about the meaning of the Constitution's provisions—including Article II").

*K. Polk During His Presidency* 430-31 (M. Quaife ed., 1910) (ex-President Tyler "informed me that he had come to Washington in obedience to a summons of a committee of Congress").  Plaintiffs instead rely (Pls. Opp. 8) on an agreement with *then-incumbent* President Polk to keep confidential specific matters "connected with the foreign relations of the country," H. Rep. No. 29-684, at 4 (1846), in an unpersuasive attempt to suggest that the *former* Presidents' testimony was voluntary.

The only relevant historical evidence that Plaintiffs muster (Pls. Opp. 8) is former President Truman's refusal to comply with a House subpoena.  But this example offers Plaintiffs scant support, because the committee there "never pressed for Truman's appearance" and, after receiving the subpoena, former President Truman described "on national television and radio" the events that the committee was investigating, thus making public the information the committee had sought. Ronald D. Rotunda, *Presidents and Ex-Presidents As Witnesses*, 1975 U. Ill. L.F. 1, 8-9 (1975).

Plaintiffs erroneously suggest (Pls. Opp. 7) that the Committee is estopped from proposing any balancing test here because the Supreme Court agreed with the Committee that the "demanding standards" applicable to executive privilege claims do not apply "to cases involving nonprivileged, private information." *Mazars III*, 140 S. Ct. at 2032-33.  But the Committee is not proposing the same "demanding" executive privilege balancing test that the Supreme Court rejected.  If anything, the Supreme Court's decision to tailor its balancing test to the facts of the case—involving only personal, non-privileged information—shows that the balancing test in *Mazars* should not apply to an ex-President who does not have the same interests as an incumbent President.

Plaintiffs further argue (Pls. Op. 8) that there is no way to properly measure the Committee's interests here against the intrusion on the Executive Branch.  But courts are well-suited to determine whether a subpoena unduly impinges on the President's "conduct of office" or prevents the Executive Branch from "accomplishing its constitutionally assigned functions." *Nixon v. GSA*, 433 U.S. at 443, 448; *see* Cross-MSJ 26-28.  Indeed, the Supreme Court has long balanced the branches'

needs, as it did in *Mazars*, *Nixon v. GSA*, *United States v. Nixon*, and *Clinton v. Jones*.  *See also Senate Select Comm.*, 498 F.2d at 730-31.  It is thus difficult to understand why Plaintiffs believe that balancing the branches' interests is the same as "judging whether a particular line is longer than a particular rock is heavy."  Pls. Opp. 8 (citation omitted).  The concurring opinions Plaintiffs cite for this odd argument—involving abortion rights and the Commerce Clause—are easily distinguished from the separation-of-powers interests at issue here.  *See June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2136 (2020) (Roberts, C.J., concurring in the judgment); *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 895-96 (1988) (Scalia, J., concurring in the judgment).  Indeed, although the Chief Justice found "no meaningful way to compare" the "imponderable values" at issue in *June Medical*, 140 S. Ct. at 2136, he raised no such concern about balancing the interests in his majority opinion in this case.

Finally, Plaintiffs incorrectly insist (Pls. Opp. 8) that "the Committee gives the presidential side of the balance a fixed weight of zero."  The former President's side of the balance is neither fixed nor zero—but it is particularly weak in this case.  The Committee's subpoena seeks only the ex-President's *personal* papers—it does not involve official records or any claim of executive privilege.  *See Mazars III*, 140 S. Ct. at 2032.  The burden on the current President is much lower when only a former President's personal papers are at issue, since such a subpoena poses a very limited risk to the current President's discharge of his duties.  And even Plaintiffs recognize (Pls. Opp. 9) that "a subpoena to a former President will rarely impose direct 'burdens on the President's time and attention.'"  The fact that this subpoena for former President Trump's personal information does not interfere with the incumbent President's performance of his official duties does not call the balancing test into question.  It only means that former President Trump should not prevail.

13

II.    **The Separation-Of-Powers Balancing Test For A Former President Weighs Strongly In The Committee's Favor**

Whether this Court applies the *Mazars* test or balances the separation of powers under the *Nixon v. GSA* analysis, the result in this case is the same.  The Committee's legislative need for the subpoenaed information far outweighs any limited intrusion on the Presidency.

