**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                                    )
**DONALD J. TRUMP, et al.**                          )
                                                                    )
    **Plaintiffs,**                                        )
                                                                    )
            **v.**                                        )          **Case No. 19-cv-01136 (APM)**
                                                                    )
**MAZARS USA LLP,**                                   )
                                                                    )
    **Defendant,**                                       )
                                                                    )
**COMMITTEE ON OVERSIGHT AND**             )
**REFORM OF THE U.S. HOUSE OF**               )
**REPRESENTATIVES,**                                 )
                                                                    )
    **Intervenor-Defendant.**                        )
_____)


**MEMORANDUM OPINION**

## I.      INTRODUCTION

After more than two years and a roundtrip through the federal judiciary, this case returns

to where it began.  On April 15, 2019, the Committee on Oversight and Reform of the U.S. House

of Representatives issued a document subpoena to Mazars USA LLP ("Mazars"), a firm that has

long provided accounting services to former President Donald J. Trump and his business interests.

The subpoena called for Mazars to produce financial records and other documents relating to

President Trump personally and various associated businesses and entities dating back to 2011.

The Committee claimed primarily that the subpoenaed material would inform its investigation into

whether Congress should amend or supplement current financial disclosure laws.

President Trump sued to prevent Mazars from complying with the subpoena, but this court

granted summary judgment in favor of the Committee.  After the D.C. Circuit affirmed, the

Supreme Court granted certiorari and eventually vacated the Circuit's opinion.  In the process, it announced a new four-factor test to assess the validity of a congressional subpoena directed at a sitting President's personal papers.  *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035–36 (2020).  The Court remanded the case to the D.C. Circuit, which, after receiving full briefing and holding an oral argument, remanded the matter back to this court to apply the Supreme Court's decision.

Now, once again, the parties have filed cross-motions for summary judgment.  But this time they do so against a meaningfully different factual backdrop.  Since the Supreme Court announced the new *Mazars* test, President Trump lost the 2020 election.  He is no longer the sitting President of the United States.  Furthermore, the Committee reissued its subpoena to Mazars on February 25, 2021, after its initial subpoena expired at the end of the 116th Congress.  Prior to reissuance, the Committee's Chairwoman, Carolyn B. Maloney, circulated a 58-page, single-spaced memorandum explaining the legislative need for the subpoenaed material.  The parties dispute whether and how these changed circumstances should inform the court's present analysis.

This court previously allowed the Committee's demand for President Trump's financial records to proceed without qualification.  But, applying the greater scrutiny required by *Mazars*, the court cannot now go so far.  The court holds that the Committee's asserted legislative purpose of bolstering financial disclosure laws for Presidents and presidential candidates does not warrant disclosure of President Trump's personal and corporate financial records when balanced against the separation of powers concerns raised by the broad scope of its subpoena.  By contrast, the Committee's other stated justifications for demanding President Trump's personal and corporate financial records—to legislate on the topic of federal lease agreements and conduct oversight of the General Services Administration's lease with the Old Trump Post Office LLC, and to legislate

pursuant to Congress's authority under the Foreign Emoluments Clause—do not implicate the same separation of powers concerns. The records corresponding to those justifications therefore must be disclosed. Accordingly, for the reasons discussed more fully below, the court grants in part and denies in part both cross-motions.

## II.    BACKGROUND

### A.    The 116th Congress and the House Oversight and Reform Committee

On January 3, 2019, the 116th Congress convened, with the Democratic Party holding the majority of seats in the U.S. House of Representatives. Soon thereafter, the House adopted the "Rules of the House of Representatives," which governed its proceedings during the two-year term.[1] The Rules established the House's various standing committees, including the Committee on Oversight and Reform ("Committee").[2] As relevant here, the House charged the Committee with "review[ing] and study[ing] on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President."[3] 116th House Rules at 10. The House also permitted the Committee to "*at any time* conduct investigations *of any matter* without regard to [other rules] conferring jurisdiction over the matter to another standing committee." *Id*. at 11 (emphasis added). In other words, the House empowered the Oversight Committee to investigate any subject matter, even in areas expressly assigned to other committees. No other committee possessed such sweeping investigative authority. To "carry[] out . . . its functions and duties," the

---

[1] *Final Vote Results for Roll Call 19, Adopting the Rules of the House of Representatives for the One Hundredth Sixteenth Congress*, CLERK OF THE U.S. HOUSE OF REPRESENTATIVES, http://clerk.house.gov/evs/2019/roll019.xml (last visited August 11, 2021).
[2] RULES OF THE HOUSE OF REPRESENTATIVES, 116TH CONGRESS 6, 8 (2019) [hereinafter 116th House Rules], https://tinyurl.com/t8p3675v.
[3] The Executive Office of the President consists of a small group of federal agencies that most immediately aid the President on matters of policy, politics, administration, and management. The President's closest advisors typically fall within the Executive Office. *See generally* HAROLD C. RELYEA, CONG. RSCH. SERV., 98-606, THE EXECUTIVE OFFICE OF THE PRESIDENT: AN HISTORICAL OVERVIEW (2008), https://tinyurl.com/4ma76fe7.

Committee possessed the ability to "require, by subpoena or otherwise, . . . the production of such . . . documents as it consider[ed] necessary." *Id.* at 19.

**B.      The Oversight Committee's Investigation During the 116th Congress**

From the start of the 116th Congress, the Committee—led by then-Chairman Elijah E. Cummings—aggressively pursued an investigation of President Trump's finances. The Committee did not adopt a resolution or issue a formal public statement defining the scope of its investigation or its legislative purpose. Instead, it sent a series of letters to the White House and elsewhere seeking personal and business records. Even before the new Congress convened, incoming-Chairman Cummings wrote President Trump's personal lawyer, Sheri Dillon, and the Executive Vice President and Chief Compliance Counsel of the Trump Organization, George Sorial, asking them to produce previously requested "documents regarding the Trump Organization's process for identifying payments from foreign governments and foreign-government controlled entities."[4] In a separate letter, Chairman Cummings asked the General Services Administration ("GSA"), the agency that manages federally owned and leased buildings, to produce records concerning the federal government's lease with the Trump Organization for the Old Post Office Building, which houses the Trump International Hotel in Washington, D.C.[5] Chairman Cummings indicated that he sought those records at least partly out of a concern that the lease might violate the Constitution's Emoluments Clauses. Cummings' April 12th GSA Letter at 1. These are but two examples of the types of records requests made by the Committee at or around the start of the 116th Congress.

---

[4] Letter from Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, to Sheri A. Dillon, Couns. to Donald Trump, and George A. Sorial, Exec. Vice President & Chief Compliance Couns., Trump Org. (Dec. 19, 2018), https://tinyurl.com/Dec19CummingsDillonLetter.

[5] Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, & Gerald E. Connolly, Chairman, House Subcomm. on Gov't Operations, to Emily Murphy, Adm'r, Gen. Servs. Admin. (Apr. 12, 2019) [hereinafter Cummings' April 12th GSA Letter], https://tinyurl.com/Apr12CummingsHorneLetter.

The Committee issued the investigative demand that sparked this lawsuit on January 8, 2019. Chairman Cummings wrote to Pat Cipollone, the White House Counsel, asking President Trump to produce "documents related to [his] reporting of debts and payments to his personal attorney, Michael Cohen, to silence women alleging extramarital affairs with [him] before the [2016] election."[6]  Back in May 2018, the Office of Government Ethics ("OGE") had concluded that President Trump should have disclosed a payment made by Cohen as a liability on his public financial disclosure report.[7]  Chairman Cummings noted in the January 8th letter that the Oversight Committee "has jurisdiction over a wide range of matters, including the Ethics in Government Act of 1978," a law that "requires all federal officials, including the President, to publicly disclose financial liabilities that could impact their decision-making."  Cummings' January 8th Letter at 1.  On February 1, 2019, the White House Counsel responded that President Trump was prepared to consider making some documents available for review.[8]

Chairman Cummings replied on February 15, 2019.  *See* Cummings' Feb. 15th Letter.  He stated that, by way of his January 8th letter, "the Committee launched an investigation into the failure of President Donald Trump to report hundreds of thousands of dollars in payments and liabilities to his former attorney, Michael Cohen, to silence women alleging extramarital affairs during the 2016 presidential campaign."  *Id.* at 1.  Chairman Cummings explained that "[t]he Committee's interest in obtaining these documents is even more critical in light of new documents

---

[6] Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, White House Couns. (Jan. 8, 2019) [hereinafter Cummings' January 8th Letter], https://tinyurl.com/Jan8CummingsCipolloneLetter. Then–Ranking Member Cummings made a request for similar records in September 2018, which went unanswered. *See* Letter from Elijah E. Cummings, Ranking Member, House Comm. on Oversight & Reform, to Donald F. McGahn II, White House Couns., and George A. Sorial, Exec. Vice President & Chief Compliance Couns., Trump Org. (September 12, 2018), https://tinyurl.com/y7pyzj34.

[7] Letter from David J. Apol, Acting Dir., U.S. Off. of Gov't Ethics, to Rod J. Rosenstein, Deputy Att'y Gen., U.S. Dep't of Justice (May 16, 2018), https://tinyurl.com/2wxpzcxa.

[8] Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Pat Cipollone, White House Couns. 1 (Feb. 15, 2019) [hereinafter Cummings' Feb. 15th Letter], https://tinyurl.com/Feb15CummingsCipolloneLetter.

obtained by the Committee from the Office of Government Ethics (OGE) that describe false information provided by the lawyers representing President Trump." *Id.* The letter went on to detail a timeline of recent events starting with statements made by President Trump's lawyers to OGE and to the public about a supposed purpose of the Cohen payments unrelated to the election; followed by President Trump's disclosure of the Cohen payments on his 2017 Financial Disclosure form as a liability of less than $250,000; and then revelations by federal prosecutors that the Cohen payments in fact exceeded the $250,000 reported by the President. *Id.* at 2–6. Chairman Cummings cited Congress's "plenary authority to legislate and conduct oversight regarding compliance with ethics laws and regulations" as the source of its authority to make the records demand, as well as its "broad authority to legislate and conduct oversight on issues involving campaign finance." *Id.* at 7.

### C.    The Oversight Committee's Initial Subpoena to Mazars

On February 27, 2019, Michael Cohen appeared for a public hearing before the Oversight Committee.[9]  By this time, Cohen had pleaded guilty to multiple federal felonies, including tax evasion, campaign finance violations, and making false statements to Congress.[10]  During his testimony, Cohen implicated President Trump in wrongdoing.  He alleged that financial statements prepared by President Trump's accountants falsely represented the President's assets and liabilities.  *See* Cohen Testimony at 13, 19.  Cohen stated that, in his experience, "Mr. Trump inflated his total assets when it served his purposes . . . and deflated his assets to reduce his real estate taxes." *Id.* at 19.  Cohen supplied the Committee with portions of President Trump's

---

[9] *Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2019) [hereinafter Cohen Testimony], https://tinyurl.com/CohenHearing.
[10] *See* Mark Mazzetti et al., *Cohen Pleads Guilty and Details Trump's Involvement in Moscow Tower Project*, N.Y. TIMES (Nov. 29, 2018), https://tinyurl.com/xm6uesb2.

Statements of Financial Condition from 2011, 2012, and 2013, some of which were signed by Mazars.[11]

Following Cohen's testimony, Chairman Cummings wrote to Mazars on March 20, 2019. His letter first summarized aspects of Cohen's testimony accusing President Trump of manipulating financial statements to suit his purposes; it then identified a half-dozen questions about assets and liabilities reflected in President Trump's Statements of Financial Condition that Cohen had provided to the Committee.  *See* Cummings' March 20th Letter at 1–3.  Chairman Cummings stated that these financial statements "raise questions about the President's representations of his financial affairs on these forms and on other disclosures, particularly relating to the President's debts."  *Id.* at 1.  The letter concluded by asking Mazars to produce four categories of documents with respect to not just President Trump but also several affiliated organizations and entities, including the Trump Organization Inc., the Donald J. Trump Revocable Trust, the Trump Foundation, and the Trump Old Post Office LLC.  *Id.* at 4.  The records sought included statements of financial condition, audited financial statements, documents relied upon to prepare any financial statements, engagement agreements, and communications between Mazars and President Trump or employees of the Trump Organization.  *Id.*  The time period identified for the requested records was "January 1, 2009, to the present."  *Id.*  The letter to Mazars did not articulate any legislative purpose for the requested records.