A.    **Plaintiffs' Arguments Against The Committee's Need Fail**

As we explained in our principal brief (Cross-MSJ 21-26), the Committee is considering reforms to existing conflicts-of-interest laws to address weaknesses in the current regime exposed by President Trump's term in office.  Chief among the Committee's goals is ensuring that a President does not carry out his duties under financial conflicts of interest that allow him to engage in public policy for private gain.[3]  None of Plaintiffs' arguments raises any doubt about the Committee's pressing need for the subpoenaed information for all three tracks of its investigation.

Plaintiffs erroneously argue (Pls. Opp. 10) that the Committee no longer needs the subpoenaed information because—in Plaintiffs' view—the Committee's need evaporated when President Trump left office.  But as Chairwoman Maloney has made clear, the Committee has an ongoing, pressing need for this information "to inform consideration of landmark ethics reform and other remedial legislation."  Tatelman Decl., Ex. L, at 3.  The Committee's goal is "to prevent problems raised by the circumstances of [President Trump] from being repeated."  *Id.* (quoting Maloney Mem.) (alteration in original).  That the Committee urgently needed the information while

---

[3] These same purposes animated the Emoluments Clauses.  The Framers feared that "republics … afford[ed] too easy an inlet to foreign corruption," The Federalist No. 22, at 109 (Hamilton) (Carey & McClellan eds., 2001), and that the President "would not possess … that permanent stake in the public interest which would place him out of the reach of foreign corruption," 1 *The Records of the Federal Convention of 1787* 138 (Max Farrand ed., 1911) (statement of James Madison).  They accordingly "restrained [the President] from receiving any present or emolument whatever" as a "guard … against corruption."  3 Elliot's Debates 486 (statement of Edmund Randolph).

President Trump was in office does not undermine its current need:  The Committee has not

obtained the information necessary to its investigation, Congress has not yet passed remedial

legislation, and no such legislation has been signed by the President.

Plaintiffs complain that the Committee's need is focused on "*future* Presidents."  Pls. Opp.

10 (quoting Cross-MSJ 21).  Plaintiffs then astonishingly assert (Pls. Opp. 10) that such "legislation

is not pressing until 2024 at the earliest."  Congress obviously need not wait for conflicts-of-interest

problems to reappear before it investigates them and, armed with the relevant information, legislates

appropriately to minimize the likelihood of future problems.  It is surely not the role of the federal

courts to tell Congress that it is investigating a serious problem too early.

Plaintiffs contend (Pls. Opp. 11) that the Committee does not need former President

Trump's information to legislate on Presidential financial disclosures because "[t]he whole point of

these laws is that the information to be disclosed is *not known* in advance."  On this theory, Congress

evidently would not need *any* information to legislate in this area.  The Supreme Court disagrees:  It

explained that "[w]ithout information, Congress would be shooting in the dark, unable to legislate

'wisely or effectively.'"  *Mazars III*, 140 S. Ct. at 2031 (quoting *McGrain v. Daugherty*, 273 U.S. 135,

175 (1927)).  The D.C. Circuit also disagrees:  It held that former President Trump's "financial

records from [2014 through 2018] are *highly relevant* to the Committee's inquiry into whether

Candidate and [then] President Trump accurately reported his finances to federal entities, and, by

extension, whether reforms are necessary to address deficiencies with current laws, rules, and

regulations."  *Trump v. Mazars USA, LLP* (*Mazars II*), 940 F.3d 710, 740 (2019) (cleaned up)

(emphasis added).  And "[w]hether current financial disclosure laws are successfully eliciting *the right*

*information* from the sitting President, occupant of the highest elected office in the land, is

undoubtedly a matter of concern to the United States."  *Id.* at 730 (quotation marks omitted)

(emphasis added).  Plaintiffs' assertion (Pls. Opp. 11) about the "basic truths" of the legislative

process ignores that, in making judgments about whether to impose a disclosure requirement,

Congress needs to know what kind of information such a disclosure requirement would encompass.