A week later, on March 27, 2019, Mazars responded that it "[could not] voluntarily turn over documents sought in the Request."[12]  Mazars cited various federal and state regulations as

---

[11] *See* Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Victor Wahba, Chairman & Chief Exec. Officer, Mazars USA LLP at 1 (Mar. 20, 2019) [hereinafter Cummings' March 20th Letter], https://tinyurl.com/Mar20CummingsLetter; *see also* Cohen Testimony at 13.

[12] Letter from Jerry D. Bernstein, BlankRome LLP, Outside Couns. to Mazars USA LLP, to Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform (Mar. 27, 2019) [hereinafter Mazars March 27th Letter], https://tinyurl.com/Mar27MazarsLetter.

well as professional codes of conduct that prevented it from doing so.  *See* Mazars March 27th
Letter at 1.

On April 12, 2019, Chairman Cummings circulated a memorandum to his fellow
committee members, advising them of his intent to issue a document subpoena to Mazars.[13]  Under
a section titled "Need for Subpoena," Chairman Cummings cited Cohen's testimony that President
Trump had "altered the estimated value of his assets and liabilities on financial statements," as
well as the records Cohen had produced to support these claims.  Cummings' April 12th Mem. at
1–2.  Chairman Cummings also referenced "[r]ecent news reports" raising "additional concerns
regarding the President's financial statements and representations."  *Id.* at 1.  In the "Conclusion"
section of the memorandum, Chairman Cummings identified four issues that he believed "[t]he
Committee has full authority to investigate":  (1) "whether [President Trump] may have engaged
in illegal conduct before and during his tenure in office," (2) "whether he has undisclosed conflicts
of interest that may impair his ability to make impartial policy decisions," (3) "whether he is
complying with the Emoluments Clauses of the Constitution," and (4) "whether he has accurately
reported his finances to the Office of Government Ethics and other federal entities."  *Id.* at 4.  "The
Committee's interest in these matters," the memorandum stated, "informs its review of multiple
laws and legislative proposals under [its] jurisdiction."  *Id.*

On April 15, 2019, the Committee issued the subpoena to Mazars.  The subpoena sought
the same four categories of records identified in the March 20th letter, but it narrowed the relevant
time period by two years to "calendar years 2011 through 2018."  *Compare* Appl. for TRO, ECF
No. 9 [hereinafter Pls.' TRO], Ex. A to Decl. of William S. Consovoy, ECF No. 9-2 [hereinafter

---

[13] Memorandum from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Members of the
Comm. on Oversight & Reform (Apr. 12, 2019) [hereinafter Cummings' April 12th Mem.], https://tinyurl
.com/38re3nr5.

Cummings Subpoena], at 5, *with* Cummings' March 20th Letter at 4.  The subpoena instructed Mazars to comply by April 29, 2019.

> **D.**    **Procedural History and Subsequent Developments During the 117th Congress**

> *1.*    *Initial Proceedings Before This Court and the D.C. Circuit*

On April 22, 2019, President Trump, along with his affiliated organizations and entities (collectively "Plaintiffs"),[14] filed this lawsuit.  *See* Compl., ECF No. 1 [hereinafter Compl.].  Plaintiffs asked the court to, among other things, declare the Committee's subpoena to Mazars "invalid and unenforceable" and to issue a "permanent injunction quashing Chairman Cummings' subpoena."  *Id.* at 13.  Along with their Complaint, Plaintiffs also moved for a preliminary injunction.  Pls.' Mot. for Prelim. Inj., ECF No. 11.  The Committee[15] agreed to postpone the deadline to comply with the subpoena until seven days after the court ruled on Plaintiffs' motion.  Minute Order, Apr. 23, 2019.

Consistent with the Supreme Court's instruction that motions to enjoin a congressional subpoena "be given the most expeditious treatment by district courts," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975), the court consolidated its hearing on the preliminary injunction with the "trial on the merits."  *Trump v. Comm. on Oversight & Reform of the U.S. House of Representatives* (*Mazars I*), 380 F. Supp. 3d 76, 88–90 (D.D.C. 2019); *see* Fed. R. Civ. P. 65(a)(2) (permitting the court, "[b]efore or after beginning the hearing on a motion for a preliminary injunction," to "advance the trial on the merits and consolidate it with the hearing").

---

[14] The complete list of affiliated organizations and entities includes:  The Trump Organization, Inc.; Trump Organization LLC; The Trump Corporation; DJT Holdings LLC; The Donald J. Trump Revocable Trust; and the Trump Old Post Office LLC.

[15] Plaintiffs originally named as defendants Chairman Cummings; Peter Kenny, the Chief Investigative Counsel of the Oversight Committee; and Mazars.  But after discussions with the Oversight Committee, Plaintiffs consented to the Committee's intervention as a defendant and agreed to dismiss Chairman Cummings and Kenny as defendants.  *See* Consent Mot. of the Oversight Committee to Intervene, ECF No. 12; Joint Stip., ECF No. 15.

Because the material facts before the court were not in dispute, the court treated the parties' briefing as cross-motions for summary judgment. *Mazars I*, 380 F. Supp. 3d at 90.

On May 20, 2019, the court issued its opinion. Although it acknowledged that Congress may not "trench upon Executive . . . prerogatives," *id.* at 91, the court held that the four areas of investigation listed in Cummings' April 12th memorandum represented "a subject 'on which legislation could be had,'" *id.* at 94 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)). Specifically, the Committee had "identified several pieces of actual legislation" that "demonstrate[d] Congress's intent to legislate, at the very least, in the areas of ethics and accountability for Executive Brach officials, including the President." *Id.* at 96. After rejecting Plaintiffs' arguments that the subpoena had an impermissible law-enforcement purpose, *id.* at 99, the court entered summary judgment for the Committee, *id.* at 105.

The D.C. Circuit affirmed. *Trump v. Mazars USA, LLP*, 940 F.3d 710, 748 (D.C. Cir. 2019) (*Mazars II*). The Circuit concluded that "the Committee was engaged in a legitimate legislative investigation rather than an impermissible law-enforcement inquiry," *id.* at 732 (internal quotation marks and citation omitted), and held that the subpoenaed material was "reasonably relevant to remedial legislation addressing . . . potential 'undisclosed conflicts of interest' and the President's [financial disclosure] reports," *id.* at 740.

### 2.    *The Supreme Court's* Mazars *Decision*

The next stop was the Supreme Court. The Court granted certiorari on November 25, 2019, and consolidated the proceedings with *Trump v. Deutsche Bank AG*, No. 19-760 (S. Ct. 2019), a case from the Second Circuit that involved President Trump's challenges to subpoenas issued by two other House committees to financial institutions that provided services to the President and his businesses.

On July 9, 2020, the Court issued its opinion.  *See Trump v. Mazars USA, LLP* (*Mazars III* or *Mazars*), 140 S. Ct. 2019 (2020).  The Court recognized that Congress generally "has power 'to secure needed information' in order to legislate."  *Id.* at 2031 (quoting *McGrain*, 273 U.S. at 161).  But because the Committee's demand for President Trump's personal information triggered "weighty" separation of powers concerns, *id.* at 2035, the Court held that the subpoena's propriety could not be governed by "precedents that do not involve the President's papers," *id.* at 2033.  Instead, it instructed courts to "perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President."  *Id.* (internal quotation marks omitted).  The Court then announced four non-exhaustive "special considerations" meant to guide that analysis.  *Id.* at 2035–36.  Rather than apply the new test itself, the Court vacated the D.C. Circuit's judgment and remanded the case for review consistent with its opinion.  *Id.* at 2036.

### 3.     *Remand to the D.C. Circuit and the Maloney Memorandum*

So, nearly 16 months after it began, the case returned to the D.C. Circuit.  On August 10, 2020, the D.C. Circuit instructed the parties to submit supplemental briefs.  As an attachment to its brief, the Committee included a 58-page, single-spaced memorandum from Chairwoman Carolyn B. Maloney—Chairman Cummings' successor—to the other members of the Committee (the "Maloney Memorandum").[16]  Dated August 26, 2020, the memorandum began by referring to President Trump's "complex and opaque financial holdings, consisting of hundreds of interconnected business entities" and his "refusal to divest those assets" upon assuming the presidency.  Maloney Mem. at 3.  That refusal, the memorandum continued, "exposed glaring weaknesses in current ethics legislation that threaten the accountability and transparency of our

---

[16] Memorandum from Carolyn B. Maloney, Chairwoman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform (Aug. 26, 2020) [hereinafter Maloney Mem.], https://tinyurl.com/34by2cpe.

government." *Id.*  Chairwoman Maloney confirmed that the Committee "attaches immense importance to addressing th[o]se vulnerabilities." *Id.* at 4.

The memorandum noted that, "[s]ince the beginning of the 116th Congress, Congress has considered once-in-a-generation ethics reforms, including several provisions specifically applicable to presidents." *Id.*  "However, in the absence of a detailed understanding of [President Trump's] financial holdings and the conflicts they raise, Congress has been unable to tailor its legislative approaches to detailed facts and evidence, which would ensure the legislation's effectiveness." *Id.*  Chairwoman Maloney specified that the Committee's investigation had followed three tracks, all of which "are aimed at defining, understanding, and mitigating presidential conflicts of interest and self-dealing and enabling the Committee to develop and pass necessary and effective reforms in presidential ethics and related agency oversight." *Id.* at 5.

The first track addressed President Trump's federal financial disclosures to OGE. *Id.* at 4. The end goal was "to pass legislation to ensure presidential financial disclosures include sufficiently detailed information to assess potential conflicts of interest, close loopholes in the financial disclosure process, and strengthen OGE." *Id.* at 4–5; *see also id.* at 5–14.

The second track involved the lease agreement with GSA for the Trump International Hotel in the Old Post Office Building. *Id.* at 5.  That investigation would inform legislation "to ensure that GSA administers federal contracts with the President in a fair and transparent manner, prevent future presidents from engaging in and maintaining self-dealing contracts with the U.S. government, and close loopholes in government contracting." *Id.*; *see also id.* at 14–23.

The third track dealt with President Trump's "receipt of funds from foreign governments, federal officials, or state officials through his business holdings," which the memorandum characterized as "the receipt of Emoluments." *Id.* at 5.  Through its investigation, the Committee

aimed to pass legislation "to prohibit taxpayer funds from flowing to the President's businesses, strengthen disclosure requirements to ensure compliance with the Emoluments Clauses, [and] enable Congress to identify noncompliance and conflicts of interest involving foreign governments." *Id.*; *see also id.* at 23–31.

After identifying Mazars as "a crucial custodian of documents relevant to all three investigative tracks," *id.* at 5, Chairwoman Maloney explained how the Cummings Subpoena to President Trump's longtime accounting firm satisfied the four-factor test announced in *Mazars III* (the "*Mazars* test"), *id.* at 37–55. The memorandum concluded that the Committee intended to continue its investigations into the next Congress, "regardless of who holds the presidency, because the Committee's goal is to prevent problems raised by the circumstances of the current President from being repeated." *Id.* at 55.

Upon receipt of the parties' supplemental briefs, the D.C. Circuit directed the parties to address the question of what weight, if any, should be afforded to the Maloney Memorandum given that it post-dated the issuance of the Cummings Subpoena. Order, *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.), Doc. No. 1860266. Plaintiffs answered none, and the Committee argued for full consideration. *See* Appellants' Suppl. Reply Br., *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.), Doc. No. 1862695, at 2, 11–16; Committee's Suppl. Reply Br., *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.), Doc. No. 1862693, at 3–4, 28–33. On October 20, 2020, the panel heard oral argument on that question and others.