While the specific information that a particular President will disclose may not be known in

advance, the Committee is investigating what *types* of "additional information Congress should

require presidents and presidential candidates to disclose," Tatelman Decl., Ex. F, at 13 (hereinafter

Maloney Mem.), to guard against the conflicts of interests that plagued the Trump Presidency and

possibly damaged the interests of the United States.  Plaintiffs' insistence (Pls. Opp. 11) that the

Committee does not need former President Trump's information because Congress has previously

legislated on Presidential disclosures ignores the fact that President Trump's unprecedented financial

decisions exposed the weaknesses in those laws that the Committee now seeks to address.

Given President Trump's refusal to take the types of measures adopted by so many other

Presidents and high-level federal officials to protect against self-dealing by those in offices of public

trust, it is no surprise that Plaintiffs in this litigation continue to assert that the Committee should

not address the need for more effective statutory disclosure requirements.  And the fact that

Plaintiffs have argued against the constitutionality of such requirements is all the more reason why

Congress must have all of the relevant background information so that it can legislate wisely and

consistently with any applicable constitutional constraints.  No less than the federal courts, Members

of Congress must take into account whether legislation is consistent with the Constitution.  *See*

*Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) ("The Congress is a coequal branch of government whose

Members take the same oath we do to uphold the Constitution of the United States.").

Plaintiffs do not dispute (Pls. Opp. 11-12) that understanding whether discrepancies in

former President Trump's financial disclosures were "simply a mistake" or "intentional inaccuracies"

is important for the Committee's investigation.  *See* Maloney Mem. 45.  Plaintiffs even agree (Pls.

Opp. 12) that the Mazars documents "might reveal the existence of mistakes."  But they argue that

the Committee does not need the Mazars documents because—in Plaintiffs' view (Pls. Opp. 12)—
the documents cannot show why mistakes were made, which would "require an interview,
deposition, or interrogatory." This argument is wrong on every level. The Mazars documents,
which include not only the financial statements but also the underlying source documents and
related "memoranda, notes, and communications," SOMF ¶ 25, are likely to shed significant light on
the reasons for the discrepancies in former President Trump's financial disclosures. And even if the
Committee were to follow up to obtain more information about the financial disclosures, it would
need the Mazars documents to know what questions to ask. Plaintiffs cannot insist that the
Committee skip a critical step in its investigation because it might need more information later.

Plaintiffs argue (Pls. Opp. 12-13) that former President Trump's information is "barely
relevant" and suggest that the Committee should "demand a much larger sample" and talk with
"experts in the field." The Committee has already spoken to experts in the field, including the
former Director of the Office of Government Ethics, who testified that former President Trump's
"'refusal to divest his conflicting financial interests' has been the 'trigger' for an 'ethics crisis.'"
Maloney Mem. 38 (quoting Committee on Oversight and Reform, *Hearing on H.R. 1: Strengthening
Ethics Rules for the Executive Branch* (Feb. 6, 2019)). From the outset, the Committee's investigation
has recognized the need for former President Trump's information because other Presidents did not
create the same strain on existing conflicts-of-interest laws. Plaintiffs' further suggestion (Pls. Opp.
13) that the Committee "should be *speaking* to former Presidents" is hard to take seriously, given that
former President Trump has never offered to discuss his financial disclosures with the Committee.

There is similarly no merit to Plaintiffs' argument (Pls. Opp. 13-14) that the Committee no
longer needs the documents because it has already identified the gaps in existing law and passed
H.R. 1. During the 116th Congress, the House had passed H.R. 1 before the D.C. Circuit
considered this case, but the D.C. Circuit rejected the arguments that Plaintiffs reprise here. As the

D.C. Circuit explained, the House has "put its legislation where its mouth is" by passing H.R. 1 and by considering other bills "pertaining to the information sought in the subpoenas." *Mazars II*, 940 F.3d at 729, 731.  The Court recognized that the House had passed H.R. 1 without the benefit of the Mazars documents, but noted that "[i]nformation revealed by the subpoena could inform the Senate as it considers the bill, as well as any subsequent conference committee or the House itself, should it reconsider the bill post-conference." *Id.* at 731-32.  The fact that the *Senate* has not issued a subpoena to Mazars (Pls. Opp. 14) has no bearing on whether the *House* needs the information for its legislative purposes, which may include persuading Senators to vote for the bill or other legislation containing similar provisions.  Plaintiffs cannot be right that the House's need for material turns on whether the Senate has sought the same material.