Ultimately, the D.C. Circuit declined to reach the merits. After President Trump lost the 2020 election, the Committee notified the panel that "if [the] case has not been resolved before the end of [the 116th Congress], [Chairwoman Maloney] will reissue the subpoena to Mazars at the start of the next Congress." Letter, *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.),

Doc. No. 1876578.   Relying on that representation, on December 30, 2020, the D.C. Circuit vacated this court's judgment and remanded the case "for further proceedings, consistent with the Supreme Court's opinion."  *Trump v. Mazars USA, LLP* (*Mazars IV*), 832 F. App'x 6, 7 (D.C. Cir. 2020).  The panel expressed "no view" on "the merits of the parties' arguments" or "whether th[e] case [would] become moot when the subpoena expire[d]."  *Id.*

       4.    *Post-Remand Events*

On January 3, 2021, the 117th Congress began.  On January 20, 2021, President Trump left office.   On February 23, 2021, Chairwoman Maloney circulated another memorandum "provid[ing] Committee Members with notice" of her intent to reissue the subpoena to Mazars.[17] She stated that the Committee's need for President Trump's financial information "remains just as compelling now as it was when the Committee first issued its subpoena, and the Committee's legislative efforts remain just as critical to the American people as they were before President Trump vacated the White House."  Maloney February 23rd Mem. at 1.  She explained that the records sought from Mazars would "help Congress understand how to most effectively increase transparency in the finances of presidents and presidential candidates, strengthen anti-corruption laws and agencies, prevent future presidential conflicts of interest and profiteering, and create a sensible and efficient statutory regime for emoluments reporting and congressional consent."  *Id.* at 3.  The Chairwoman's February 23rd memorandum attached and incorporated the August 2020 Maloney Memorandum.  *See id.* at 4.  Two days later, Chairwoman Maloney reissued an identical subpoena to Mazars.   Intervenor-Def.'s Cross-Mot. for Summ. J, ECF No. 56 [hereinafter

---

[17] Memorandum from Carolyn B. Maloney, Chairwoman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform (Feb. 23, 2021) [hereinafter Maloney February 23rd Mem.], https://perma.cc/QP9B-3ATS.

Committee Cross-Mot.], Stmt. of Material Facts, ECF No. 56-1 [hereinafter Committee SOMF], ¶ 50.

After a status hearing in this court on March 4, 2021, the parties once again filed cross-motions for summary judgment.  *See* Pls.' Mot. for Summ. J., ECF No. 54 [hereinafter Pls.' Mot.]; Committee Cross-Mot.  On June 15, 2021, the court instructed the parties to make efforts to narrow their dispute and assess the possibility of an accommodation, but those efforts were unsuccessful. *See* Joint Status Report, ECF No. 64.  On July 1, 2021, the court heard oral argument on the cross-motions for summary judgment.

## III.   THRESHOLD ISSUES

At the outset, the court addresses two threshold issues:  (1) whether the court can consider the August 2020 Maloney Memorandum and (2) whether the reissued subpoena is invalid because it was issued for an impermissible, non-legislative purpose.

### A.   Consideration of the Maloney Memorandum

Plaintiffs contend that the court should exclude from its consideration the Maloney Memorandum because "the memo is plainly a subsequent attempt to retroactively rationalize the subpoena."  Pls.' Mot. at 14 (cleaned up).  They assert that the legality of congressional inquiries must be evaluated as of the time they are made—in this case, when the subpoena was issued or, at the very latest, when the subpoena's target objected.  *Id.* at 13 (citing *Gojack v. United States*, 384 U.S. 702, 715 n.12 (1966); *Watkins v. United States*, 354 U.S. 178, 214–15 (1957); *United States v. Rumely*, 345 U.S. 41, 48 (1953); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963)). In Plaintiffs' view, because the Maloney Memorandum was issued 16 months after the Cummings Subpoena, it has "the usual infirmity of post litem motam, self-serving declarations."  Pls.' Mot. at 14 (quoting *Rumely*, 345 U.S. at 48).

15

The court disagrees.  Plaintiffs' position elides the fact that the subpoena now in dispute is not the Cummings Subpoena issued on April 15, 2019, but rather the one the Committee reissued to Mazars on February 25, 2021.  *See* Hr'g Tr., ECF No. 69 [hereinafter Hr'g Tr.], at 9.  The Cummings Subpoena expired along with the 116th Congress.  As Plaintiffs acknowledge, to avoid mooting the case, Chairwoman Maloney invoked a House Rule that permits committee chairs to "ensure continuation of . . . litigation" by reissuing prior subpoenas and acting as "the successor in interest" to the "prior Congress."  *See* Pls.' Mot. at 11 (quoting House of Representatives Rule II, cl. 8(c)).  Pursuant to the Rule, Chairwoman Maloney reissued the Cummings Subpoena, without modification, on February 25, 2021.  *Id*. at 10; Committee Cross-Mot. at 15.

Plaintiffs would have the court treat that reissuance as a mere resurrection of the earlier subpoena, but to accept that position would require the court to ignore a significant act of the Committee.  That it cannot do.  Although the reissued subpoena is identical to the Cummings Subpoena in substance, the House reissuance process required the Committee to serve upon Mazars an entirely separate, fresh subpoena, and the Committee did so.  *See* Hr'g Tr. at 64 (providing clarification).  *Compare* March 2, 2021 Joint Status Report, ECF No. 51, Ex. 1, ECF No. 51-1 [hereinafter Maloney Subpoena], *with* Pls.' TRO, Ex. A, ECF No. 9-2.  Thus, it is the reissued subpoena that Plaintiffs now challenge, not the expired subpoena issued by Chairman Cummings.

With the proper focus then on the reissued Maloney Subpoena, the relevance of the August 2020 Maloney Memorandum is self-evident.  When Chairwoman Maloney announced that the Committee would be reissuing an identical subpoena to Mazars, she did so in a four-page memorandum dated February 23, 2021.  The February 23rd memorandum expressly referenced and quoted from the Maloney Memorandum, and it summarized the legislative rationale for the

subpoenaed records set forth in the earlier memo.  The February 23rd memorandum also attached and incorporated the Maloney Memorandum.  The Maloney Memorandum is therefore critical to understanding the Committee's reasons for reissuing the subpoena to Mazars, and it would blink reality to ignore it.

None of the cases on which Plaintiffs rely compels a contrary result.  Both *Watkins* and *Shelton* turned on improper attempts by Congress to retroactively rationalize subpoenas that later formed the basis for criminal contempt convictions.  *See Watkins*, 354 U.S. at 204 ("Looking backward from the events that transpired, we are asked to uphold the Committee's actions . . . ."); *Shelton*, 327 F.2d at 607 (noting the defendant "had a right under the [Senate] Subcommittee charter to have the Subcommittee responsibly consider whether or not he should be subpoenaed *before* the subpoena issued" (emphasis added)).  Here, because Chairwoman Maloney circulated the Maloney Memorandum well before the Maloney Subpoena issued, the former cannot be characterized as a retroactive rationalization of the latter.  Thus, neither *Watkins* nor *Shelton* precludes the court's consideration of the Maloney Memorandum.

### B.    Improper Purpose

Next, Plaintiffs assert that the court need not even evaluate the Maloney Subpoena under the four *Mazars* factors because it is invalid due to its improper purpose.  *See* Pls.' Mot. at 30. Plaintiffs have advanced this argument at each stage of review, and no court has accepted it. *See Mazars II*, 940 F.3d at 726–32; *Mazars I*, 380 F. Supp. 3d at 99–101; *see also Mazars III*, 140 S. Ct. at 2035–36 (opting not to address the issue).  This court rejects it once more.

All congressional subpoenas must serve a "valid *legislative* purpose."  *Mazars III*, 140 S. Ct. at 2031 (emphasis added) (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). "Congress may not issue a subpoena for the purpose of law enforcement" or "expos[ure] for the

sake of exposure." *Id.* at 2032 (cleaned up).  Plaintiffs argue that the "gravamen" or "primary purpose" of the Maloney Subpoena is exposing President Trump's supposed "wrongdoing."  *See* Pls.' Mot. at 31 (quoting *Mazars II*, 940 F.3d at 774 (Rao, J., dissenting)).  For support, Plaintiffs point to (1) statements made by Chairman Cummings and other Democratic members of the Oversight Committee in the lead-up to the issuance of Cummings Subpoena; (2) a June 13, 2019 Office of Legal Counsel memorandum opinion indicating that the House's attempts to obtain President Trump's financial information were pretextual;[18] and (3) statements made by various Democratic Committee members in the lead-up to the issuance of the Maloney Subpoena. *See* Pls.' Mot., Pls.' Stmt. of Material Facts, ECF No. 54-1 [Pls.' SOMF], ¶¶ 9–15, 28–30, 38, 47, 49–63.

None of the cited evidence convinces the court that the Committee issued the subpoena to Mazars for an improper purpose.  For one, the D.C. Circuit in *Mazars II* already held that some of the evidence cited by Plaintiffs—namely, the statements made prior to issuance of the Cummings Subpoena and the OLC memorandum opinion—does not establish an improper purpose.  *See* 940 F.3d at 728 (rejecting the view that an interest in uncovering illegality "spoils the Committee's otherwise valid legislative inquiry").  The parties dispute whether—in light of the Supreme Court's vacatur of the D.C. Circuit's judgment—this court is bound by the holdings and reasoning in *Mazars II* that the Supreme Court left untouched.[19]  The court concludes that it is.  In *Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan*, the D.C. Circuit left intact certain holdings from a prior opinion that the Supreme Court had vacated, because the Court "expressed

---

[18] On July 30, 2021, the Office of Legal Counsel issued a memorandum opinion revising its view and applying a "presumption of good faith and regularity" to the House's actions.  *See* Memorandum Opinion for the Acting General Counsel Department of the Treasury, 45 Op. O.L.C. __, at 21–26 (July 30, 2021).

[19] *See* Hr'g Tr. at 18 (Plaintiffs' counsel: "I think [the Supreme Court] spoke when it vacated the D.C. Circuit's whole opinion."); *id.* at 86–88 (Committee's counsel: "[T]he D.C. Circuit opinion continues to have precedential weight.").

no opinion on the merit of th[o]se holdings."  930 F.2d 77, 83 (D.C. Cir. 1991).  The Circuit concluded that its earlier holdings "continue to have precedential weight, and in the absence of contrary authority, [the panel] do[es] not disturb them."  *Id.*  That result controls here.  Because the Supreme Court declined to opine on the merits of the D.C. Circuit's analysis of improper purpose, the Circuit's holding on that issue—at least with respect to the evidence then in the record—is binding on this court.[20]

Plaintiffs also highlight additional statements from Democrats on the Committee suggesting a non-legislative purpose for the Maloney Subpoena.  *See* Pls.' SOMF ¶¶ 50–61.  These statements were made after *Mazars II*, so the court undertakes its assessment unbound by—but mindful of—the D.C. Circuit's opinion.

The Supreme Court has said repeatedly that "in determining the legitimacy of a congressional act," courts may "not look to the motives alleged to have prompted it."  *Eastland*, 421 U.S. at 508; *see also Watkins*, 354 U.S. at 200 ("[A] solution to our problem is not to be found in testing the motives of committee members for [legislative] purpose."); *Wilkinson v. United States*, 365 U.S. 399, 412 (1961) ("[I]t is not for [the courts] to speculate as to the motivations that may have prompted the decision of individual [committee] members . . . .").  That instruction is sounder still "[i]n times of political passion," when "dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed."  *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) (noting that "[c]ourts are not the place for such controversies").

Plaintiffs attempt to draw a distinction between judicial scrutiny of congressional *motives*, which they concede is impermissible, and identification of legislative *purpose*, which courts must evaluate.  *See* Pls.' Mot. at 31.  Although these concepts are in theory different, the line between

---

[20] In any event, the court finds the D.C. Circuit's treatment of the evidence persuasive.

them is ill defined at best.  Plaintiffs argue that *Mazars II* affirmed the distinction in practice when it addressed the Cummings Subpoena's legislative purpose on the record before it.  *See id.*  But the panel merely *assumed* the distinction before upholding the Committee's stated purpose anyway.  *Mazars II*, 940 F.3d at 726.