Plaintiffs mischaracterize (Pls. Opp. 11) the D.C. Circuit's opinion as foreclosing the Committee from relying on any legislative interest other than Presidential financial disclosures.  The D.C. Circuit did hold that Congress could constitutionally enact "laws requiring Presidents to publicly disclose certain financial information.  And that is enough." *Mazars II*, 940 F.3d at 737.  But the D.C. Circuit also stressed that there were "other potentially fertile grounds from which constitutional legislation could flower." *Id.*  The Court thus did not hold that the Committee's investigation into GSA's management of the Trump lease or Presidential emoluments could not lead to constitutional legislation.

Having erroneously argued that the Committee can only rely on the financial disclosure track of the investigation, Plaintiffs offer no response to the Committee's arguments that it requires the subpoenaed information to advance the GSA and emoluments tracks.  *See* Cross-MSJ 23-26.  The Court should accept those unrebutted arguments, which are well-documented in our filings.

Plaintiffs confusingly suggest (Pls. Opp. 14) that the Committee should obtain the information it needs from the new Administration.  The Committee seeks financial information

from former President Trump's longtime accountant.  The vast majority of that information is not in the possession of the Executive Branch, and there is thus no possibility that "the new House and new executive branch" (Pls. Opp. 14) could resolve this case.  To the extent GSA has relevant financial documents, it has thus far not provided those documents to the Committee, and, regardless, they would constitute only a subset of the subpoenaed information.  *See* Cross-MSJ 9.

Plaintiffs rely on GSA's separate document production to a subcommittee of a different House Committee.  But Plaintiffs are wrong to assert (Pls. Opp. 14) that the Committee has simply "fail[ed] to ask GSA."  The Committee is continuing to press for material from GSA, which has not to date provided relevant financial documents.  *See* SOMF ¶ 21.

### B.    Plaintiffs Have Not Demonstrated A Risk To The Separation Of Powers

Plaintiffs have essentially no argument that the Committee's subpoena poses an unconstitutional burden on the Office of the President.  That is because this subpoena for ex-President Trump's personal information does not impermissibly burden the incumbent President's "conduct of office."  *Nixon v. GSA*, 433 U.S. at 448.

Instead of articulating any actual burden on the Presidency imposed by the subpoena, Plaintiffs criticize (Pls. Opp. 15-17) the Committee for failing to seek accommodation directly with former President Trump.  Although this litigation has been proceeding for more than two years, former President Trump has never indicated any willingness to turn over, or allow Mazars to turn over, a single financial document—or even proposed terms upon which such documents could ever be produced—breaking with more than two centuries of Presidential cooperation with Congressional investigations.  *Cf. Comm. on Judiciary v. McGahn*, 968 F.3d 755, 777 (D.C. Cir. 2020) (en banc) (President Trump's "apparently unprecedented categorical direction" not to cooperate in a House investigation breaks "a long tradition of Presidential cooperation with the Legislative Branch exercising its constitutional responsibilities").  Indeed, all such attempts at obtaining information

directly from Plaintiffs failed while President Trump was in office.  *See, e.g.*, Maloney Mem. 7-9, 27-29.  After resisting all efforts by the Committee to obtain the Mazars documents, Plaintiffs now fault (Pls. Opp. 16) the Committee for failing to ask them directly for the documents that they refuse to allow Mazars to produce.  "Some people might call that *chutzpah*."  *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 766 (2011) (Kagan, J., dissenting).

Plaintiffs point to (Pls. Opp. 17) the negotiation process in the *Deutsche Bank* litigation and assert that "[n]othing prevents similar compromises here."  But similar compromises cannot be had without a willingness on the part of *both parties* to negotiate.  The Committee has always been open to considering any proposal from Plaintiffs identifying which of the subpoenaed material they are willing to allow Mazars to produce.  But, in sharp contrast to their approach in the *Deutsche Bank* litigation, Plaintiffs have never offered to compromise concerning the Mazars materials, nor given any indication that negotiations could be fruitful.  They cannot now use the illusory prospect of accommodations to prevent the Committee from obtaining documents to which it is entitled.