Regardless, as the D.C. Circuit noted, "an interest in past illegality can be wholly consistent with an intent to enact [valid] remedial legislation."  *Id.* at 728; *see also Hutcheson v. United States*, 369 U.S. 599, 617–18 (1962) (concluding that the Senate committee's investigation into the defendant's illegal conduct did not vitiate the legitimate purpose of remedial federal legislation).  Here, the Maloney Memorandum serves as the clearest and most comprehensive explanation of the Committee's purpose in reissuing the subpoena to Mazars.  It includes a sample of 18 measures that "may be aided by the Committee's investigations."  Maloney Mem. at 56.  Those measures address, among other things, "presidential ethics and conflicts of interest, presidential financial disclosures, and presidential adherence to Constitutional safeguards against foreign interference and undue influence."  *Id.*  In the presence of such facially valid legislative purposes, the court declines to invalidate the Maloney Subpoena on improper purpose grounds.

## IV.   LEGAL STANDARD

The D.C. Circuit remanded this case "for further proceedings, consistent with the Supreme Court's [*Mazars*] opinion."  *Mazars IV*, 832 Fed. App'x at 7.  But since the remand order, President Trump left office.  That prompts an obvious constitutional question:  How do the *Mazars* factors— which sprung from a dispute over a congressional subpoena for the personal records of a *sitting* President—apply, if at all, to a subpoena seeking the personal records of a *former* President?  Not surprisingly, the parties disagree on the answer.  The court first discusses the Supreme Court's decision in *Mazars* before turning to the parties' positions.

20

A.      *Mazars*

In *Mazars*, the Supreme Court instructed that "in assessing whether a subpoena directed at the President's personal information" is consistent with Congress's powers to legislate and investigate, courts must perform a "careful analysis" that accounts for both the "significant legislative interests of Congress" and "the unique position of the President." *Mazars III*, 140 S. Ct. at 2035 (cleaned up).  The Court offered four non-exhaustive factors as a guide.  *See id.* at 2036 (recognizing that "one case every two centuries does not afford enough experience for an exhaustive list").

*First*, "the asserted legislative purpose" must "warrant[] the significant step of involving the President and his papers."  *Id.* at 2035.  "Congress may not rely on the President's information if other sources could reasonably provide . . . the information [Congress] needs in light of its legislative objective."  *Id.* at 2035–36.  Moreover, "[t]he President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."  *Id.* at 2036.  *Second*, the subpoena should be "no broader than reasonably necessary to support Congress's legislative objective."  *Id.*  "The specificity of the subpoena's request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'"  *Id.* (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387 (2004)).  *Third*, "courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose."  *Id.*  "[U]nless Congress adequately identifies its aims and explains why the President's information will advance its consideration of possible legislation," "it is impossible to conclude that a subpoena is designed to advance a valid legislative purpose."  *Id.*  *Fourth*, courts should "assess the burdens imposed on the President by [the] subpoena" because

21

"[the burdens] stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage." *Id.*

### B.    The Parties' Positions on *Mazars*

Plaintiffs would have the court evaluate the Maloney Subpoena with the same scrutiny required by the Supreme Court in *Mazars*; they urge the court to treat the Maloney Subpoena as if it were directed at the personal papers of a sitting President.  Pls.' Mot. at 12 ("Because the Committee chose to revive a subpoena to the President and continue justifying it on President-specific grounds, it must answer President-specific defenses, including [the *Mazars* test].").  According to Plaintiffs, "there has only ever been one Mazars subpoena—the one that the Committee issued against President Trump in 2019," and so, the *Mazars* test fully applies irrespective of changed circumstances.  Pls.' Opp. to Cross-Mot. & Reply, ECF No. 60 [hereinafter Pls.' Reply], at 2.

The court rejects this approach because, once again, Plaintiffs conflate the Cummings Subpoena and the Maloney Subpoena.  The latter was issued on February 25, 2021, and is the subpoena to which Plaintiffs now object.  *See* Hr'g Tr. at 9.  The Cummings Subpoena expired with the 116th Congress.  *See supra* Part III.A.  That the two subpoenas are substantively identical does not mean "there has only ever been one Mazars subpoena."  The Maloney Subpoena is a new demand for records, which the Committee separately served on Mazars.  Thus, when the Maloney Subpoena issued—more than a month after President Trump left office—it was directed at, and sought the personal papers of, a *former* President.

Plaintiffs would have the court ignore these events, but to do so would be contrary to Circuit precedent.  Plaintiffs' suit requests prospective relief.  *See* Compl. ¶ 50 (asking for a declaratory judgment and a permanent injunction).  Because "this form of relief operates only in

futuro, . . . the right to it must be determined as of the time of the hearing." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464 (1921).  That principle explains the D.C. Circuit's consideration of changed factual circumstances in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, another case involving the enforcement of a congressional subpoena.  *See* 498 F.2d 725 (D.C. Cir. 1974) (en banc).   There, a Senate committee sought the enforcement of a subpoena directing President Nixon "to produce 'original electronic tapes' of five conversations between the President and his former Counsel" regarding Watergate.  *Id.* at 726.   After the subpoena issued, the House Committee on the Judiciary, in the course of its impeachment investigation, obtained copies of the five tapes, and President Nixon publicly released partially deleted transcripts of the contents.  *Id.* at 732.  As a result, the D.C. Circuit asked the Senate committee to file a supplemental memorandum addressing "whether the Committee ha[d] a present sense of need for the materials subpoenaed."  *Id.* (quotation marks omitted).  The en banc court eventually dismissed the Senate committee's enforcement action, holding that "the Committee's argument that the subpoenaed materials are necessary to its legislative judgments ha[d] been undermined by subsequent events." *Id.*   Just as the D.C. Circuit gave due weight to post-subpoena developments in *Senate Select Committee*, the court does so here.

Plaintiffs try to distinguish *Senate Select Committee* on the ground that subsequent events in that case undercut—rather than contributed to—the need to enforce the subpoena.  Pls.' Reply at 6 n.2.  But the court sees no reason why changed factual circumstances should only be considered when they benefit the party challenging enforcement.

Plaintiffs also assert that the court should disregard events subsequent to *Mazars* because the legality of congressional subpoenas must be assessed, "at the very latest, upon objection," and Plaintiffs objected to production by Mazars, at the latest, by initiating this litigation.  *Id.* at 3; *see id.*

at 4 ("Because a recipient must decide at his peril whether or not to answer a subpoena, fundamental fairness demands that his objection be judged at that time." (cleaned up)).  But, once more, this contention assumes that the operative subpoena is the Cummings Subpoena rather than the Maloney Subpoena.  Plaintiffs objected to the latter subpoena, quite naturally, after it issued on February 25, 2021.  The record before the court therefore appropriately encompasses President Trump's January 2021 departure from office.

Moreover, as the Committee points out, the cases Plaintiffs cite all involve criminal prosecutions rather than civil enforcement.  *See Watkins*, 354 U.S. at 181 (reviewing a conviction for contempt of Congress); *Gojack*, 384 U.S. at 704–05 (same); *Rumely*, 345 U.S. at 42 (same); *Shelton*, 327 F.2d at 602 (same).  This distinction is crucial.  A civil enforcement proceeding, like this case, concerns *future* compliance with a congressional subpoena.  By contrast, criminal prosecutions seek to impose punishment for *past* non-compliance.  Due process demands that an individual "compelled" under pain of criminal prosecution to decide whether to comply with a congressional subpoena "is entitled to have knowledge of the subject to which the interrogation is deemed pertinent."  *Watkins*, 354 U.S. at 208–09.  "That knowledge must be available with the same degree of explicitness and clarity . . . require[d] in the expression of any element of a criminal offense."  *Id.* at 209.  Thus, criminal punishment for non-compliance cannot be imposed on a witness based on facts not yet in existence at the time the witness made the decision not to comply.  Such a concern does not exist in civil enforcement proceedings demanding only prospective relief.  The court, therefore, must recognize that President Trump is no longer in office (along with any other relevant changed circumstances) when evaluating the Maloney Subpoena.

The Committee meanwhile would have the court ignore the *Mazars* test altogether.  Committee Cross-Mot. at 21.  It insists that the court instead should apply the more generic

balancing test from *Nixon v. Administrator of General Services* (*Nixon v. GSA*), 433 U.S. 425 (1977).   In that case, President Nixon, after his departure from office, challenged the constitutionality of the Presidential Recordings and Materials Preservation Act, which directed GSA to take custody of his presidential papers and tape recordings to ensure that he would not destroy any records relevant to the Watergate affair.  *See id.* at 429.  The Court expressly rejected the notion that, as a former President, President Nixon could not assert separation of powers as a defense.  *Id.* at 439.  Nevertheless, after balancing "the important interests that the Act [sought] to attain" with "the extent to which it prevent[ed] the Executive Branch from accomplishing its constitutionally assigned functions," the Court upheld the statute against a facial challenge.  *Id.* at 441–46, 484.  The Committee insists that this court should apply a similar balancing test "that weighs the Committee's need for the subpoenaed materials for its legislative purposes against the limited intrusion on the Presidency when Congress seeks a former President's information." Committee Cross-Mot. at 21.

The Committee's proposed balancing test strikes the court as little more than a watered-down version of *Mazars*.  Indeed, the two interests that the Committee seeks to have balanced are two of the four considerations set forth in *Mazars* itself—"the asserted legislative purpose" and "the burdens imposed on the President by a subpoena."  *Mazars III*, 140 S. Ct. at 2035–36.  Yet, the Committee would have the court eschew, or at least not explicitly weigh, the other two considerations deemed pertinent by the Court:  inquiring whether the subpoenaed records are "reasonably necessary to support Congress's legislative objective" and asking whether "the nature of the evidence offered by Congress . . . advances a valid legislative purpose."  *See id.*  The court cannot abide.  As the Supreme Court held in *Nixon v. GSA*, separation of powers considerations do not entirely disappear merely because the entanglement is between Congress and a former

25

President.  433 U.S. at 439.  That those constitutional concerns are admittedly less substantial when a former President is involved does not warrant jettisoning the *Mazars* factors altogether.

In the court's view, the correct approach requires an application of a "*Mazars* lite" test—that is, an examination of the *Mazars* factors cognizant of the fact that this case now involves a subpoena directed at a former President.  That change affects the foundations of the *Mazars* test in at least two critical ways.

First, because President Trump no longer "alone composes a branch of government," this dispute no longer implicates a present "clash between rival branches of government."  *Mazars III*, 140 S. Ct. at 2034.  The Maloney Subpoena does not "intru[de] into the operation of the Office of the President," nor will it burden "the [sitting] President's time and attention."  *Id.* at 2036.  The only remaining separation of powers concern identified by Plaintiffs involves Congress using the threat of a post-presidency subpoena for personal information to influence "how the sitting President treats Congress while in office."  Pls.' Reply at 17.  Of course, the threat of a post-presidency subpoena is not nearly as injurious to the separation of powers as an actual subpoena for the same information *during* an incumbent President's tenure.  In the former scenario, the political party issuing the threat may not even control the seats necessary to make good on its threat in the future.  Still, even remote threats to separation of powers must be given appropriate consideration.

Second, the *Mazars* test was crafted against a "tradition of negotiation and compromise" between co-equal branches of government, 140 S. Ct. at 2031, but, as the Committee notes, a former President's incentives to accommodate Congress are greatly diminished compared to those of an incumbent, *see* Committee Cross-Mot. at 16.  A former President no longer needs Congress's help to fund government or advance his policy priorities.  Nor does he fear impeachment or

electoral consequences for defying a congressional subpoena.  Thus, a refusal to comply with a congressional demand is far less consequential for a former President than an incumbent. A President's motivation to compromise with Congress ebbs upon leaving office.