In addition to faulting the Committee for failing to pursue an accommodation that Plaintiffs have resisted at every turn, Plaintiffs also rely extensively (Pls. Opp. 15, 18-19) on an amicus brief that DOJ filed when President Trump was still in office.  That brief addressed the application of the *Mazars* test to a subpoena for then-sitting President Trump's information—which is nothing like the incumbent President supporting former President Trump's separation-of-powers claims.  Although Plaintiffs cite the brief as if it reflected DOJ's current view, DOJ has tellingly not filed any brief in this Court supporting ex-President Trump's current arguments, nor has it supported his theory about the proper test to apply where a Congressional subpoena seeks an ex-President's information.

Plaintiffs repeat their theory (Pls. Opp. 17-18) that Congressional subpoenas for a former President's information might affect the incumbent President's relationship with Congress.  But Plaintiffs do not dispute that there are limitations on Congressional subpoenas—previously

identified by the Committee (Cross-MSJ 27, 40-41)—that assuage these concerns.  The theory that Congress could nonetheless unduly pressure an incumbent President through the threat of a subpoena for his personal information after he leaves office is extremely attenuated.  Indeed, Congress has subpoenaed former Presidents' information on occasions dating back to John Quincy Adams without any evident damage to the separation of powers.  Plaintiffs' inability to produce evidence from the intervening nearly two centuries that any President's relationship with Congress has been affected by this history underscores the farfetched nature of Plaintiffs' purported concerns.

Plaintiffs point to (Pls. Opp. 18) the Committee's decision to pursue its subpoena for ex-President Trump's information as evidence that their separation-of-powers concerns are not remote.  But the Committee's legislative purposes and the evidentiary record here refute any suggestion that "[i]t will be open season on a former President's information."  Pls. Opp. 17 (quotation marks omitted).  Plaintiffs' speculation about other information Congress might seek from a former President has little force because—unlike the academic and medical records that Plaintiffs invoke (Pls. Opp. 17)—Presidential financial disclosures have traditionally been regulated by Congress.  *See* Cross-MSJ 41.  And even if Plaintiffs' hypothetical concerns about future subpoenas someday come to pass, courts could address those subpoenas by applying the *Mazars* test for a sitting President's information or by applying the appropriate balancing test for an ex-President's information.

## III.   Plaintiffs' Rehashed Arguments Remain Unconvincing

This Court and the D.C. Circuit rejected Plaintiffs' arguments about: (1) the subpoena's supposed law enforcement purpose; (2) the alleged unconstitutionality of all legislation the subpoena might inform; and (3) the subpoena's purported overbreadth.  Plaintiffs concede (Pls. Opp. 19) that the Supreme Court neither addressed nor accepted those arguments.  But Plaintiffs nonetheless assert (Pls. Opp. 19) that, because it vacated the decision below, the Supreme Court "expected" those arguments "to be important focal points of litigation on remand."

Plaintiffs overread the Supreme Court's vacatur.  The D.C. Circuit has explained that where "the Supreme Court vacated [a] prior opinion" but "expressed no opinion on the merit" of the holding, lower courts should continue to adhere to that holding "in the absence of contrary authority."  *Broudy v. Mather*, 460 F.3d 106, 120 & n.8 (D.C. Cir. 2006) (quotation marks omitted).  Nothing about the Supreme Court's decision in *Mazars* calls into question this Court's and the D.C. Circuit's rejection of Plaintiffs' arguments on any of these three questions.

### A.   The Subpoena Is Not Invalid As Prohibited Legislative Law Enforcement Or Exposure For The Sake Of Exposure

The Court need not, as Plaintiffs urge (Pls. Opp. 20), "revisit whether the Mazars subpoena pursues law enforcement or exposure for the sake of exposure."  Plaintiffs identify nothing in the Supreme Court's opinion that calls into doubt this Court's and the D.C. Circuit's rejection of this argument.  *See Trump v. Comm. on Oversight & Reform of U.S. House of Representatives (Mazars I)*, 380 F. Supp. 3d 76, 97 (D.D.C. 2019); *Mazars II*, 940 F.3d at 728.  Indeed, nothing in the Supreme Court's opinion invited any inquiry into Congress's law enforcement purposes at all.