These foundational differences alter the *Mazars* framework in important ways that support reduced judicial scrutiny of a congressional subpoena to a former President.  Most significantly, under the fourth *Mazars* factor, the "burdens imposed on the President by a subpoena" are greatly diminished, if not eliminated entirely, when the President to whom the subpoena is issued no longer occupies the office.  *Mazars III*, 140 S. Ct. at 2036.  Perhaps in different circumstances a subpoena to a former President might impose some burden on a sitting President's time and attention, but the Maloney Subpoena seeks only President Trump's personal records, so it imposes no burden on the sitting President.  Next, under the first *Mazars* factor—a careful assessment of "the asserted legislative purpose"—the Supreme Court characterized a subpoena to a sitting President as a "significant step" that requires a court to determine whether "other sources could reasonably provide Congress the information it needs in light of its particular legislative objective."  *Id.* at 2035–36.  When Congress subpoenas a former President, the step remains "significant" but less so than when a sitting President is involved, because the risk of inter-branch conflict is mitigated when a President no longer occupies office.  So, a court's inquiry about alternative sources should be less rigorous.  For the same reason, with respect to the second *Mazars* factor—which requires a court to "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objectives," *id.* at 2036—a court need not "insist" on as precise a fit when the subpoena is not directed to a sitting President.  And, finally, as to the third *Mazars* factor—which instructs that a court must be "attentive to the nature of the evidence offered" to establish a valid legislative purpose, *id.*—the court's inquiry involving a former President must be

no less "attentive," but a less "detailed and substantial" evidentiary submission to substantiate Congress's claimed legislative purpose may suffice given the circumscribed separation of powers concerns at play.

With these principles in mind, the court now turns to a "*Mazars* lite" analysis of the Maloney Subpoena.

## V.  DISCUSSION

The Committee identifies three legislative tracks that it believes are advanced by the Maloney Subpoena:  (1) presidential conflicts of interest and financial disclosures (the "financial disclosure track"); (2) oversight of GSA's management of the Trump Hotel lease (the "GSA track"); and (3) presidential conformity with the Emoluments Clauses of the Constitution (the "emoluments track").  The court considers each in turn.

### A.    The Financial Disclosure Track

#### 1.    Relevant Context

The Committee's financial disclosure rationale for obtaining President Trump's personal financial information begins with the Ethics in Government Act of 1978.  *See* Maloney Mem. at 6. The Act "requires many aspiring and current government officials, including presidential candidates and sitting Presidents, to file financial disclosure reports at various times during their candidacies and incumbencies." *Mazars II*, 940 F.3d at 714–15 (citing 5 U.S.C. app. 4 § 101(a), (c), (d), (f)).  Presidential candidates and new Presidents must file initial reports that "provide information concerning their income, assets, liabilities, and employers." *Id.* at 715 (citing 5 U.S.C. app. 4 § 102(b)).  Upon entering office, "sitting Presidents must file annual reports disclosing that same information plus details about any covered gifts, real estate and securities transactions, and blind trusts." *Id.* (citing 5 U.S.C. app. 4 § 102(a)).  Incumbent Presidents file their reports with

OGE, "an executive agency tasked with interpreting rules and regulations governing the filing of financial statements." *Id.* (cleaned up).

The Maloney Memorandum explains the need for President Trump's personal financial records, and those of his businesses, to support the Committee's financial disclosure track. The court summarizes that justification here. On May 15, 2018, President Trump disclosed payments to Michael Cohen, his longtime personal attorney, of "$100,001-$250,000" in his financial disclosure form for the 2017 calendar year ("CY 2017 disclosure").[21] Maloney Mem. at 6 (internal quotation marks omitted). The disclosure raised multiple issues. In a letter dated May 16, 2018, the Acting Director of OGE advised the Deputy Attorney General that "based on the information provided" in President Trump's CY 2017 disclosure, the President's calendar year 2016 disclosure omitted a reportable liability, specifically a payment made by Cohen to a third party.[22]  *Id.* Furthermore, court documents from a 2018 federal prosecution of Cohen indicated that he "was actually paid $420,000—not $250,000 or less, as President Trump had personally certified" to OGE in his CY 2017 disclosure.[23]  *Id.* at 7.

On February 27, 2019, Cohen testified before the Committee that he made multiple hush money payments on President Trump's behalf and at his direction.[24]  *Id.* at 10. Cohen provided the Committee with copies of multiple reimbursement checks, signed by President Trump and others, that were issued prior to the President's CY 2017 disclosure.[25]  *Id.* Cohen also testified that President Trump routinely inflated or deflated the estimated value of his assets and liabilities

---

[21] *See* U.S. Office of Gov't Ethics, *OGE Form 278e for President Donald J. Trump* at 45 (May 15, 2018), https://tinyurl.com/4bahex38.
[22] Letter from David J. Apol, Acting Dir., U.S. Office of Gov't Ethics, to Rod J. Rosenstein, Deputy Att'y Gen., U.S. Dep't of Justice (May 16, 2018), https://tinyurl.com/2wxpzcxa.
[23] Government's Sentencing Mem. at 11, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y.), ECF No. 27 (Dec. 7, 2018), https://tinyurl.com/uey8jupu.
[24] Cohen Testimony at 10.
[25] Documents Produced to the Committee, *Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2019), https://tinyurl.com/2tb9vxwu.

29

on financial statements depending on the purpose of those statements.[26]  *Id.*  To corroborate his

claims, Cohen gave the Committee President Trump's "Statements of Financial Condition" from

2011 and 2012, and a one-page "Summary of Net Worth" from 2013.  *Id.*  Those financial

statements—"[a]t least two" of which the Committee claims were prepared by Mazars—along

with Cohen's testimony "raised new questions" for the Committee "about how President Trump

valued his assets and liabilities . . . in his financial disclosures filed with OGE."  *Id.*

After "compar[ing] the information from the Mazars financial statements to [President

Trump's] first federal financial disclosures in 2015, the Committee identified numerous apparent

discrepancies."  *Id.* at 11.  In the Committee's view, these discrepancies suggested "apparent

weaknesses in the financial disclosure requirements."  *Id.*  But because the financial statements

provided only "an incomplete record of [President Trump's] financial holdings," the Committee

"needed significantly more information . . . to tailor legislation to ensure that presidential filers

provide that information."  *Id.*  The Committee considered Mazars to be "a more direct and reliable

source" for what it sought.  *Id.*

The Maloney Memorandum further notes that "[t]he Committee's investigative activities,"

including "the hearing with Michael Cohen, all took place against the backdrop of Congress's

consideration of once-in-a-generation ethics reform legislation."  *Id.* at 12.  Specifically, "the

Committee has been examining whether amendments to the Ethics in Government Act are

appropriate, whether additional legislation is necessary, and, if so, what mechanism or process

would best accomplish the public interest."  *Id.*  The Maloney Memorandum states that the

"Committee's investigation into President Trump's interactions with OGE and the accuracy of his

financial disclosures would inform these important considerations."  *Id.*  The memorandum also

---

[26] Cohen Testimony at 13, 19.

cites other pending disclosure and divestment legislation, and states that the "information from the subpoenaed Mazars documents is necessary for the Committee to determine whether its provisions are over- or under-inclusive." *Id.* at 13.

       2.    *Analysis*

Although the Committee's explanation might validate the Maloney Subpoena were it directed at the personal papers of an ordinary citizen, this case is different. Even under a modified *Mazars* test, the Committee's financial disclosure rationale for the Maloney Subpoena falls short in two key respects.

First, the Committee does not adequately explain why other sources of information—outside President Trump's personal papers—could not "reasonably provide Congress the information it needs in light of its particular legislative objective." *Mazars III*, 140 S. Ct. at 2035–36. The Maloney Memorandum offers many examples of hypothetical legislation that the Committee may consider in the financial disclosure realm. "[T]he Committee may recommend amending the Ethics in Government Act to require presidents and presidential candidates to reveal more details about their financial holdings or require submission of supporting materials such as tax returns, bank statements, or other supporting documents." Maloney Mem. at 13–14. It may "update the financial disclosure requirements in order to reflect the true ownership structure of businesses" held by Presidents. *Id.* at 14. It "could decide that OGE's review of financial disclosures should . . . examin[e] underlying information for accuracy rather than screen[] for technical correctness." *Id.* And it could support "legislation that grants additional investigative and enforcement authority to OGE, provides OGE with additional resources to undertake investigations and audits, or insulates OGE from undue influence by the President." *Id.* Additionally, the Committee could support "requir[ing] the disclosure of any executive branch or

federal agency spending at any privately-held company owned by [the] President, either in full or in part." *Id.*

For every legislative objective above, however, the court is still left wondering about the necessity (or even unique usefulness) of President Trump's personal papers. The Committee primarily refers to "the extent and complexity of his financial holdings," as the reason President Trump's information could aid in the tailoring of disclosure legislation. *Id.* at 11. But President Trump is hardly the only high-level public official to have presented potential disclosure concerns based on ownership of significant businesses and other assets.[27] It remains unclear, for instance, why the question of whether Presidents' financial disclosures should "reflect the true ownership structure" of businesses they own, *id.* at 14, cannot be just as informed by investigating the finances of other, non-presidential officials with similar complex interests.[28] Or why an expert in complex business holdings might not supply the information the Committee seeks.

The Committee offers a series of independent reasons why President Trump's personal papers will uniquely advance its legislative objectives. None are persuasive. The Committee asserts that the subpoenaed material could convince the Senate that the House's proposed reforms are necessary. *See* Committee Cross-Mot. at 32–33. But that argument proves too much. It can always be said that additional facts might in theory convince on-the-fence legislators, even when the practical likelihood is exceedingly low. If that reason were enough, the separation of powers claims asserted by former Presidents in cases like this one would be entirely toothless. The

---

[27] *See, e.g.*, Josh Mitchell, *Penny Pritzker Understated Income by $80 Million*, WALL ST. J. (May 22, 2013), https://tinyurl.com/w4myjbvh; Carrie Levine, et al., *'Not In Compliance': Wilbur Ross, The Trump Official Who Keeps Watchdogs Up at Night*, NPR (Feb. 27, 2019), https://tinyurl.com/yv6vr35h.

[28] At oral argument, the Committee speculated that Plaintiffs would still object if presidential disclosure requirements were tailored "based on Cabinet officials, et cetera." Hr'g Tr. at 79–82. But such an objection would likely ring hollow in the absence of the same separation of powers concerns attending the personal papers of either current or former Presidents.

Committee also suggests that reviewing President Trump's personal financial information would permit more tailored legislation and thus would "serve[] to protect the Office of the President." Maloney Mem. at 41.  This reasoning strikes the court as too clever by half.  The Committee cannot justify an imposition on the separation of powers by contending that the imposition would itself help protect the separation of powers.  Finally, the Committee argues that the subpoenaed material "is necessary . . . to determine whether" its legislative efforts "are over- or under- inclusive." *Id.* at 13.  But Congress is not entitled to perfect information before it legislates on a given topic, especially when the claimed need for tailoring is predicated on the personal records of a former President.  As the Supreme Court noted, "efforts to craft legislation involve predictive policy judgments that are 'not hampered . . . in quite the same way' [as criminal proceedings] when every scrap of potentially relevant evidence is not available." *Mazars III*, 140 S. Ct. at 2036 (quoting *Cheney*, 542 U.S. at 384).  In sum, the Committee fails to demonstrate why the subpoenaed material is "reasonably necessary" to support its legislative objectives.  *Id.*

Second, the Committee's need for insights into President Trump's finances is outweighed by "the burdens imposed . . . by [the] subpoena." *Id.*  The Committee is not demanding the subpoenaed material on a clean slate; the preexisting financial disclosure regime the Committee seeks to build on is already quite extensive.[29]  So, too, are Congress's efforts to bolster that regime. As explained above, Presidents must file annual reports that cover their income, assets, liabilities, covered gifts, real estate and securities transactions, and blind trusts.  *See* 5 U.S.C. app. 4 § 102(a), (b); *see* Public Financial Disclosure Guide (describing 37 types of reportable employment assets and income, 40 types of other reportable assets and income, and 24 types of reportable employment

---

[29] *See* U.S. Office of Gov't Ethics, *Public Financial Disclosure Guide* [hereinafter Public Financial Disclosure Guide], https://www.oge.gov/Web/278eGuide.nsf (last visited August 11, 2021) ("The Act imposes *detailed* requirements for public financial disclosure by senior United States Government officials." (emphasis added)).

Case 1:19-cv-01136-APM   Document 72   Filed 08/11/21   Page 34 of 53

agreements and arrangements); Maloney Mem. at 6 (noting that a reportable liability is "defined broadly and includes a wide variety of debts"). Moreover, the House has already considered and passed H.R. 1, "a sweeping bill that includes a number of reforms that will strengthen accountability for executive branch officials—including the President." Maloney Mem. at 12 (internal quotation marks omitted). The Maloney Memorandum reinforces the comprehensive nature of the proposed reforms:

> The relevant provisions in H.R. 1 would amend the Ethics in Government Act to require additional financial disclosures to be filed with OGE, require the President and Vice President to divest from financial holdings that may pose a conflict of interest or else disclose significant financial information on their business interests, including ownership structure and assets and liabilities exceeding $10,000, and require candidates for President and Vice President to disclose ten years of federal tax returns with the Federal Election Commission.