Rather than identifying anything new in the Supreme Court's opinion, Plaintiffs repeat the same basic arguments that this Court and the D.C. Circuit already rejected.  Plaintiffs wrongly suggest (Pls. Opp. 20) that the Committee now agrees that the Court should determine whether legislation is the subpoena's "'gravamen'" or "'primary purpose.'"  We have repeatedly explained that Plaintiffs' arguments for such a test misstate Supreme Court precedent, which asks whether Congress's "legislative purpose is being served" rather than searching for legislators' hidden motivations.  *Watkins*, 354 U.S. at 200.  Thus, contrary to Plaintiffs' argument, it is "not for the courts to speculate as to the motivations that may have prompted the decision of individual committee members."  *Mazars II*, 940 F.3d at 725 (quoting *Wilkinson v. United States*, 365 U.S. 399, 412 (1961) (alterations omitted)).  "In times of political passion, dishonest or vindictive motives are

readily attributed to legislative conduct and as readily believed," but "*[c]ourts are not the place for such controversies*." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) (emphasis added).[4]

This Court therefore should not consider Plaintiffs' new "evidence" (Pls. Opp. 20), which consists of social-media posts and out-of-context statements by individual Representatives, and which sheds no light on the Committee's legislative purposes.  Similarly, that "[t]he New York District Attorney … photocopied the Mazars subpoena" (Pls. Opp. 20)—apparently to reduce the burden on recipients, *see* Vance Br. in Opp. at 5 n.2, *Trump v. Vance*, 140 S. Ct. 659 (Nov. 21, 2019) (No. 19-635)—cannot possibly bear on the Committee's purposes in issuing the subpoena.  Nor is an OLC opinion regarding a different committee's requests for different information (Pls. Opp. 20) evidence of anything in this case.  Finally, the suggestion (Pls. Opp. 20) that the House passed H.R. 1 "without a hint of concern about Plaintiffs' documents," misses the fundamental point that the Maloney Memorandum and the reissued subpoena are an expression of that very concern.

## B.      The Subpoena Is Relevant To Legislation That May Be Had

Plaintiffs exhume the bulk of their argument (Pls. Opp. 21-22) that all regulation of Presidential ethics is unconstitutional.  Everything about their argument is wrong.

Not surprisingly, Plaintiffs do not mount a full-throated defense of their theory that Presidential financial disclosure laws are unconstitutional—a theory this Court rejected because it "flies in the face of decades of legislation covering the President." *Mazars I*, 380 F. Supp. 3d at 102-03.  Instead, Plaintiffs observe (Pls. Opp. 21-22) that Presidential financial disclosure laws raise "sensitive constitutional issues."  But that is several logical leaps away from the conclusion that all disclosure laws are invalid.  And while the fact that every President has complied with applicable

---

[4] Plaintiffs cannot avoid this conclusion by attempting to distinguish between "purpose" and "motive."  The D.C. Circuit did not "agree" with that distinction (Pls. Opp. 20), but indulged it only for the purpose of rejecting Plaintiffs' arguments.  *See Mazars II*, 940 F.3d at 726.

disclosure laws may not prove their constitutionality (Pls. Opp. 22), Plaintiffs do not dispute that

this Court must "take[] a 'considerable impression' from 'th[at] practice of the government.'"

*Mazars III*, 140 S. Ct. at 2035 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819)).

Plaintiffs do not defend their prior mischaracterization of *U.S. Term Limits v. Thornton*, 514

U.S. 779 (1995), on which they premised their argument that all Presidential financial disclosure laws

are unconstitutional.  Instead they cite *Griffin v. Padilla*, 408 F. Supp. 3d 1169 (E.D. Cal. 2019), for

the same basic proposition.  But that now-vacated district court opinion held only that a particular

state-law ballot-access provision violated the Qualifications Clause, not that *all* Presidential

disclosure laws are unconstitutional.  And Plaintiffs are wrong to argue (Pls. Opp. 11) that the D.C.

Circuit's decision in this case "suggest[ed] that presidential conflict-of-interest laws are

unconstitutional" under the Qualifications Clause.  Plaintiffs pressed that argument, but the D.C.