*Id.* at 12–13 (footnotes omitted) (citing H.R. 1, §§ 8012, 8013, 8022, 10001). Viewed in the context of what Congress and the House in particular have already done in crafting enhanced financial disclosure legislation, the legislative objectives the Committee identifies are relatively incremental and therefore present only a limited need for President Trump's financial records. *See id.* at 13–14 (discussing hypothetical legislation).

Such limited legislative need cannot justify the degree to which the Maloney Subpoena imposes on the separation of powers, even in the case of a former President. Recall that the remaining separation of powers concern at issue involves the threat of a post-presidency congressional subpoena for personal information in order to influence "how the sitting President treats Congress while in office." Pls.' Reply at 17. The risk of "unnecessary intrusion into the operation of the Office of the President," *Mazars III*, 140 S. Ct. at 2036 (internal quotation marks omitted), increases with a subpoena's breadth and intrusiveness. The more Congress can invade

the personal sphere of a former President, the greater the leverage Congress would have on a sitting President. *See id.* at 2034–35 ("In fact, a subpoena for personal papers may pose a heightened risk of such impermissible purposes, precisely because of the documents' personal nature and their less evident connection to a legislative task."). And the greater the leverage, the greater the improper "institutional advantage," *id.* at 2036, Congress would possess over a co-equal branch of government.

Here, the scope of the Maloney Subpoena is undeniably broad. It covers President Trump, his revocable trust, five of his corporations, his foundation, and "any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing." Maloney Subpoena at 2. As to those parties, the subpoena demands (1) "[a]ll statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited" by Mazars; (2) "all [related] engagement agreements or contracts"; (3) all related "source documents"; and (4) "[a]ll [related] memoranda, notes, and communications." *Id.* The covered time period defaults to "calendar years 2011 through 2018"—from years before President Trump took office through only the first two years of his term. *Id.* Due to its broad, invasive nature, the subpoena poses an appreciable risk to the separation of powers. The Supreme Court recognized as much. *Mazars III*, 140 S. Ct. at 2035 (observing that the "personal" nature of the papers sought "appears to be what makes the matter of such great consequence to the President and Congress"). In the current polarized political climate, it is not difficult to imagine the incentives a Congress would have to threaten or influence a sitting President with a similarly robust subpoena, issued after he leaves office, in order to "aggrandize itself at the President's expense," *Id*. at 2034. In the court's view, this not-insignificant risk to the institution of the presidency outweighs the Committee's incremental legislative need for the material subpoenaed from Mazars.

After balancing the attendant legislative objectives and needs with the risk to the separation of powers posed by the Maloney Subpoena, the court concludes that the financial disclosure track cannot justify the Maloney Subpoena, even under a modified *Mazars* test.[30]

**B.      The GSA Track**

Separately, the Committee argues that the Maloney Subpoena would advance its parallel investigation into President Trump's lease agreement with GSA for the Old Post Office Building and related legislation.  Maloney Mem. at 5.  Here, the court agrees, but with certain qualifications.

*1.      Relevant Context*

In March 2011, "GSA began soliciting proposals for the redevelopment of the Old Post Office Building."[31]  Maloney Mem. at 15.  The solicitation required, among other things, "[a]udited or certified financial statements" from "the developer and each participating principal, partner or co-venturer."[32]  *Id.*

On June 5, 2013, GSA announced that it had completed negotiations with the Trump Organization on a 60-year lease to redevelop and manage the Old Post Office building as a luxury hotel.[33]  On August 5, 2013, GSA entered a lease agreement with the newly created Trump Old

---

[30] The Committee also contends that the Office of Legal Counsel's July 30, 2021 memorandum opinion "supports the enforceability of the subpoena in this case."  Notice of Recent Office of Legal Counsel Op., ECF No. 71 [hereinafter OLC Opinion Notice], at 1.  There, OLC concluded that the Secretary of the Treasury must comply with a congressional request for tax and financial information related to President Trump and his businesses.  *See* OLC Opinion Notice, Ex. 1, ECF No. 71-1, at 39.  But OLC's opinion arises out of a materially different factual context. The relevant congressional request was made pursuant to an actual statute.  *Id.* at 24 ("Executive Branch officials should pay particular heed to this judgment.").  That is not the state of play here.  More importantly, the principal legislative need offered for President Trump's tax returns—"evaluating the extent to which the IRS audits and enforces Federal tax laws against a President," *id.* at 3 (internal quotation marks omitted)—is not at issue in the present dispute.

[31] Gen. Servs. Admin., '*Request for Proposals': Redevelopment of The Old Post Office Building, 1100 Pennsylvania Avenue, NW, Washington DC* (Mar. 24, 2011), https://tinyurl.com/tp3a9yf7 (updated Sept. 12, 2013).

[32] *Id.*

[33] Press Release, Gen. Servs. Admin., *GSA and Trump Organization Reach Deal on Old Post Office Lease* (June 5, 2013), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-and-trump-organization-reach-deal-on-old-post-office-lease.

36

Post Office LLC.[34]  *Id.* at 16.  Section 37.19 of the lease prohibited any "elected official of the Government of the United States" from being "admitted to any share or part of th[e] Lease, or to any benefit that may arise therefrom."[35]  *Id.* (emphasis omitted) (internal quotation marks omitted). Immediately after the 2016 election, then–Ranking Member Cummings began an investigation into how GSA would resolve "the imminent breach-of-lease and conflict-of-interest issues created by" President Trump's election.  *Id.* at 17.  At the time, GSA took the position that it would be premature to address those issues until President Trump took office and his "business arrangements [had] been finalized."[36]  *Id.* (internal quotation marks omitted).  On March 23, 2017, two months after President Trump was sworn in, GSA concluded that he was "in full compliance with Section 37.19" and that "the Lease [was] valid and in full force and effect."[37]  *Id.* at 18 (internal quotation marks omitted).

Nearly two years later, on January 16, 2019, GSA's Office of Inspector General issued a report finding that President Trump's continued interest in the lease "raised issues under the Constitution's Emoluments Clauses" that GSA officials had "improperly ignored."[38]  *Id.* at 18–19. The report also determined that "GSA's unwillingness to address the constitutional issues affected its analysis of Section 37.19" of the lease.[39]  The report concluded that "GSA's decision-making process related to . . . [the] possible breach of the lease included serious shortcomings."[40]

---

[34] Gen. Servs. Admin., *Ground Lease by and Between the United States of America (as "Landlord") and Trump Old Post Office LLC (as "Tenant")* (GS-LS-11-1307) (Aug. 5, 2013), available for download at https://tinyurl.com/3jzkn7t6.
[35] *Id.*
[36] Press Release, Gen. Servs. Admin., *GSA Releases Statement on Old Post Office Lease* (Dec. 14, 2016), https://tinyurl.com/dyd835x3.
[37] Letter from Kevin M. Terry, Contracting Officer, Gen. Servs. Admin., to Donald J. Trump, Jr., Old Post Office LLC, at 1 (Mar. 23, 2017), available for download at https://tinyurl.com/3jzkn7t6 (last visited August 11, 2021).
[38] Gen. Servs. Admin., Office of Inspector Gen., *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease* at 23 (Jan. 16, 2019) [hereinafter GSA Inspector General Report], https://tinyurl.com/c5uc46ny.
[39] *Id.*
[40] *Id.*

Adding fuel to the fire, during his hearing in late February 2019, Michael Cohen testified that President Trump routinely altered the estimated value of his assets and liabilities on financial statements.[41]   Maloney Mem. at 19.   So, the Committee "expanded its investigation" and "requested documents from both Mazars and GSA in order to understand whether the President's initial bid and later financial guarantees for the Old Post Office hotel [also] contained inaccuracies." *Id.* at 20.  "On April 12, 2019, Chairman Cummings and Subcommittee Chairman Gerald E. Connolly sent a letter to GSA requesting 14 categories of documents relating to the Committee's investigation of the" Old Post Office Building lease.[42] *Id.*  On August 22, 2019, GSA sent a letter to Cummings and Connolly explaining the agency's production of over 15,000 pages of responsive documents and its withholding of certain categories of requested documents.[43]  GSA stated, however, that it could not produce any responsive documents that fell under the lease's definition of "Confidential Information" "without [the Trump Organization's] consent," and that the Trump Organization had objected.[44]  As for its refusal to produce documents submitted by President Trump in response to the agency's request for proposals for the redevelopment of the Old Post Office Building, GSA stated that the "information may be more readily available from third parties, including [Trump Old Post Office LLC], wh[ich] had specifically objected to its disclosure."[45]  *Id.* at 22.  On April 29, 2020, Chairwoman Maloney "sent a letter to GSA

---

[41] Cohen Testimony at 13, 19.

[42] Cummings' April 12th GSA Letter.

[43] *See* Letter from Jeffrey A. Post, Assoc. Adm'r, Gen. Servs. Admin., to Chairman Elijah E. Cummings, Comm. on Oversight & Reform, Chairman Gerald E. Connolly, Subcomm. on Gov't Operations (Aug. 22, 2019), https://tinyurl.com/tzz9xwsc.

[44] *Id.* at 2.

[45] *Id.*

demanding full compliance with the outstanding document requests contained in the Committee's April 12, 2019 letter."[46]  *Id.*

More than a year later, on July 14, 2021, after remand to this court, GSA produced 1,600 pages of records, some of which the Committee considers also responsive to the Maloney Subpoena.  *See* Notice, ECF No. 67 [hereinafter July 14th Notice], at 1; Reply to Pls.' Resp. to Intervenor-Def.'s Notice, ECF No. 70 [hereinafter Reply to Notice], at 2.  Those records "include six financial statements, each less than 20 pages in length."  Reply to Notice at 2.  Notwithstanding this recent production by GSA, the Committee insists that it still needs documents from Mazars "to determine the accuracy and completeness of the information submitted to GSA, to assess the need for legislative reforms to safeguard the GSA bid process and the administration of its leases, and to address the constitutional deficiencies and potential Emoluments Clause violations stemming from the Old Post Office Building lease."  *Id.*

2.    *Analysis*

The Maloney Memorandum lists several legislative objectives of the GSA track that the Committee claims could be aided by the subpoenaed material.  Maloney Mem. at 23.  Depending on the information revealed, the Committee could consider legislation that would, among other things:

> (i) increase oversight of GSA's management of federal leases that may implicate Emoluments Clause or conflict-of-interest issues; (ii) tighten requirements for the submission of audited financial documentation from bidders and leaseholders, particularly those who may be able to exert undue influence on GSA; (iii) require GSA to provide bidding and financial documents of federal leaseholders to Congress upon request; and (iv) require consideration of the

---

[46] Letter from Chairwoman Carolyn B. Maloney, Comm. on Oversight & Reform, Chairman Gerald E. Connolly, Subcomm. on Gov't Operations, to Emily Murphy, Adm'r, Gen. Servs. Admin. (Apr. 29, 2020), https://tinyurl.com/xseuhds.

> Emoluments Clause in GSA's management and assessment of lease
> agreements.

*Id.*

For their part, Plaintiffs advance three primary objections. First, they assert that the Committee "has not 'adequately identif[ied]' the 'particular legislative objective' that justifies a subpoena to [President Trump]." Pls.' Mot. at 20 (quoting *Mazars III*, 140 S. Ct. at 2036). In Plaintiffs' view, the Committee's "vague[]" references to potential legislation regarding "stewardship of taxpayer dollars" and "proper review and management" of GSA leases "lack the detail necessary to justify a subpoena for a President's papers." *Id.* at 20–21 (cleaned up).