Circuit Court concluded that it "need not reach this issue."  *Mazars II*, 940 F.3d at 736.

Plaintiffs similarly mischaracterize (Pls. Opp. 21) the D.C. Circuit as having concluded that

"laws requiring the disclosure of financial information" are the *only* permissible laws that could result

from the Committee's investigation.  To the contrary, the D.C. Circuit held that Presidential

financial disclosure laws were "enough" to uphold the subpoena.  940 F.3d at 737; *see id.* at 733

(using such laws as a "litmus test").  As discussed above, the D.C. Circuit did *not* rule out "other

potentially fertile grounds from which constitutional legislation could flower."  *Id.* at 737.

The two other tracks of the Committee's investigation are each "enough" to uphold the

subpoena as well.  *Id.*  Congress could clearly pass constitutional laws concerning GSA and the lease

for the Trump Old Post Office Building—a fact that we noted in our principal brief (Cross-MSJ 24-

25) and that Plaintiffs do not contest.  Such legislation would justify the subpoena even apart from

any financial disclosure legislation.

The emoluments track of the subpoena may also yield constitutional legislation.  Despite Plaintiffs' claim otherwise (Pls. Opp. 22), Congress's power to consent (or refuse to consent) to foreign emoluments, U.S. Const. art. I, § 9, cl. 8, allows it to enact laws that are "derivative of, and in service to, [that] granted power."  *NFIB v. Sebelius*, 567 U.S. 519, 560 (2012) (opinion of Roberts, C.J.); U.S. Const. art I, § 8, cl. 18.  These might include laws requiring prophylactic disclosure of emoluments, *e.g.* Maloney Mem. 30-31; laws that would "clarify and define incidental or *de minimis* payments that Congress could exempt categorically from needing to seek consent," *id.* at 31; or laws that would "define the entities or organizations that fall into the definition of 'King, Prince, or foreign State' in the Foreign Emoluments Clause of the Constitution," *id.*

## C.   The Subpoena Is Not Overbroad

Plaintiffs have abandoned any meaningful argument that the subpoena is overbroad. Instead, they criticize the Committee (Pls. Opp. 23) for not knowing what is in documents it has not received.  But "[t]he very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys.'"  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975). Plaintiffs also worry (Pls. Opp. 23) about "the potential for abuse" and the need for "limits" to ensure that future committees do not seek information merely for the purpose of exposure.  But if a future committee ever issued such a subpoena, the subject of that subpoena could challenge it at that time.  The remedy for that abuse, should it ever occur, "lies[] not in … the judicial authority … but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."  *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959); *Tenney*, 341 U.S. at 378.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and enter summary judgment for the Committee.

Dated:  June 8, 2021

/s/ Douglas N. Letter
Douglas N. Letter (D.C. Bar No. 253492)
General Counsel
Todd B. Tatelman (VA Bar No. 66008)
Megan Barbero (MA Bar No. 668854)
William E. Havemann (VA Bar No. 86961)
Eric R. Columbus (D.C. Bar No. 487736)
OFFICE OF GENERAL COUNSEL[5]
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

Alan D. Strasser (D.C. Bar No. 967885)
Jennifer S. Windom (D.C. Bar No. 502481)
D. Hunter Smith (D.C. Bar No. 1035055)
Brandon L. Arnold (D.C. Bar No. 1034238)
Leslie C. Esbrook (D.C. Bar No. 1670737)
Jeffrey C. Thalhofer (D.C. Bar No. 1658324)
ROBBINS, RUSSELL, ENGLERT, ORSECK
& UNTEREINER LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
(202) 775-4500
astrasser@robbinsrussell.com

Counsel for Intervenor-Defendant Committee on
Oversight and Reform of the U.S. House of
Representatives

---

[5] The Office of General Counsel wishes to acknowledge the assistance of law clerk Jennifer Kaplan, a student at The Catholic University of America, Columbus School of Law, and legal fellow Rekha Kennedy, a student at Yale Law School, in preparing this brief.

26

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2021, I filed this document with the Court via ECF, which

will electronically notify all counsel of record.

/s/ Douglas N. Letter
Douglas N. Letter