Second, Plaintiffs contend that "the Committee has not substantiated why its lease rationale warrants a subpoena to a President, let alone a subpoena of this breadth." Pls.' Mot. at 21 (citing *Mazars III*, 140 S. Ct. at 2035–36). Among its justifications, the Committee claims that it needs the subpoenaed material for its study of GSA's process for awarding and managing leases. *See* Maloney Mem. at 23. Specifically, the Committee asserts that President Trump might have misrepresented his finances when he bid on the lease in 2011 and when he "personally certified every six months" from August 2013 to August 2016 "that his financial condition had not adversely changed since he submitted his proposal to GSA." *See id.* at 20 (noting that, until substantial completion of the Old Post Office redevelopment project, President Trump was "required to maintain a personal net worth of at least $2 billion"). Plaintiffs cry foul, calling the Committee's assertions "baseless speculation" predicated on "Cohen's vague testimony about *entirely different* financial statements and transactions." Pls.' Mot. at 22. That testimony, Plaintiffs argue, can "hardly . . . justify" a subpoena for President Trump's personal financial information. *Id.*

40

Third, Plaintiffs assert that the Committee "is perfectly capable of considering reforms to GSA's lease policies without detailed information about President Trump's finances." *Id*. at 23. "[I]f the Committee needs to know more about GSA's lease policies, then it can simply ask GSA." *Id.* They add that "[t]o the extent the Committee is dissatisfied that GSA did not turn over every last document the Committee asked for, that is how accommodation [between the executive and legislative branches] works." *Id.* (citation omitted) (citing *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977)).

Each of these arguments assumes the application of separation of powers principles that have little, if any, force here. During oral argument, Plaintiffs conceded that the Committee could subpoena the same material for an ordinary leaseholder who was not (and had never been) President. Hr'g Tr. at 34. When asked why President Trump should be treated differently, Plaintiffs responded that the Committee should "have to satisfy [the *Mazars* test]." *Id.* at 34–35. But the *Mazars* test was premised on separation of powers notions *inherent* to the Office of the President. *See Mazars III*, 140 S. Ct. at 2035 (emphasizing the "unique position" of the President (internal quotation marks omitted)). Here, the genesis of the Committee's GSA investigation is a lease that President Trump, through his business interests, signed with GSA in 2013, more than three years before becoming President; maintained throughout his presidency; and continues to hold after leaving office. *See* Committee SOMF ¶¶ 16–18. The decision to bid for the lease was entirely voluntary, as was the decision to sign it and be bound by its terms. The same is true for President Trump's choice not to divest his interests in the lease upon entering public office. Nothing about the lease or the Committee's subsequent investigation necessarily implicates the concerns underlying the *Mazars* test because neither is inherent to the presidency and both are straightforwardly avoidable. A presidential candidate can choose not to contract with the federal

41

government, or can divest his interests upon assuming office, and thereby avoid the accompanying scrutiny.  Contrast that with the financial disclosure track, which could result in Congress issuing or threatening to issue broad subpoenas for personal information to future sitting Presidents. Because Congress can always assert *some* disclosure-related legislative rationale for any President's personal papers, the potential threat of a related subpoena is unavoidable for a President and therefore implicates the separation of powers. The same cannot be said about the Committee's GSA track rationale.  It is unique to President Trump.  By freely contracting with GSA for his own private economic gain, and by not divesting upon taking office, President Trump opened himself up to potential scrutiny from the very Committee whose jurisdiction includes the "management of government operations and activities, including Federal procurement," House of Representatives Rule X(n), cl. (6) (2021).  That he happened to occupy the presidency for some portion of his still-in-effect lease does nothing to change that fact.

And the likelihood that future Presidents will be subject to similar congressional inquiry appears remote.  Neither side has cited any historical precedent for a former President maintaining a business relationship with the federal government of the kind at issue here.  Absent such a business tie, Congress's leverage over a sitting President who might fear a retributive subpoena upon leaving office for personal financial records disappears.  Thus, there is little "institutional advantage" to be had from a subpoena that springs from a voluntary business relationship that a President maintains with the federal government.  *Mazars III*, 140 S. Ct. at 2036.

Once separation of powers principles no longer factor into the analysis—or are at least greatly diminished—the court's treatment of the Maloney Subpoena and the GSA track resembles the treatment of any ordinary congressional subpoena.  More to the point, Plaintiffs' various arguments lose their force.  At the outset, the Maloney Memorandum's explanation of the

42

Committee's legislative objective suffices, even if those objectives are imprecise.  "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  *Eastland*, 421 U.S. at 509.  Next, the allegedly "vague" nature of Cohen's testimony about President Trump's financial statements is insufficient to call the subpoena into question.  *See Mazars I*, 380 F. Supp. 3d at 92–93 (noting that in ordinary circumstances, "[o]nly an investigative demand that is 'plainly incompetent or irrelevant to any lawful purpose of the [committee] in the discharge of its duties' will fail to pass muster" (quoting *McPhaul v. United States*, 364 U.S. 372, 381 (1960))).  And finally, the court need not closely scrutinize whether "other sources could reasonably provide . . . the information [the Committee] needs."  *Mazars III*, 140 S. Ct. at 2035–36.  On this last point, even assuming the Committee were required to ask GSA for documents first, it already has.  *See* Maloney Mem. at 20 & n.85; *see* Pls.' Mot. at 23 (acknowledging the same).  As recently as July 14, 2021, GSA produced certain documents that the Committee recognizes as overlapping with the subpoenaed material from Mazars.  *See* July 14th Notice at 1 (indicating that the Committee will "communicate with Mazars regarding any feasible ways to reduce Mazars' burden by excluding identical documents received from GSA").  But the Committee still requires the nonidentical subpoenaed material "to determine the accuracy and completeness of the information submitted to GSA."  *Id.* at 2.[47]

---

[47] Also inapplicable is the Supreme Court's instruction that Congress may not look to the President "as a 'case study' for general legislation."  *Mazars III*, 140 S. Ct. at 2036.  Just as with Plaintiffs' arguments above, this constraint on Congress's subpoena authority turns on the application of separation of powers principles that are greatly diminished in the context of the GSA track.  *See id.* (listing this concern in light of the principal that "constitutional confrontation between the two branches should be avoided whenever possible" (internal quotation marks omitted)).  Moreover, the GSA track is not directed at "general legislation" of the kind that the Supreme Court referenced in *Mazars*.  *See id.* (citing a congressional examination of how well banking regulators are discharging their responsibilities and whether new legislation is needed).  The stated legislative purpose here centers on the leasing of federal properties, not on a broad industry.

Of course, Plaintiffs' objections aside, the Committee nevertheless maintains the burden to show that the subpoenaed material is "related to, and in furtherance of" its valid legislative purpose. *See Watkins*, 354 U.S. at 187. The subpoena, taken as a whole, fails this standard. On the present record, of the eight individuals and entities listed in the Maloney Subpoena, the Committee has demonstrated that only the materials concerning President Trump, Trump Old Post Office LLC, and the Trump Organization are related to the GSA track. *See* Maloney Mem. at 15, 20 (President Trump and Trump Old Post Office LLC submitted certificates of financial status pursuant to the lease); *id*. at 16 (GSA selected Trump Organization for the Old Post Office redevelopment effort). The remaining entities are not evidently within the scope of the Committee's GSA track.

The parties disagree on how to address the subpoena's overbreadth. Plaintiffs cite language in *Mazars III* instructing courts "to insist on *a* subpoena that is no broader than reasonably necessary." Hr'g Tr. at 47 (emphasis added) (citing 140 S. Ct. at 2036). In their view, that means the subpoena must be "good in full." *Id.* And the proper remedy for an overbroad subpoena, Plaintiffs contend, is invalidation. *Id.* Plaintiffs admit, however, that "if [the court] invalidate[s] a full subpoena, the Committee is free to come back with a narrower subpoena." *Id.* By contrast, the Committee submits that narrowing is an option. *See id.* at 96 ("[I]f [the court] find[s] that some parts of the subpoena are valid and other parts are not, [the Committee is] not aware of any reason why [the court] couldn't so rule.").

The Committee has the better argument. Plaintiffs overread the language in *Mazars III*. A judicially narrowed subpoena is still a subpoena. And insofar as the Committee is of the view that a judicial narrowing poses no separation of powers concerns, the court sees no issue with that course of action. Accordingly, the court finds that the GSA track warrants summary judgment for

the Committee on the subpoenaed materials of only President Trump, Trump Old Post Office LLC, and the Trump Organization.[48]

## C.    The Emoluments Track

Finally, the Committee asserts that the Maloney Subpoena would advance its investigation into whether "President Trump's receipt of funds from foreign governments, federal officials, or state officials through his business holdings[] result[ed] in receipt of Emoluments."   Maloney Mem. at 5.   As with the GSA track, the court agrees in some respects but not others.

### 1.    Relevant Context

The Constitution "imposes two separate requirements pertaining to the President's private finances."   *Mazars II*, 940 F.3d at 734.   "[T]he so-called Domestic Emoluments Clause[] prohibits the President from receiving 'any . . . Emolument' from the federal or state governments other than" his salary as President.   *Id.* (quoting U.S. Const. art. II, § 1, cl. 7).   "[T]he so-called Foreign Emoluments Clause prohibits any federal official 'holding any Office of Profit or Trust'—the President included—from 'accept[ing] . . . any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State' without 'the Consent of Congress.'"   *Id.* (quoting U.S. Const. art. I, § 9, cl. 8).   Neither the Supreme Court nor the D.C. Circuit has clarified the precise meaning of an "emolument."   That said, the only two district courts to interpret the term have done so broadly.   *See Blumenthal v. Trump*, 373 F. Supp. 3d 191, 207 (D.D.C. 2019) ("'Emolument' is broadly defined as any profit, gain, or advantage."), *rev'd on other grounds*, 949 F.3d 14 (D.C. Cir. 2020); *District of Columbia v. Trump*, 315 F. Supp. 3d 875, 904 (D. Md. 2018) (finding that "emoluments" "extend[] to any profit, gain, or advantage, of more than *de minimis*

---

[48] This ruling does not foreclose the Committee's ability to later demonstrate that the materials of other entities covered in Maloney Subpoena are also related to the GSA track.  On the present record, however, the Committee has not done so.

value, received by [the President], directly or indirectly, from foreign, the federal, or domestic governments"), *vacated*, 838 F. App'x 789 (mem.) (4th Cir. 2021).

As for foreign emoluments, the Committee, relying on various news articles, claims that "foreign governments reportedly . . . paid millions of dollars to [President Trump's] businesses—hotels, commercial and residential towers, and golf courses and resorts—at the same time the Trump Administration . . . developed and conducted foreign policy affecting those foreign governments." Maloney Mem. at 24–26 (citing articles indicating payments and benefits from the governments of Afghanistan, China, India, Iraq, Kuwait, Malaysia, Qatar, Saudi Arabia, Slovakia, and Thailand).

The Committee's investigation into foreign emoluments began in April 2017, when the Republican-led Committee sent a bipartisan letter to counsel for the Trump Organization.[49] *Id*. at 27. "The letter requested documents and a meeting with Trump Organization officials to determine how [President Trump] intended to comply with the Constitution's Foreign Emoluments Clause." *Id.* On May 11, 2017, the Trump Organization wrote back, stating that it would be "premature" to respond before the close of the calendar year.[50] *Id.* (internal quotation marks omitted). In response to congressional and media scrutiny regarding payments from foreign governments, "President Trump pledged to donate to the United States Treasury all profits from foreign government payments to his hotels during his presidency." *Id.* at 26 (internal quotation marks omitted). In 2017, the Trump Organization transmitted payment of $151,470 to the Department of the Treasury. *Id.*

---

[49] Letter from Chairman Jason Chaffetz & Ranking Member Elijah E. Cummings, Comm. on Oversight & Gov't Reform, to Sheri A. Dillon, Partner, Morgan Lewis (Apr. 21, 2017), https://tinyurl.com/mxve4tyk.

[50] Letter from George A. Sorial, Exec. Vice President & Chief Compliance Couns., The Trump Organization, to Chairman Jason Chaffetz & Ranking Member Elijah E. Cummings, Comm. on Oversight & Gov't Reform, at 2 (May 11, 2017), https://tinyurl.com/4694u977.

On March 12, 2018, then–Ranking Member Cummings wrote to the Trump Organization asking for "documents sufficient to show the calculation for the payment to Treasury, including the foreign government entities that made payments, the amounts of the payments, the dates of the payments, which Trump Organization entities received the payments, the goods or services received for the payments, and any calculation of profits."[51]   *Id.* at 28 (internal quotation marks omitted).

On April 6, 2018, the Trump Organization responded with a general description of its "methods of identifying and calculating foreign government patronage," but it declined "to provide all responsive documents, including the identities of foreign sources of income."[52]   *Id.*   In April 2019, after the GSA Inspector General issued a report concluding that the agency had mishandled Emoluments Clause concerns related to the Trump International Hotel in Washington, D.C., Chairman Cummings and Subcommittee Chairman Connolly sent a letter to GSA requesting records regarding, among other things, the agency's treatment of those concerns.[53] *Id.* at 29.  As noted above, the Committee has received some but not all the requested documents. *See* July 14th Notice at 1.

The Committee also suggests that "President Trump's failure to fully separate himself from his businesses may have affected domestic policy."  Maloney Mem. at 26 (citing a news article for the claim that "[a]t least 285 administration officials, 90 Members of Congress, and 47 state officials reportedly visited and patronized [President Trump's] properties by January 2020").

---

[51] Letter from Ranking Member Elijah E. Cummings, Comm. on Oversight & Government Reform, to George A. Sorial, Exec. Vice President & Chief Compliance Couns., The Trump Org., at 4 (Mar. 12, 2018), https://tinyurl.com/3jchzae3.
[52] Letter from George A. Sorial, Exec. Vice President & Chief Compliance Couns., The Trump Org., to Ranking Member Elijah E. Cummings, Comm. on Oversight & Gov't Reform (Apr. 6, 2018), https://tinyurl.com/pv5md25s.
[53] Cummings' April 12th GSA Letter.

2.      *Analysis*

a.      Foreign Emoluments

The Maloney Memorandum asserts that the subpoenaed material "may show the tangible and intangible benefits President Trump has received and how [his] businesses have kept track of, or failed to keep track of, payments from . . . sources." *Id.* at 31.  That information, according to the memorandum, could help:

- "[A]id consideration of legislation regarding the type of expenses that must be reported as foreign emoluments, [as] [d]epending on the value and types of benefits, Congress could consider requiring [President Trump's] and future presidents' businesses to separately report funds received from certain sources until Congress . . . reviews and approves";
- "Congress clarify and define incidental or *de minimis* payments that [it] could exempt categorically from needing to seek consent";
- "Congress decide how to define the entities or organizations that fall into the definition of 'King, Prince, or foreign State' in the Foreign Emoluments Clause."

*Id.*

Plaintiffs argue that the emoluments track fails each factor of the *Mazars* test.  On the first factor, they characterize the Committee's description of potential legislation as "precisely the kind of 'vague' and 'loosely worded' evidence" of legislative purpose "that the Supreme Court deemed insufficient."  Pls.' Mot. at 16 (quoting *Mazars III*, 140 S. Ct. at 2036); *id.* ("[T]he Committee has provided no detailed or substantial explanation of the disclosure laws or other remedial legislation that it's considering." (cleaned up)).

Regarding the second factor, Plaintiffs submit that the Committee "does not need a 'full accounting' of President Trump's financial history" to make any of the legislative decisions listed in the Maloney Memorandum.  *Id.* at 16–17 (quoting Maloney Mem. at 30–31).  The press reports and responses from the Trump Organization cited in the Maloney Memorandum, Plaintiffs claim, are "more than enough."  *Id.* at 17.  Plaintiffs also contend that by subpoenaing Mazars rather than

Plaintiffs directly, the Committee sidestepped its obligation to engage in the "traditional accommodation process" between Congress and the President.  *Id.* at 18.

As for the third factor, Plaintiffs maintain that the subpoena "is not cabined to documents that would reveal what the Committee would call 'emoluments.'"  *Id.* at 19.  In Plaintiffs' view, the only relevant documents potentially in Mazars's possession "are the Trump Washington, D.C. hotel's ledger, receipts, and other financial and accounting documents showing the hotel's revenue from foreign governments."  *Id.* (cleaned up).  "But the Mazars subpoena is not limited to those documents."  *Id.*

On the fourth factor, Plaintiffs first note how the subpoena's scope contributes to its burden on "the operation of the office of the Presidency."  *Id.* at 19 (internal quotation marks omitted) (quoting *Mazars III*, 140 S. Ct. at 2036).  They then assert that the Committee's rationale "would allow Congress to subpoena the financial records of *any* President or *any* federal employee" in the name of considering disclosure legislation.  *Id.* at 20.

The court disagrees with these contentions.  Plaintiffs overstate the separation of powers concerns attendant to potential legislation in furtherance of Congress's expressly granted authority under the Foreign Emoluments Clause.  Recall that the Clause prohibits any federal official "holding any Office of Profit or Trust"—including the President—from "accept[ing] . . . any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State" without "the Consent of Congress."  U.S. Const. art. I, § 9, cl. 8.  By its own terms, the Clause contemplates Congress's active enforcement or waiver of the default prohibition on foreign emoluments.  Therefore, the "balanced approach" to separation of powers made concrete by the four-factor *Mazars* test must, in this context, lean in favor of Congress.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring) ("Where a power has been

committed to a particular Branch of Government in the text of the Constitution, the balance has been struck by the Constitution itself."); *I.N.S. v. Chadha*, 462 U.S. 919, 945 (1983) (concluding that the lawmaking process must adhere to the "[e]xplicit and unambiguous provisions of the Constitution [that] prescribe and define the respective functions of [Congress and the Executive]").

Sensing this conclusion, Plaintiffs reply that Congress's "power [to 'consent' to foreign emoluments] says nothing about the power to compel disclosures." Pls.' Reply at 22. "The power to mandate disclosure would have to be necessary and proper to the power to consent, but whether disclosure legislation is necessary and proper would simply reraise the difficult questions surrounding presidential disclosures more broadly." *Id.* But as Plaintiffs admit, the Necessary and Proper Clause is "properly read as 'a means of making the exercise of powers by the various branches effective.'" *Id.* (internal quotation marks omitted) (quoting *Consumer Energy Couns. of Am. v. FERC*, 673 F.2d 425, 455 n.127 (D.C. Cir. 1982)). Applied here, Congress's power to consent—or not consent—to foreign emoluments allows it to enact laws that are "derivative of, and in service to, [that] granted power," *NFIB v. Sebelius*, 567 U.S. 519, 560 (2012). If Congress cannot mandate disclosure pursuant to its consent authority, one wonders how it could possibly exercise that authority effectively. *Cf. Mazars II*, 940 F.3d at 734 ("If the President . . . must seek Congress's permission before accepting any foreign emoluments, then surely a statute facilitating the disclosure of such payments lies within constitutional limits."). Presidents could simply conceal foreign emoluments from Congress to avoid scrutiny—a result contrary to the Framers' intent.

Plaintiffs also suggest that, to validate any part of the Maloney Subpoena under the emoluments track, the court would have to first define an emolument, in order to ensure that the Committee's legislative objectives are constitutionally sound. *See* Hr'g Tr. at 44; *see also* Pls.'

Mot. at 16 (criticizing the Committee's potential disclosure laws for incorporating an overly broad definition of an emolument).  Plaintiffs are mistaken.  In this context, the court need not precisely define the outer bounds of what qualifies as a foreign emolument.  *See Rumely*, 345 U.S. at 46 (counseling that courts should avoid declaring an investigation by Congress unconstitutional unless "no choice is left"); *see also Nashville, C. & St. L. Ry v. Wallace*, 288 U.S. 249, 262 (1933) (explaining that courts may not make "abstract determination[s] . . . of the validity of a statute" or issue "decision[s] advising what the law would be on an uncertain or hypothetical state of facts"). Federal courts do not "render advisory opinions.  For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite."  *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 76, 89 (1947) (internal quotation marks omitted) (footnote omitted). Because that requirement is not met here, the court need not define the four corners of an emolument in order to accept the Committee's argument.  *Cf. Mazars II*, 940 F.3d at 737 (finding "no inherent constitutional flaw" in the Committee's disclosure justification as a basis on which legislation may be had).  In any event, the types of foreign payments that the Committee seeks to learn about here are not so far outside the scope of what might be considered a foreign emolument as to justify denying the Committee's request for records.  *See Blumenthal*, 373 F. Supp. 3d at 207; *Trump*, 315 F. Supp. 3d at 904; *see also* GSA Inspector General Report at 16 ("In sum, we found evidence that the term 'emolument' as used historically and today includes the gain from private business activities.").

Finally, Plaintiffs' concern that an emoluments rationale always could be used to subpoena a past President's personal records is a legitimate one, but is ameliorated here by the fact that the Committee has presented "detailed and substantial" evidence, *Mazars III*, 140 S. Ct. at 2036, that President Trump, at least through his business interests, likely received foreign payments during

the term of his presidency. *See* Maloney Mem. at 25–26 (citing sources regarding hotel revenues, trademark rights, and commercial and residential leases). Indeed, early on, this was an issue of bipartisan interest to Congress, and it led President Trump to commit to contribute to the U.S. Treasury the profits from foreign government payments to his hotels. *Id*. at 27. The Trump Organization transmitted payments to the Treasury of $151,470, $191,538, and $105,465 in 2017, 2018, and 2019, respectively, *id.* at 26, thereby validating the Committee's belief that President Trump's businesses received some foreign payments during his presidency. The Committee therefore is not engaged in a baseless fishing expedition. It has presented the requisite degree of evidence to substantiate the Committee's legislative purpose.

Thus, the court holds that the emoluments track justifies the scope of the Maloney Subpoena as to the entities listed and the types of documents requested. That said, the time period covered by the subpoena cannot be fully justified under the same rationale. Plaintiffs correctly note that President Trump "could not have received any emoluments until he became President in January 2017." Pls.' Mot. at 18. "Yet the Mazars subpoena seeks financial documents starting in 2011, years before President Trump was even a candidate for public office." *Id.*; *see* Maloney Subpoena at 2. The Committee explains this apparent disconnect by theorizing that emoluments from the Trump presidency might have their origins in his business dealings from years prior. Hr'g Tr. at 95–96. This is nothing more than speculation without any limiting principle. If the Committee were to find a concrete instance of the scenario it describes, perhaps then the subpoenaed material from 2011 to 2016 would "relate[] to[] and [be] in furtherance of" the emoluments track. *See Watkins*, 354 U.S. at 187. But it hasn't. Accordingly, the court finds that the emoluments track warrants summary judgment for the Committee on the subpoenaed materials for only the years 2017 and 2018.

b.      Domestic Emoluments

The Committee also attempts to validate parts of the Maloney Subpoena by way of a perceived authority to mandate disclosures pursuant to the Domestic Emoluments Clause.  *See* Maloney Mem. at 30; Committee Cross-Mot. at 44.  Predictably, Plaintiffs disagree.  *See* Pls.' Reply at 22 ("The Domestic Emoluments Clause does not contemplate *any* role for Congress— legislative or otherwise.").  Regardless, any such authority would, at most, justify the subpoenaed material for only the years President Trump was in office.  Because the Committee has already won summary judgment as to those materials via its Foreign Emoluments Clause authority, the court need not address domestic emoluments or the parties' related arguments.[54]

## VI.     CONCLUSION

For the foregoing reasons, the court grants in part and denies in part both cross-motions for summary judgment.  The GSA track warrants entry of summary judgment for the Committee (and denial of Plaintiffs' motion) on the subpoenaed materials of only President Trump, Trump Old Post Office LLC, and the Trump Organization.  The emoluments track warrants entry of summary judgment for the Committee (and denial of Plaintiffs' motion) on the subpoenaed materials for only the years 2017 and 2018.  As for the remaining documents covered by the Maloney Subpoena, Plaintiffs' motion is granted, and the Committee's motion is denied.  A separate final order accompanies this Memorandum Opinion.

Dated:  August 11, 2021

Amit P. Mehta
United States District Court Judge

---

[54] For the same reason, the court also need not evaluate the Committee's argument that the documents "may help Congress scrutinize President Trump's policies toward foreign states that have paid his businesses and respond to any potential conflict of interest or self-dealing," Maloney Mem. at 31.